Exhibit "D"

Summary Under the Criteria and Evidence for

Final Determination against Federal Acknowledgment

of the

Ramapough Mountain Indians, Inc.

Prepared in response to a petition
submitted to the Assistant Secretary -
Indian Affairs for Federal acknowledgment
that this group exists as an Indian
tribe.

Approved: _1 - 16 - 96_____
(date)

_Ada E. Deer_____
Assistant Secretary - Indian Affairs

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . .   1
    Administrative History . . . . . . . . . . . . .   1
    Bases for the Final Determination . . . . . . . .   4
        Intent of the Federal acknowledgment
            regulations . . . . . . . . . . . . . . .   5
        Overview of the Proposed Finding . . . . . . .   7
        The impact of the 1994 revised Federal
            acknowledgment regulations on the
            RMI Final Determination . . . . . . . . .   7
        Responses to the Proposed Finding . . . . . .   8
    List of Abbreviations and Acronyms . . . . . . . .   9

SUMMARY CONCLUSIONS UNDER THE CRITERIA
    (25 CFR 83.7(a-g)) . . . . . . . . . . . . . . .  11
    Criterion 83.7(a) . . . . . . . . . . . . . . . .  11
        Proposed Finding . . . . . . . . . . . . . .  11
        Impact of the 1994 revised Federal
            acknowledgment regulations . . . . . . .  12
        Comment . . . . . . . . . . . . . . . . . . .  14
        Summary of the Evidence under
            Criterion 83.7(a) . . . . . . . . . . . .  15
        Summary Conclusion under Criterion 83.7(a) .  19
    Criterion 83.7(b) . . . . . . . . . . . . . . . .  21
        Proposed Finding . . . . . . . . . . . . . .  21
        Impact of the 1994 revised Federal
            acknowledgment regulations . . . . . . .  21
        Comment . . . . . . . . . . . . . . . . . . .  22
        Summary of the Evidence under
            Criterion 83.7(b) . . . . . . . . . . . .  23
        Summary Conclusion under Criterion 83.7(b) .  23
    Criterion 83.7(c) . . . . . . . . . . . . . . . .  24
        Proposed Finding . . . . . . . . . . . . . .  24
        Impact of the 1994 revised Federal
            acknowledgment regulations . . . . . . .  24
        Comment . . . . . . . . . . . . . . . . . . .  25
        Summary of the Evidence under
            Criterion 83.7(c) . . . . . . . . . . . .  25
        Summary Conclusion under Criterion 83.7(c) .  26
    Criterion 83.7(d) . . . . . . . . . . . . . . . .  26
        Proposed Finding . . . . . . . . . . . . . .  26
        Comment . . . . . . . . . . . . . . . . . . .  27
        Summary of the Evidence under
            Criterion 83.7(d) . . . . . . . . . . . .  27
        Summary Conclusion under Criterion 83.7(d) .  27
    Criterion 83.7(e) . . . . . . . . . . . . . . . .  27
        Proposed Finding . . . . . . . . . . . . . .  29
        Comment . . . . . . . . . . . . . . . . . . .  30
        Summary of the Evidence under
            Criterion 83.7(e) . . . . . . . . . . . .  30
        Summary Conclusion under Criterion 83.7(e) .  32

## TABLE OF CONTENTS

Criterion 83.7(f) . . . . . . . . . . . . . . . 33
Criterion 83.7(g) . . . . . . . . . . . . . . . 33

TECHNICAL   REPORT   SUPPORTING   FINAL   DETERMINATION   AGAINST
    FEDERAL ACKNOWLEDGMENT OF THE RAMAPOUGH MOUNTAIN INDIANS,
    INC.

APPENDICES

LIST OF SOURCES

## INTRODUCTION

**Administrative History.** The Ramapough Mountain Indians, Inc. (RMI) submitted an undocumented letter of intent to petition for Federal acknowledgement on August 14, 1978, thereby becoming administrative case #58. The group submitted a documented petition on April 23, 1990. A letter outlining the obvious deficiencies in the petition was sent by the Bureau of Indian Affairs (BIA) on June 15, 1990. The RMI submitted a partial response on January 28, 1991. A fully revised petition was determined to be ready for active consideration on March 5, 1992. The petition was placed on active consideration status on July 14, 1992.

A Proposed Finding against Federal acknowledgment of the RMI was published in the FEDERAL REGISTER on December 8, 1993. The Proposed Finding stated that the RMI failed to meet mandatory criteria 83.7 (a), 83.7(b), 83.7(c), and 83.7(e). Most of the concerns under these four criteria had been raised in the 1990 "Obvious Deficiencies Review Letter" and subsequent technical assistance meetings between the BIA and the RMI. The technical reports that accompanied the Proposed Finding suggested possible additional sources for research.

The original 120-day comment period provided by the regulations ended on April 6, 1994. By letter dated February 23, 1994, the RMI requested a 180-day extension of the comment period. This request was granted and the ending date for comments became October 7, 1994. In the February 23, 1994, letter, the RMI posed the question of "how much" proof was needed to change the Proposed Finding. The petitioner was advised in a letter dated March 24, 1994, that it was <u>not simply a question of how much and what type</u> of evidence was necessary, but that they must also respond to the evidence reviewed for the Proposed Finding and how it was evaluated.

The petitioner was told that in order to reverse the Proposed Finding, they would need to accomplish two tasks. First, the RMI would need to refute the evidence and arguments contained in the Proposed Finding. Second, the RMI would need to present additional evidence that demonstrated that the petitioner did meet the four criteria. Specifically the petitioner was told that, first and foremost, the RMI would need to present new evidence which demonstrated that the members, as a group, were the descendants of a historical American Indian tribe, genealogically, socially, and politically.

The BIA again offered that staff from the Branch of Acknowledgment and Research (BAR) would meet with the petitioner's researchers to discuss the evidence needed to respond to the

Introduction, Final Determination, Ramapough Mountain Indians, Inc.

Proposed Finding.   In March 1994, the BAR was contacted by a private consultant claiming to represent the RMI who wanted information regarding their petition.   He also wanted to know what it would take to "walk the papers through the process." The BAR met with the consultant, described the petitioning process, and gave him the same information previously provided to the RMI regarding the type of research that was necessary to respond to the Proposed Finding.   The BAR viewed this as an informational exchange with a prospective researcher for the RMI.   However, the BAR did not receive confirmation from the RMI that the consultant indeed represented them or that he was conducting research on their behalf.   The consultant did not maintain contact with the BIA regarding the RMI, nor did he contribute any evidence or comments during the comment period.

On April 22, 1994, the RMI requested that the petition be reviewed under the revised 25 CFR 83 regulations (published in the <u>Federal Register</u> on February 24, 1994, with an effective date of March 28, 1994).   The BIA notified the RMI on May 10, 1994, that the petition would be considered under the revised regulations.

Mr. Ronald Jarvis, one of the RMI's newly authorized legal representatives, met with several BIA staff members on September 13, 1994.   Mr. Jarvis indicated that they were pioneering new ways of looking at the evidence, researching in Holland, investigating the records of French explorers, and researching other historical records.   The BIA research staff emphasized the importance of concentrating not on the early colonial period, but rather on the 1750 to 1820 time period and providing evidence that the proven ancestors of the RMI descended from a historical tribe of Indians.   Church records and deeds were again specifically identified as likely sources for additional research.   The BIA encouraged Mr. Jarvis to have the RMI researchers meet directly with the Government's researchers so that they would not pursue research areas that were not productive in meeting the criteria.

At the same meeting, Mr. Jarvis presented a letter from the RMI which requested that the Assistant Secretary - Indian Affairs (AS-IA) extend the comment period an additional six months.   The letter also stated:

> In addition, there is a substantial body of new and
> probative evidence that we intend to bring to bear
> in the Tribe's response to the Proposed Findings,
> and there are new approaches to the research which
> we are presently exploring.

2

Introduction, Final Determination, Ramapough Mountain Indians, Inc.

Acting on good faith that the RMI would be pursuing viable avenues of research, the request for an additional 180-day extension was granted on September 27, 1994, pursuant to the terms of the new regulations in 25 C.F.R. §§ 83.3(g) and 83.10(g). At the same time, the BIA again offered technical assistance. However, neither the RMI nor its researchers contacted the BIA to set up a meeting between the RMI researchers and BIA researchers.

In late November 1994, the RMI indicated that the petitioner was interested in holding a formal meeting to discuss the Proposed Finding as provided by 25 C.F.R. §§ 83.10(j)(2). The regulations state:

> [T]he Assistant Secretary shall, if requested by the petitioner or any interested party, hold a formal meeting for the purpose of inquiring into the reasoning, analyses, and factual bases for the proposed finding. The proceedings of this meeting shall be on the record. The meeting record shall be made available to any participating party and become part of the record considered by the Assistant Secretary in reaching a Final Determination.

However, after a preliminary meeting on December 6, 1994, and in subsequent discussions, the RMI chose to meet with the BIA's researchers in less formal settings. At this December meeting, the RMI again inquired as to avenues of research and the BAR staff reiterated the areas and time periods where records should be searched.

On January 12, 1995, RMI leaders and legal representatives met with the BAR to discuss the criteria which had not been met. At this meeting, the BAR emphasized that research was often long and tedious and the closing date for comments was on April 7, 1995. On February 6, 1995, the BAR sent the RMI a letter summarizing the January meeting and again specifically listing the critical time period (1750-1820) and possible resources.

The RMI requested an additional 120-day "suspension of consideration" of the petition or an extension of the comment period on March 14, 1995, citing "good cause" for the extension. The BIA did not find good cause for a four-month extension, but did extend the comment period for an additional 30 days, until May 8, 1995 (BIA letter, March 30, 1995).

The RMI submitted the Response to the Proposed Finding (hereafter cited as "the RMI Response") on May 8, 1995. This

3

Introduction, Final Determination, Ramapough Mountain Indians, Inc.

initiated a 60-day time period established in the regulations
to allow petitioners to review and respond to third party
comments on the Proposed Finding.  On July 10, 1995, the RMI
submitted a reply to the comments.  The AS-IA then determined
an equitable time-frame for the publication of the Final
Determination.

The BIA began consideration of the Response on September 18,
1995.  Under the regulations, the BIA had 60 days to complete
the Final Determination.  Because of delays in regulatory
deadlines resulting from the Federal Government furlough in
November, 1995, the Assistant Secretary for Indian Affairs
(AS-IA) extended the deadline until December 11, 1995.

**Bases for the Final Determination.**  This Final Determination
is based on a consideration of new evidence and arguments
submitted by the RMI in the Response to the Proposed Finding,
comments submitted by third parties (including both interested
and informed parties), the RMI Response to the third-party
comments, and materials developed by the BAR in evaluating the
RMI Response and the comments of third parties.  According to
the regulations:  "The Assistant Secretary - Indian Affairs
may also conduct such additional research as is necessary to
evaluate and supplement the record.  In either case, the
additional materials will become part of the petition record
(25 CFR Part 83.10(l)(1))."

The evidence and arguments presented by the RMI for the
Proposed Finding were also considered in making this Final
Determination, in addition to evidence generated by BIA staff
or contractors in conducting their own research in preparing
the Proposed Finding.  This Final Determination report should
be read together with the Proposed Finding and the three
technical reports that accompanied it.  The actual Proposed
Finding is the Summary Under the Criteria, which contained the
decision issued by the AS-IA.  The technical reports repre-
sented a narration and analysis of the factual evidence
pertaining to the petition.  The Summary Under the Criteria
contains the decisional material.

The 25 CFR Part 83 regulations are well founded, based on
Federal Indian law and the history of tribal acknowledgment in
this country.  The allegations of racism made by RMI against
the BAR staff have been addressed in a separate inquiry by the
Deputy Commissioner of Indian Affairs (BIA letter, September
20, 1995) and will not be responded to in this Final Determin-
ation.  Because the issue of outside political interference
has been raised by the petitioner in numerous instances, as

4

Introduction, Final Determination, Ramapough Mountain Indians, Inc.

well as by some informed parties, that issue is addressed in the technical report to the Final Determination.

Intent of the Federal acknowledgment regulations.  The Federal Government has an obligation to protect and preserve the inherent sovereign rights of all Indian tribes, whether a tribe has been recognized in the past or not.  The regulations governing the acknowledgment process (25 CFR Part 83) state the requirements that unrecognized groups must meet to be acknowledged as having a government-to-government relationship with the United States.

> **The purpose of the acknowledgment process is to acknowledge that a government-to-government relationship exists between the United States and tribes which have existed since first contact with non-Indians** (25 CFR Part 83, "Standards of Evidence and Stringency of Requirements," Federal Register 59:9281).

The acknowledgment regulations require that all seven criteria under section 83.7 must be met in order for a petitioner to be acknowledged.  Section 83.10(m) states:

> The Assistant Secretary shall acknowledge the existence of a petitioner as an Indian tribe when it is determined that the group satisfies **all of the criteria in section 83.7**.  The Assistant Secretary shall decline to acknowledge that a petitioner is an Indian tribe **if it fails to satisfy any one of the criteria in section 83.7** (25 CFR 83.10(m)) [emphases added].

In 1994, revised Federal acknowledgment regulations were published in the Federal Register (Volume 59, No. 38, February 25, 1994, 9280-9300), after a lengthy period of dialogue with the unrecognized Indian groups, recognized Indian tribes, scholars, and other interested parties.  The revision of the regulations in 1994 did not alter the basic purpose of the acknowledgment procedure.

The revised acknowledgment regulations provided petitioners whose petitions were already under active consideration the option to choose to continue having the petition evaluated under the 1978 regulations (Federal Register 43(172), 39361-39364) or to change to the revised 1994 regulations.  The RMI exercised their option to have their petition evaluated under the revised regulations.  As will be seen from the following discussion, this option has not changed the outcome of this

Introduction, Final Determination, Ramapough Mountain Indians, Inc.

Final Determination.  That is, the Final Determination would have been the same if the RMI had chosen to have their petition evaluated under the 1978 regulations (43 F.R. 172).

The legal and policy precedents for acknowledgment are codified in the regulations.  These precedents also provide the fundamental bases for interpreting the regulations.  The acknowledgment criteria are based on and consistent with past determinations of tribal existence by Congress, the courts, and the Executive Branch.  These past determinations have required that to be acknowledged as having tribal status a group must have maintained its social solidarity and distinctness and exercised political influence or authority throughout history until the present.

The criteria used by the Interior Department between 1934 and 1978 to recognize tribes are summarized in the 1942 <u>Handbook of Federal Indian Law</u> by Felix Cohen, and are commonly referred to as the "Cohen criteria."  These summarized Executive Branch practice as well as judicial and legislative precedents.  One of these criteria required that a group have "exercised political authority over its members through a tribal council or other governmental forms" (Cohen 1942, 171). A supplementary consideration was the "social solidarity of the group."  The Cohen criteria also considered previous Federal recognition, e.g., treaty relations, executive orders, Congressional acts, or other actions.

Fundamental to the definition of a tribe is the nature of tribal membership.  The Department has long said that an Indian tribe is an entity whose members maintain a bilateral political relationship with the tribe.  The courts have supported this interpretation, most recently in a March 13, 1992, decision, <u>Masayesva v. Zah v. James</u> (CIV 74-842 PHX EHC, CIV 90-666 PCT EHC, consolidated, D. Ariz.).

The preamble to the acknowledgment regulations, published in 1978, indicated the intent by stating that "groups of descendants will not be acknowledged solely on a racial basis. Maintenance of tribal relations--a political relationship--is essential" (43 F.R. 172, Bureau of Indian Affairs 1978).

The review of petitions for acknowledgment must balance the fundamental requirements of the regulations with the effect of historical influences on, and changes in, past and present Indian society.  Unrecognized tribes often face limitations which differ from those of recognized tribes, such as lack of resources, difficulty in maintaining a separate land base, and absence of Federal support for political institutions.

6

Introduction, Final Determination, Ramapough Mountain Indians, Inc.

Although these historical and social conditions may have made it difficult for some unrecognized groups to meet the requirements of criteria 83.7(b) and 83.7(c), the regulations require that petitioners maintain a significant level of community and political influence or authority in order to be federally acknowledged as entitled to a government-to-government relationship.

<u>Overview of the Proposed Finding</u>.  The Proposed Finding concluded that the Ramapough Mountain Indians, Inc. met criteria 83.7(d), 83.7(f), and 83.7(g).  The Proposed Finding concluded that the RMI failed to meet mandatory criteria 83.7 (a), 83.7(b), 83.7(c), and 83.7(e).

<u>The impact of the 1994 revised acknowledgment regulations on the RMI final determination</u>.  Because of changes in the revised regulations, the conclusions for this Final Determination are slightly different from those reached in the Proposed Finding under criteria 83.7(a), identification by external observers; 83.7(b), social community; and 83.7(c), political authority.  At the time of the Proposed Finding, the AS-IA found that the RMI did not meet any of these criteria.  It is now found that, under the revised regulations, the petitioner meets criterion 83.7(a).

Under the provisions of the revised regulations, the petitioner has been found to meet criteria 83.7(b) and 83.7(c) only for a limited period of time, from 1870 to about 1950.  The modifications under the revised regulations do not change the ultimate finding concerning criteria 83.7(b) and 83.7(c), however, since the requirement of continuous existence as a social community and political entity, from the time of first sustained contact of the antecedent historical tribe or tribes with non-Indians to the present, remains in force.  Therefore, meeting a criterion for a limited period is not sufficient to meet the criterion overall, because of the requirement of continuous existence.

Even if the revised regulations had been in force at the time the Proposed Finding on the RMI was issued (1993), the conclusions regarding criteria 83.7(b), 83.7(c), and 83.7(e) would not have been different.  In fact, if the revised regulations had been in force at the time the RMI petition was submitted, it would have received an expedited negative finding under criterion 83.7(e), without reference to the other criteria.  Under the 1994 revised regulations, the RMI still do not meet three of the seven mandatory criteria: 83.7(b), 83.7(c), and 83.7(e).

7

Introduction, Final Determination, Ramapough Mountain Indians, Inc.

<u>Responses to the Proposed Finding</u>.   The only extensive
response received to the Proposed Finding was from the
Ramapough Mountain Indians, Inc.   This RMI Response included
numerous exhibits, including many third-party letters.   These
are analyzed in the technical report supporting the Final
Determination.   Brief letters in response were received from
the Office of the Attorney General, State of New Jersey; some
local government agencies, and informed parties.   These are
also analyzed in the technical report supporting the Final
Determination.

8



Introduction, Final Determination, Ramapough Mountain Indians, Inc.

## LIST OF ABBREVIATIONS AND ACRONYMS

25 CFR Part 83 = The part of the Code of Federal Regulations dealing with the Federal acknowledgment of Indian groups as Indian tribes. Revised regulations were published in the _Federal Register_ on February 25, 1994.

A.M.E. = African Methodist Episcopal

AS-IA = Assistant Secretary - Indian Affairs, Department of the Interior.

BAR = Branch of Acknowledgment and Research, Bureau of Indian Affairs (Evaluator of the Petition)

BIA = Bureau of Indian Affairs

Ex. = Documentary exhibit submitted by the petitioner

FD = Field data (research conducted by the BAR staff for the purpose of verifying and adding to the information submitted in the petition)

F.R. = _Federal Register_

"Jackson Whites" = An imprecise, racist term for poor residents of the Ramapo Mountains in use from the late 1800's to the present. The origin of the term is unknown, but its first known use in print was in the 1870's. By the time of the Vineland Study (1917)."Jackson White" was used by outsiders to refer to people in several distinct social communities in the Ramapo Mountains, some perceived as predominantly White and Indian, some perceived as predominantly African American and Indian, and some perceived as poor White. The term was used to refer to individuals in the Ramapough Mountain People (RMP) community (see definition of RMP, below), among others.

Joslyn Report = Report by Roger D. Joslyn, genealogist for the RMI, which was included in the RMI Response.

Petition = Petition submitted in 1993 by the RMI for acknowledgment as an Indian tribe.

9



Introduction, Final Determination, Ramapough Mountain Indians, Inc.

Proposed Finding = The Proposed Finding of the Assistant
              Secretary - Indian Affairs, Department of the
              Interior, which declined to acknowledge the exis-
              tence of the RMI as an Indian tribe; published
              December 8, 1993. This included: a Summary Under
              the Criteria (an evaluation of the evidence as
              pertains to each of the seven mandatory criteria
              for Federal acknowledgment, found in 25 CFR §83.7);
              Summary of the Evidence; and three supporting
              technical reports (historical, anthropological, and
              genealogical).

RMI      =    Ramapough Mountain Indians, Inc., a 1978 incorpora-
              tion with a membership of about 3,000 people; in
              this report, also known as "the petitioner." The
              RMI membership list includes some, but not all, of
              the Ramapo Mountain People (see below). When
              referring to events before 1978, the members of the
              RMI will be referred to as RMP, since there is no
              known Ramapough Mountain Indian tribe prior to that
              year.

RMI Response = Response of the RMI to the Assistant Secre-
              tary - Indian Affairs' Proposed Finding; received
              by the BIA May 8, 1995.

RMI Response Appendix = Appendix of unnumbered items included
              with the May 8, 1995, RMI Response.

RMI Response Ex. = Numbered exhibits included with the RMI Re-
              sponse to third party comments; received by the BIA
              on July 10, 1995.

RMP      =    Ramapo Mountain People: a term used in this report
              as a designation for the people of the Van Dunk,
              Mann, DeGroat, and DeFreese families living in and
              around (or originating from) the towns of Mahwah,
              New Jersey, Ringwood, New Jersey, and Hillburn, New
              York. Not all of the RMP are members of the Rama-
              pough Mountain Indians, Inc., even though they
              share a common ancestry. Also, not all of the RMP
              claim to be Indian. As used in this final determi-
              nation, RMP is <u>not</u> synonymous with "Jackson
              Whites," the latter being much broader in meaning,
              and less well-defined (see definition of "Jackson
              Whites," above).

10

SUMMARY CONCLUSIONS UNDER THE CRITERIA (25 CFR 83.7(a-g))

### Criterion 83.7(a)

83.7(a)   The petitioner has been identified as an American Indian entity on a substantially continuous basis since 1900. Evidence that the group's character as an Indian entity has from time to time been denied shall not be considered to be conclusive evidence that this criterion has not been met. Evidence to be relied upon in determining a group's Indian identity may include one or a combination of the following, as well as other evidence of identification by other than the petitioner itself or its members.

(1) Identification as an Indian entity by Federal authorities.

(2) Relationships with State governments based on identification of the group as Indian.

(3) Dealings with a county, parish, or other local government in a relationship based on the group's Indian identity.

(4) Identification as an Indian entity by anthropologists, historians, and/or other scholars.

(5) Identification as an Indian entity in newspapers and books.

(6) Identification as an Indian entity in relationships with Indian tribes or with national regional or state Indian organizations.

**Proposed Finding.** The proposed finding on the RMI was prepared under the provisions of the 1978 25 CFR Part 83 regulations (43 F.R. 172). The proposed finding concluded

Summary under the Criteria, Ramapough Mountain Indians, Inc.

that the petitioner did not meet criterion 83.7(a) before 1978, and therefore did not meet criterion 83.7(a).

**Impact of the 1994 revised Federal acknowledgment regulations.**
The final determination has been prepared under the 25 CFR Part 83 regulations as revised in 1994. Part of the purpose of the revision was to reduce the burden of proof imposed upon petitioners. In that process, criterion 83.7(a) was modified in such a way that external identification of the group as an Indian entity was no longer required from earliest historical times to the present, but only from 1900 to the present. As a result, petitioners no longer need to address the issue of continuity of tribal existence from first sustained contact with non-Indian settlers under criterion 83.7(a), but only under criteria 83.7(b) for distinct community and 83.7(c) for political authority or influence over the membership.

This modification leaves criterion 83.7(a) standing alone, without pre-1900 historical identifications as a foundation. Essentially, all that it now requires is that the petitioner demonstrate that external observers identified the petitioning group as an "Indian entity" on a "substantially continuous basis" from 1900 to the present. Even in this context, however, it should be noted that each individual criterion incorporates the definitions contained in section 83.1. Also, the final determination references both the technical report to the final determination and the set of three technical reports prepared for the proposed finding.

Criterion 83.7(a) does not require that the petitioner was consistently identified as an Indian entity by all of the six types of possible evidence listed since 1900. Identification by any one type of the possible evidence throughout the time period since 1900, or by a combination of the different types of evidence at various points during the time period since 1900, is adequate for the petitioner to meet criterion 83.7(a).

Additionally, criterion 83.7(a) does not require that the identification as an Indian entity was factually accurate on the part of the observer, or that the observer was a specialist in anthropology or ethnography. There is no requirement that the observer's assertions be documented or verified by historical evidence. Another section of the regulations, section 83.8(d)(3), does require "substantially continuous historical identification, by **authoritative, knowledgeable** [emphasis added] external sources," to show the succession of leaders for those petitioners claiming to have had prior unambiguous Federal acknowledgment. Criterion 83.7(a),

Summary under the Criteria, Ramapough Mountain Indians, Inc.

however, omits any such provision.   Criterion 83.7(a) is designed to elicit a sense of the opinion about the group which was being expressed by external observers.   The observers did not need to be knowledgeable.   Evaluation of factual accuracy is now conducted under criteria 83.7(b), 83.7(c), and 83.7(e).

Nonetheless, criteria 83.7(a) through 83.7(g) are not totally discrete from one another.   Section 83.3 Scope specifically states that:

> This part . . . is intended to apply to groups that can establish a substantially continuous tribal existence and which have functioned as autonomous entities throughout history until the present (59 F.R. 38, 9294).

The General provisions for the documented petition, section 83.6(d), also state that:

> A petitioner may be denied acknowledgment if the evidence available demonstrates that it does not meet one or more criteria.   A petitioner may also be denied if there is insufficient evidence that it meets one or more of the criteria.   A criterion shall be considered met if the available evidence establishes a reasonable likelihood of the validity of the facts relating to that criterion.   Conclusive proof of the facts relating to a criterion shall not be required in order for the criterion to be considered met (59 F.R. 38, 9295).

Under criteria 83.7(a), 83.7(b), and 83.7(e), the BIA must consider the validity of the content of the statements in the evidence and the knowledgeability and reliability of the source.   Otherwise it is impossible to determine if the criterion is met.   By contrast, in the context of criterion 83.7(a), the "facts" are not the objective truth of what an observer said about the group, but simply the opinion expressed by the observer.   Therefore, the "facts" to be analyzed under criterion 83.7(a) are the precise content, taken in context, of what the observer said--not whether the observer was correct.   Does the opinion being expressed amount to identification of the petitioner's antecedent group as an Indian entity?

The regulations under 25 CFR Part 83 do not exist to acknowledge as Indian tribes all groups in the United States which do or may have some American Indian ancestry.   They are designed

13

to extend Federal acknowledgment as Indian tribes to those
indigenous North American Indian groups which can demonstrate
continuous existence as communities which have possessed
political authority or influence over their members since
first sustained contact with non-Indian settlers.

Criterion 83.7(a) does not address race or ancestry <u>per se</u>.
Neither does it allow the introduction of a different type of
racism.  On the one hand, we state once more that the presence
of non-Indian ancestry in a petitioning group does not negate
its Indian identity <u>if it has a specific Indian identity</u>.  On
the other hand, the "one-drop-rule" does not work in reverse.
The mere presence of some Indian ancestry in a group of
people, or attribution of partial Indian ancestry to a group
of people by outside observers, does not automatically make
that group eligible for Federal acknowledgment as an Indian
tribe under 25 CFR Part 83.  Neither does it mean that the
group will be found to meet criterion 83.7(a).

**Comment.**  The RMI Response maintained that the handling of the
evidence for criterion 83.7(a) in the Proposed Finding was
"Arbitrary and Capricious."  The BIA denies this allegation.

The RMI Response discussed the issue of Indian ancestry
extensively under criterion 83.7(a).  Criterion 83.7(a) does
not pertain to the issue of generic Indian or specific tribal
ancestry.  The final determination discusses that issue under
criterion 83.7(e), as appropriate.  The placement of the
discussion in the petitioner's response may, however, indicate
confusion about the nature of the Federal acknowledgment
regulations.

The basic questions raised by the RMI Response under criterion
83.7(a) are whether (1) <u>in the absence of traditional identi-
fying source materials</u> (see the discussion of the evidence,
below), the definition of a petitioning group as a distinct
tri-racial isolate with an Indian component by observing
anthropologists, historians (both academic and local),
scholars, and journalists is to be deemed by the AS-IA as
equivalent to the identification of the group as an Indian
entity by such observers, or (2) whether identification as a
distinct entity with some kind of Indian component, <u>in the
absence of other types of stronger corroborative evidence</u>,
offers only "insufficient evidence" that the petitioner meets
criterion 83.7(a).

We take note that several of the third-party comments received
by the BIA from contemporary anthropologists indicated that
the writers considered that the first of the above questions

Summary under the Criteria, Ramapough Mountain Indians, Inc.

should be answered in the affirmative in the context of modern academic anthropological theory. These comments, like the RMI Response, intermingled discussion of the interpretation of the significance of part-Indian ancestry in a petitioning group with discussion of the issue of external identification of a group as an Indian entity. None of these third-party comments received by the BIA addressed the question from the perspective of Federal Indian law and the legal precedents defining the nature of American Indian tribes and groups.

**Summary of the Evidence under Criterion 83.7(a).** The evidence under criterion 83.7(a) is summarized in order of the types of evidence acceptable to the Secretary listed in the 25 CFR Part 83 regulations.

<u>Criterion 83.7(a)(1)</u>. The petitioner's response to the proposed finding presented no additional evidence to indicate identification of the RMI as an Indian entity by Federal authorities. The petitioner claimed that the inclusion of a one-page description of the RMI predecessor community in a book about surviving Indian groups on the East Coast published by the Smithsonian Institution in 1948 amounted to identification as an Indian entity by Federal authorities for purposes of criterion 83.7(a). That entry and an evaluation of why it did not equal identification by Federal authorities are discussed in the technical report to the final determination. The actual passage has been determined by the BIA to fall under the category of identification by "anthropologists, historians, and/or other scholars." We conclude that there were no Federal records which identified the RMI as an Indian entity within the meaning of the 25 CFR Part 83 regulations prior to 1978.

<u>Criterion 83.7(a)(2)</u>. The proposed finding found that:

At no time prior to the RMI's incorporation in 1978 was the group of people who were precursors to and ancestors of the RMI the subject of any separate series of Indian documents in the records of either the States of New York and New Jersey or the Federal Government.

This remains the case. One aspect of the petitioner's evidence has become weaker since the proposed finding was issued. The proposed finding stated that:

The RMI were recognized as American Indian by resolutions of the New Jersey and New York State legislatures in 1980. Since that time, the RMI

Summary under the Criteria, Ramapough Mountain Indians, Inc.

have been repeatedly identified as an "Indian" group in newspaper accounts and have received Indian Education funding from the Federal government (RMI PF, Summary Under the Criteria 5).

In November 1995, the BIA received conflicting information from the State of New Jersey as to whether or not the 1980 resolution to recognize the RMI had been withdrawn by its sponsors and never voted upon by the New Jersey legislature, or had been passed by both houses of the New Jersey legislature. A newspaper article dated January 17, 1980, tended to confirm that the resolution had received passage. Because of the conflicting nature of the information, the denial was not weighed as evidence against the conclusion expressed in the Proposed Finding that the RMI had received New Jersey state recognition in 1980.

Claims by the petitioner that the fact that the Vineland Study was written by employees of the New Jersey Training School, and that later mention of this study by a New Jersey state employee in a magazine article published in 1931, amounted to state identification of the RMI predecessor community as an Indian entity was found not to be valid. Neither of these was an official study sponsored by the State of New Jersey. They are discussed in the technical report under the category of "identification as an Indian entity by anthropologists, historians, and/or other scholars." The evidence reveals that neither the State of New Jersey nor the State of New York identified the RMI as an Indian entity prior to 1980.

Criterion 83.7(a)(3). Evidence relating to churches and missionary organizations is considered under 83.7(a)(3) along with "dealings with a county, parish, or other local government in a relationship based on the group's Indian identity." The proposed finding concluded that:

> During the later 19th and first half of the 20th century, neither the churches nor the schools utilized by the petitioner were identified as "Indian."

The petitioner's response asserted that other BIA acknowledgment determinations had given great weight to church records, but the RMI proposed finding had not adequately considered a letter written in 1926 by a minister who had served the RMI predecessor community from 1876 to 1880. The petitioner presented in evidence a 1926 letter written by the Rev. George A. Ford, in which he described the church members as "col-

16

Summary under the Criteria, Ramapough Mountain Indians, Inc.

ored," with "considerable Indian blood coming down from early
days."

BIA researchers undertook additional research on the petition-
er's church history to evaluate this level of evidence in
preparing the final determination.   The context of this
specific letter and its relationship to the 19th century
records of the church where this man had served as a minister
are discussed in the technical report.   The letter does
demonstrate an opinion about the nature of the petitioning
group expressed in 1926.  However, the actual church records,
which were available through 1918, did not identify the church
as Indian, or its members as Indian.

Criteria 83.7(a)(4) and 83.7(a)(5).  Aside from the material
cited above, essentially all of the material presented by the
petitioner relating to identification of the group as an
Indian entity by external sources fell into these two catego-
ries.   Since most of the identifications of the petitioning
group made by anthropologists, historians, and/or other
scholars were made in newspapers and books, discussion of
paragraphs 83.7(a)(4) and 83.7(a)(5) is combined here.

The Proposed Finding on the RMI concluded that:

> Since the third quarter of the 19th century, an-
> thropologists, social workers, journalists, and
> others have consistently described the RMI precur-
> sor community as a distinct group of mixed race, or
> as an entity whose members were said by tradition
> to have some Indian ancestry.   The petitioner's
> ancestors were never described as an American
> Indian group per se.   Occasional references which
> used such terms as "tribe" or "clan" to describe
> the community were essentially using these words as
> synonyms for "a kinship-based, non-white community
> distinct from the surrounding society" (Proposed
> Finding 1993, Summary under the Criteria 4).

> Since the first newspaper article discussing the
> petitioner's ancestors was published in 1872, the
> composition and origins of the RMI precursor commu-
> nity have been extensively discussed by local
> historians, by journalists, and occasionally by
> anthropologists, archaeologists, and folklorists.
> In addition to acknowledging European and African
> components among the RMI ancestors, such writers
> have variously attributed the possibilities of
> Minsi and Hackensack (Delaware), general Algonquin

17

or Munsee, Tuscarora (Iroquoian), and occasionally
Creek and Seneca ancestry to the group.  These
reports attributed a certain amount of Indian
ancestry to the RMI based primarily upon the physi-
cal appearance of some members of the group and
stereotyped character traits (Proposed Finding
1993, Summary under the Criteria 5).

The technical reports to the proposed finding analyzed in
detail all of the external identifications presented by the
petitioner and reached the above-quoted conclusions as to the
nature of these identifications.  The petitioner's response to
the proposed finding did not present any new or additional
evidence pertaining to external identifications of the
petitioner since 1900.

However, the petitioner's response to the proposed finding
asserted that the BIA had acted in an arbitrary and capricious
manner in not equating the above type of descriptions of the
RMP with conclusive identification as an "Indian entity"
within the meaning of criterion 83.7(a).

The technical report to the final determination, therefore,
returned to the issue, and analyzed more extensively, with
augmented direct quotations, those portions of the material
relating to the RMP published from 1900 through 1978 which,
according to the petitioner's Response, amounted to conclusive
identification as an Indian entity.  Material in this category
published since 1978 was not re-analyzed for the final
determination, since the proposed finding had already conclud-
ed that the petitioner met criterion 83.7(a) since 1978.

The re-analysis has concluded that no matter what the context
of the specific work under consideration (i.e., whether the
book was titled as a survey of surviving Indian groups on the
East Coast or titled as a survey of the Negro family in
America), the sources presented as evidence by the petitioner
and analyzed in the proposed finding did consistently identify
the RMP as a mixed tri-racial isolate group to which tradition
attributed a certain amount of American Indian ancestry.

There was no indication that any of these sources published
between 1900 and 1978 were written by authors whose intent was
to deny the RMP's "Indian" component on the basis of a "one-
drop-rule" theory that any African ancestry made a community
black.  On the contrary, although they did not identify the
RMP as an Indian entity per se, these authors consistently
distinguished the RMP from contemporary (1970-1978) American
Negro society.  The RMP were described not as a white communi-

18

Summary under the Criteria, Ramapough Mountain Indians, Inc.

ty, or as a black community, or as a Native American community, but as an "other"--a unique and distinct community, with its uniqueness and distinctiveness specifically resulting from the perceived long-standing amalgamation of three races.

The implications of this consistent definition of the RMP as uniquely and distinctively "other" for criterion 83.7(a) are discussed more fully below.

<u>Criterion 83.7(a)(5)</u>.    See combined discussion under 83.7 (a)(4).

<u>Criterion 83.7(a)(6)</u>.    The RMI Proposed Finding also found that:

> No evidence was presented by the petitioner to indicate that the Munsee as a whole, individual Munsee-speaking tribes, or other Delawarean groups which moved west, maintained any type of contact with ancestors of the RMI in the later 18th, 19th, or first half of the 20th centuries (Proposed Finding 1993, Summary under the Criteria 2).

While the part of this conclusion relating to the 18th and 19th centuries is no longer relevant under criterion 83.7(a), it remains the case that in its response to the proposed finding, the petitioner presented no new evidence to indicate that the Munsee as a whole, individual Munsee-speaking tribes, or other Delawarean groups which moved west maintained any type of contact with ancestors of the RMI in the first half of the 20th century, the period from 1900 to 1950.

**Summary Conclusion under Criterion 83.7(a).**    In the case of the RMI, taking all the ambiguities into consideration, there are several caveats that must be stated prior to making a determination on criterion 83.7(a).

<u>Caveats</u>.    First, criterion 83.7(a) does not require that external identifications of the petitioning group have been factually correct in order to evaluate their relevance. Accepting the relevance of a given document for criterion 83.7(a) does not mean that the contents of that document were accurate.

Second, the BIA does not accept at face value the statements made since 1900 by anthropologists, historians, other scholars, and journalists about the petitioner's alleged connection with any known historical American Indian tribe.  The factual basis of these statements are considered and analyzed under

19

Summary under the Criteria, Ramapough Mountain Indians, Inc.

criteria 83.7(b) and 83.7(c), where demonstration of continuous tribal existence since first sustained contact with non-Indian settlers until the present are still required.

Third, the BIA does not accept at face value the statements made since 1900 by anthropologists, historians, other scholars, and journalists about the alleged Indian ancestry of the RMP. The factual basis of these are considered and analyzed under criterion 83.7(e).

Fourth, the BIA requires that note be taken that the reduced burden of proof in the revised regulations has had the effect of separating out from evaluation under criterion 83.7(a) the analysis that was done in the proposed finding of how the attribution of partial Indian identity and ancestry to this petitioner developed in the literature between 1872 and 1900.

Conclusion. The nature and character of the evidence regarding criterion 83.7(a) have not changed from the proposed finding to the final determination. The BIA specifically denies that the treatment of this evidence in the proposed finding was arbitrary and capricious. The RMP, the group which included ancestors of the RMI, was described from 1900 until 1978 as an isolated community of mixed-race origins, or a tri-racial isolate, one of whose components was perceived to be Indian in origin.

The present petitioner has not presented as evidence under criterion 83.7(a) such traditional identifying source materials for Indian groups as the records of a former reservation, detribalization records, or recording on the special Indian population schedules of the Federal census in 1900 and 1910. Such sources have been used by various petitioners who have received positive decisions in the matter of Federal acknowledgment.

Within these limitations, the AS-IA has determined that identification by anthropologists, historians, and other scholars of the existence of a distinct tri-racial entity which is generally believed to have included an Indian component in its originating population shall be regarded as minimal evidence for identification of the existence of an American Indian entity under the regulations.

Therefore, we find that the petitioner has met criterion 83.7(a) since 1900, under the reduced burden of proof standard required by the 1994 revision of the regulations.

20



Summary under the Criteria, Ramapough Mountain Indians, Inc.

## Criterion 83.7(b)

83.7(b)    **A predominant portion of the petitioning group comprises a distinct community and has existed as a community from historical times until the present.**

**Proposed Finding.**    The 1978 Federal acknowledgment regulations, under which the Proposed Finding was prepared, stated under criterion 83.7(b) that the petitioner must present:

> Evidence that a substantial portion of the petitioning group inhabits a specific area or lives in a community viewed as American Indian and distinct from other populations in the area and that its members are descendants of an Indian tribe which historically inhabited a specific area (43 F.R. 172, 39363).

The Proposed Finding concluded that the RMI did not meet this criterion at any point in time, for although there was substantial evidence that a distinct community had existed for a portion of the petitioner's history, from approximately 1870 until approximately 1950, this community had neither been "viewed as American Indian" nor were its members "descendants of an Indian tribe which historically inhabited a specific area."

**Impact of the 1994 revised Federal acknowledgment regulations.** The RMI chose, on April 22, 1994, to have their petition evaluated under the revised 1994 regulations, which contain new wording for the social community requirement:

> A predominant portion of the petitioning group comprises a distinct community and has existed as a community from historical times until the present (CFR 25 §83.7(b); 59 F.R. 38, 9295).

Under the 1994 revised regulations, there must be evidence that establishes, as a minimum, a reasonable likelihood that the petitioner has been a distinct community from historical times to the present. Criterion 83.7(b) no longer requires evidence that a petitioner's community has been <u>viewed as American Indian</u> as well as "distinct from other populations in the area," as had been required for criterion 83.7(b) under the 1978 regulations.

21

Summary under the Criteria, Ramapough Mountain Indians, Inc.

It should be noted that in the 1994 revision the issue of
demonstrating descent from an Indian tribe has also been
analytically separated from the consideration of community,
and is now considered under 25 CFR §83.7(e).

**Comment.**   One of the comments received from Dr. Karen Cant-
rell, an interested party, seemed to imply that the 1994
revision of the Federal acknowledgment regulations imposed a
new, more strict requirement for the community criterion (25
CFR §83.7(b); see Cantrell 1995/7/5, RMI Response Ex. 16).   It
appears that Dr. Cantrell distinguished between the Proposed
Finding terminology "community" and "social community."   She
assumed that the latter concept was more strictly defined and,
therefore, required a different kind of evidence.   This is not
the case.   With the exception of the modifications specifical-
ly addressed in this Summary under the Criteria, which have
worked to the advantage of the RMI petitioner, the standard
for the maintenance of community in the 1994 revised regula-
tions is the same as it was in the 1978 regulations.[1]   While
the 1994 regulations changed the wording and contain more
specific examples of evidence that is acceptable to the
Secretary, the standard has not been changed.

The Proposed Finding used the terms "community" and "social
community" interchangeably.   The regulations under 25 CFR Part
83 provide the following definition for community: "any group
of people which can demonstrate that consistent interactions
and significant social relationships exist within its member-
ship and that its members are differentiated from and identi-
fied as distinct from nonmembers.   Community must be under-
stood in the context of the history, geography, culture, and
social organization of the group" (25 CFR §83.1).

The term "geographical community" is used as a designation for
people living in a village-like setting.   It is accepted by
the regulations as a high level of evidence if more than 50%
of the petitioner's members live in such a setting.   This
means that the BIA is willing to assume that people who share
kinship ties and live in a limited, homogeneous, isolated
geographical area are interacting with each other in signifi-
cant ways, if there is no significant evidence to the con-
trary.   Some of the petitioners since 1978 have successfully
met this level of evidence, but most have not.

_____

[1]   This is true for all seven criteria listed in the regulations for
Federal acknowledgment (25 CFR §83.7(a)-(g)).

22

Summary under the Criteria, Ramapough Mountain Indians, Inc.

Petitioners are <u>not</u>, however, <u>required</u> to provide evidence at this high level.  If there is no evidence for the existence of an endogamous community or a geographical community, the regulations provide for other forms of evidence that fulfill the requirement for community.    These include newspaper articles, local histories, diaries, church records, personal correspondence, oral histories, and any other sources of information that might produce evidence concerning the social interaction of group members.  This procedure is precisely how the Proposed Finding arrived at the conclusion that the RMP community was distinct from 1870 to 1950.   The analytical concept of "social community," therefore, is not a stricter requirement under the new regulations.    It is used as a synonym for community, and the standard for community remains the same.

**Summary of the Evidence under Criterion 83.7(b).**  Contrary to the RMI Response's assertions, the petitioner has not documented that the RMP coalesced into a distinct community until around 1870.   The RMI Response presented no new evidence to support the assertion that the RMP have been a continuous community from colonial times to the present.  In conducting its evaluation of the RMI petition, the RMI Response to the Proposed Finding, and comments from interested parties, the BIA found no new evidence to support the contention that the RMP social community had existed from colonial times to 1870.

Also, the petition did not provide acceptable evidence which clearly demonstrated that the RMI social community continued to exist from 1950 to the present.   The RMI Response offered no new evidence concerning the community of the RMI from 1950 to the present.  BIA researchers found only limited, anecdotal evidence for RMI social community from 1950 to the present.

**Summary Conclusion under Criterion 83.7(b).**   The change in wording for 25 CFR §83.7(b) in the 1994 revised regulations requires a modification in the conclusion reached in the Proposed Finding.   The Proposed Finding found that there was sufficient evidence that the RMP were a distinct community from about 1870 to 1950.   Nevertheless, because they were not a distinct <u>American Indian</u> community whose members were "descendants of an Indian tribe which historically inhabited a specific area," the petitioner failed to meet the requirements of 25 CFR §83.7(b) for that time period.

Under the revised regulations, however, it is now determined that the petitioner meets criterion 83.7(b) at a high level of evidence from 1870 to 1950, because the qualifying "viewed as American Indian" language has been dropped from the revised

23

Summary under the Criteria, Ramapough Mountain Indians, Inc.

regulations. The conclusion that the RMP distinct community met criterion 83.7(b) from 1870 to 1950 at a high level of evidence is based on the more complete data on group endogamy found by BIA researchers in the <u>Ramapo Presbyterian Church Register</u> during evaluation of the RMI Response. The change is consistent with the Proposed Finding since the Proposed Finding did determine that the RMI were a separate community for these years. The pattern of over 50 percent group endogamy is consistent with evidence which indicates close residential patterning for the RMI ancestors for much of the same period. Thus, we agree, in part, with conclusions in the RMI Response that the 1994 revised regulations necessitate a change in the finding for criterion 83.7(b), but only for the period from 1870 to 1950.

The petitioner has not documented that the RMI and their antecedent group, the RMP, have existed as a continuous community from the time non-Indians first established themselves in the New York-New Jersey area to 1870. It remains the conclusion of the AS-IA that the RMI's ancestors have not been shown to have formed a distinct community in the Ramapo Mountains until about 1870. Because the petitioner has not demonstrated community before 1870, the group does not meet criteria 83.7(b) or (c) prior to 1870. Also, very little acceptable evidence was presented to show that the current members of the RMI have continued to maintain a social community from 1950 to the present.

Therefore, the petitioner has not meet the overall requirements of criterion 83.7(b). The 1994 revised regulations still require that community be in evidence from first sustained contact with non-Indians to the present.

We conclude that under the 1994 revised 25 CFR Part 83, the petitioner does not meet criterion 83.7(b) prior to 1870 or from 1950 to the present. Therefore, the petitioner does not meet criterion 83.7(b).

### Criterion 83.7(c)

83.7(c)     **The petitioner has maintained political influence or authority over its members as an autonomous entity from historical times until the present.**

**Proposed Finding.** The Proposed Finding concluded that the petitioner did not meet criterion 83.7(c) at any point in

24

Summary under the Criteria, Ramapough Mountain Indians, Inc.

time.  The RMI Response to the Proposed Finding did not
present any new evidence with regard to criterion 83.7(c).

**Impact of the 1994 revised Federal acknowledgment regulations.**
The final determination concludes that the RMP community,
antecedent to the RMI, met criterion 83.7(c) for a limited
period, from 1870 to about 1950.  This determination that the
RMP met criterion 83.7(c) from 1870 to 1950 is the result of
the new, explicit linkage in the 1994 revised regulations
between criteria 83.7(b) and 83.7(c).  The revised regulations
state that a petitioner meeting criterion 83.7(b) at a high
level of evidence at any point in time will be assumed to have
met 83.7(c) at that same point in time.

Under the revised 1994 regulations, if the petitioner meets
criterion 83.7(b), the maintenance of community, at a high
level of evidence (for example, 50 percent of the membership
lives in an isolated, homogeneous, geographical community, or
there is at least 50 percent endogamy among the group's
members), then the regulations assume automatically that
political authority has also been maintained within the
community:  "A group that has met the requirements of para-
graph 83.7(b)(2) at a given point in time shall be considered
to have provided sufficient evidence to meet this criterion at
that point in time" (25 CFR 83.7(c)(3)).

Since the AS-IA has concluded that the RMP community anteced-
ent to the RMI met criterion 83.7(b) at the high level of
evidence from 1870 to 1950, they therefore met 83.7(c) for the
same period.   The evidence supporting this conclusion is
discussed in detail in the technical report that accompanies
this final determination.

This final determination, therefore, concludes that, from 1870
to about 1950, the RMI met criterion 83.7(c) because they met
criterion 83.7(b) at the high level of evidence, based on the
high rate of endogamy (over 50 percent) and the high percent-
age of members living in a geographical community (over 50
percent).

**Comment.**  The RMI Response did not present any new evidence
directly pertaining to criterion 83.7(c).   No third-party
comments addressed criterion 83.7(c).

**Summary of the Evidence under Criterion 83.7(c).**  Continuous
exercise of political influence and authority has always been
required under the Federal acknowledgment regulations, and
this requirement has been met by all successful petitioners.
For example, in their original petition and in their response

25

Summary under the Criteria, Ramapough Mountain Indians, Inc.

to their own Proposed Finding, the Mohegan Tribe provided evidence of continuous political authority in the group from 1641 to the present. This requirement has been met by other successful New England petitioners as well (see the Proposed Findings and Final Determinations for the Wampanoag Tribal Council of Gay Head in Massachusetts and the Narragansett Tribe in Rhode Island).

Without the benefit of the <u>assumption</u> of political authority that was made for the period from 1870 to 1950 under the revised regulations, the petitioner needed to present evidence demonstrating political authority for two distinct periods: from the time of first sustained contact with non-Indians to 1870, and from 1950 to the present. This would have included evidence that: political authority was vested in the membership as a whole; that the members and leadership maintained a bilateral political relationship; that the leaders represented their members on matters of importance to the group as a whole; that the members communicated to their leaders their opinions on issues of importance to the group, that members were able to influence their leaders on such issues; and that the leaders in whom the authority is vested were able to influence the behavior of group members.

The petitioner did not present such evidence, nor was such evidence located by BIA researchers.

**Summary Conclusion under Criterion 83.7(c).** The RMI petition did not present evidence that the RMP maintained any political influence or authority from historical times (from the time of first sustained contact with non-Indians) to 1870. The petition also did not present evidence that established a reasonable likelihood that the RMI had maintained political authority from 1950 to the present. Without the linkage to criterion 83.7(b) for a high level of evidence for the maintenance of community, the regulations do not assume that the RMP maintained political influence or authority before 1870 and from 1950 to the present.

Therefore, the conclusion of the Proposed Finding stands: the petitioner does not meet the requirements of criterion 83.7(c).

### Criterion 83.7(d)

83.7(d)  **A copy of the group's present governing document, including its membership criteria. In**

26

Summary under the Criteria, Ramapough Mountain Indians, Inc.

> the absence of a written document, the petitioner must provide a statement describing in full its membership criteria and current governing procedures.

**Proposed Finding.** The Proposed Finding concluded that the petitioner had met criterion 83.7(d).

**Comment.** A comment received from the office of the Attorney General of the State of New Jersey, as an interested party, challenged the conclusion, on the grounds that the RMI did not have clearly established membership criteria to which the organization adhered.

**Summary of the Evidence under Criterion 83.7(d).** The Federal regulations for acknowledgment do not compel a petitioner to meet prescribed standards regarding membership or to follow its own membership criteria and governing procedures. Criterion 83.7(d) requires only that the petition provide a copy of its governing document, and that either this document or a separate written statement must provide a full description of the governing procedures and membership criteria. The RMI provided this information.

**Summary Conclusion under Criterion 83.7(d).** The conclusion of the Proposed Finding that the petitioner meets criterion 83.7(d) stands.

### Criterion 83.7(e)

83.7(e)    The petitioner's membership consists of individuals who descend from a historical Indian tribe or from historical Indian tribes which combined and functioned as a single autonomous political entity.
(1)    Evidence acceptable to the Secretary which can be used for this purpose incudes but is not limited to:
(i)    Rolls prepared by the Secretary on a descendancy basis for purposes of distributing claims money, providing allotments, or other purposes;

27

Summary under the Criteria, Ramapough Mountain Indians, Inc.

(ii)   State, Federal, or other official records of evidence identifying present members or ancestors of present members as being descendants of a historical tribe or tribes that combined and functioned as a single autonomous political entity.

(iii) Church, school, and other similar enrollment records identifying present members or ancestors of present members as being descendants of a historical tribe or tribes that combined and functioned as a single autonomous political entity.

(iv)   Affidavits of recognition by tribal elders, leaders, or the tribal governing body identifying present members or ancestors of present members as being descendants f a historical tribe or tribes that combined and functioned as a single autonomous political entity.

(v)   Other records or evidence identifying present members or ancestors of present members as being descendants of a historical tribe or tribes that combined and functioned as a single autonomous political entity.

(2)   The petitioner must provide an official membership list, separately certified by the group's governing body, of all known current members of the group.   This list must include each member's full name (including maiden name), date of birth, and current residential address.   The petitioner must also provide a copy of each available former list of members based on the group's

> **own defined criteria, as well
> as a statement describing the
> circumstances surrounding the
> preparation of the current list
> and, insofar as possible, the
> circumstances surrounding the
> preparation of former lists.**

**Proposed Finding.** The Proposed Finding concluded that the RMI
did not meet criterion 83.7(e) of the Federal acknowledgment
regulations because the petitioner had not presented and BIA
staff had not located any evidence that the earliest proven
ancestors of the four core families, DeFreese, Van Dunk, Mann,
and DeGroat, were Indian, were of Indian descent, or were
affiliated with any of the tribes in the New York-New Jersey
border area at the time of historic contact.

Historians, anthropologists, and journalists have mentioned
many tribes as possible precursors of the RMI:   Munsee,
Minisink, Tuscarora, Creek, Lenape (generically), Hackensack,
and Delaware.  However, none of the documentation submitted by
the petitioner or any other documents reviewed for the
proposed finding connected the earliest documented RMI
ancestors with any of the tribes that once resided in New York
or New Jersey.

The provisions of the 1978 25 CFR Part 83 regulations under
which the Proposed Finding was prepared were essentially the
same as the 1994 revised regulations regarding tribal ancestry
under criterion 83.7(e).   They read:

> (e)   A list of all known current members of
> the group and a copy of each available former list
> of members based on the tribe's own defined crite-
> ria.   The membership must consist of individuals
> who have established, using evidence acceptable to
> the Secretary, descendancy from a tribe which
> existed historically or from historical tribes
> which combined and functioned as a single autono-
> mous entity.   Evidence acceptable to the Secretary
> of tribal membership for this purpose includes but
> is not limited to:
> (1)   Descendancy rolls prepared by the Secre-
> tary for the petitioner for purposes of distribut-
> ing claims money, providing allotments, or other
> purposes;
> (2)   State, Federal, or other official records
> or evidence identifying present members or ances-

Summary under the Criteria, Ramapough Mountain Indians, Inc.

tors of present members as being an Indian descen-
dant and a member of the petitioning group;
(3) Church, school, and other similar enroll-
ment records indicating the person as being a
member of the petitioning entity;
(4) Affidavits of recognition by tribal
elders, leaders, or the tribal governing body, as
being an Indian descendant of the tribe and a
member of the petitioning entity;
(5) Other records or evidence identifying the
person as a member of the petitioning entity (43
F.R. 172, 39363).

The November 17, 1992 membership list of the RMI contained
2,815 names, including 122 names marked as deceased.   For
acknowledgment purposes, names of deceased persons were
subtracted from the 1992 list, leaving the petitioner with an
estimated membership of 2,693.   The petitioner did not submit
an updated membership list in its Response to the Proposed
Finding.   Therefore, the 1992 list was referred to for this
final determination.   The BIA has no reason to believe that
the membership of the RMI changed in any significant manner
since the Proposed Finding.

The Proposed Finding concluded that the earliest proven RMI
progenitors were John DeFreese, born before 1790, James
DeGroat, born about 1792, William R. DeGroat, born about 1814,
John DeGroat, born about 1821, William Mann, born about 1827,
John Van Dunk, probably born about 1780, and possibly, a
second man named John DeGroat, born about 1797, and their
wives.   The Proposed Finding concluded that virtually every
current RMI member descends from at least two of the four
families of Van Dunk, DeFreese, DeGroat, and Mann because of
a high rate of endogamy which could be documented beginning in
the early 1800's.

**Comment.**   The RMI Response did not present any new evidence
under criterion 83.7(e), but reanalyzed evidence that had been
presented with the original petition.   The RMI Response
emphasized attributions of Indian "characteristics" that were
ascribed by outside observers to some RMI ancestors, and to
collateral relatives of direct RMI ancestors, in the late
1800's and early 1900's as proof of Indian "descent."

Third-party comments also failed to present new genealogical
evidence.   Both the RMI Response and comments by interested
and informed parties referred to long-standing traditions of
Indian ancestry as "evidence" that the RMI descend from a
historical tribe of Indians.   However, no documentary evidence

30

was submitted to connect the earliest known RMI ancestors with any 18th century progenitors, be they Indian or non-Indian.

**Summary of the Evidence under Criterion 83.7(e).** None of the evidence submitted by the petitioner or uncovered during the research process identified the parentage or origin of the proven early 19th century progenitors of the RMI.

The petitioner presented no claims, allotment, or annuity rolls prepared by the Secretary (83.7(1)(i)). The petitioner presented no State, Federal, or other official records or evidence identifying the earliest known ancestors of present members as being descendants of a historical tribe or tribes that combined and functioned as a single autonomous political entity (83.7(1)(ii)). The petitioner presented no church, school, or other similar enrollment records identifying the earliest known ancestors of present members as being descendants of a historical tribe or tribes that combined and functioned as a single autonomous political entity (83.7(1) (iii)).

The petitioner's response cited two DeGroat men, one of whom has no known descendants in the modern RMI, who were referred to as "7/8th's Indian" on a New York State census entry in 1875. Neither man was referred to as Indian on any other census record, nor were their parents or other siblings ever identified as Indian or of Indian descent in their own lifetimes. The 1875 New York census provided no tribal identification.

In like manner, the petitioner's response cited the identification of a man named Florence Maguiness as Indian on the 1870 Federal census. The 1870 Federal census provided no tribal identification. The immediate family members of Florence Maguiness, who was identified as Indian on the 1870 Federal census, were not identified as Indian or of Indian descent on any other census, church or civil record in their own lifetimes. None of Florence Maguiness' known descendants are in the RMI, although there are a few descendants of his collateral relatives in the membership.

The Federal regulations for the acknowledgment of a tribe of American Indians do not permit acknowledgment on the basis of the petitioner's assertion that the group's unknown and unnamed 18th century ancestors were Indian. Beyond "Indian" ancestry, which in itself has not been shown to exist for the RMI, the petitioner has not demonstrated specific tribal ancestry as required by the Federal regulations in order to meet criterion 83.7(e).

Summary under the Criteria, Ramapough Mountain Indians, Inc.

In making this Final Determination, the BIA has reviewed the evidence used to prepare the Proposed Finding, the RMI response to the Proposed Finding, and additional research conducted for the Final Determination by BIA staff. None of the interested party or third party comments were directed to the specific genealogies of the RMI progenitor families. None of the interested party or third party comments provided substantive proof that the earliest proven RMI ancestors descended from a historical tribe of North American Indians. Therefore, the third-party comments were not directly pertinent to criterion 83.7(e).

None of the outside observers cited in the RMI Response provided documentation of actual tribal descent. Statements of generically "Indian" characteristics are not equivalent under the 25 CFR Part 83 regulations to documented descent from "a historical Indian tribe or from historical Indian tribes which combined and functioned as a single autonomous political entity." Statements concerning more general "Indian" descent are not in themselves adequate to meet criterion 83.7(e), and must also be evaluated in the full context of the available evidence.

Neither the petitioner nor BIA staff researchers were able to identify the ancestors of the earliest known RMI progenitors or to trace them to a historical 18th century tribe with a continuous existence in southeastern New York or northeastern New Jersey from the colonial period until the present. This situation offered a clear contrast to other petitioners from the eastern United States that have received Federal acknowledgment through the 25 CFR Part 83 process, such as the Narragansett, the Gay Head Wampanoag, or the Mohegan. In those cases, a clear historical and genealogical record tied the petitioner's modern membership to a specific historical tribe.

**Summary Conclusion under Criterion 83.7(e).** In conclusion, the origins and parentage of the earliest genealogically proven ancestors of the petitioner are not known. The petitioner has not demonstrated that their earliest documented ancestors were members of a historical North American Indian tribe, nor has the petitioner documented that their earliest proven progenitors descended from any known historical tribe of North American Indians. Without documentation, the BIA cannot make an assumption, on the basis of late 19th-century and early 20th-century ascriptions, that these unknown RMI ancestors were members of a historical North American Indian tribe. The petitioner has not presented acceptable evidence that the RMI descend from a historical Indian tribe, or from

32

Summary under the Criteria, Ramapough Mountain Indians, Inc.

tribes which amalgamated and functioned as a single unit, either as individuals or as a group.

Therefore, the Proposed Finding that the RMI had not documented descent from a historical tribe stands. The Final Determination concludes that the petitioner does not meet criterion 83.7(e).

## Criterion 83.7(f)

83.7(f)   **The membership of the petitioning group is composed principally of persons who are not members of any acknowledged North American Indian tribe.**

**Proposed Finding.** The Proposed Finding concluded that there was no evidence that the membership of the RMI was composed principally of persons who were members of other federally acknowledged Indian tribes.

**Comment.** No comments pertaining to this conclusion were received during the comment period.

**Summary of the Evidence under Criterion 83.7(f).** No evidence to refute the conclusion of the Proposed Finding was received during the comment period.

**Summary Conclusion under Criterion 83.7(f).** The conclusion that the petitioner meets criterion 83.7(f) stands.

## Criterion 83.7(g)

83.7(g)   **Neither the petitioner nor its members are the subject of congressional legislation that has expressly terminated or forbidden the Federal relationship.**

**Proposed Finding.** The Proposed Finding concluded that there was no evidence that the RMI petitioner represented an Indian group which had been the subject of congressional legislation that expressly terminated or forbade the Federal relationship.

**Comments.** No comments pertaining to this criterion were received during the comment period.

33

Summary under the Criteria, Ramapough Mountain Indians, Inc.

**Summary of the Evidence under Criterion 83.7(g).**  No evidence to refute this conclusion was received during the comment period.

**Summary Conclusion under Criterion 83.7(g).**  The conclusion that the petitioner meets criterion 83.7(g) stands.

34

# FINAL DETERMINATION

# RAMAPOUGH MOUNTAIN INDIANS, INC.

January 18, 1996

United States Department of the Interior

Bureau of Indian Affairs

Branch of Acknowledgment and Research

(202) 208-3592

Technical Report, Ramapough Mountain Indians, Inc.

## TABLE OF CONTENTS

A.  DISCUSSION OF CRITERION 83.7(a):
    IDENTIFICATION AS AN AMERICAN INDIAN ENTITY
    BY EXTERNAL SOURCES . . . . . . . . . . .  42
    1.  The RMI Response . . . . . . . . . .  44
    2.  The RMI Response's criticism of the BIA's
        evaluation of the evidence in the
        Proposed Finding . . . . . . . . . .  46
        a.  Federal government identifications
            of the Ramapo Mountain People (RMP) .  47
        b.  New Jersey State identifications
            of the RMP . . . . . . . . . . .  50
        c.  Scholars and journalists . . . . .  51
        d.  Evaluation of church records . . .  55
            Presbyterian records . . . . . . .  56
            Methodist records . . . . . . . .  58
            Relationship of the Methodist
                chapel to other religious
                denominations . . . . . . . .  63
    3.  Summation . . . . . . . . . . . . .  64
B.  DISCUSSION OF CRITERION 83.7(b):
    DISTINCT COMMUNITY . . . . . . . . . . .  64
    1.  Regulatory definition of "community" used
        for the Proposed Finding . . . . . .  64
    2.  Endogamy as evidence under 83.7(b)(2)(ii) .  65
    3.  Geographical community as evidence under
        83.7(b)(2)(i) . . . . . . . . . . .  67
    4.  The RMI Response's comments on the
        Anthropological Technical Report . . . .  68
    5.  Cultural distinctiveness not a regulatory
        requirement . . . . . . . . . . . .  69
    6.  Lack of evidence for social community from
        first sustained contact with non-Indians
        to 1870 . . . . . . . . . . . . . .  72
    7.  Evidence for social community from 1870
        to 1950 . . . . . . . . . . . . . .  78
    8.  Lack of evidence for social community from
        1950 to the present . . . . . . . .  79
C.  DISCUSSION OF CRITERION 83.7(c):  POLITICAL
    INFLUENCE OR AUTHORITY . . . . . . . . .  81
D.  DISCUSSION OF CRITERION 83.7(e):  DESCENT FROM
    A HISTORICAL INDIAN TRIBE . . . . . . . .  85
    1.  Introduction . . . . . . . . . . . .  85
    2.  The RMI Response . . . . . . . . . .  85
    3.  Comparison with genealogical evidence
        used in other decisions . . . . . . .  86
    4.  The Vineland Study considered
        extensively in the Proposed Finding . . .  88

TECHNICAL REPORT
IN SUPPORT OF FINAL DETERMINATION

RAMAPOUGH MOUNTAIN INDIANS, INC.

TABLE OF CONTENTS

I.   EVALUATION PROCEDURE UNDER 25 CFR PART 83 . . . . . . 1
     A.  Purpose of the Federal acknowledgment
         regulations . . . . . . . . . . . . . . . . . . 1
     B.  Acceptable and unacceptable evidence in the
         Ramapough Mountain Indians, Inc. (RMI)
         Response and in third party comments . . . . . 1
     C.  Historical Methodology . . . . . . . . . . . 9
         1.  Primary source documentation essential
             under 25 CFR Part 83 . . . . . . . . . . 9
         2.  Verification and evaluation of historical
             documentation . . . . . . . . . . . . . 11
         3.  Standard of proof under 25 CFR Part 83 . . 13
         4.  Evaluation of folkloric material . . . . . 14
         4.  Summation . . . . . . . . . . . . . . . . 16
     D.  Genealogical Methodology . . . . . . . . . . 16
         1.  Genealogical research methodology . . . . . 16
         2.  Specific Federal acknowledgment concerns in
             genealogy . . . . . . . . . . . . . . . . 19
     E.  Specific Aspects of the Proposed Finding . . . . 20
         1.  The evaluation of David Cohen's
             research . . . . . . . . . . . . . . . . 20
         2.  Anthropologists and the origins of
             the RMI . . . . . . . . . . . . . . . . . 21
         3.  Blood quantum, phenotype, and the
             acknowledgment criteria . . . . . . . . . 26
         4.  The process for writing technical reports
             for proposed findings . . . . . . . . . . 29
         5.  The RMI and social discrimination . . . . . 30
         6.  The responsibility of the BAR and the
             roles of research team members . . . . . . 31
             a.  The role of the BAR historian . . . . 32
             b.  The role of the BAR anthropologist . . 33
             c.  The role of the BAR genealogist . . . 33
     F.  Preparation of the Final Determination . . . . 33
         Efforts of the BIA to supplement the
         petitioner's research . . . . . . . . . . . 33

II.  TECHNICAL REPORT . . . . . . . . . . . . . . . . 41
     Introduction . . . . . . . . . . . . . . . . . 41
         1.  The RMI Response to the Proposed
             Finding . . . . . . . . . . . . . . . . . 41
         2.  Procedural handling of the RMI Response
             to the Proposed Finding . . . . . . . . . 41

Technical Report, Ramapough Mountain Indians, Inc.

## TABLE OF CONTENTS

5.   Analysis of RMI core families . . . . . . 93
    a.   The DeGroat family . . . . . . . . . 95
    b.   The DeFreese family . . . . . . . . 104
       Relevance of the Jacquemont data . . 108
    c.   The Van Dunk family . . . . . . . . 110
    d.   The Mann family . . . . . . . . . . 111
6.   The Maguiness family . . . . . . . . . . 114
7.   Historical usage of ethnic designations. . 117
8.   Summation . . . . . . . . . . . . . . . 118

APPENDIX A:   A list of Pastors for the Ramapo Church's
    "Brook Chapel" . . . . . . . . . . . . . . . 121
APPENDIX B:   Map of the Ramapo Valley Area (1876) . . . 123
APPENDIX C:   Map of the RMP Area (1827) . . . . . . . . 124

LIST OF SOURCES. . . . . . . . . . . . . . . . . . . 125

Technical Report, Ramapough Mountain Indians, Inc.

## EVALUATION PROCEDURE UNDER 25 CFR PART 83

**Purpose of the Federal acknowledgment regulations.**

The purpose of the acknowledgment process is to acknowledge that a government-to-government relationship exists between the United States and tribes which have existed since first contact with non-Indians (25 CFR Part 83, "Standards of Evidence and Stringency of Requirements," 59 F.R. 38, 1981).

The purpose of the regulations for Federal acknowledgment of American Indian tribes (25 Code of Federal Regulations Part 83) is the establishment of a government-to-government relationship between the United States and Indian groups that have existed continuously since first sustained contact with non-Indian settlers.  In 1994, revised Federal acknowledgment regulations were published in the Federal Register (59 F.R. 38 (February 25, 1994), 9280-9300), after a lengthy period of dialogue with the unrecognized Indian groups, recognized Indian tribes, scholars, and other interested parties.  The revision of the regulations in 1994 did not alter either the basic purpose of the acknowledgment procedure or the standards of continuity of tribal existence. The revised regulations in some circumstances reduced the burden of evidence to be provided.

The revised acknowledgment regulations provided a choice to petitioners whose petitions were already under active consideration.  They could opt either to continue having the petition evaluated under the 1978 regulations or to change to the revised 1994 regulations.  The Ramapough Mountain Indians, Inc. (RMI) exercised their option to have their petition evaluated under the revised regulations.

**Acceptable evidence and unacceptable evidence in the RMI Response and in third party comments.**  A number of written comments on the RMI Proposed Finding from third parties (both interested and informed; for definitions and roles of third parties, see 25 CFR 83.1 and 83.10(i)) were submitted. Most of them were one- or two-page letters, either expressing support for, or opposition to, the acknowledgment of the RMI.  Most of these letters did not address the seven mandatory criteria or provide new evidence.  Those letters which did not address the criteria (25 CFR 83.7(a-g)) were not influential in the evaluation of the evidence and preparation of the Final Determination.  A letter of this nature

was received from Roy Scheulen, President of the Genealogical Society of Rockland County (Scheulen 1995/6/18, RMI Response Ex. 5). The same form letter was signed by Marie Koestler, Past President of the Genealogical Society of Rockland County (Koestler 1995/6/18, RMI Response Ex. 5) and by Craig H. Long, Town Historian of Ramapo, New York (Long 1995/6/30, RMI Response Ex. 5). A single, joint letter was received from Jeffrey Keahon and Debra Walker of the Historical Society of Rockland County (Keahon and Walker 1995/6/22, RMI Response Ex. 6).

The BIA also received a number of letters from town officials and other local sources concerning the denial of tribal acknowledgment to the RMI. Under the acknowledgment regulations, town officials and councils, like other interested parties living in the vicinity of the petitioner, are allowed to submit evidence concerning whether or not the petitioner meets the mandatory criteria in 25 CFR Part 83. Most of the letters from town officials, both pro and con, did not include any evidence that was pertinent to the criteria in the acknowledgment regulations. They usually consisted of simple and unresearched statements of support for, or opposition to, RMI acknowledgment. Letters of this nature also did not carry any weight in the evaluation process.

Because they did not address the requirements of the acknowledgment criteria, the following letters from the public, letters from town councils and their members, a newspaper editorial (Rockland Journal News, September 9, 1993, RMI Response Ex. 25) and a community petition (RMI Response Ex. 21; labelled "Petition in Favor of Recognition for the RMI Tribe") were not considered as evidence in formulating the recommendation of this Final Determination: Maia Wojciechowska (Wojciechowska 1995/6/6 and Wojciechowska 1995 6/24, RMI Response Ex. 8; also Wojciechowska 1993/7/26, RMI Response Ex. 25); Herbert Reisman, Supervisor, Town of Ramapo, New York (Reisman 1995/6/15, RMI Response Ex. 22); Robert Frankl, Mayor of the Village of Wesley Hills (Frankl 1995/6/12, RMI Response Ex. 22).

One letter dated May 8, 1995, from the Office of the New Jersey Attorney General, was submitted as "comment" under the meaning of the Federal regulations (25 CFR 83.10 (i)):

> Please accept this comment, on behalf of the State of New Jersey, supporting the Bureau of Indian Affairs' (BIA) proposed negative finding denying acknowledgment of the petitioner, Ramapough Moun-

Technical Report, Ramapough Mountain Indians, Inc.

tain Indians, Inc. (RMI), federal [sic] acknowl-
edgment as an Indian tribe (New Jersey. Office of
the Attorney General 1995/5/8).

According to this letter, the State of New Jersey concurred
with the BIA proposed finding, with one exception regarding
criterion 83.7(d).  The State of New Jersey contended that
the RMI did not meet criterion 83.7(d) regarding providing a
full description of its membership criteria and current
governing procedures, on the grounds that the document
submitted was not an accurate reflection of the petitioner's
practices.

The Proposed Finding stated:

> The petitioner has submitted copies of its governing
> documents which describe the membership criteria and
> the procedures by which the petitioner governs its
> affairs and its members.  Although it is not clear how
> the membership criteria is applied, we conclude that
> technically the petitioner meets criterion d [sic] (RMI
> FF, Summary Under the Criteria 18).

The Federal regulations for acknowledgment do not compel a
petitioner to meet prescribed standards regarding membership
or governing procedures.  Criterion 83.7(d) simply stipu-
lates that the petitioner meet a technical requirement of
the regulations by submitting a copy of its governing docu-
ment which describes the group's membership criteria and
governing procedures.

A letter indicating political support for the RMI petition
for acknowledgment was received from the Stockbridge-Munsee
Community, Band of the Mohican Indians (Murphy 1995/6/29,
RMI Response Ex. 17).  Also submitting letters were The Six
Nations Council (Williams 1995/7/10, RMI Response Ex. 20)
and the Munsee-Delaware Nation (Dolson 1995/6/28, 1995, and
a tribal resolution, RMI Response Ex. 19), both Canadian
Indian tribes.  None of these tribes submitted any new
evidence.  Instead, they simply expressed their "support"
for RMI acknowledgment.  Because they provided no new evi-
dence, these letters were not considered in the evaluation
of the evidence and preparation of the Final Determination.

In a letter from United States Congressman Robert Torricelli
to Secretary of the Interior Bruce Babbitt (Torricelli
1993/5/4, RMI Response Ex. 25), Mr. Torricelli indicated his
support for Federal acknowledgment of the RMI unless the RMI
made plans to do Indian gaming.  This was another example of

3

Technical Report, Ramapough Mountain Indians, Inc.

support for the petitioner which was <u>not</u> based on evidence
that addressed the mandatory criteria for acknowledgment of
an Indian tribe.

If a group of people exists as an Indian tribe, the group
does not cease to be an Indian tribe if the tribe's members
decide to enter into Indian gaming. Because this letter
provided no new evidence, it was not considered in the
evaluation of the evidence and preparation of the Final
Determination.

Letters from informed parties such as anthropologists,
historians, and genealogists were also received during the
comment period. Generally, these letters were supportive of
the RMI efforts to become acknowledged by the Federal gov-
ernment, though few of them presented evidence that ad-
dressed the mandatory criteria. Those comments from schol-
ars that did address the criteria are discussed in the
Summary of the Evidence for this Final Determination.

A number of comments were received that did not present any
new evidence from scholars. For example, a letter was
received from anthropologist Dr. Susan Greenbaum which main-
tained that the BAR researchers were prejudiced against the
"Ramapo" [sic] because they would build a casino if they
were acknowledged. According to Dr. Greenbaum, this alleged
bias against the RMI was revealed in the history and anthro-
pology reports by the discussions of RMI minutes (Greenbaum
1995/6/24, RMI Response Ex. 14; see also Grabowski 1995/7/6,
RMI Response Ex. 15). The same issue was raised by the
petitioner in several technical assistance meetings.

Indian gaming is legal and benefits many Indian tribes. The
policy of the BIA is to support the development of Indian
tribes, including Indian gaming. The BIA does not treat
petitioners negatively because they intend to enter Indian
gaming if recognized. This would be contrary to Federal law
and to BIA policy and practice. The Government has recog-
nized other petitioners who openly discussed their interest
in Indian gaming, when they met the seven mandatory crite-
ria.

There was a good reason why the Proposed Finding considered
Indian gaming as evidence under criteria 83.7(b) and
83.7(c). Gaming was considered in the Proposed Finding
because the RMI council minutes were dominated by discus-
sions concerning gaming and there were numerous newspaper
articles about the group's plans to build a casino (RMI PF,
Historical Technical Report 95-101; RMI PF, Anthropological

4

Technical Report, Ramapough Mountain Indians, Inc.

Technical Report 28; BAR FD 1993). This led the anthropologist to consider the possibility that gaming might be a serious political issue within the group; that is, that gaming was of concern to a large number of RMI members, across extended family lines. This possibility also appeared to be reasonable given the larger context of tribal politics in the United States, where Indian gaming has become a lively political issue for many recognized Indian tribes.

If the anthropologist's field work had confirmed that the RMI membership showed widespread concern about this issue (or other issues), it would have been considered positive evidence for the existence of bilateral political influence within the modern group. The anthropologist followed this up while in the field by asking interviewees about the issue, but found that gaming was not important to the RMI outside of a few council members. Therefore, the issue could not be used as positive evidence for political authority within the group. In fact, gaming was repeatedly played down by the council members as not being very important.

The petitioner has expressed concern that the BAR researchers were "caving in" to pressure from non-Indian gaming interests, naming, most often, Donald Trump. The BAR has not been lobbied by gaming interests generally, nor have the BAR researchers been contacted either by Mr. Trump or by anyone who identified himself as Mr. Trump's representative more specifically. The BAR staff members do typically keep up with current events in Washington, D.C., and they are aware that Mr. Trump has lobbied the United States Congress against the acknowledgment of some unrecognized Indian groups. In addition, the petitioner has submitted information on Donald Trump's activities to the BAR.

The BIA does not deny acknowledgment to petitioners on the grounds that they contemplate Indian gaming. For example, the BIA acknowledged the Mohegan Indian Tribe of Connecticut in its 1994 Final Determination, even though it was known that they were planning to build a casino and theme park. The recommendation to acknowledge the Mohegan was forwarded to the Assistant Secretary - Indian Affairs (AS-IA) in spite of strong political opposition from the state and local governments over the issues concerning the construction of a gaming facility. The recommendation was based on the new evidence pertaining to the mandatory criteria submitted by the Mohegan Tribe which, like the RMI, had received a negative Proposed Finding.

5

Technical Report, Ramapough Mountain Indians, Inc.

The letter from John A. "Bud" Shapard, a former BAR Branch Chief who currently acts as consultant to unrecognized Indian groups, can also be considered in this context. Mr. Shapard asserted that the Mohegan petition was interpreted more "leniently" in light of the regulations than the petition of the RMI (Shapard to Ada Deer 1995/7/5, RMI Response Ex. 13; see similar argument in Grabowski 1995/7/6, RMI Response Ex. 15). The letter did not specify any evidence to support this assertion. The major difference between the RMI and Mohegan petitions was the evidence submitted by the respective petitioners, supplemented by the evidence found by the BIA during its evaluation of the petitions. The Mohegan Tribe had extensive primary source documentation concerning its members' Indian tribal ancestry, as well as reliable, satisfactory evidence demonstrating the continuous maintenance of their social community and the exercise of leadership within that community from first contact with Europeans (1641) to the present. For example, the Mohegan lived on a Connecticut State Indian reservation before 1871, and traced their genealogies to an official State 1861 allotment roll. Prior to the allotment of the reservation, the tribe could be traced through official Connecticut State overseers' reports and censuses. The Mohegan petition and the RMI petition differed in the kind and quality of evidence presented.

The petitioner did not submit nor did the BAR researchers locate any primary source documentation demonstrating tribal Indian ancestry for the RMI, from the Munsee or any other historical tribe of Indians. There was also no primary source documentation presented establishing a reasonable likelihood that the Ramapo Mountain People (RMP) were a distinct community before 1870 or that the RMI membership had remained a distinct community since 1950.

A letter from Henry Bischoff (Professor of History and Urban Studies, Ramapo College) was included as an exhibit in the RMI Response to the Proposed Finding (Bischoff 1995/6/5, RMI Response Ex. 7). Professor Bischoff stated that he had no specialization in Native American studies and that, therefore, the book he co-authored on the growth of Mahwah, New Jersey (Bischoff and Kahn 1979) should not have been used as evidence against the RMI in the Proposed Finding. He also said that his book should not have been used against the RMI because it had not used primary sources. In contrast, the RMI Response, and the letters of several third parties (Sessions 1995/6/19, RMI Response Ex. 9), had indicated that the BAR researchers had not adequately considered the work of local historians who had written about the RMI, citing

6

Technical Report, Ramapough Mountain Indians, Inc.

Bischoff among the local historians whose work should be
considered in evaluating the RMI petition (Sessions
1995/6/19, RMI Response Ex. 9).

The BAR researchers regularly consult local histories,
including the work of local amateur historians, as poten-
tially valuable secondary sources of information on a peti-
tioning group. The BIA does not assume that all local
histories are reliable on their face; rather, the BAR
researchers evaluate each book and/or article for the sound-
ness of primary source evidence drawn upon for the history
and the consistency of the internal logic in drawing conclu-
sions recorded in it. So-called "historical" accounts,
based purely on speculation, are given no weight in prepar-
ing the recommendations.

In the case of the book co-authored by Bischoff, the BAR
researchers concluded that the authors had done careful,
primary source research, particularly on Civil War records
of some of the RMI's ancestors. Therefore, his book was
consulted as a potential source of information on some RMI
member families. It was used as a neutral source of histor-
ical background information on the RMP, and the RMI more
specifically. The information on the RMI ancestors in the
book was sparse, so it was in no way critical to the recom-
mendation made by the BAR on any of the seven mandatory
criteria (25 CFR §83.7(a)-(g)).

One of the comments received from an interested party seemed
to imply that there was a new, more strict requirement for
the community criterion applied to the RMI than used in
prior proposed findings (25 CFR 83.7(b); see Cantrell,
1995/7/5, RMI Response Ex. 16). Dr. Cantrell distinguished
the Proposed Finding terminology "community" and "social
community," assuming that the latter concept was more
strictly defined and therefore required a different kind of
evidence. This is not the case.

Finally, a letter from Stewart J. Rafert (historian and
author of the Miami Nation of Indian's Petition for Federal
acknowledgment) (Rafert n.d. [c1995], RMI Response Ex. 10)
maintained that the BAR genealogist who evaluated the RMI
petition was not qualified " . . . to make judgements [sic]
on ethnic boundaries and what constitutes an Indian" (Rafert
n.d. [c1995], RMI Response Ex. 10). Judgments on "ethnic
boundaries" are more the domain of the anthropologist and
the historian than that of the genealogist. The data col-
lected by the genealogist can sometimes be used by the
anthropologist and the historian who determine if there are

7

Technical Report, Ramapough Mountain Indians, Inc.

boundaries between ethnic groups in an area.  It is part of the genealogist's task to evaluate material concerning the petitioning group's ancestry and descent from a historical Indian tribe.  The genealogist's primary role is to determine whether the petitioning group descends from a historical American Indian tribe by finding documents, analyzing them, and drawing conclusions about a group's ancestry based on them, in order to evaluate the claims in a petition for Federal acknowledgment.

The letter from Dr. Rafert implied that some researchers in the BAR have more influence than others in the recommendation-making process.  When evaluating a petition, the BAR researchers work in teams of three: a historian, a genealogist, and an anthropologist.  However, the recommendations of the BAR are the recommendations of at least seven professionals, who conduct an extensive peer review before a recommendation is reached on the basis of consensus.  The peer review process includes the three researchers assigned to evaluate the petition, three peer reviewers from the same disciplines, and the Branch Chief of the BAR.  Other staff members are sometimes called into the peer review sessions when their technical expertise is needed.  The reports submitted by contractors to the BIA are not accepted without evaluation and are submitted to the same process of peer review.  Contractors do not evaluate the petition and evidence under the mandatory criteria.  The use of peer review eliminates the potential for any one person to unduly influence a recommendation.

Once a consensus is reached by the BAR, the recommendations are forwarded to the AS-IA through the BIA review process, adding to the list of knowledgeable professionals who review the decision before it is finalized and published.  No one person formulates recommendations unilaterally concerning any of the criteria.  Through the peer review process, the BIA submits its own research and conclusions to the same rigorous evaluation that it performs on the research of others.  The peer review team helps the BIA research team to question assumptions about the evidence in each petition and in the BIA reports.  Peer reviewers look for logical and factual inconsistencies in the technical reports, to make sure that the three primary researchers are in agreement on the facts in the petition.  Peer review also ensures that BIA's recommendations comply with the standards in the regulations, and that they are consistent with standards used in and precedents set by prior Federal acknowledgment decisions.

8

Technical Report, Ramapough Mountain Indians, Inc.

### Historical Methodology

**Primary source documentation essential under 25 CFR Part 83.**
The petitioner contends in the RMI Response that the Pro-
posed Finding established an excessive requirement, beyond
the regulations and guidelines, by maintaining that the
continuous existence of a petitioning group as an Indian
tribe since the time of first sustained contact with non-
Indian settlers must be shown through the use of contempo-
rary primary evidence (RMI Response 1995, B-3). Specifical-
ly, the RMI Response said:

> **Nowhere in the regulations or the guidelines does
> it state that a petitioner must use primary and/or
> contemporaneous source material to prove anything**
> [emphasis in original] (RMI Response 1995, B-3).

The requirement for contemporary primary evidence was not
specifically stated in the regulations because it is univer-
sally regarded as a component of standard scholarly research
methodology. The evaluation of evidence by the BIA under
the 25 CFR Part 83 regulations is consistent with this
standard scholarly research methodology, as evidenced by
previous decisions. As examples of the standard requirement
for contemporaneous source materials, we cite the follow-
ing:[1]

> **By a "source" the historian means material that is
> contemporary to the events being examined . . .
> The term is meant to be restrictive rather than
> inclusive, in that it attempts to indicate that
> works of secondary scholarship, or synthesis, are
> not sources, since the data have been distilled by
> another person (Winks 1970, xx).**

Conversely, non-contemporary material is not direct evi-
dence:

> **Source often means what we call evidence; but as
> combined in the term "secondary source" it means
> just the opposite (i.e., material not produced by
> a witness). The words contemporary, original, or**

---

[1] All historical research methodology manuals discussed in this
section are in standard use in undergraduate and graduate training in the
United States. Editions were chosen which had publication dates which
would have made them available to the petitioner's researchers at the time
the RMI documented petition was in preparation.

Technical Report, Ramapough Mountain Indians, Inc.

   primary are often combined with "source" to mean
   evidence.  Note that what may be nonevidence
   ("secondary source") for one purpose, may be evi-
   dence ("primary source") for another:  Mao Tse
   Tung's opinions of Karl Marx are not evidence for
   the life of Marx, who died before the Chinese
   communist was born, but Mao's views are evidence
   for studies of modern Marxism or modern views of
   Marx the man (Shafer 1980, 78 n2).

Standard manuals on historical research methodology, whether
prepared for the training of undergraduate or graduate
students in the discipline, emphasize the requirement that
historians must use contemporary, primary sources in order
to obtain valid results.  Examples from two such manuals
follow:

   The value of a piece of testimony usually increas-
   es in proportion to the nearness in time and space
   between the witness and the events about which he
   testifies.  An eyewitness has a good chance of
   knowing what happened; a reporter distant from the
   event by only a few years has a better chance than
   one separated by a century (Barzun and Graff 1970,
   149-150).

   The most important distinction is between material
   (written or other) produced by a *witness or par-
   ticipant* in events, and material produced by oth-
   ers, meaning (a) persons living at the time the
   events occurred but who did not witness or partic-
   ipate in them, and (b) historians living after the
   event.  To be sure, nonwitnesses contemporaneous
   with the events often leave us a record of their
   conversations with witnesses, or relevant evidence
   on encircling events or environment.  Thus
   "contemporary evidence" is a useful category to
   bear in mind, encompassing witnesses, nonwitness-
   es, and a third class of nonpersonal documents
   (e.g., constitutions) and artifacts (e.g., blud-
   geons, coins, feather capes) produced at the time.
   It is suggested, therefore, that the most useful
   categorization with this purpose in view is into
   "contemporary materials" ("materials" is more
   neutral than "sources") and "studies" (Shafer
   1980, 77-78).

Therefore, it was not considered necessary to mention the
point in the regulations.  All prior Federal acknowledgment

Technical Report, Ramapough Mountain Indians, Inc.

decisions have required the petitioner to submit primary
source documentation, generated at a time contemporary with
the events under consideration.

**Verification and evaluation of historical documentation.**   In
addition to the basic distinction between contemporary
evidence (primary sources) and secondary narratives produced
at a later period, it is also necessary to verify the mate-
rial used and evaluate its reliability.  This is generally
acknowledged as another basic--indeed, "central"--responsi-
bility of historical method:  "The central methodological
problem for the historian, then, is to know how to interro-
gate witnesses, how to test evidence, how to assess the
reliability and the relevance of testimony" (Winks 1970,
39).  According to Boyd Shafer, at this point in the process
of historical research, "We are . . . concerned with the
different *forms* of evidence, and with the social and indi-
vidual psychological factors that determine the *quality* and
*credibility* of evidence" (Shafer 1980, 73).

The basic techniques for evaluating the reliability of
historical evidence are well-established.  Barzun and Graff
stated the requirements in straightforward English:

> Faced with a piece of evidence, the critical mind
> of the searcher for truth asks the fundamental
> questions:
>> Is this object or piece of writing genu-
>> ine?
>> Is its message trustworthy?
>> How do I know?
> This leads to an unfolding series of subordinate
> questions:
> 1.  Who is its author or maker?
> 2.  What does it state?
> 3.  What is the relation in time and space between
>     the author and the statement, overt or im-
>     plied, that is conveyed by the object?
> 4.  How does the statement compare with other
>     statements on the same point?
> 5.  What do we know independently about the author
>     and his credibility? (Barzun and Graff 1970,
>     149).

Shafer used somewhat more technical terminology, but to
precisely the same effect:

> Using evidence requires knowledge of (1) external
> criticism, which determines the authenticity of

11

Technical Report, Ramapough Mountain Indians, Inc.

evidence; (2) internal criticism, which determines
the credibility of evidence;[2] (3) the grouping of
evidence in relationships of various sorts; (4)
the interpretation of evidence in the light of
many factors and in the absence of others; and (5)
exposition or the communication of evidence to
others (Shafer 1980, 127).

Any one document must be collated with and corroborated by
other evidence in order to determine in so far as possible
if it is consistent.[3] If only one piece of evidence ex-
ists, it cannot be accepted on its face: its worth must
still be evaluated.[4]

_____

[2] "What can be learned about the author's life and character helps
make up our judgment . . . Was he there? Had he the expertness to
appreciate the facts? Was he biased by partisan interest? Did he
habitually tell the truth?" (Barzun and Graff 1970, 150).

[3] When we come to the problems of corroboration and
contradiction, we . . . are now comparing evi-
dence. It is proper to think of this either as a
more complex type of analysis than that involved
in the single document, or as a low level of
synthesis. A major part of historical method
relates to efforts to find corroborative evidence
and weigh its quality, or to resolve problems
arising from contradictory evidence, by corroba-
tion [sic] for one explanation or another (Shafer
1980, 167-168).

[4] Difficult as this process [collation of various
pieces of evidence] can be it occasions less
doubt than the problem of the single source,
where we have neither corroboration nor contra-
diction. . . . How much corroboration is re-
quired to make us feel comfortable in our inter-
pretation? The answer is that it depends on (1)
the problem (i.e., on what is being investigated-
-an entire culture, the location of a ford over a
stream, a man's motives), and (2) what evidence
is available (a three-line diary, 6,000 pages of
legislation, no eyewitness reports, or the obser-
vations of 3,000 witnesses). It is foolish and
simplistic to fix a number of corroborators, even
of stated quality; e.g., two or more reliable and
independent witnesses. We are not in a court of
law. Reliability and independence are highly
desirable in evidence, but two witnesses may give
us no more of either than one witness. It de-
pends both on the types of witnesses and on the
types of problems (Shafer 1980, 168).

12

Technical Report, Ramapough Mountain Indians, Inc.

**Standard of proof under 25 CFR Part 83.** The RMI Response states that the standard of proof required under 25 CFR Part 83 is "reasonable likelihood" (RMI Response 1995, B-3). This takes a part of the regulations out of context. The full passage in 25 CFR Part 83, Sections 83.6(c), 83.6(d), 83.6(e), and 83.6(f) reads:

(c)   A petitioner must satisfy all of the criteria in paragraphs (a) through (g) of Section 83.7 in order for tribal existence to be acknowledged. Therefore, the documented petition must include thorough explanations and supporting documentation in response to all of the criteria. The definitions in Section 83.1 are an integral part of the regulations, and the criteria should be read carefully together with these definitions.
(d)   A petitioner may be denied acknowledgment if the evidence available demonstrates that it does not meet one or more criteria. A petitioner may also be denied if there is insufficient evidence that it meets one or more of the criteria. A criterion shall be considered met if the available evidence establishes a reasonable likelihood of the validity of the facts relating to that criterion. Conclusive proof of the facts relating to a criterion shall not be required in order for the criterion to be considered met.
(e)   Evaluation of petitions shall take into account historical situations and time periods for which evidence is demonstrably limited or not available. The limitations inherent in demonstrating the historical existence of community and political influence or authority shall also be taken into account. Existence of community and political influence shall be demonstrated on a substantially continuous basis, but this demonstration does not require meeting these criteria at every point in time. Fluctuations in tribal activity during various years shall not in themselves be a cause for denial of acknowledgment under these criteria.
(f)   The criteria in Section 83.7(a) through (g) shall be interpreted as applying to tribes or groups that have historically combined and functioned as a single autonomous political entity (59 FR 38, 9295).

In order to evaluate the evidence under the criteria, the BAR historian employs the historical method, which requires

13

Technical Report, Ramapough Mountain Indians, Inc.

meticulous, detailed investigation of the provenance and credibility of statements found in the primary sources themselves. Additionally, it is necessary that, in historical research, close attention be paid to the basic chronology of the subject under study: "It is expected, of course, that the researcher into any subject will approach it with a well-developed sense of time . . ." (Barzun and Graff 1970, 116).

A census taken in 1870 or 1875 is only a secondary source for the ethnicity of the parents of a man or woman being enumerated. It cannot be relied upon, in and of itself, as showing "reasonable likelihood" of such ethnicity, and does not in itself provide a floor of adequate "evidence" from which further conclusions may be derived. It is not an axiom on the basis of which further postulates may be stated, any more than the statement in the blank for "birthplace" on a man's death certificate is primary evidence of his place of birth. If an 1850 census which enumerates the parents themselves does not accord with the 1870 or 1875 statement, then the full concatenation of available documentation pertaining to that family must be brought to bear in order to determine the reliability of this one piece of documentation, or "evidence."

A local history written in the 1880's, which does not cite its sources, cannot be relied upon as evidence for what was happening in the region a century earlier, although it may be useful as an indication of what documents the historian should look for. An article written in the 1890's describing a settlement does not provide primary evidence for circumstances in 1810, or in 1840. Residential patterns, population, and economic circumstances may have changed drastically in the interval. In the United States in the 19th century, they certainly did. No reasonable scholar would accept a description of northern New Jersey and southern New York in 1890, however accurate, as providing a description of the population distribution of the same area a half-century earlier.

**Evaluation of folkloric material.** In addition to keeping a close focus on chronology, both of the events under study and of the documentation pertaining to those events, the historian needs also to investigate the possible folkloric component in the written record. Researchers, while

14

Technical Report, Ramapough Mountain Indians, Inc.

utilizing oral tradition, remain aware that it cannot be
accepted without independent confirmation:

> Consider the sort of inquiry that leads to the
> exploding of a legend.  Legends abound and flour-
> ish despite the verifiers.  But this does not
> lessen the importance of verification, . . . .
> (Barzun and Graff 1970, 116).

A recent, excellently documented, example of the deconstruc-
tion of such a very elaborate historical legend, which had
previously been accepted by both state-issued materials and
National Park Service materials, is Carl A. Brasseaux's
tracing of the development of the Acadian "Evangeline" myth
in Louisiana (Brasseaux 1988).[5]  Analysis of this type of
historical legend reinforces the researcher's awareness that
when one secondary source simply quotes a prior secondary
source, or compiles information from several prior secondary
sources ("scissors and paste history"), without having done
independent research, this repetition in no way adds to the
weight of the evidence.

Manuals on methodology also warn beginners explicitly that
no historical researcher can rely unquestioningly on "stan-
dard" published reference works.  For example,

> Occasionally, one of these reference works will
> unwittingly mislead, as when *Who's Who in America*
> printed in good faith the "facts" (complete with a
> Heidelberg medical degree) about a drug manufac-
> turer who was an ex-convict living under a false
> name.  Again, the nineteenth-century *Appleton's
> Cyclopaedia of American Biography* contained at
> least forty-seven sketches of persons invented by
> one or more unscrupulous contributors (Barzun and
> Graff 1970, 84).[6]

---

[5]  Examples of such historical legends are too numerous to recite:
a very familiar one is that of the alleged love affair between Abraham
Lincoln and Ann Rutledge (Angle 1929 in Winks 1970, 127-141), which also
indicates how such a legend can continue to flourish even though the
evidence is clearly against it.  See also the analysis of the Horn papers,
also republished by Winks (Middleton and Adair 1947 in Winks 1970, 142-
177).

[6]  For a fuller discussion, see Allan Nevins, The Case of the Cheating
Documents [excerpt from The Gateway to History 1962] (Winks 1970, 202).

15

Technical Report, Ramapough Mountain Indians, Inc.

Summation:

Elsewhere HONESTY may be the best policy, but in research it is the only one. Unless you put down what you find to be true with complete candor, you are nullifying the very result you aim at, which is the discovery of the past as embedded in records. You may have a hypothesis that the new fact shatters, but that is what hypotheses are for--to be destroyed and remolded closer to the reality. The troublesome fact may go against your moral purpose or prejudice, but nothing is healthier for the mind than to have either challenged. You are a searcher after truth, which should reconcile you to every discovery (Barzun and Graff 1970, 60).

## Genealogical Methodology

**Genealogical Research Methodology.** The BAR researchers follow standard genealogical research practices.

There are significant similarities between historical research methodology and genealogical research methodology, including the distinction between primary and secondary sources (Greenwood 1983, 95). Noel C. Stevenson's discussion of genealogical evidence (Stevenson 1979) indicated clearly that genealogy as a discipline is subject to all of the general cautions on the use of "evidence" discussed above as part of the section on historical methodology. For example, "compilations should be used, but only with the greatest searching scrutiny, subject always to verification of references (if any) and careful analysis of the compilers' interpretation of facts . . . ." (Stevenson 1980, 42). He noted that one recurring research hazard was:

THE PERPETUATION OF MISTAKES copied time after time and republished in genealogies and local histories throughout the years. Just because four or five family genealogies agree factually is often an indication that successive compilers borrowed from previous writers and thus perpetuated the same error or errors (Stevenson 1980, 41).

Stevenson is particularly useful for his analysis of the legal standards of genealogical evidence. While a manual such as that by Val D. Greenwood's widely used The Research-er's Guide to American Genealogy (Greenwood 1983) focused on

16

Technical Report, Ramapough Mountain Indians, Inc.

introducing the researcher to various types of records that
have been created in the past, where to locate them, how to
use them, and common hazards in interpreting them, Stevenson
concentrated on analyzing the comparative evidentiary value
of the information contained in such records:

> Evidence is simply "information."  The information
> may be correct or false, but it is that which you
> must consider in genealogical research and then
> decide whether you should accept the information
> or facts totally or partially, or reject them
> totally or partially (Stevenson 1980, 39).

The weighing of the evidence by individual genealogists is
to some extent dependent on its context (Stevenson 1980,
40).  The standards used by the BIA to evaluate evidence do
not differ from those universally accepted by genealogists.
How BAR researchers handle genealogical evidence is clear
from the precedents set in earlier BIA acknowledgment deci-
sions.  These precedents are not the product of one individ-
ual, but of peer review of the evidence.

There are two levels of genealogical methodology:  tech-
niques for locating documentation, and evaluation of the
evidence located.  While "how to do it" research manuals
train the researcher in the existence of census records, the
location of census records, how to abstract census records,
etc., this is not the end of the process.  Stevenson warned:

> The purpose of census records is not genealogical,
> therefore statements regarding relationship,
> names, ages, places of birth, etc., cannot be
> assumed to be without error.  Although records of
> birth, marriage and death disclose relationships,
> they were not prepared for genealogical purposes
> but have sociological and statistical functions
> (Stevenson 1980, 42).

Similarly, for legal purposes, Stevenson noted that many
important types of original documents may have limitations
as legal evidence:

> The custodians of official records, such as a
> clerk of the court, recorder of deeds, and others,
> simply file or record documents presented to them;
> they do not possess any personal knowledge of the
> truth or accuracy of such documents (Stevenson
> 1980, 42).

17

Technical Report, Ramapough Mountain Indians, Inc.

Even the value of eyewitness testimony depends "on the
*competency and credibility* of the witness" (Stevenson 1980,
48).

> CONCLUSIVE PROOF is not possible in genealogical
> research.  It is impossible to "prove" ancestry to
> an absolute certainty . . . .  Unfortunately,
> there are no witnesses to a birth present today to
> testify regarding a birth of a child born in 1800.
> In genealogy, since *personal knowledge* (except in
> rare instances) is lacking the rule is that ances-
> try may be established *by a preponderance or grea-*
> *ter weight of the evidence*.  This term does not
> mean physical weight, such as ten books stating
> the same facts against one book which states a
> different fact.  It means quality, not quantity.
> For example, the genealogical facts stated in a
> valid last will and testament will be considered
> very reliable and, if the ten books disagreed, you
> would reject the ten printed volumes (Stevenson
> 1980, 40).[7]

Because a positive determination in the matter of Federal
acknowledgment of an Indian tribe results in legal obliga-
tions on the part of the Federal Government, the techniques
to be used in determining the ancestry of the members of a
group petitioning under the 25 CFR Part 83 regulations must
provide a high level of evidence in the aggregate.  Unspeci-
fied "Indian ancestry" is not an adequate showing under
criterion 83.7(e):  the petitioner must document direct
ancestry from a historical American Indian tribe (or amal-
gamation of tribes) which existed at the time of first
sustained contact with non-Indian settlers.  However, the
regulations do not demand "conclusive proof" of every spe-
cific fact.

Stevenson pointed out that under the technical rules of
evidence, most available genealogical documentation is

---

[7] Stevenson is here stating a general principle:  that an original
will is normally **better** evidence than a printed, secondary, compilation.
Of course, even the "evidence" of a will may not be genealogically
accurate (Stevenson 1980, 42-43):  a man may have had what he privately
regarded as good and sufficient reason to publicly acknowledge as **his**
child an individual whom his wife had conceived by another man during the
time of their marriage.  Additional genealogical complications may be
introduced by adoptions, or by a grandfather referring to a grandchild
whom he had reared, or an uncle referring to a niece whom he had reared,
as his "child" in his will.

18

Technical Report, Ramapough Mountain Indians, Inc.

"hearsay" (Stevenson 1980, 48-49).   To quote Stevenson directly:

> There is a body of rules already in existence which applies to genealogy.  These are the rules of evidence applied in court proceedings involving pedigree, ancestry or heirship cases. . . .  If you are compiling a genealogy which will be presented in a court proceeding, careful attention to the instructions of the lawyer you are assisting is extremely important as the technical rules of evidence will be in effect (Stevenson 1980, 39).

**Specific Federal acknowledgment concerns in genealogy.**  In conducting research for Federal acknowledgment decisions, the first responsibility of the genealogist is to determine the veracity of the evidence, as discussed above.  Greenwood manual emphasizes that:

> Regardless of what you find, your first responsibility is to the truth.  A true report, regardless of the nature of the facts, is the responsibility of the genealogist as it is the responsibility of any historian or scientist (Greenwood 1983, 9-10).

However, there are some additional considerations in preparing a genealogical technical report for the BIA.  Although the standard of evidence applied in Federal acknowledgment cases is high, it does not meet the legal standard for heirship.  For example, to a strictly genealogical study, it is crucial for the researcher to determine whether John Doe is the particular John Doe who was the son of Robert Doe and Mary Ann, or the particular John Doe who was the son of Albert Doe and Mary Kay, if only because the determination of the mother opens new lines of ancestral research.

However, under 25 CFR Part 83, only American Indian ancestral lines are relevant.  If it can be shown that both Robert Doe and Albert Doe were the sons of Hubert Doe, and it is through Hubert that the tribal ancestry derived, either set of possible parents would be acceptable as John Doe's parents:  the precise parentage can be left undetermined as long as it is clear from the evidence presented that the John Doe whom the petitioning group claims as a progenitor was Hubert Doe's grandson.

However, if Hubert Doe and his wife were Scottish, Mary Ann was Ottawa, and Mary Kay was Filipino, it is necessary that the genealogist determine the precise parentage of John Doe,

19

Technical Report, Ramapough Mountain Indians, Inc.

if the petitioner's members are claiming American Indian
ancestry through him.  The dispositive question is:  is this
genealogical fact relevant to a determination of whether or
not the petitioning group meets the criteria?

### Specific Aspects of the Proposed Finding

**The evaluation of David Cohen's research.**  The RMI Response
to the Proposed Finding stated that:

> BAR chose to follow Cohen's [David Cohen] bizarre
> theory (*i.e.* that the Ramapough have no Indian
> ancestry, but are descended solely from Afro-Dutch
> pioneers) blindly and used his work as the center-
> piece of its Proposed Findings (RMI Response
> A-15).

The work of David Cohen, which did discuss evidence perti-
nent to the issue of social community for the (RMP), was
evaluated in the same manner as all material that is pre-
sented as evidence.  The BAR researchers read the book, The
Ramapo Mountain People (Cohen 1974), carefully evaluated the
methods used in gathering the data presented, and questioned
the assumptions.  The BAR staff conducted additional re-
search to verify or reject the conclusions he reached.  The
book was not accepted uncritically (RMI Response A-15).
Points of disagreement with Cohen were specified in the
historical, anthropological, and genealogical reports that
accompanied the Proposed Finding.  Consider, for example,
the following excerpts from the Historical Technical Report:

> The culturally Dutch settlers of southeastern New
> York and northeastern New Jersey included a number
> of families who were in part of African ancestry.
> In 1974, David Steven Cohen, in his book The Ram-
> apo Mountain People, made an effort to link the
> modern RMI community with these Afro-Dutch pio-
> neers (Cohen 1974, 25-42).  His efforts at making
> the linkages were not fully successful, as demon-
> strated by the following analysis of possible RMI
> ancestry (RMI PF, Historical Technical Report,
> 14).

> Cohen's research on the ancestry of the de Vries
> family of the Tappan Patent, however, has not
> significantly advanced an understanding of RMI
> ancestry.  Further research indicates that the

Technical Report, Ramapough Mountain Indians, Inc.

> Tappan Afro-Dutch family died out in the male line
> (RMI PF, Historical Technical Report, 16).

The Proposed Finding attempted to provide a full analysis of
Cohen's book. It was taken seriously, as the only book-
length monograph on the RMP based on extended fieldwork. In
the interest of scholarly objectivity and fair-mindedness,
it was not excluded from consideration, even though it is
evidence which petitioner finds offensive or with which the
petitioner disagrees.

In the final analysis, Cohen's book was not pivotal in the
evaluation of the RMI petition (RMI Response, A-15; see
also, Shapard to Ada Deer 1995/7/5, RMI Response Ex. 13).
The BIA continues to agree with Cohen's conclusion regarding
the lack of primary source evidence for Indian ancestry
among the RMI. This conclusion is not based on an uncriti-
cal acceptance of Cohen's work, but on the BIA's own analy-
sis of data presented by the petitioner and data found by
BIA staff.

The research conducted by the BIA anthropologist did not
produce evidence that established social or political conti-
nuity of the RMI with an Indian tribe from colonial times to
1870. The anthropologist also found the evidence for social
community and political leadership among the RMI to be much
less convincing for the period from 1950 to the present,
though anecdotal evidence was found during the research trip
and noted. This is also consistent with the recommendation
in this Final Determination.

**Anthropologists and the origins of the RMI.** The writings of
anthropologists who have written about the RMI's ancestors
were also considered carefully. The early twentieth century
articles and correspondence by archaeologist Max Schrabisch
and ethnographer Frank Speck assumed that the RMI's ances-
tors were part Indian, but their work was not based on any
primary source documentation, or historical research of any
kind (Schrabisch 1909, 1919, 1922; Speck 1908a, 1908b,
1911). Consider the opinion of Julian Salomon, a local
historian:

> From his reading, Schrabisch knew that the Tusca-
> rora Iroquois had been driven by the settlers from
> their homeland in North Carolina and in a long
> series of migrations had come north to join the
> main body of Iroquois in central New York. Yet he
> never produced a shred of archeological evidence
> to prove Tuscarora presence at the site on the

Technical Report, Ramapough Mountain Indians, Inc.

Ramapo River; neither has anyone else (Salomon
1982, 65).

Speck only cited "local tradition" as the source of his
information on the Indian ancestry of the RMP.  The same is
true of the articles written by William Harlen Gilbert on
what he considered "tri-racial" groups in the United States
(Gilbert 1946, 1947, 1948).  Their ascriptions of specific
tribal ancestry varied widely and were not based on any
reliable evidence.  They were repeating the widely held
belief of the non-RMI inhabitants of the Mahwah area regard-
ing the people who inhabited the Ramapo Mountains.

Assertions of Indian ancestry, among other ancestries, for
the RMI began in the late 1800's and gradually grew into the
"Jackson White" legend (see the lengthy analysis in the RMI
PF).  An elaborated version of the folk legend was printed
by J.C. Storms in the 1930's, and became accepted by local
non-RMI as history.  As shown by a number of researchers
(Merwin 1963, Stamato 1968, Cohen 1974, and the RMI PF), the
legend was not founded on fact or evidence of any kind, and
reflects the racial prejudice that existed (and still ex-
ists) against the Ramapo Mountain People in the local area.
In general, the petitioner agrees with and applauds the
search for primary sources that has debunked the racist
views in the Jackson White legend (RMI Response A-12).
These same historical research and evidentiary standards are
used regarding Indian ancestry.

The petitioner asserts that they are entitled to the assump-
tion that the RMI descend from the Munsee Indian tribe.
This is based on the following argument:

1. Some of the Munsee Indians inhabited the region around
the Ramapo Mountains at the time of first sustained contact
with non-Indians;
2. It has been asserted, since 1870, that some of the RMI
ancestors were descendants of a variety of Indian tribes;
3. Today, the RMI live in the Ramapo Mountains;
4. Therefore, the RMI are Munsee descendants.

This seems to be the same assumption underlying the opinion
of archaeologist Herbert C. Kraft.  In his book, The Lenape:
Archaeology, History and Ethnography, Kraft stated his
opinion that the RMI descended from the Delaware Indians who

22

Technical Report, Ramapough Mountain Indians, Inc.

remained in the region after most of the Delaware Tribe was
removed to the west as follows:

> The origins of these people are very controver-
> sial, but it is clear, that some are descended
> from local Munsee-speaking Indians who moved into
> the isolated Ramapo Mountains seeking a haven from
> the Dutch and English settlers in the latter half
> of the seventeenth century.  They were joined
> later by multiracial settlers of varied back-
> grounds who intermarried with the Indians (Kraft
> 1986, 241-242).

Dr. Kraft also wrote that "Indians doubtless also remained
undisturbed, in relatively isolated parts of the Ramapo
Mountains, in the New Jersey Pine Barrens, and in other
places where they perpetuated some of their ancestral ways"
(Kraft 1995/6/19, RMI Response Ex. 1, 2).* Yet in his
letter to George N. Rover, Deputy Attorney General of New
Jersey, Kraft stated that he had, "limited knowledge of
these specific peoples" (Kraft 1995/6/19, RMI Response Ex.
1, 1-2).  And again, Kraft said:

> At no time did I profess an in-depth knowledge
> concerning the Ramapough Mountain Indians.  My
> expertise is in prehistoric archaeology and in the
> Indian/European contact period; I have no training
> in or expertise as a genealogist and only limited
> experience as an ethnologist . . . ." (Kraft 6/19/
> 1995, RMI Response Ex. 1, 1-2).

Neither the letter nor the book included any references to
evidence considered by Dr. Kraft in concluding that Indians
generally had continued to live in the Ramapo Mountains
around Mahwah.  He also cited no evidence supporting his
conclusion that the RMI were descendants of the Munsee.  It
must, therefore, have been an assumption on his part.

---

* Archaeologist Edward Lenik made a similar argument in his letter
(Lenik 1995/6/20, RMI Response Ex. 12).  This line of argumentation is
consistent with the theory of Mexican anthropologist, Gonzolo Aguirre
Beltran, who wrote a book called <u>Regions of Refuge</u> (Aguirre Beltrán 1963).
His theory is that indigenous people tended to end up living in marginal,
less desirable areas (mountains, deserts, etc) after the arrival of
Europeans in the Americas, due both to pressure from the Europeans and
because the Indians wanted to be left alone so that they could preserve
their way of life.  The problem is that there is no primary evidence
supporting this theory in the case of the RMI.

Technical Report, Ramapough Mountain Indians, Inc.

A problem with the petitioner's analysis is precisely in the assumptions that it makes, assumptions that cannot be made by the BIA in the context of Federal acknowledgment decisions. Given the very fluid social and political situation during and after the colonial period, most specifically the voluntary and forced resettlement of Indian groups and the migration of isolated Indian individuals and families, in the absence of primary source evidence, Indian ancestry or tribal origins of the RMI or any other petitioner cannot be assumed. Added to this fluid social situation is the evidence that most Indian tribes were removed from New Jersey soon after the Treaty of Easton. There is little evidence for any Indian communities in northern New Jersey after that time, although there were some individual Indians left in the area after the treaty was signed. The Appendix to the RMI Response included a reference to Catoonah (Rockwell 1927), with no explication of its significance to the petitioning group; see the evaluation of evidence concerning Catoonah, the "Ramapoo sachem" from Connecticut, in this technical report under criterion 83.7(a).

The only citation that might be construed as primary evidence for a continuing Indian community in the Ramapo Mountains was found in a letter of the French naturalist Victor Jacquemont, which he wrote from the Mahwah area in 1827 (Chinard 1959; see also translation by Christine Jones, RMI Response, Appendix). Although the RMI Response states that Jacquemont was definitely referring to the RMI ancestors, it is not certain that this was the case. In his letter, Jacquemont did not give the names of any of the mixed-blood Indians to whom he referred. He gave no specific information regarding the location of the Indians' homes, and he did not refer to the Indians as a community or give any characteristics of their living places that indicated they were a community. There was no other information in his letter which can be used to further identify the Indian descendants to whom he referred. With these limitations, and without corroborating sources, this letter is inadequate to establish Indian ancestry, community, and a tribal linkage for the RMI.

Some third party comments on the RMI Proposed Finding subscribe to the theory that the RMI descend from multiple Indian tribes. The petition materials submitted by the RMI alternated between assertions of Munsee ancestry on the one hand, and multiple tribal ancestry on the other, in an attempt to accommodate conflicting data contained in the various unsubstantiated assertions about the RMI's tribal origins since the late 1800's. Field data collected under

24

Technical Report, Ramapough Mountain Indians, Inc.

contract with the BIA indicated that different individual RMI members claimed that their Indian ancestry came from a variety of tribes (BAR FD 1993). Examples of the third party comments that referred to the hypothesis of multiple tribal origins for the RMI include the following.

Linda Stamato stated:

> The Algonquin and Iroquois Confederacies, consisting of several sub-tribes among which were the Lenni-Lenape, Tappan, Haverstraw and Tuscarora, have generally been regarded as the primary groups constituting the Ramapo Mountain people . . ." (Linda Stamato, letter, dated July 3, 1995, RMI Response Ex. 11).

The comment by Ms. Stamato accurately reflects what has been printed about the RMI's ancestry since the late 1800's. As the Jackson White legend grew from the late 1800's to the 1950's, a number of assertions about possible tribal origins were made. Eventually it became "common knowledge" that the RMI's Indian ancestry came from more than one tribe. The folk legend version of RMP origins was never questioned until the 1970's research of David Cohen.

Dr. Christine Grabowski stated:

> The second problem with BAR's handling of the Ramapo [sic] petition stems from its misinterpretation of its own codified regulations. Although criterion (e) clearly states that a petitioner's membership must include those who descend "from a historical Indian tribe or from historical Indian tribes which combined and functioned as a single autonomous entity," BAR ignored substantial historical and anthropological documentation that the Ramapo [sic] are descendents of the remnants of several Indian tribes and groups who at one time inhabited the southern New York-northern New Jersey regions (Grabowski 1995/7/6, RMI Response Ex. 15).

The finding of the AS-IA was that no acceptable, reliable documentation, whether historical, anthropological, or genealogical, demonstrated that the RMI descend from a historical American Indian tribe or tribes which amalgamated and functioned as a single unit. The technical reports noted that since 1870, there had been repeated attributions of Indian ancestry for the RMP by journalists and local

Technical Report, Ramapough Mountain Indians, Inc.

residents, and later by anthropologists, historians, geneal-
ogists, social workers, and medical doctors. These were
analyzed in the Proposed Finding and rejected as unsubstan-
tiated assertions. Unsubstantiated assertions are not the
same as reliable evidence. The "substantial historical and
anthropological documentation" (Grabowski 1995/7/6, RMI
Response Ex. 15) includes only one primary source (the
letter of Victor Jacquemont) and thus does not establish a
"reasonable likelihood" of tribal descent.

The inclusion in criterion 83.7(e) of the qualification
concerning tribes which have combined and functioned as a
single tribal entity applies to tribes, not individual
Indians. The BIA has found no primary source evidence for
an amalgamation of tribes to which the RMI can trace their
ancestry and social community. Neither has the BIA found
any evidence that individual Indians from a variety of
tribes settled in the Mahwah, New Jersey, area, and over
time came to form a single Indian community. The petitioner
has not presented any primary source evidence that such a
settlement of Indians from several tribes ever developed in
the vicinity of Mahwah. Even if there were evidence of such
a community, it would still not meet the requirements for
criterion 83.7(e). The provision of the criterion concerns
the amalgamation of tribes, not individual Indians. If
there had been evidence presented that two or more tribes
joined forces politically or socially, and that the RMI were
the descendants of this newly amalgamated tribe, this evi-
dence would have been evaluated by the BIA under criterion
83.7(e). No such primary evidence was presented.

**Blood quantum, phenotype, and the acknowledgment criteria.**
Herbert Kraft stated, as many people have done before him,
that he perceived that some of the RMI had the physical
features of Native Americans: "... I knew some of the
members of the RMI group who also impressed me with their
phenotypic Indianess" (Kraft 1995/6/19, RMI Response Ex. 1,
1). A similar opinion was expressed by Thomas C. France in
his letter to Ronald Van Dunk (France 1995/6/12, RMI Re-
sponse Ex. 22). Many other outside observers for more than
a century have made similar statements regarding the physi-
cal appearance of some of the RMP. The physical appearance
of some of the "Jackson Whites" was the grounds for the
Vineland Study's assertion that they had Indian ancestry.

The RMI Response stated that "BAR policy" was based on
racist principles. They, along with several third parties,
commented that the BAR (as distinct from the BIA) seemed to
have a standard of "racial purity" for demonstrating Indian

26

Technical Report, Ramapough Mountain Indians, Inc.

ancestry.  This is not the case.  The Federal regulations governing acknowledgment (25 CFR Part 83) do not include physical appearance as evidence demonstrating that a person has or does not have Indian ancestry.  Such principles are not applied by the BIA researchers in evaluating petition evidence.

The BIA does not use the concept of phenotype in its evaluation of petitions.  There are several practical reasons why phenotype is not included in the regulations as evidence under the seven mandatory criteria.  Requiring people to "look Indian" would be a subjective standard, based on personal perceptions of selected physical features usually used in racial typologies (for example, copper colored skin; long, straight black hair; and high cheek bones).  It would be impossible to implement such a standard because of the fact that intermarriage between some American Indians and non-Indians did occur.

Also, the migration of individuals from Indian groups outside the territorial boundaries of the United States, who were not from tribes whose aboriginal territory lay wholly or partly within what is now the United States, could account for a stereotypical "Indian" appearance within an isolated group.  Marriage into a group of non-Indians by such immigrant individuals who are not North American Indians as defined by the 25 CFR Part 83 regulations would clearly not entitle the group into which they married to Indian tribal status under the criteria established by the Federal government.

The RMI Response stated:

> Indeed, the outrageous standard uniquely designed for the Ramapough by the BAR staff (i.e., "part-Indian" means "non-Indian") [emphasis in original] could not be met by those tribes already recognized (RMI Response A-3).

No such standard was imposed in the RMI case.  Previous Federal acknowledgment decisions clearly show that intermarriage with non-Indians is not a barrier to Federal acknowledgment.  However, primary source documentation of descent from known American Indian ancestors, rather than phenotype or tradition, must demonstrate descent from a historical Indian tribe.  Unsubstantiated attributions of blood quantum and descriptions of physical appearance cannot be used to establish the specific tribal origin of a petitioner.  The

27

Technical Report, Ramapough Mountain Indians, Inc.

essential element is tribal entity, not individual pheno-
type.

A similar concern was expressed by anthropologist Dr. Susan
Greenbaum:

> There are very disturbing aspects of the Ramapo
> [sic] decision, and the language contained in the
> declination. The alleged racial identity of the
> members of this community, in which African ances-
> try appears to invalidate claims of Indian ances-
> try, is dangerously inconsistent with the legal
> meaning of federal [sic] Indian status. If the
> existence of other ancestries were considered
> sufficient to deny recognition, no tribes would be
> recognized. It matters not at all if in-marrying
> ancestors were European, African, Asian, Austra-
> lian, or from any other continent (Greenbaum 1995/
> 6/24, RMI Response Ex. 14).

Previous BIA decisions have extended Federal acknowledgment
to petitioners with mixed racial heritage (in all of the
following combinations: Indian and European; Indian and
African; Indian, European, and Asian; Indian, European, and
African). The presence of mixed racial ancestry in a group
does not rule out the possibility of Federal acknowledgment
for a petitioner. However, failure of a petitioner to
document Indian ancestry and demonstrate descent from a
historical tribe, as in the case of the RMI, does eliminate
the possibility of acknowledgment.

Dr. Greenbaum indicated that in the Proposed Finding:

> The apparent emphasis on African ancestry overrul-
> ing Indian ancestry can only be interpreted as a
> vestige of the racist notion that "one drop" of
> black "blood" defines an individual as Negro
> (Greenbaum 1995/ 6/24, RMI Response Ex. 14).

The point of difference between the BIA's position and that
of Dr. Greenbaum is not acceptance or rejection of the "one
drop rule." Rather, when considering the establishment of a
government-to-government relationship with a petitioner, the
BIA cannot accept "claims of Indian ancestry" (Greenbaum
1995/6/24, RMI Response Ex. 14) as proof of Indian tribal
ancestry dating back to the time of first sustained contact
with non-Indians.

28

Technical Report, Ramapough Mountain Indians, Inc.

Dr. Greenbaum made an assumption that there once existed an ancestral tribal American Indian community from which the RMI descend, and that Europeans and Africans married into this ancestral tribal community: "It matters not at all if in-marrying ancestors were European, African, Asian, Australian, or from any other continent" (Greenbaum 1995/6/24, RMI Response Ex. 14). However, she presented no primary source documentation of the existence of such an ancestral tribal community. Without acceptable, primary source evidence for ancestry from a historical tribe, or tribes which amalgamated and functioned as a single political entity, the BIA cannot assume Indian ancestry or tribal origin. This has been the standard used by the BIA under the 1978 regulations, and continues to be so under the 1994 revised regulations.

If there had been specific evidence linking the RMI to the "mixed blood" Indians spoken of by Victor Jacquemont in 1827, or any known Indian entity, the recommendation on criterion 83.7(e) in the RMI Proposed Finding may have been different. However, no evidence linking the RMI to a historical Indian tribe was submitted by the petitioner or found by the BAR researchers.

**The process for writing technical reports for proposed findings.** The RMI Response indicates that the BAR anthropologist said that "if it were up to *him* they [i.e., the RMI] would be **recognized** [emphasis in original]" (RMI Response B-5). The BAR anthropologist did not make such a statement. The same paragraph states that the anthropology report "was originally written to find in favor of recognition and later was edited to change the outcome" (RMI Response B-5 - B-6). This is not true. An anthropologist went to the RMI area to conduct fieldwork in 1993, for the specific purpose of researching "modern community." Specifically, the research was to focus on the continuing existence of social community and political leadership among the RMI, mainly during the period from around 1960 to 1993.

The RMI council members and their representatives were told by the BAR in technical assistance meetings that the biggest hurdle the RMI faced with the BIA was the lack of evidence for Indian ancestry and continuity with a historical Indian tribe. The evidence available at the time of the Proposed Finding (the documentation submitted in the petition materials and the BIA field research) demonstrated the reasonable likelihood that there was a distinct social community based in the three traditional RMP settlements (Mahwah/Stag Hill, New Jersey; Hillburn, New York; and Ringwood, New Jersey),

Technical Report, Ramapough Mountain Indians, Inc.


from around 1850 to 1950.'  The Proposed Finding was favor-
able regarding the existence of a distinct community (25 CFR
83.7(b)) and maintaining political authority (25 CFR 8-
3.7(c)) from about 1850 to 1950, and the Anthropological
Technical Report reflected that.  The recommendation to the
AS-IA was consistent with the anthropological technical
report that accompanied the Proposed Finding.  This Final
Determination is also consistent with the Proposed Finding
anthropological technical report.

The RMI Response has suggested that the anthropological
technical report was written to "favor" recognition.  This
revealed two misunderstandings concerning the purpose and
character of the technical reports.  First, contract employ-
ees, such as the anthropologist in this case, are not hired
to make recommendations on Federal acknowledgment cases or
comment on their merits.  The contractor's role is limited
to objectively reporting the data that he or she collects.
For the anthropologist, this data concerns the maintenance
of social community and the exercise of political authority.

Second, the technical reports are not written to favor or
disfavor the acknowledgment of a particular petitioning
group.  The technical reports are a summary of all the
evidence discovered during the petition evaluation process.
The argument for or against extension of Federal acknowledg-
ment to the petitioner is contained in the Summary Under the
Criteria.  It is this part of the proposed findings and
final determinations issued by the AS-IA that weighs the
evidence and analyzes the significance of the data under 25
CFR Part 83.  In keeping with this pattern, the Anthropolog-
ical Technical Report was not written to "favor" acknowledg-
ment of the RMI, nor was it written to "disfavor" acknowl-
edgment.

**The RMI and social discrimination.**  One third party com-
menter on the RMI Proposed Finding, Maia Wojciechowska,
suggested that the RMI had been discriminated against for a
long time and should therefore be recognized.  She wrote, in
part:

> I know the Chief and many of the members of the
> Council, and in all the years that I had known
> them there had been a single minded desire for

---

' In the process of evaluating the petition, the historian found
evidence that refined the date at which the RMI community started living
on the Houvenkopf to around 1870, rather than 1850.

30

Technical Report, Ramapough Mountain Indians, Inc.

recognition for the sake of pride as much as any-
thing else.  I've lived around these parts for
over forty years and have seen how very much these
people suffer from local prejudice and disdain.
Their recognition is, I believe, not only their
right but a matter of their survival (Wojciechow-
ska 1995/6/6, RMI Response Ex. 8).

The Proposed Finding discussed the fact that the RMI and
their ancestors had been discriminated against in the past,
and that this discrimination continues at present.  In the
Proposed Finding, this was treated as supporting evidence
for the petitioner having a distinct community under crite-
rion 83.7(b).  The fact that the petitioner has been dis-
criminated against in the past and in the present, however,
does not mean that they meet the requirement for continuous
existence as an Indian tribe from first contact with non-
Indians to the present.  The 25 CFR Part 83 regulations do
not provide for acknowledging a petitioner as an Indian
tribe based on the presence of racial discrimination alone.

**The responsibility of the BAR and the roles of research team
members.**  The BAR prepared the technical reports which
accompanied the Proposed Finding.  The BAR has also prepared
this technical report which accompanies the Final Determina-
tion.  The report is based on both information submitted by
the petitioner and research conducted by the BAR.  This
research is conducted as part of the evaluation of data
included in the petition, the RMI Response, substantive
comments from informed and interested parties, and the
petitioner's response to comments from third parties.

The historian, the genealogist, and the anthropologist each
have a specific role in the petition evaluation process.
While each team member has primary responsibility for evalu-
ating certain kinds of data, the team members work coopera-
tively and share data that may be relevant to their respec-
tive tasks.  Team members also share their thoughts about
how to evaluate and interpret data during the evaluation
process.

In light of some of the letters submitted in the "Response
to Comments" by the RMI, it should be stated that cross-
qualification among the disciplines is not required in the
BAR job descriptions.  For example, there is no expectation
that the historian should also have an advanced degree in
anthropology, or that the anthropologist should have also
obtained genealogical certification.  Nevertheless, the BAR
is fortunate to have some professional staff members who are

31

Technical Report, Ramapough Mountain Indians, Inc.

professionally trained and experienced in more than one discipline.

Role of the BAR historian.

> . . . the historian recognizes that his first duty is to be sure of his facts, let their meaning be what it may . . . To establish the facts is always in order, and is indeed the first duty of the historian . . . . (Becker 1932 in Winks 1970, 17-18).

It is the additional duty of the BAR historian to present the facts so that the AS-IA may functionally use the technical report as a basis of a determination as to whether or not the petitioner qualifies for Federal acknowledgment as an Indian tribe under 25 CFR Part 83: the data presented must be relevant to and focused on the criteria.

The historical technical report is not intended to explore all facets of the petitioner's history or produce a comprehensive study of all facets of the development of the petitioning group through time. It necessarily concentrates on establishing those facts and determining those aspects of the petitioner's history which are pertinent to formulating a decision on Federal acknowledgment.

The RMI Response indicated that the BAR researchers did not research historical land deeds "to determine the exact locations of RMI families" in the course of evaluating the RMI petition (RMI Response, B-11). According to the regulations, it is the responsibility of the Federal Government to verify and evaluate what the petitioner submits, not to conduct research for the petitioner. As stated in the regulations:

> The Department shall, upon request, provide petitioners with suggestions and advice regarding preparation of the documented petition. The Department shall not be responsible for the actual research on behalf of the petitioner (25 CFR 83.5(c)).

As part of the technical assistance process, the BAR did recommend deed research to the RMI. For the preparation of the Final Determination, BIA researchers did obtain and review a recently published book of abstracts of Bergen County, New Jersey, deeds (Davis 1995). No relevant evidence was identified from this additional source.

Technical Report, Ramapough Mountain Indians, Inc.

Role of the BAR anthropologist.  The role of the anthropologist is to evaluate evidence in the petition concerning the maintenance of social community and the exercise of political authority by the petitioner.  The anthropologist also supplements the research of the petitioner, as may be necessary to verify and evaluate information in the petition. This is done through archival research as well as conducting field research using standard anthropological research techniques.  The focus of the anthropological field research is usually on the petitioner's "modern community."  "Modern community" is used as an analytical term to designate, roughly, the last 20 to 40 years, depending on the historical circumstances of the petitioner.  The anthropologist works cooperatively with the genealogist and the historian on interpreting data for the period from first sustained contact with non-Indians to the present.

Role of the BAR genealogist.  The BAR genealogist is required to evaluate and verify the petitioner's documentation, and to apply the unique characteristics of the genealogical discipline to research additional records as needed and analyze available evidence.  The genealogist is responsible for evaluating the evidence to determine if the petitioner's membership descends from a historical tribe of American Indians.  This is done using standard genealogical research methods beginning with the current generation, using primary documentation and reliable secondary evidence to identify each preceding generation back through time to a historical Indian tribe.

The genealogical technical report reflects the nature of the evidence as it relates to the petitioner and focusses on criteria 83.7(d), 83.7(e), and 83.7(f) to complement, but not overlap with, the reports prepared by the historian and anthropologist.

### Preparation of the Final Determination

Efforts of the BIA to supplement the petitioner's research. Under the regulations, the AS-IA has the option of conducting additional research if necessary to evaluate and supplement the record (83.10(1)(1)).  Several sources were suggested to the petitioner by the BIA as avenues of research in technical assistance letters, technical assistance meetings, and the Proposed Finding itself.  To ensure that obvious sources had not been overlooked, the BAR conducted additional research both in the field and in repositories in the Washington, D.C. area.  The research focused on locating

33

Technical Report, Ramapough Mountain Indians, Inc.

the ancestors of the earliest proven RMI progenitors, on
evaluating possible sources at Rutgers University, and on
identifying any additional sources that might prove that a
historical tribe had remained in the Ramapo Mountain area
after 1758 and that the RMI descended from any such remain-
ing tribal entity.

The BAR conducted field research at the Rutgers University
Library Special Collections and the Reformed Church in
America Archives in New Brunswick, New Jersey; the Johnson
Free Public Library in Hackensack, Bergen County, New
Jersey; the Orange County, New York Genealogical Society;
the Orange County, New York Courthouse; and the Goshen, New
York, Town Historian's office.

Daniel DalCais submitted an informed party comment that
suggested several sources that might be profitably pursued
for information on the RMI during the crucial period before
1820 (DalCais to BIA 1995/4/19).   In response to his sugges-
tion, the BAR researchers visited the Special Collections at
Rutgers University's Alexander Library during the field trip
undertaken in August 1995, guided by a priority list pre-
pared from Donald A. Sinclair's A Guide to Manuscript Dia-
ries and Journals in the Special Collections Department
Rutgers University (Sinclair 1980).   DalCais' letter
listed as sources "requiring review" the following diaries
and journals:

    Joseph Bloomfield, 1703-1792
    Lucy H. Eddy 1796-?
    Samuel Kirkland 1741-1808
    John Neilson 1745-1833
    George Reyerse [sic] 1703-1792
    Peter Thompson 1802-1845

The majority of the diaries and journals listed by DalCais
(DalCais 1995) were determined to be irrelevant to the RMI
petition.  The Joseph Bloomfield journal applied to New
York's Mohawk Valley in 1776, rather than to the Ramapo
Mountain region (Sinclair 1980, 11).  The diary of Lucy H.
Eddy, who was born in 1796, was written by a member of the
Society of Friends who lived in Rahway, Essex County, New
Jersey, and in New York City:  it covered her "household,
social, and religious life," including visits to Hyde Park,
New York, and to Elizabeth, New Jersey (Sinclair 1980, 20).
The missionary journal of Samuel Kirkland pertained to his
work among the Oneida Indians in central New York in 1803-
1804 (Sinclair 1980, 15), a date earlier than any collateral
relatives of the petitioner's ancestors are known to have

34

Technical Report, Ramapough Mountain Indians, Inc.

settled near the Onondaga reservation.  The travel journal
of Peter Thompson was a description of a trip taken from New
York City to Michigan, returning to Readington, New Jersey,
in 1828;  Thompson's itinerary did not include the Ramapo
Mountains (Sinclair 1980, 19).  The John Neilson travel
journals covered trips from New Brunswick, New Jersey, to
Albany, New York, in 1795 (Sinclair 1980, 14).

The BIA historian reading the full diary of George Ryerse
(Sinclair 1980, 9), a surveyor for the Board of Proprietors
of East Jersey in the second half of the 18th century, since
Ryerse's work focused on the "Ramapo Tract."  Photocopying
from this manuscript was not permitted by Rutgers.  Through-
out Ryerse's work in surveying and collecting rents from
numerous named tenants on the Ramapo Tract from the period
1752 to 1771, he made no mention of encountering Indians
within the area,[10] which contained "66 square miles, and
comprised the present townships of Franklin, Hohokus, and
Ridgewood, with part of Orvil in Bergen County," in addition
to some territory within modern Passaic County, New Jersey,
and Rockland County, New York (Rankin 1932).

The only references to previous Indian occupation of the
region were as follow.  On August 10, 1753, Ryerse mentioned
a piece of "cleared land that one Gerrit accerman [sic] laid
claim to by & [sic, "an"] Indian Deed" (Ryerse 1771, [6r]).
On May 1, 1766, he surveyed to the old Indian fields in the
vicinity of Mahwah:  "we . . . toke our Courses from the one
top of the mountain to & other and Run that Day so far as
above that place Called mawier where the indian field had
binn" (Ryerse 1771, [47v]).  This 1766 reference used the
past perfect tense ("had been") to refer to the Indian field

---

[10]    Testimony taken in 1785 to determine the boundaries of the
Wawayanda and Cheesecocks Patents in Orange County, New York, contained
one statement that at some unspecified time in the past, when William
Thompson, age 62 in 1785, had served as a chain bearer with Col. Clinton
in surveying the Cheesecocks Patent, they lodged one night in a wigwam
near Wickhams Pond, saw the Indians, and talked with them (Proceedings to
Determine Boundaries 1915, 14).  Other testimony indicated that the survey
for the Cheesecocks Patent was made in the period from 1735 to 1747
(Proceedings to Determine Boundaries 1915, 18), or 1735 to 1738 (Proceed-
ings to Determine Boundaries 1915, 23).  There is no demonstrated
connection between the Indians referred to in this testimony regarding the
Cheesecocks Patent and the RMI petitioner.
    Generally speaking, the extensive testimony in these proceedings
indicates that the Ramapo Mountain region was well known and frequently
travelled by non-Indians in the 18th century.  Therefore, the lack of
reference to Indians in the area tends to confirm that they had left the
region.

Technical Report, Ramapough Mountain Indians, Inc.

at Mahwah, indicating that the site was not inhabited by Indians at the time of his writing, but had been in the past. In fact, this well-known, early 18th-century Indian archaeological site near Mahwah was discussed in the Proposed Finding (RMI PF, Historical Technical Report 13; RMI PF, Anthropological Technical Report 7). There is no demonstrated connection between this archaeological site and the petitioner.

DalCais also referred to manuscripts written by the eighteenth century Moravian missionaries C. Heckewelder, C.J. Loskiel, C.D. Rauch, and D. Zeisberger, and the diary of Presbyterian missionary David Brainerd, as being of special interest, since all of these men worked with the Lenape Indians. The Moravian records which DalCais recommended for consultation--Heckewelder, Loskiel, Rauch, and Zeisberger (DalCais 1995)--did not pertain to the region of Bergen and Passaic Counties, New Jersey, or Rockland and Orange Counties, New York. The Moravian missionary work among the Indians during the 18th century was focused in Pennsylvania and, to a lesser extent, in Ohio and Indiana.

Although the Moravian records did not pertain to the petitioning group, the BIA historian did additional research to determine whether or not additional church records from the second half of the 18th century and the 19th century for the region of northeastern New Jersey and southeastern New York, which might provide insight into the antecedents of the RMI petitioner, still existed, beyond those which had been used in preparation of the Proposed Finding. This involved consultation of Leiby's The United Churches of Hackensack and Schraalenburgh New Jersey 1686-1822 (Leiby 1976), Old Paramus Reformed Church, Ridgewood, New Jersey (Old Paramus 1975), and Randall Balmer's A Perfect Babel of Confusion: Dutch Religion and English Culture in the Middle Colonies (Balmer 1989). While these provided insight into the congregational development and expansion of the Dutch Reformed and Lutheran denominations in the area, none of these historical works indicated that the churches hold records beyond those which have been abstracted and published. Neither did the Reformed Church in America Archives located at the Sage Library, covering congregational records and transcriptions of congregational records, indicate the existence of extensive additional relevant Dutch Reformed Church parish-level documents (Gasero 1991).

The journal of Presbyterian missionary David Brainerd, and monographs on his career, had already been consulted for the Proposed Finding (Edwards 1822). Aside from the fact that

36

Technical Report, Ramapough Mountain Indians, Inc.

David Brainerd worked in central New Jersey rather than in northern New Jersey, the comparatively early date of his death (October 9, 1747) meant that most of his records were not critical to an analysis of the development of the petitioning community. The Proposed Finding did not question that Indian groups remained resident in New Jersey until the Treaty of Easton era, nor did it question the continuation until a later date of Brainerd's Brothertown settlement in central New Jersey (RMI PF, Historical Technical Report 7-9). The BIA, however, was unable to determine any connection between this well-documented historical group and the antecedents of the RMI petitioner. Neither David Brainerd nor his younger brother, John Brainerd, who also acted as a missionary to the Indians in New Jersey and New York, made mention of individual Indian families or of a tribe of Indians in the Ramapo Mountains (Sherwood 1884; Presbyterian Publishing Committee 1865; Presbyterian Board of Publications 1843).

Additional church record transcriptions which were located and consulted during the field trip did not provide relevant information to the RMI petitioner (True Dutch Reformed Congregation n.d.; Burman 1981), with the significant exception that BAR researchers located, in the holdings of the Orange County Genealogical Society, Goshen, New York, an indexed photocopy of the manuscript register of the Ramapo Presbyterian Church (Ramapo/Hillburn/Brook Chapel) of Rockland County, New York, covering the years 1868-1918 (Ramapo Presbyterian Church Register 1994).

According to the introduction by Marjorie Smeltzer-Stevenot, the Ramapo Presbyterian Church was begun 1810 by Jeremiah H. Pierson and associates at Ramapo Works and was dedicated in 1812. From 1841 to 1846 it was served by the pastor of the Lutheran Church at Saddle River, New Jersey. From 1851 to 1857 the pulpit was generally supplied by the pastor of the Dutch Reformed Church in Mahwah. As far as is known, there is no church register for the period 1812 to 1857. The Ramapo Presbyterian Church closed in 1857 and reopened in 1862. In 1893, the Hillburn Presbyterian Church (now known as Ramapo Presbyterian) was built in the center of the village (Ramapo Presbyterian Church Register 1994, ii). Concerning the discovery of the Ramapo Presbyterian Church Register for the years 1868 to 1918, Smeltzer-Stevenot wrote, "Believed 'lost' for a number of years, the Ramapo register was returned to the Hillburn church about a year ago" (Ramapo Presbyterian Church Register 1994, ii). She included a brief description of Brook Chapel:

37

Technical Report, Ramapough Mountain Indians, Inc.

Ramapo Presbyterian welcomed all races as members.
Some of the families in the mountains, who
belonged to the church, had been holding prayer
meetings in private homes.  Under the guidance of
Rev. Ford, a log chapel was built by the volunteer
labor of church members of both Ramapo and the
mountain community.  A Sunday Schol [sic] was
conducted by E. R. Pierson in homes in the moun-
tains until the log chapel opened in 1877.  Dedi-
cated in 1893, the Brook Chapel building was pre-
sided over by the assistant pastor of Ramapo.
Records of the churches in Ramapo Works, Hillburn
and Brook Chapel are included in the Ramapo Parish
register (Ramapo Presbyterian Church Register
1994, ii).

Evaluation of the details contained in the Presbyterian
Church Register relevant to RMI families appears later in
this technical report under criteria 83.7(a), (b), and (c).

The BAR researchers visited the Reformed Church in America
Archives in New Brunswick looking for original manuscripts
of early church records.  Although the Archives had a size-
able collection of published transcripts or abstracts of
church registers, those same published sources had been
previously reviewed and where appropriate, had been cited in
the Proposed Finding.  The BAR researchers did not find
additional church registers or consistory (vestry) minutes
from churches in the Ramapo Mountain region.  The BAR re-
searchers also found no new evidence from the key time
period of 1750 to 1820.

The Johnson Free Public Library in Hackensack, Bergen Coun-
ty, New Jersey houses the Bergen County Historical Society
collection.  One of the items in the collection was a re-
print of the 1876 Atlas of Bergen County, New Jersey.[11]
The atlas had one reference to possible descendants of the
Hackensack Indians, which is discussed below in the Techni-
cal Report.  This one brief reference did not name any
actual descendants of the Hackensack Indians.  It implied
that any possible connection to an Indian tribe had long
been forgotten by the people themselves.  This sketchy

---

[11]  The Atlas of Bergen County 1776 - 1876 was published by C.C.
Pease, successor to A.H. Walker.  The preface, dated June 1, 1876 was
simply signed, "The Author."  The preface states that the historical
descriptions were compiled by J.F. Cowan, Esq., of Englewood, [New
Jersey].  No other biographical information could be found on Mr. Cowan.

Technical Report, Ramapough Mountain Indians, Inc.

secondary reference was not viewed as substantive evidence
of tribal relations or of descent from a historical tribe.

For all petitioners, the acknowledgment regulations require
evidence that the members of the modern petitioning group
are the actual descendants of a specific historical Indian
tribe, or tribes that have combined historically (for exam-
ple, see the kind of evidence included in the Mohegan peti-
tion for acknowledgment, linking their modern day members to
the historical Mohegan tribe, as discussed in the Mohegan
Proposed Finding).[12]

A concerted search of the Bergen County Historical Society
collection did not reveal any information to identify the
ancestors of the proven RMI progenitors or to connect the
RMI ancestors with a historical tribe of Indians.

The BIA researchers also investigated the genealogical
collections and references to sources for Bergen and Passaic
County, New Jersey in the Alexander Library at Rutgers
University.  Although there was one Mann family Bible record
in the Genealogical Society of New Jersey file, there was no
evidence that the family connected to the RMI Mann family
(GSNJ Bible).  The church records for two eighteenth century
churches were reviewed for references to Mann, VanDunk,
DeFreese, and DeGroat families.  Neither the records of the
Protestant Dutch Reformed Church at Acquackanonk 1692-1944
nor the "Kercken-Boeck 1703-1783" for the Evangelical Lu-
theran Church New York City, New York revealed any informa-
tion relating to the known RMP families or to missions to
Indians in the Ramapo Mountain area.

A search of the records in Orange County, New York was also
made. The Genealogical Society of Orange County in Goshen,
New York maintains a card file, the Helen Predmore Collec-
tion, and the Elizabeth Horton collection of family files,
transcripts and newspaper articles on families and subjects
relating to Orange County and the surrounding area.  None of

---

[12] This is also required of petitioners claiming previous unambiguous
Federal acknowledgment as descendants of a treaty signing tribe.  In such
a case, the modern petitioner must show that its members are the actual
descendants of the Indian tribe or band whose representatives signed the
treaty.  It would not be sufficient, for example, for the Huron Potawatomi
Indian petitioner to point to a treaty signed by a different group of
Potawatomi Indians in the 1800's.  They would be required to show that
their members are descendants of the particular Potawatomi Indian group
whose chiefs or leaders signed the treaty.

Technical Report, Ramapough Mountain Indians, Inc.

the three files contained new or substantive information on any of the known RMI ancestors.

The index to the records of the Surrogate Court, Orange County cited one reference to the will of a Catherine E. Mann who died in 1869.  There were no references to RMI names Mann, DeFreese, DeGroat, or Van Dunk prior to the late 1800's.

In 1788, a man named Johannes DeVries, yeoman, of Haverstraw obtained a mortgage from Elihu Smith, also of Haverstraw Precinct for 50 acres in the Kackiat patent.  A note in the margin said that the mortgage was paid in full in 1797 (Mortgage Liber B, 200).  Johannes DeVries was not identified as Indian or of Indian descent.  There were no other references to mortgages for RMI family names in the pertinent time period.

The original 1825, 1835, and 1845 New York State censuses were in the offices of the Orange County Clerk.  Each of these censuses were examined for RMI family names.  Additional research was conducted in the Civil War pension records in the National Archives (NARS), Washington, D.C. and the National Society Daughters of the American Revolution Library (DAR) in Washington, D.C.  The results of the BAR's investigation of these sources of information will be discussed later in this technical report under criterion 83.7(e).

Technical Report, Ramapough Mountain Indians, Inc.

## TECHNICAL REPORT

### INTRODUCTION

**The RMI Response to the Proposed Finding.**  The RMI Response submitted very little new evidence, but rested primarily on new analysis of the data submitted in the 1993 petition. Most of the new data presented was irrelevant to the four mandatory criteria that the RMI had not met at the time of the Proposed Finding.  The same is true of most of the third party (informed and interested parties) comments, both the comments of persons who favored RMI acknowledgment and those who were opposed to it.  The issue of relevance and acceptability of evidence is discussed at length below.

**Procedural handling of the RMI Response to the Proposed Finding.**  Material in the RMI Response that is not relevant to the case at hand is not addressed to in this Final Determination.  For example, the individual referred to as "William Starner" and as "Stoner" by the RMI Response (RMI Response A-16) is presumed to be Dr. William Starna (Starna 1991).  Dr. Starna's article represented a criticism of a 1990 academic publication, in the journal, The American Indian Quarterly, by a former BAR ethnohistorian.  The article does not reflect the intent of the 1994 revision of Federal acknowledgment regulations (25 CFR Part 83).  Dr. Starna did not document his generalization when he stated that, "[Quinn's] behavior, and **possibly** [emphasis added] that of other BAR personnel, does represent a particularly inimical form of 'pre-decisional bias'" (Starna 1991, 498). The Starna article did not mention the RMI Proposed Finding, and the RMI Response made no connection between the Proposed Finding and the article.  Therefore, it is only noted that none of the BIA researchers or managers involved in preparing this Technical Report have ever met Dr. Quinn.

The 25 CFR Part 83 regulations are the product of notice and comment rulemaking and are based on Federal Indian law, judicial precedent, and the history of tribal recognition. It is not necessary to defend the regulations in this report.  The accusations of racism were addressed in a separate inquiry by the Deputy Commissioner of Indian Affairs and will not be responded to in this technical report. Because the issue of outside political interference has been raised by the petitioner, as well as by some informed parties, it is addressed in this report.

41

Technical Report, Ramapough Mountain Indians, Inc.

This technical report addresses the research methods and standards used by the BAR in evaluating a petition, responding to the arguments and data in the RMI Response and third-party comments that address the criteria, and discusses any new evidence found by the BAR in its evaluation of the petition, the RMI Response, and third party comments.

### DISCUSSION OF CRITERION 83.7(a): IDENTIFICATION AS AN AMERICAN INDIAN ENTITY BY EXTERNAL SOURCES

83.7(a)     **The petitioner has been iden-tified as an American Indian entity on a substantially continuous basis since 1900. Evidence that the group's character as an Indian entity has from time to time been denied shall not be considered to be conclusive evidence that this criterion has not been met.**

The 1994 revision of the 25 CFR Part 83 regulations reduced the burden of proof on the petitioner. It did not change the standards for Federal acknowledgment as an Indian tribe.

Under the 1994 regulations, criterion 83.7(a) considers evidence as to whether or not the petitioner has been iden-tified as an American Indian entity from 1900 to the pres-ent. The term "American Indian entity" is not defined under 25 CFR 83.1. Nevertheless, the word "entity" was chosen intentionally, instead of the word "tribe," in recognition of the difficulty that some unrecognized Indian groups might have in providing evidence of having been identified specif-ically as an "Indian tribe" by outsiders. For example, it might be easier for some petitioners to demonstrate that outsiders have thought of them as a distinct Indian "commu-nity" or "group," rather than as a tribe. For this criteri-on, the particular label that is used to represent the "American Indian entity" is irrelevant. To meet this crite-rion, the petitioner must demonstrate only that external sources have identified them as an American Indian entity; that is, that they have been perceived by outsiders as a distinct social unit that is American Indian.

This criterion does not require factual, historical accuracy of the identification by external sources. As will be

42

Technical Report, Ramapough Mountain Indians, Inc.

demonstrated below, the complete lack of primary source evidence documenting that the RMI are descended from a historical Indian tribe has not deterred external sources from asserting that the RMI, and their RMP ancestors, were Munsee descendants (and Tuscarora, Mohawk, Creek, Seneca, Hackensack, et cetera descendants). The assertions of Indian ancestry for the RMP began in the late 1800's and have continued to the present. Such assertions could be considered as "identification" of the group as an American Indian entity by an external source, even if they were based on an unsubstantiated folk tradition.

With a few exceptions, the petitioner was characterized by external sources, from 1900 to 1978, as a distinct community of mixed race people, some of whom had Indian ancestry, or who had some Indian ancestry. The Proposed Finding concluded that this was not the same as being directly identified as an American Indian entity, stating:

> Since the third quarter of the 19th century, anthropologists, social workers, journalists, and others have consistently described the RMI precursor community as a distinct group of mixed race, or as an entity whose members were said by tradition to have some Indian ancestry. The petitioner's ancestors were never described as an American Indian group per se. Occasional references which used such terms as "tribe" or "clan" to describe the community were essentially using these words as synonyms for "a kinship-based, non-white community distinct from the surrounding society (RMI PF, Summary Under the Criteria, 4-5)

For the last two decades (1978 to 1995), the RMI have been consistently identified by external sources as an American Indian entity. The Proposed Finding concluded:

> Only since organizing as the "Ramapough Mountain Indians, Inc." in 1978 has the petitioner been identified as an American Indian entity. The RMI were recognized as American Indian by resolutions of the New Jersey and New York State legislatures in 1980. Since that time, the RMI have been repeatedly identified as an "Indian" group in newspaper accounts and have received Indian Education funding from the Federal government (RMI PF, Summary Under the Criteria, 5).

Technical Report, Ramapough Mountain Indians, Inc.

The RMI commented in the petition and press reports frequently stated that the group had been acknowledged as an Indian tribe by the New Jersey and New York legislatures. The petitioner submitted a copy of a resolution as printed by the New Jersey legislature, filed with the Secretary of State January 8, 1980 (RMI Pet. Ex. 18). During the preparation of the Final Determination, the BIA received information that a bill to acknowledge the RMI had been introduced into the New Jersey legislature on January 14, 1980, but withdrawn by its sponsors two weeks later, on January 29, 1980. The informant, speaking by telephone, said that the bill in question was never voted on and that no other legislation regarding the RMI had ever been voted on by the New Jersey legislature.

As part of the research undertaken in preparing the Final Determination, the BIA requested from the State of New Jersey all available information pertaining to state recognition of the RMI (Reckord to Haytaian 1995/9/20). In reply, in October and November 1995, the BIA received information concerning a recognition resolution of a different date, 1979 ACR 3031, introduced May 21, 1979. The information submitted by the State of New Jersey and by the bill's original sponsor, W. Cary Edwards, indicated that the resolution had been passed by both houses of the New Jersey legislature, being approved January 7, 1980; filed January 8, 1980 (Edwards to Reckord 1995/11/3; Edwards Declaration 1995/11/3; Joyce to Kingston 1995/10/27; McCulloch to Kingston 1995/11/16; Kingston to Reckord 1995/11/17). A newspaper article dated January 17, 1980, tended to confirm that the resolution had been passed (New York Times 1980/1/17, B1, B10).

A BIA request to the Speaker of the New York General Assembly for background information on the resolution concerning the RMI passed by that body in 1982 (Reckord to Silver 1995/9/20) had not been answered by the time the Final Determination became due. Technically, the New York resolution memorialized the Federal government to extend acknowledgment. The resolution did not recognize the RMI as a tribe, but asked the President to "do what he could to see that the RMI were recognized by the United States Government."

**The RMI Response.** The "Summary of the Evidence" section of the Proposed Finding (RMI PF, Historical Technical Report 1) drew the following conclusion after considering all of the evidence available at that time:

Technical Report, Ramapough Mountain Indians, Inc.

**Identification as an American Indian Tribe.** The
Ramapough Mountain Indians, Inc. (hereafter re-
ferred to as RMI) are a group of people whose
members have been vaguely identified by journal-
ists, social workers, and local historians as of
partially Indian ancestry, of Indian appearance,
and/or of Indian lifestyle since the third quarter
of the 19th century. At no time prior to the
group's incorporation in 1978 was it the subject
of any separate series of Indian documents in the
records of either the States of New York and New
Jersey or the Federal government. Throughout the
20th century, anthropologists consistently de-
scribed it as a mixed-blood or tri-racial group[13]
(Speck 1911; Gilbert 1948; Collins 1972) (RMI PF,
Historical Technical Report 1).

Much of what the petitioner included in the RMI Response
under criterion 83.7(a) was more appropriate to criterion
83.7(e). Criterion 83.7(a) requires identification of the
petitioner by external sources as an Indian entity. It does
not take into consideration the actual genealogy of the
petitioner or the ancestry of the individuals making up the
group's modern day membership. For this reason, the por-
tions of the RMI Response under criterion 83.7(a) that
addressed the group's genealogy are considered under the
technical report section on criterion 83.7(e).

Under the regulations, identification as an American Indian
entity under criterion 83.7(a) is not acceptable genealogi-
cal evidence under criterion 83.7(e). The RMI Response
under criterion 83.7(a) stated that the ancestors of the RMI
were Indians because several individuals in the group, from
1870 to the present, were described by external sources as

---

[13] The definition of a tri-racial group for purposes of academic
study was given clearly by Edward Thomas Price, Jr. in 1950:

(1) The people must be racial mixtures of white and non-
white groups, Indian and/or negro peoples presumably
providing the latter blood in the absence of evidence to
the contrary;
(2) they must have a social status differing from that
accorded whites, Indians, or negroes in the area in such
a way as to throw them generally together in their more
personal social relationships;
(3) they must exist in such numbers and concentration as
to be recognized in their locality as such a group and
usually to be identified by a distinguishing group name
(Price 1950, 5).

Technical Report, Ramapough Mountain Indians, Inc.

having stereotypical Indian physical features and/or as possessing stereotyped Indian personality and social traits such as basket-making. This manner of projecting backwards, from modern day assertions about Indian ancestry to the colonial past, does not prove Indian ancestry under the Federal acknowledgment regulations.

**The RMI Response's criticism of the BIA's evaluation of the evidence in the Proposed Finding.** The RMI Response stated that "The BAR Staff's Proposed Finding On Criterion (a) Is Arbitrary and Capricious Because It Has No Rational Nexus To The Facts in the Record" (RMI Response A-1)." The BIA disagrees. First, a proposed finding is not issued by the "BAR Staff," but by the AS-IA. The technical reports are prepared by the BAR staff members and are sent, with a recommendation, through the BIA review process, to the AS-IA, by whom the proposed finding is issued. Second, the evidence on which the Proposed Finding was based and the way in which the evidence was weighed are clearly delineated in the Summary Under the Criteria section of the Proposed Finding. The RMI Proposed Finding was consistent with the standards set in previous acknowledgment decisions made by the AS-IA.

The RMI Response reasserted that "The Ramapough Mountain Indians Have Been Identified As An American Indian Entity On A Substantially Continuous Basis Since 1900," but it did not present any new evidence supporting this contention. The RMI Response listed numerous articles and studies published between 1890 and 1969 to support its contention that the RMI have been identified as an American Indian entity since 1900 (RMI Response A-6 - A-12): the same evidence which the RMI submitted with their original petition, but with a new analysis of its significance. Each of the items listed in the RMI Response had been analyzed for its value as evidence demonstrating external identification as an American Indian entity for the Proposed Finding. The conclusion of the Proposed Finding was that the RMI did meet criterion 83.7(a) from 1978 to the present (1993). The analysis that follows constitutes a reconsideration of the quotations included in the RMI Response and further explication of why Proposed Finding did not conclude that this evidence demonstrated identification by external sources of an American Indian entity before 1978.

The RMI Response selectively quoted excerpts from the sources it cited and many of the partial quotations were taken

46

Technical Report, Ramapough Mountain Indians, Inc.

out of context.  These selective quotations were presented
as "evidence" that the petitioner had been regularly identi-
fied as an American Indian entity, and that the BIA had
acted in an arbitrary and capricious manner by not accepting
this "evidence."  In the technical reports to the RMI Pro-
posed Finding, the BIA attempted to be sensitive to the
concerns of the petitioner by avoiding, in so far as possi-
ble, the repetition of unsubstantiated allegations as to the
group's origins, and ethnic nicknames and slurs.  Because
the RMI Response did not accurately reflect the evidence,
the statements must be quoted more extensively in order to
be accurate in this Technical Report for the RMI Final
Determination, though some of the quotations will be offen-
sive to the RMI and to other readers.

The RMI Response stated that "The BAR Staff's Insistence On
Characterizing the Ramapough As 'Tri-Racial Isolates' Is
Racist and Illegal" (RMI Response A-4).  The RMI Response
states that a published article written by BAR historian Dr.
Virginia DeMarce,[14] allegedly revealed her personal opin-
ions regarding tri-racial isolates and "Indianess," because
she characterized a work by William H. Gilbert (Gilbert
1948) as being about tri-racial isolates rather than Indian
groups.  First, Dr. DeMarce's article was written for the
purposes of orienting persons descended from such groups in
order that they could efficiently research their individual
family histories.  Second, the term "tri-racial isolate" was
used in the technical reports to the Proposed Finding be-
cause it is a concept used for researching and analyzing
mixed race social isolates around the United States.  Final-
ly, the recommendations made by the BAR to the AS-IA are
based on the consensus of at least seven professional staff
members from three disciplines.  The implication that the
historian unduly influenced the conclusions in the Proposed
Finding are inaccurate.

<u>Federal Government identifications of the Ramapough Mountain
People (RMP)</u>.  No evidence was submitted to indicate that
the Federal Government at any time had a treaty with the RMI
or with the RMP as a predecessor group of the RMI, or at-
tempted to negotiate such a treaty.  No attempt was ever
made to place the RMP on a Federal reservation.  The Federal
Government never conducted a military action against the

---

[14] The full citation of this article is in the bibliography of this
Final Determination (DeMarce, 1992).

47

Technical Report, Ramapough Mountain Indians, Inc.

RMP.  The RMP were not included on the Indian Population Schedules of the 1900 or 1900 Federal censuses.  No evidence was submitted to show that members of the RMP attended boarding schools conducted by the BIA.

One item cited by the RMI Response as indicating that the Federal Government identified the RMP as a distinct American Indian entity was the Works Progress Administration's Federal Writers Project book on New Jersey (Federal Writers' Project 1946).  The actual passage, based on the popular historical work of J.C. Storms (see below) read:

> Few isolated racial groups have had so tragic a history as the Jackson Whites.  Hessian, English, West Indian, Dutch, Portuguese, Negro, Spanish, Italian, and American Indian by blood . . . (Federal Writers' Project, New Jersey, New Jersey (New York:  The Viking Press, 1939, 505); cited in Price 1950, 2).

Another work cited in the RMI Response (RMI Response A-5), as a Federal Government identification of the RMP as an American Indian entity was that of William Harlen Gilbert, Jr.  In 1948, Gilbert included the "Jackson Whites" in a reference work entitled "Surviving Indian Groups of the Eastern United States," 1948 Annual Report of the Smithsonian Institution (Gilbert 1948).[15]  The inclusion of the RMP in this publication must be considered in the light of the full context of Gilbert's work.  In his introductory paragraph to Surviving Indian Groups of the Eastern United States, Gilbert stated that, "Any attempt to estimate the total amount of this Indian and mixed population must be based on an arbitrary classification of mixed-bloods as Indian who may frequently be more white or Negro in appearance" (Gilbert 1948, 407).  Clearly, Gilbert did not himself regard the title of his work as "evidence" that all of the

---

[15]  As indicated in the RMI Response (RMI Response 1995, A-5) in 1948, William Harlen Gilbert, Jr. included the "Jackson Whites" in a reference work entitled "Surviving Indian Groups of the Eastern United States," 1948 Annual Report of the Smithsonian Institution (Gilbert 1948).  The evidentiary value of the title of Gilbert's 1948 article must be considered in the light of the full context of Gilbert's work.  One year earlier, Gilbert titled an earlier version of this work, "Synoptic Survey of Data on the Survival of Indian and Part-Indian Blood in the Eastern United States" (Gilbert 1947).  Two years earlier, he had also included the "Jackson White" group in a study entitled "Memorandum Concerning the Characteristics of the Larger Mixed Blood Racial Islands of the Eastern United States" (Gilbert 1946; RMI Pet., Ex. 16).  These are not the same as being directly identified as American Indian.

Technical Report, Ramapough Mountain Indians, Inc.

mixed race groups discussed in his article were distinct American Indian entities. In the instance of the RMP, for whom he used the term "Jackson Whites," he noted that they were not included as Indians in census reports, although he referred to them in the same paragraph as "a mountain people with a strongly marked Indian background" (Gilbert 1948, 411).

In the fuller description of the petitioner's antecedent group, Gilbert wrote:

> *Jackson Whites.*--These people are located in an area roughly extending from Goshen to Nyack along the New Jersey borders [sic] in Orange and Rockland Counties. In some parts they show a predominance of Indian physical characteristics and in others of white or a mixture of white and Negro. The Indian blood is said to be derived from the Tuscarora and Munsee tribes, but the traditions and customs of the Indian are now difficult to find. A Negro Presbyterian church at Hillburn, N. Y., has carried on mission work among the Jackson Whites . . . Living on the margins of society, as they have been forced to do, the Jackson Whites have been a somewhat neglected class of people (Gilbert 1948).[16]

There is nothing in this article to indicate that Gilbert was directly describing the RMP as a distinctly American Indian entity.

In 1978, the Smithsonian Institution's <u>Handbook of North American Indians, Volume 15, Northeast</u> (Trigger 1978) did not mention "Ramapo Mountain Indians," though it classified the "Ramapo Mountain People" as among the "Marginal Groups" discussed in the section written by Brewton Berry (Berry 1978). Berry stated that:

> Their history goes back to the seventeenth century, when free mulattoes of Dutch-Negro origin, with perhaps some Indian ancestry also, began buying farms in the Hackensack River valley. A century later, harassed by their White neighbors, they sold their farms and sought refuge in the

---

[16] Note that this entire description amounts to a paraphrase of Speck (Speck 1911), whom Gilbert elsewhere cites as his source (Gilbert 1948, 429).

49

Technical Report, Ramapough Mountain Indians, Inc.

Ramapo Mountains.  There, and in the nearby towns,
their descendants have remained (Berry 1978, 291).

In this instance, it is clear that Berry categorized the
RMP's ancestors as a distinct social group of Dutch--Negro
people with some possible Indian ancestry.  This is not the
same as direct identification of the petitioner as an Ameri-
can Indian entity.

Ives Goddard's article on the Delaware in the Smithsonian
Handbook of North American Indians said only, "There were
scattered remnants in Ulster and Orange counties, New York,
who provided the Indian heritage among the triracial groups
later found in the area" (Goddard 1978, 222).  The assertion
that there were scattered remnants of the Delaware remaining
in these two counties is not the same as identifying the RMP
as an American Indian group.

The area around Mahwah, New Jersey was included as a special
Indian area in the 1990 Federal census.

New Jersey State identifications of the RMP.  The state of
New Jersey never established a state reservation for the
RMP, nor did any series of state records exist that were
based on a relationship between the RMP as an American
Indian group and the state.

The RMI Response cited the Vineland Study (see extensive
discussion elsewhere) and an article published in 1931
(Jones 1931) as evidence that the State of New Jersey, by
way of Dr. Charles T. Jones' authorship of this article and
superintendency of the New Jersey State Colony at New Lis-
bon, "adopts the findings of the Vineland Study" (RMI Re-
sponse A-9).  In this citation, an article written by Dr.
Jones for another publication was quoted in a 1931 column in
Eugenical News.[17]  The original article was not submitted
in evidence, but the terminology of the notice in Eugenical
News indicates Jones wrote the article as a private individ-
ual rather than as an official of the State of New Jersey as
purported in the RMI Response.  The RMI Response's claim
that "Dr. Jones made these findings after reviewing the
Vineland Study and studying the group independently for
almost two decades" (RMI Response A-9) is apparently an
interpretation of a sentence in this one-column notice which

─────────────────────

[17]  The Response incorrectly attributed the Eugenical News article to
Dr. Jones.  Actually, the Eugenical News article quotes from a different
item that Jones had written for another publication.

50

Technical Report, Ramapough Mountain Indians, Inc.

stated that Dr. Jones had "in his possession a report of a special study started on this interesting group in 1913. He has also continued his investigations on these people from time to time since 1918" (Jones 1931, 218). The article submitted in evidence reads:

> In the *Pathfinder* for September 5, 1931, Dr. Jones supplied that paper with the following note in answer to the question "Who are the Jackson Whites?"
> "The Jackson Whites are a settlement of mixed-blood Indians, negroes and whites in the Ramapo mountains in the northern part of New Jersey and the adjoining section of New York. They are the descendants of freed negro slaves who, due to economic and social forces, were crowded back into the mountains where they intermarried with white outcasts and a remnant of Algonquin Indians, sup-posedly members of the Minsi or Wolf clan. These people themselves do not like the name "Jackson Whites" and they insist that it is of comparative-ly recent origin. Several traditions regarding its origin are current, the most probable being that the freed slaves were contemptuously called "Jacks." After they intermarried with the white outcasts and Indians they were spoken of as "Jacks and Whites," which in time was contracted into Jackson Whites (Jones 1931, 218).

Jones did not speak of the "Jackson Whites" as an American Indian entity, but as a distinct settlement that originated from a variety of racial origins.

Scholars and journalists. The petitioner suggests that Frank G. Speck, an ethnographer who visited the Ramapo Mountain area in 1908 to learn more about the "Jackson Whites," considered the group to be an American Indian entity. Speck wrote:

> According to current tradition the tribe, so-called, seems to have been founded by the blending of a few families of native Algonquian Indians, probably Minisinks of the Delaware, with some of the Tuscaroras who lingered for a rest in the Ramapo Valley on their way from Carolina in 1714 to join their colleagues, the Iroquois, in New York State. To this small nucleus became added from time to time runaway Negro slaves and perhaps freedmen from the Dutch colonial plantations in

51

Technical Report, Ramapough Mountain Indians, Inc.

the adjoining counties in New Jersey.  Vagabond
white men of all sorts also contributed a share to
the community from the early days until now.  The
Jackson-Whites may be regarded, therefore, as a
type of triple race mixture (Speck 1911, 104-105).

Speck continued his description by saying of the group in
his own day that:

Absolutely no semblance of an organization exists
among them, nor do they recognize any bonds of
union other than those of direct kinship . . . As
regards vestiges of native culture, the Jackson-
Whites are quite barren . . . .  Though I heard
from time to time of some old person who was re-
ported to know a few Indian words, I never encoun-
tered one (Speck 1911, 105-106).

This 1911 article by Speck clearly was tentative in the
attribution of origin for the ancestors of the petitioning
group.  Again, it must be re-emphasized that identification
as a "triple race mixture" (Speck 1911, 105) was not direct
identification as an "Indian entity."  While numerous ob-
servers clearly identified the group as a distinct entity,
their words do not clearly indicate that they perceived it
as an American Indian entity.

The RMI Response quoted the following statement from John C.
Storms, a local writer and publisher who adopted and exten-
sively embellished folklore concerning the origins of the
"Jackson Whites":

It is known that to this day there are occasional
visits paid to this region by representatives of
the tribes from the central part of New York
State.  They seek certain places and conduct ritu-
al services, probably in relation to some of their
tribe who are buried there (RMI Response A-10;
citing Storms 1936).

No documentation for such visits has ever been presented.
Another researcher commented that if they took place, the
members of the petitioning group, at that time, were not
aware of them (Price 1950, 254).

The petition submitted only an abstract by Miriam B.
Lernerd, Division Classification & Education, Department of
Institutions and Agencies, Trenton, New Jersey, 1942 of a

52

Technical Report, Ramapough Mountain Indians, Inc.

1940 MA thesis submitted at New York University by Constance Crawford.

> Set apart from other isolated groups by their
> historical setting, important in the development
> of America, the Jackson-Whites maintain their
> unique distinction.  Whether it will ever be pos-
> sible to prove fully their complete racial origin,
> is a problem for social research.

> Two well known ethnologists and anthropologists,
> who have spent considerable time in the Ramapo
> region, hold that there is no proof of the origin
> of the Jackson Whites (Crawford 1942, 13).

Because the abstract of the thesis does not provide cita-
tions to the two anthropologists to whom Crawford referred,
their identities are unknown.  Nevertheless, Crawford did
identify the "Jackson Whites" as a distinct, isolated group.
And she expressed her opinion that they were likely tri-
racial (meaning that they were, in her opinion, part-
Indian).  Again, this is different from specifically identi-
fying the group as an American Indian entity.

Edward T. Price's discussion of the petitioning group ap-
peared in a University of California Ph.D. dissertation in
geography which was submitted and accepted in 1950.  Price
stated:

> The society of colored people in the area is near-
> ly as complex as that of the whites.  Many colored
> families of the area date from the time of the
> first census.  Some light-colored negroes live on
> the Houvenkopf (the summit region of the Ramapos
> near Hillburn, New York); many of their relatives
> are found on the lowland, especially in and around
> Hillburn and Mahwah, as well as at Ringwood to the
> west.  Other negroes, usually with other family
> names, live in the vicinity and work in the shops
> and other places (Price 1950, 245).

> It is the first of these colored groups [that is,
> the ones on the Houvenkopf, near Hillburn] who
> will be considered as Jackson Whites in this dis-
> cussion (Price 1950, 245)

> Most of the Jackson Whites are light in color;
> most of them bear the names of DeFreese, DeGroat,
> VanDunk, and Mann; and evidence is that until

53

Technical Report, Ramapough Mountain Indians, Inc.

recent years they lived on the Houvenkopf (Price
1950, 245).

Price's description of the "Jackson Whites" did categorize
them as an isolated racial group.  As to the petitioner's
ancestors, he did not identify them as an American Indian
entity.

More recent external scholarly authorities have also re-
frained from identifying the petitioner explicitly as an
American Indian entity.  In 1972, Daniel Collins published
an article in The American Anthropologist entitled "The
Racially-Mixed People of the Ramapos:  Undoing the Jackson
White Legends" (Collins 1972).  Collins' opening statement
read:

> A review of the literature fails to validate the
> Jackson White legends which traditionally have
> accounted for the presence of a racially mixed
> collectivity in the Ramapo Mountain area (Collins
> 1972, 1276).

He then continued by saying:

> That a people known as "Jackson Whites" inhabit
> the rugged Appalachian foothills called the Ramapo
> Mountains is true; whether or not they constitute
> a "race of people" and what the historical compo-
> nents of that people are until most recently have
> been open questions (Collins 1972, 1276).

While debunking the Storms legend of "Jackson White
origins," Collins' descriptions of views of the group held
by local non-Indians does not confirm that he regarded them
as an American Indian entity (Collins 1972, 1283-1284).

The next portion of the RMI Response on Criterion 83.7(a)
(RMI Response A-12 - A-15) addressed the genealogical por-
tion of David Cohen's book, The Ramapo Mountain People
(Cohen 1974).  Criterion 83.7(a) is not concerned with
genealogy, but with identification by external sources.
This portion of the petitioner's Response is discussed else-
where in the Technical Report.

In summary, external descriptions of the RMP since 1900 have
used tentative adjectives and adverbs that indicate a lack
of sureness.  As late as 1978, local historians wrote:

54

Technical Report, Ramapough Mountain Indians, Inc.

> It seems likely that some poor whites, poor
> blacks, and even a few descendants of the Indians
> probably were living in the mountains by the 1790s
> when the proprietors started to sell land in that
> area (Bischoff and Kahn 1978, 96).

These descriptions do not demonstrate clear identification
of the petitioner as an American Indian entity. Rather,
they were tentative, ambivalent, and ambiguous.

**Evaluation of church records.** As a result of the assertion
in the RMI Response that the BAR researchers had ignored
church records in the Technical Reports to the RMI Proposed
Finding, while relying heavily on such church records in
positive proposed findings such as Poarch Creek (RMI Re-
sponse B-23 to B-24), the BIA undertook additional research
in preparing the Technical Report to accompany the RMI Final
Determination. The specific purpose of this additional
research was to look for church records relevant to the RMP.
What follows is a summary of that new evidence, along with a
reexplication of the evidence considered at the time of the
Proposed Finding.

The petitioner stated that the Proposed Finding had ignored
evidence, in the form of church records, that indicated the
RMI's ancestors were thought of as an Indian entity (RMI
Response B-23 to B-24). The RMI Response cited a 1926
letter from George A. Ford, a former pastor of the Presbyte-
rian Brook Chapel (1876 to 1880), who stated his belief that
the RMP in the congregation were, in part, of Indian descent
(Ford 1926, RMI Response Appendix). The Ford letter was a
single item. In relation to criterion 83.7(a), church
records were consulted to establish whether or not the RMI
ancestors were identified as an American Indian entity, not
to establish the genealogical ancestry of the members.

Neither the race of the ministers to the churches, whether
Indian or non-Indian, nor the denominational affiliation of
the churches that the RMI and their ancestors attended, were
issues per se. The Proposed Finding did not reason that if
the RMI ancestors belonged to a church affiliated with the
A.M.E denomination that they were non-Indians. For example,
it was common for non-Indians to establish missions to
Indians. If the ministers had been considered Indian, or if
the ministers thought of themselves as missionaries to an
Indian community, this might have led to evidence identify-
ing the RMP as an American Indian entity. No such evidence
was found. This is very different from the evidence that
was located during the evaluation of the Mohegan, Huron

55

Technical Report, Ramapough Mountain Indians, Inc.

Potawatomi, and Poarch Creek petitions, for example.  In
each of those cases, there was clear evidence that the
ministers serving the churches in these communities were
considered by the denomination as serving distinct American
Indian entities.

Denominational records were considered important in the case
of the RMI petition, not as labels that would disprove the
Indian ancestry of the RMP, but to see if the denominations
that established missions to the RMI ancestors left any
records that indicated they viewed the RMP as an Indian
entity.  If such evidence had been found, this would have
been considered as evidence that the group was being identi-
fied as an American Indian entity.  No such evidence has
been found.

Church records are handled as evidence in a manner parallel
to how other types of secular, non-ecclesiastical, evidence
are used.  Documentation contemporary with the event is
regarded as more significant than documentation produced at
a later date.  For example, a marriage record entered into a
church register in 1840 identifying the bride, the groom, or
the witnesses, as members of a certain tribe is primary evi-
dence.  A set of 1850 minutes identifying a certain church
then in existence as an Indian mission is primary evidence.
Histories of the denomination written a century later, or
recollections and memoirs recorded long after the fact, are
secondary evidence.  Thus, a letter written by the Rev.
George A. Ford some 50 years after his ministry at Brook
Chapel referring to American Indian blood coming down from
the early days (RMI Response, Appendix, unnumbered), was not
the equivalent of the types of church records upon which the
BIA has "relied heavily" in other cases such as Poarch
Creek, Mohegan, or Huron Potawatomi (RMI Response A-9).

Presbyterian records.  During the period of the Rev. Ford's
actual ministry at the Ramapo Presbyterian Church (1876-
1880), during which he assisted in the founding of Brook
Chapel, and throughout the period to 1918, the original
registers of the church did not identify any member of the
petitioning group as American Indian:  they either were
described as "colored" or given no ethnic description, i.e.,
the column was left blank (Ramapo Presbyterian Church Regis-
ter 1994).  There is nothing in the Ramapo Presbyterian
Church Register that indicates Brook Chapel was classified
as an Indian mission or that the ancestors of the RMI were
identified as an Indian entity.

56



Technical Report, Ramapough Mountain Indians, Inc.

From colonial times to the present, American missionary agencies sometimes, though not always, trained American Indians as lay preachers and ministers to Christianize their fellow Indians. The BAR researchers attempted to locate evidence that the ministers who served Brook Chapel were Indian, as a potential basis for demonstrating that the Presbyterian Church treated the RMI ancestors as an American Indian entity. The <u>Ramapo Presbyterian Church Register</u> identified most of the ministers during the period it covered as "colored." Some of the ministers' race was not marked which, in the context of the record itself, is interpreted to mean that they were "white." None of the ministers were identified as American Indian (Appendix A). This method of trying to show that the petitioner was identified by the Presbyterian Church as an American Indian entity was, therefore, not successful. However, the fact that the ministers were not Indian does not establish that the petitioner was not an Indian entity.

Some churches also established special facilities for training American Indians and others for doing mission work with American Indians. Since several of the ministers assigned to Brook Chapel in the late 19th and early 20th centuries were identified by the records of Ramapo Presbyterian Church as having been trained at Lincoln University in Pennsylvania, the BAR researchers made an effort to determine whether or not one of the functions of this institution was the education of American Indians, or the training of missionaries to American Indians.

This search led to a major history of Lincoln University, <u>Education for Freedom</u>, which was prepared at the time of the American Revolution Bicentennial (Bond 1976). It discussed the background of this Presbyterian institution, established in 1854 as "the first institution founded anywhere in the world to provide a higher education in the arts and sciences for 'youth of African descent'" (Bond 1976, 3), exclusively from the perspective of its efforts on behalf of African-Americans and missions in Africa (Bond 1976, xi).[18] The Introduction referred to Lincoln University as a "black college" (Bond 1976, xvi). There were no index entries pertaining to American Indians or Native Americans. This evidence indicates that the Lincoln University was not used

---

[18] Lincoln University was the alma mater of, among others, Langston Hughes, Thurgood Marshall, and Kwame Nkrumah. American Indians are mentioned only in a discussion of the 18th-century ancestry of the Bustill family of Philadelphia (Bond 1976, 1837).

57

Technical Report, Ramapough Mountain Indians, Inc.

as an institution to train American Indians for ministry or to prepare missionaries to Indian communities.

At the turn of the century, the Presbyterians published two surveys of the denomination's mission work among American Indians. The first was a general survey of home missions, which contained a 33-page chapter on Indian missions (Doyle 1902, 63-96). It began with the colonial period and continued until the time of writing, including a complete list of "Indian Churches and Sabbath Schools and Mission Schools, With Their Ministers and Teachers" (Doyle 1902, 85). The only mention of Presbyterian Indian mission work in the state of New Jersey was in connection with David Brainerd (Doyle 1902, 69). David Brainerd did not work with Indians in the vicinity of Mahwah, New Jersey, but in the central part of the state.[19] Doyle's book covered the activity of the "New York Missionary Society," beginning in 1796, among the Tuscaroras and Senecas, and indicated that there was still a mission among the Iroquois in 1902 (Doyle 1902, 71, 85). Doyle did not mention Brook Chapel.

The second survey was specifically on Indian missions (Brain 1904). It covered work being done by the Presbyterian Church among 33 tribes in 15 states, and also mentioned previously discontinued missions (Brain 1904, 28). The only mission mentioned in the state of New York was that to the Seneca (Brain 1904, 140). The book did not mention Brook Chapel.

Methodist records. In searching for church records that might identify the petitioner as an American Indian entity, the BAR researchers examined not only the Brook Chapel records, but also those which might pertain to the other, Methodist, chapel attended by the RMP. In connection with the mid-19th century Methodist chapel attended by the RMP, the Historical Technical Report to the Proposed Finding drew the following information from local historians:

> The first church intended specifically for members of the RMI was founded in 1857, when a Methodist chapel was constructed at the entrance to the RMI settlement at Green Mountain Valley (at that time a RMI residential center, but not one of the three modern RMI communities). At that time, it was named "The John Wesley Chapel of Darlington, New

---

[19] See discussion of the Brotherton Reservation in Burlington County (RMI PF, Historical Technical Report, 9).

58

Technical Report, Ramapough Mountain Indians, Inc.

Jersey" and was located across the Ramapo River from the Ramapo Dutch Reformed Church at the foot of the Ramapo Mountains (Cohen 1974, 63; Bischoff and Kahn 1978, 98; RMI Pet., Ex. 32; see Map No. 8) [see Appendix C, Map of the RMI Area] (RMI PF, Historical Technical Report 47-48).

The RMI Response said that Cohen identified the John Wesley Chapel at Darlington, New Jersey, founded in 1857 for the RMP, as "associated with white Methodist missionaries" (RMI Response A-16; citing Cohen 1974, 114). The cited passage from Cohen concerning the church's early history reads:

In Mahwah the history of the local African Method-ist Episcopal (A.M.E.) church reveals the strained relationships between the Mountain People and blacks. The church was founded in 1857 and was named The John Wesley Chapel of Darlington, New Jersey. It was originally located back of the Havemeyer estate at the foot of the mountains. Later it was moved farther into the mountains to Green Mountain Valley, where there was a settle-ment of Mountain People. In 1876 Elliot Mann was the local preacher and William Mann the licensed exhorter. In 1904 this Green Mountain Valley church withdrew from the Union Conference and joined the A.M.E. Zion Conference. In 1915, the church was moved to its present location on Grove Street in West Mahwah (Cohen 1974, 114-115; citing the 1970 church anniversary program).

The small congregation of about twenty-five today consists of both blacks and a few Mountain People. The singing style is distinctly black gospel. The pastor is a black who comes from out-of-town every week to conduct services. He gave me a different version of the history of this church. He said that the Mountain People applied for but were refused membership in the white Methodist church. So they reluctantly became affiliated with the A.M.E. Zion church, a black denomination (Cohen 1974, 115).

The two persons identified by the RMI Petition as serving the Green Mountain Valley Church were Mr. Jackson from Paterson (April, 1877) and Mr. Green (January, 1895) (Bischoff and Kahn 1978, 209-210). BAR researchers attempt-ed to identify these men. The 1876-1878 Paterson, New Jersey city directories did not identify any minister with

59

Technical Report, Ramapough Mountain Indians, Inc.

the surname of Jackson. As the given name of this individual was not provided, it remains a possibility that he was a lay elder or deacon rather than a full-time ordained minister, and therefore identified in the directory under his secular vocation. The 1894-1895 city directory for Paterson did not contain any entry for the Rev. Green who, the petition said, began to minister to this church in 1895, so he apparently did not represent a continuation of the supply ministry from Paterson. Again, the RMI Petition did not provide Rev. Green's given name.

The full statement in the Historical Technical Report to the RMI Proposed Finding read as follows:

> The founding of this chapel did not indicate the introduction of full-scale segregation. Several RMI ancestral families continued to attend Ramapo Dutch Reformed Church long after the Methodist chapel was founded and continued to be buried in a separate section of its churchyard (RMI Pet., Ex. 32). However, the founding of this chapel does represent the first time that some portion of the RMI population attended a separate church of their own rather than churches open to the general population.

> No documentation pertaining to the history of the chapel was provided by the petitioner. However, some information has been obtained. In 1876, this chapel was moved about a mile farther back into the mountains, to the Green Valley RMI settlement itself. The preacher at this Methodist chapel in 1876 was Elliott Mann; the licensed exhorter was William Mann. According to Bischoff and Kahn, the local historians of Mahwah, it was apparently this chapel to which the April 8, 1877 report in the Bergen Democrat and a similar one in the Ramsey Journal applied. These indicated that the mountain congregation met every Sunday in the log cabin of Johnnie De Groat, with a Reverend Mr. Jackson from Paterson, New Jersey, preaching on Sunday mornings, followed by Sunday school in the afternoon and prayer meeting in the evening (Bischoff and Kahn 1978, 209-210) (RMI PF, Historical Technical Report 47-48).

The RMI Response (RMI Response A-16) stated that, "there is no evidence to show that the Church become [sic] affiliated with the African church until 1895" (RMI Response A-16).

60

Technical Report, Ramapough Mountain Indians, Inc.

For the purposes of the acknowledgment regulations, the denominational affiliation of the petitioner's church, whether associated with whites or African Americans, is not of importance.  The Historical Technical Report to the Proposed Finding indicated that the chapel became affiliated with the A.M.E. Zion denomination in 1904, after the church building was moved into the mountains (1895).  However, the Historical Technical Report also noted that the chapel, before joining the A.M.E. Zion denomination in 1904, was affiliated with the Union Conference, an African-American denomination.

> As the population moved from Green Mountain Valley toward Stag Hill (the Houvenkopf) near Mahwah, the church moved with it, quite literally--they moved the building.  In 1904, the Green Mountain Valley church withdrew from the Union Conference and joined the A.M.E. Zion[20] Conference (RMI PF, Historical Technical Report 49, citing to Cohen 1974, 114-115).

This change in denominational affiliation was mentioned in the anniversary booklet on the history of the church (A.M.E. Zion Church, Mahwah, New Jersey, 113th Anniversary Program, January 25, 1970).  The 1895 transfer was not a move from a "white" Methodist Conference to a "black" Methodist Conference, as the Petition indicates.  The Union Church of Africans was founded in 1813, and its successor group is now known as the Union African Methodist Episcopal Church (Lincoln & Mamiya 1990, 48; see also Shaw 1954, 88-91; Shockley 1991, 31).  The nature of the Union Conference within the Methodist Church prior to 1895 is historically clear.  In 1878, Bishop Matthew Simpson wrote that the:

> Union African Methodist Episcopal Church is an organization founded by Rev. Peter Spencer, in Wilmington, Del., in June, 1813.  It was composed of colored members of the Methodist Episcopal Church, who seceded from it and established an independent congregation.  Its original chartered title was "The African Union Church," which continued to be its title until after the Civil War, when the present name was adopted (Simpson 1878, 876).

---

[20]   The African Methodist Episcopal Zion Conference is not the same organization as the African Methodist Episcopal Conference.

Technical Report, Ramapough Mountain Indians, Inc.

In 1876, the Union African Methodist Episcopal Church had six congregations in New Jersey, with 300 members, 103 Sunday School scholars, and church property worth $35,000 (Simpson 1878, 877). More extensive information on the Union movement can be found in Lewis Baldwin's "Invisible" Strands in African Methodism: A History of the *African Union Methodist Protestant* and *Union American Methodist Episcopal* Churches, 1805-1980 (Baldwin 1983).

In an attempt to obtain further information about the trans-fer of this congregation from one synod to the other, the BAR wrote a letter of inquiry on July 7, 1994, to the A.M.E. Zion archives located at Livingstone College in North Caro-lina (BAR, Reckord to Archivist 07/05/1994, BAR Files). No reply was received. Several telephone inquiries directed by the BAR historian to Dr. Baldwin at Vanderbilt University were not returned.

An encyclopedia of Methodism published in 1878 (Simpson 1878) provided a survey of Methodist missionary work among American Indians by both the Methodist Episcopal Church South (Simpson 1878, 471-472) and the Methodist Episcopal Church (Simpson 1878, 472-474). It made no mention of the New Jersey area: work among the Delawares began in the Sandusky, Ohio, area in 1815 (Simpson 1878, 472). In the northeastern United States, in 1878, the Methodist Episcopal Church had missions at Onondaga, Oneida, St. Regis, and Cattaragus, all in central, northern, and western New York State (Simpson 1878, 474).

The minutes of the conferences of the Methodist Episcopal Church in the northern New Jersey and southeastern New York area for the period 1856-1865 make no mention of a mission in Darlington, New Jersey, or in Green Mountain Valley. These Conference minutes were very detailed, listing not only churches, pastors assigned, church property held, etc., but also the individual names of members and the amounts contributed by individuals who made contributions to mission work. The only "Wesley Chapel" within the Newark Conference was in New York, often combined as a charge with Mechanics-ville. The only mention of a church for non-Caucasian communities within the Newark Conference was that of the Zion Church, "Colored," in Nyack, New York (Methodist Epis-copal Church 1856; Methodist Episcopal Church 1857; Method-ist Episcopal Church. Newark Conference 1858; Methodist Episcopal Church. Newark Conference 1859; Methodist Episco-pal Church. Newark Conference 1860; Methodist Episcopal Church. Newark Conference 1861; Methodist Episcopal Church. Newark Conference 1862; Methodist Episcopal Church. Newark

62

Technical Report, Ramapough Mountain Indians, Inc.

Conference 1863; Methodist Episcopal Church.  Newark Confer-
ence 1864; Methodist Episcopal Church.  Newark Conference
1865).

The "Reverend Jackson," who was mentioned by local histori-
ans as a Methodist minister who worked among the RMP in the
1870's. could not be identified in records of the Newark
Conference of the Methodist Episcopal Church.  The published
minutes of the Newark Conference's annual sessions from 1876
through 1885 did not mention Jackson as a preacher, elder,
or deacon (Methodist Episcopal Church.  Newark Conference
1876-1885).

Neither was there evidence to support the RMI Response's
statement that "white" missionaries were working among the
RMP at this period of time.  The minutes of the Newark
Conference did not mention the John Wesley Chapel at Dar-
lington, New Jersey, or at Green Mountain Valley.  The white
Methodist churches at Darlington, Monsey, and Suffern were
under the charge of Elder Millard F. Warner of Monsey, New
York (Methodist Episcopal Church.  Newark Conference 1877,
56).  The only "Wesley Chapel" was still, at this date, a
combined charge with Ladentown and Mechanicsville, under the
charge of James H. Robertson of Suffern, New York (Methodist
Episcopal Church.  Newark Conference 1877, 56).  Darlington
fell within the bounds of the Jersey City District of the
Newark Conference.  In 1878, the Conference minutes con-
tained a three-page report of activities within the Jersey
City District.  It made no mention of missionary activity
among the RMP or of the John Wesley Chapel at Darlington
(Methodist Episcopal Church.  Newark Conference 1878, 13-
15).

**Relationship of the Methodist chapel to other religious
denominations.**  Neither Cohen nor Bischoff and Kahn's **From
Pioneer Settlement to Suburb** made any statement at all about
the ethnicity of the ministers who served the Methodist
chapel at the time of its founding (Bischoff and Kahn 1978,
209-210).  The only "white missionaries" mentioned by
Bischoff and Kahn were the Wheatons, who were not Methodist,
were not associated with this particular church, and did not
begin their work among the RMP until 1902 (Bischoff and Kahn
1978, 211-213).

Discussing the separate graveyard section for the RMI prede-
cessors maintained at the Ramapo Reformed Church, Bischoff
and Kahn commented:  "The symbolism of this physical reality
is clear, and it is not surprising that some of the mountain
people built their own Methodist chapel in 1857 across the

63

Technical Report, Ramapough Mountain Indians, Inc.

Ramapo River at the entrance to Green Mountain Valley"
(Bischoff and Kahn 1978, 98).  In this instance, Bischoff
and Kahn simply cited to Cohen (Bischoff and Kahn 1978, 414
n45).  The RMI Response did not present any primary evidence
relating to the beginnings of this chapel.

**Summation.**  Generally, the additional research undertaken on
the church affiliation of the RMP during the 19th century
and early 20th century did not provide any information to
support the single letter by a former missionary written in
1926 and identifying the group's ancestry as having included
a significant Indian component.

### DISCUSSION OF CRITERION 83.7(b):  DISTINCT COMMUNITY

83.7(b)    **A predominant portion of the
petitioning group comprises a
distinct community and has
existed as a community from
historical times until the
present.**

**Regulatory definition of "community" used for the Proposed
Finding.**  The criterion for community in the 1978 regula-
tions which governed Federal acknowledgment at the time of
the Proposed Finding required the following:

Evidence that a substantial portion of the peti-
tioning group inhabits a specific area or lives in
a community viewed as American Indian and distinct
from other populations in the area and that its
members are descendants of an Indian tribe which
historically inhabited a specific area (25 CFR
§83.7(b)).

The Proposed Finding concluded that the RMI did not meet
criterion 83.7(b) at any point in time, because although
"community" was found to exist from approximately 1870 to
1950, it was not "a community viewed as American Indian"
whose members were "descendants of an Indian tribe which
historically inhabited a specific area."  The Proposed
Finding reached this conclusion because there was no evi-
dence that the RMP ancestors existed as a distinct social
community, Indian or non-Indian, before 1870, or that the
petitioner's membership had continued to exist as a distinct
social community since 1950.

Technical Report, Ramapough Mountain Indians, Inc.

At the time the Proposed Finding was issued, there was no
evidence that the RMI descended from an Indian tribe which
historically inhabited a specific area.  The evidence sub-
mitted by the petitioner, and that found by the BAR re-
searchers, showed that a few of the ancestors of the RMI
petitioner, who later coalesced into a community in the
vicinity of Houvenkopf Mountain around 1870, were living in
and around the Ramapo Mountain area by the early 1800's.
But there was no evidence that they came to form a distinct
community before 1870.

**Endogamy as evidence under 83.7(b)(2)(ii).**  The RMI Response
states that:

> The BAR acknowledges that the petitioning group
> "does represent a distinct community with signifi-
> cant continuity from the early 19th century to the
> present."  (H-2).  This is confirmed by the Joslyn
> Report submitted with this response that shows a
> high degree of endogamy (greater than 50%) from
> colonial times to the present (RMI Response B-6 -
> B-7).

The full passage from the Historical Technical Report to the
Proposed Finding reads:

> The petitioning group **does represent a distinct
> community with significant continuity from the
> early 19th century to the present**, but it is not a
> community that has resided in the Ramapo Mountains
> since colonial times.  On tax lists of the later
> 18th and early 19th centuries, ancestors of the
> RMI (the **DeFreese, DeGroat, Mann, and VanDunk
> families**) are found clustered in other localities
> in **Bergen County and Passaic County, New Jersey,
> and Rockland County, New York**, in the valleys
> rather than in the mountains.  Their places of
> residence are identifiable by the names of neigh-
> bors when household heads were not themselves
> landowners, or by such indicators as the residenc-
> es of the Justices of the Peace who performed
> civil marriage ceremonies for some of the couples
> (RMI PF, Historical Technical Report, 2-3).

The RMI Response states that the RMI have demonstrated
community at a sufficient level under criterion 83.7(b)(2)
(ii) by showing a high degree (more than 50 per cent) of
endogamous marriages from colonial times to the present.
The RMI Response cites the Joslyn Report as providing evi-

65

Technical Report, Ramapough Mountain Indians, Inc.

dence that the RMP met criteria 83.7(b) at a sufficient
level of evidence from 1750 to 1850:

> Joslyn demonstrates how the families of Ramapough
> "base ancestries," clearly identified as Indian by
> a number of credible sources, have married among
> themselves consistently from the late 1700s for-
> ward (RMI Response B-7).

The BIA has not accepted that the "base ancestries" were
clearly identified as Indian (see the discussion below under
criterion 83.7(e)). Joslyn described the methodology for
his study on endogamy as follows:

> The following list covers all RMIs found for the
> genealogy study who are known to have married,
> arranged by the birth date of the male, for those
> born up to and including 1850 (RMI Response,
> Joslyn Report).

The list included 163 marriages where the bride or groom's
surname was one of the surnames common to the RMI (Van Dunk,
De Groat, Mann, De Freese.) The list included the groom's
name and birthdate (many were approximated), the bride's
name (the maiden name was not always known), and in many
cases a marriage date. The compiler did not cite any docu-
mentation for the information presented. The names and
dates were apparently compiled from various sources.

This list of marriages does not establish endogamy among the
RMP prior to 1870. It is a list of individuals, some of
whose descendants formed an endogamous RMP community in
later generations, but some of whom have not been documented
to be ancestors of the petitioning group. The RMI Response
assumes endogamy based on a faulty evaluation of incomplete
evidence.

One such example is the January 25, 1763, marriage of Sara
DeGroat. The source appears to be the Schraalenburgh Re-
formed Dutch Church records of Bergen County, New Jersey,
which state that Sarah Groot [sic], who was born in Kinder-
gemek, married Albert Cornel (Schraalenburgh, New Jersey,
Reformed Dutch Church 1891, 56). This Sara DeGroat was
baptized in Tappan, New York in 1741, a daughter of Joost
DeGroat and Ariantje Sloove (Cole 1884, A17). Sara DeGroat
and Albert Cornel are not known to have any descendants in
the RMI, nor is the Cornel family otherwise ancestral to the
RMI. If the BIA accepted the records of Sara DeGroat's
baptism and marriage as evidence indicating the existence of

66

Technical Report, Ramapough Mountain Indians, Inc.

an endogamous community of RMP ancestors in the mid-18th century, then it would have to accept the evidence from the same sources that the family of Sara DeGroat was Afro-Dutch. The RMI have rejected the Afro-Dutch connection.

As the above example indicates, it has not been established that all of the individuals in the Joslyn list were ancestors of the current RMI. As stated in the Proposed Finding and elsewhere in this report, the progenitors of the proven RMI ancestors are not known. For example, the earliest documented RMI DeGroat ancestor was James De Groat, who was born about 1792. The RMI Response lists eleven marriages for DeGroat men before 1792 without identifying if or how those men were related to the known RMI ancestors or where the marriages took place (RMI Response, Joslyn Report).

In 42 instances in the list of 163 marriages, the maiden name of the wife is not given, nor is her association with or descent from any of the RMP families indicated. Without proof of the wife's family of origin, it cannot be assumed that the bride lived in the same community as the groom, nor does the marriage show that any such community was endogamous. Since the list is incomplete, undocumented, and includes the marriages of persons who are not shown to be ancestors of the petitioning group, the material does not establish the existence of community at a sufficient level from 1750 to 1850 under 83.7(b)(2)(ii) through the use of community endogamy.

**Geographical community as evidence under 83.7(b)(2)(i).** The RMI Response states that the Proposed Finding "Distorted Distances Between Families In The Late 1700s And Early 1800s In Reaching Its Conclusion That the Ramapough Settlements Were 'Spread Out' Over A Wide Area" (RMI Response, B-9). In analyzing the residential patterns of the RMP before 1870, the technical reports to the Proposed Finding used New Jersey tax rolls as a partial substitute for the early Federal census records that no longer exist (Proposed Finding, Historical Technical Report, 27 n25). The RMI Response describes these as "sterile tax lists" (RMI Response, B-11). However, the Proposed Finding did not "tell where families are living in relation to one another simply by looking at a tax list" (RMI Response, B-11), nor were the tax lists "viewed and analyzed in a vacuum" (RMI Response, B-13). The BAR researchers did not use the pre-1850 New Jersey tax rolls in isolation, but supplemented them with all available Federal and state census records from both New York and New Jersey, with church records, with such civil vital statistics records as were kept at that time, and with as many

Technical Report, Ramapough Mountain Indians, Inc.


deed records as were available, such as the history of the
Kakiat Patent (Durie 1970).

The narrative of a tax collector's trip through the Ramapo
Mountain area of Bergen County, New Jersey, published in The
Sun in 1905 (RMI Response, B-12) is not primary evidence
concerning population distribution in the period prior to
1870.  It was treated in the Proposed Finding as an item of
primary evidence for RMP population distribution in 1905.
The population distribution in 1905 accorded fully with the
description in the RMI Response (RMI Response, B-13 - B-18).
The 1905 tax collector's narrative was confirmed by the
other primary evidence pertaining to the early 1900's.  The
Proposed Finding based the conclusion that the RMI petition
had documented the existence of a distinct RMP geographical
and social community from 1870 until approximately 1950 upon
such primary evidence.

The Final Determination's conclusion that the RMI meet
criterion 83.7(b) from 1870 to 1950 is a result of changes
in the wording for criterion 83.7(b) of the revised regula-
tions.  The new wording only requires the petitioner to
maintain a distinct social community, not a distinct commu-
nity "viewed as American Indian" (as had been the case under
the original 1978 regulations).  In addition, the BAR also
found new, more complete evidence establishing a high level
of group endogamy from 1878 through 1918.  This evidence,
coupled with evidence establishing the existence of a sepa-
rate, distinct geographical community from 1870 to 1950, was
found to be convincing that the petitioner had met criterion
83.7(b) for this specific period.

The 1994 revision of the 25 CFR Part 83 regulations was de-
signed to reduce the burden of proof on the petitioner.  It
is no longer necessary to show the existence of a distinct
community "viewed as American Indian" at a particular point
in time, but only the existence of a "distinct" community.
On the basis of this reduced burden of proof, the RMP dis-
tinct community between 1870 and 1950 is accepted as having
met criterion 83.7(b) for this limited period of time.

**The RMI Response's comments on the Anthropological Technical
Report.**  A footnote in the RMI Response to the Proposed
Finding (RMI Response B-6 n6), referring to the Anthropolog-
ical Technical Report, read as follows: "The opening para-
graph states the 'RMI' ancestors were first documented in
the Ramapo Mountains along the border between New York and
New Jersey around 1800" (RMI Response C-1).  "Since then
they -- the Ramapough Mountain Indian ancestors as a group -

Technical Report, Ramapough Mountain Indians, Inc.

- have been referred to by various names" (RMI Response C-1). This sentence is misquoted by the petitioner. The opening paragraph of the Anthropological Technical Report reads:

> The ancestors of the Ramapough Mountain Indians (RMI) were first documented in the Ramapo Mountains, along the border between New York and New Jersey, around 1800. Since then they have been referred to by various names, each with a different meaning (RMI PF, Anthropological Technical Report, 1).

The part that is inserted by the RMI Response, "----the Ramapough Mountain Indian ancestors as a group---", changes the meaning of the sentence. The Anthropological Technical Report referred to the RMI ancestors, not, "ancestors as a group." The remainder of the report clarified and elaborated the introductory statement, showing that the anthropologist had found no evidence indicating that a RMI ancestral community existed before 1870.

The RMI Response said that the "BAR anthropologist" "knows" that the RMI are culturally distinct (RMI Response, B-5; RMI Response B-42 - B-43). The conclusion that there was no cultural distinctiveness was a consensus decision by all of the BIA staff members involved in deliberating the merits of the RMI petition.

There was no heavy-handed editing of the Anthropological Technical Report, as alluded to in the RMI Response (RMI Response B-6 n6). The distinction made in the opening paragraph between Ramapo Mountain People (RMP) and Ramapough Mountain Indians (RMI) was a necessary analytical distinction. Analysis of the data without such a distinction would have been impossible, since the RMP and the RMI share the same ancestry, but not all of the RMP are members of the RMI. Also, not all of the RMP claim to be Indians or to have Indian ancestry.

**Cultural distinctiveness not a regulatory requirement.** The RMI Response stated that the regulations have been interpreted to require cultural distinctiveness as evidence for a distinctive community (RMI Response B-42 to B-43). The regulations do not require petitioners to maintain a distinctive Indian culture. However, the maintenance of Indian cultural heritage by a petitioner is a high level of evidence that a group has continued to maintain its community

69

Technical Report, Ramapough Mountain Indians, Inc.

from colonial times to the present. For example, mainte-
nance of the indigenous language, religious practices, and
beliefs, and patterns of social organization are evidence
for a culturally distinct community (see Proposed Finding
for the Jena Band of Choctaw).

The issue of cultural distinctiveness was considered in the
Proposed Finding because the petitioner stated that the RMI
had maintained a distinct indigenous culture. The evidence
presented in the original petition to support "cultural
distinctiveness" as demonstrating continuing existence as a
social community was rejected. Much of the same evidence is
repeated in the RMI Response. For example, the RMI Response
states that some of the RMI's ancestors continued to speak
Jersey Dutch as late as 1910 (Prince 1910), and that this
demonstrates their continued isolation as an Indian communi-
ty.

The petitioner asserted that the use of Jersey Dutch was
evidence that the RMP had maintained their Indian culture.
Jersey Dutch is not an Indian language; it is a European
language which borrowed a few Munsee words as a result of
culture contact between Munsee Indians and the Dutch that
lived in the area during the colonial era (Prince 1910).
Jersey Dutch was spoken by everyone in the Bergen County
vicinity, European and Indian, as the lingua franca. The
fact that the RMI's ancestors spoke Jersey Dutch until such
a comparatively late date is evidence of their isolation as
a social group. But it does not constitute cultural dis-
tinctiveness under criterion 83.7(b) (compare this with the
Jena Band of Choctaw, some of whom continue to speak Choctaw
to this day).

The point that the petitioner's ancestors spoke Jersey
Dutch, a non-Indian language, was not considered as evidence
that the petitioner did not meet the requirements of crite-
rion 83.7(b). The fact that Jersey Dutch was still spoken
by the RMP on the Houvenkopf as late as 1910 is not evidence
that a distinct Indian culture was maintained from the time
of first sustained contact with non-Indians. The conclusion
that the RMI did not meet criterion 83.7(b) was based on the
lack of evidence, linguistic and otherwise, for continuous
existence of the RMP as a social community from first sus-
tained contact with non-Indians to 1870.

Other evidence from the late 1800's and early 1900's which
the petitioner said supported their cultural distinctiveness
included:  living in log cabins, making baskets and wooden
spoons, folk medical beliefs and practices, and folktales.

70

Technical Report, Ramapough Mountain Indians, Inc.

These characteristics, while culturally distinctive, were not distinctively Indian. They were cultural traits which the RMP shared with other mountaineers in that region (for example, the Pitts and Conklins of the Pine Meadows region near Ladentown), even though the other mountaineers did not share a common ancestry with the RMI. Similarly, the petition said that other evidence from more recent times, including the RMI members' love of hunting and the outdoors (RMI Pet. A-30 - A-31, B-28 - B-29), provided supporting evidence that the group had maintained a distinct Indian culture. However, these characteristics are widely shared by many non-Indian American citizens.

The Proposed Finding stated that the RMP had not demonstrated the maintenance of a community viewed as American Indian from the time of first sustained contact with non-Indians. That conclusion was primarily based on the lack of evidence before 1870. However, the cultural traits mentioned in the foregoing paragraph could not be weighed as positive evidence of the maintenance of tribal community.

The RMI also created "clans" after the 1978 incorporation, one for each of the three primary RMI settlements (Mahwah/Stag Hill, New Jersey; Hillburn, New York; and Ringwood, New Jersey). They were not organized as nor did they function as clans based on lineal descent. Rather than mediate social and personal behavior in diverse social aspects of personal and community life, they are part of the formal RMI structure and operate like subcommittees of the RMI council. According to council members, they were, in part, designed to increase participation by the RMI membership in RMI activities. There is no evidence that the clan structure has increased participation. The Anthropological Technical Report noted that, while most RMI knew their "clan," there was no evidence that it was more than a reference to one's place of residence (or family's origin place, for those who no longer live in the core area), Earlier references to "clans" and "tribe" in newspaper accounts about the RMI's ancestors were found to be generic (Donoghue 1942; Speck 1911; Sweet 1935a, 1935b).

Linda Stamato, in her Master's thesis, contended that the manner in which the RMP governed their own affairs was similar to Munsee Indian tribal councils of the past (Stamato 1968). The description of the political process was extremely vague and based on unstudied notions of Munsee society specifically and North American Indian society in general. The analysis of RMP process as an Indian cultural "survival" was not substantiated through actual study of

71

Technical Report, Ramapough Mountain Indians, Inc.

historical documents to demonstrate that an actual link
existed, or by in-depth comparative analysis of the two
systems of governance.

Ms. Stamato's contention that the RMI on Stag Hill governed
their own affairs, without appealing to local law enforce-
ment, was consistent with other accounts, and with the
conclusions of the AS-IA in the Proposed Finding concerning
the nature of the RMP community during the period from 1870
to 1950.  The data at hand did not show that the character-
istics of the community of the RMI's ancestors on Stag Hill
(patriarchal, run by elders, and autonomous) demonstrated
the maintenance of Indian culture as evidence for community
under 25 CFR Part 83 (1978).  Many Indian societies are not
patriarchal.  A community may be patriarchal, administered
by elders, politically autonomous, and culturally distinct
without being distinctively Indian.[21]

Whether or not the RMP governed themselves in a manner
consistent with the Munsee is irrelevant, for neither crite-
rion 83.7(b) nor criterion 83.7(c) requires that petitioners
govern themselves according to traditional "Indian" custom.
It is sufficient that the evidence demonstrates that the
RMI's ancestors did govern their own affairs.  The Final
Determination (see evidence considered in the section on
criterion 83.7(c) in this technical report) concludes that
the RMP did govern themselves during the period when, ac-
cording to the Proposed Finding, social community was very
strong (from 1870 to 1950).  Like speaking Jersey Dutch,
evidence of political autonomy supports the conclusion in
the Proposed Finding that the RMP had maintained a social
community from 1870 to 1950, although the Proposed Finding
found that it was not "viewed as American Indian" whose
members were "descendants of an Indian tribe which histori-
cally inhabited a specific area" as required by criterion
83.7(b) (1978).

**Lack of evidence for continuous social community from first
sustained contact with non-Indians to 1870.**  The RMI did not
demonstrate that a distinct RMP community had existed since
the time of first contact with non-Indians, as required by
criterion 83.7(b).  The RMI Response did not present any new

---

[21]  This has been clearly demonstrated by anthropological studies of
many European immigrant communities in the United States.  After all,
there are many societies, most notably in Europe, which would fit these
attributes.  Conversely, many Indian societies do not fit these stereo-
types.

72

Technical Report, Ramapough Mountain Indians, Inc.

evidence regarding the maintenance of social community
before 1870.  The following summary discusses what informa-
tion the RMI did provide concerning the pre-1870 period.

The RMI Response submitted, in the "Exhibits" section, a
deed dated September 30, 1708, in which "Catoonah Sachem of
Ramapoo Indians and Associates within her Majesties province
of New York in America" (Rockwell 1927, 10), along with
eight other named Indians (Rockwell 1927, 13), deeded ap-
proximately 20,000 acres of land in Connecticut, lying on
the west side of the Norwalk River, to a consortium of
purchasers (Rockwell 1927, 10-11).  The petitioner did not
accompany this exhibit with any analysis or explanation as
to why they thought this Indian leader was historically
connected to the RMI (RMI Response B-37).[22]

The BAR researchers attempted to identify the precise loca-
tion and tribal allegiance of the "Ramapoo" sachem who made
this Ridgefield, Connecticut, deed.  Information was provid-
ed by a history of the village of Katonah in Westchester
County, New York (Duncombe 1961), some 80 miles from the
petitioner's geographical center (see map supplement).
While Duncombe identified the local Indian group as
"Mohegan" (Duncombe 1961, 1), using the spelling of the
Montville, Connecticut, tribe, she must have meant, given
the geographical location, the Mahican, a Hudson River group
closely allied with the Wappinger (Brasser 1978, 198 map).
The Mahican spoke an Algonquian language believed to have
been closely related to Munsee (Brasser 1978, 198).[23]
Goddard treats the Wappinger themselves under the general
category of "Delaware" (Goddard 1978, 238).

According to Duncombe, "as we understand it, the Ramapo
Sachemdom was part of the Tankiteke Chieftaincy of the
Wappinger Confederacy" (Duncombe 1961, 4; citing R. P.
Bolton, <u>New York City in Indian Possession</u>, New York 1920,

---

[22]    The Response says:    "Interestingly, a deed dated 1708 in
Connecticut specifically refers to a 'Ramapoo Indians and Associates
within her Majesties province of New York in America.  (See Response to
the Proposed Finding, Appendix.  The double 'o' spelling is in fact used
in documents in the Ramapo area.  (Bischoff,460) [spacing and emphasis
sic]" (RMI Response 1995, B-37).

[23]    By 1698, shortly before the date of the Ridgefield deed, "only 90
Mahican warriors were left on the Hudson, implying a total population in
New York of about 300 people" (Brasser 1973, 206).  This was followed by
considerable additional outmigration to Canada, the Mohawk Valley, and
Pennsylvania (Brasser 1978, 206).

Technical Report, Ramapough Mountain Indians, Inc.

246). However, Goddard's synonymy did not mention "Ramapo" and for "Tankitekes" cited only a usage date of 1655 and said "location and synonyms uncertain" (Goddard 1978, 238). Goddard also added that:

> [t]here is no evidence that a 'Wappinger Confederacy' (Ruttenber 1872:77-85; Mooney 1910f; Speck 1928a: map facing p. 212) under this or any other name extended from the Hudson to the Connecticut (Goddard 1971a:20-21) (Goddard 1978, 238).

Katonah (the same man as "Catoonah" in the 1708 Ridgefield, Connecticut, deed) also sold land in the Town of Bedford, Westchester County, New York, between 1680 and 1704 (Duncombe 1961, 3-4; Town of Bedford 1967, 132, 141, 149-150, 160, 172; see also Indian deeds in: Town of Bedford 1969; Town of Bedford 1972) and on a confirmation of a deed in Stamford, Connecticut (Duncombe 1961, 4). Later in the 18th century, most of Katonah's Mahican people left to go to Stockbridge (Duncombe 1961, 12; see also Brasser 1978, 207-209), but some remained in Westchester County, New York, past the mid-18th century (Duncombe 1961, 12) and fought on the American side in the Revolution (Duncombe 1961, 11).

The primary location of the Wappinger Indians was east of the Hudson River in Dutchess County, New York, rather than in Westchester County. In the colonial period, the Wappinger group did have ties into the region now inhabited by the RMI:

> **The Westchester Indians [east bank of the Hudson River] sold the bulk of their remaining landholdings to their English allies during the last decades of the seventeenth and first decades of the eighteenth century. The sachem Wessecanow, alternately identified as a Wiechquaeskeck, Wappinger, or Kichtawanck chief, depending on where he happened to be living at the time, served as the primary agent between his people and the English from 1676 to 1690. During this period, his brother, the Tappan sachem Goharius, another Tappan Indian known as Jan Claes or Towachkack, and Oscawana sold their lands along the east bank of the Hudson River (Grumet 1983, 22).[24]**

---

[24] The petitioner presented no primary source material pertaining to direct, documented, connections between the Tappan Indians and the petitioner's ancestral group.

74

Technical Report, Ramapough Mountain Indians, Inc.

Grumet pointed out that:

> The lower River Indians came to spend more time
> away from their ancestral homeland as their popu-
> lation and land base in Westchester County dwin-
> dled.  Those moving to or near Minisink on the
> western border of northern New Jersey and southern
> New York came to be known either as Pompton, Op-
> ing, or Minisink Indians while living there.
> Those choosing to live farther west in the Susque-
> hanna and Ohio valleys became known either as
> Munsee or Mahican . . .  Westchester Indians liv-
> ing to the east of the Minisink country around
> Pompton, New Jersey fled to their settlements at
> Coshecton along the upper Delaware River valley
> following such an attack [by relatives of English
> settlers] in 1745.  Their sachem, Nimham, subse-
> quently negotiated an agreement with the New York
> authorities the following year, enabling his peo-
> ple to return in safety to their homes at Pompton
> (Grumet 1983, 23).

A later New Jersey connection of potential interest was that
the Wappinger chief Daniel Nimham, who prosecuted a New York
land claim against a proprietor in the 1760's (Handlin and
Mark 1964) appears to have been a relative of the man who
signed away the Wappinger and Pompton Indians' New Jersey
land interests at the Treaty of Easton in 1758 (Grumet 1983,
23).[25]

---

[25]   The Historical Technical Report to the RMI Proposed Finding
stated:

> In fact, some Indian bands seem to have moved into
> northeastern New Jersey during this period rather than
> migrating out--particularly the Mahican-speaking
> Wappinger from the east bank of the Hudson River who
> settled for a time prior to 1745--at least until the
> Treaty of Easton in 1758--around Pompton in modern
> Passaic County (18th century Bergen County), New Jersey
> (Grumet 1979, 83-84; Brawer 1983, 23).  Grumet noted
> that on March 16, 1756, a number of these Indians in
> Bergen County sent three belts of wampum to the New
> Jersey Council (Grumet 1979, 84-85 citing to NJA 1st Ser
> 17, 4-7).  The actual entry indicates that George
> Vreelandt Esqr. presented to the council "three Belts of
> Wampum from Harcop John Keyon and Six Indians in the
> County of Bergen as A token of their Fidelity to his
> Majesty & Affection to their Brethren the English &
> their desire to be included in the Treaty lately held
> with the Indians at Crosswicks" (NJA 1st Ser 17, 4).

Technical Report, Ramapough Mountain Indians, Inc.

These background materials indicated that _if_ there were a
"Ramapoo" or "Ramapough" Indian tribe at any date, it was
apparently a subdivision of the Wappinger, and possibly the
same as the Pompton, who in the mid-18th century (ca. 1740-
1760) resided in Passaic County, New Jersey, to the _west_
(not to the east in Bergen County, New Jersey, and
Orange/Rockland Counties, New York) of the petitioner's cur-
rent geographical focus.

The same basic problem remained in attempting to tie the
petitioner to the Wappinger as existed with attempts to
connect the petitioner to colonial-era Lenape or Delawarean
tribes of New Jersey, such as the Hackensack: namely, that
no documentation was discovered to bridge the period between
the known Indians of the tribal era (pre-1758) and the
earliest documented ancestors of the petitioning group (born
ca. 1790-1810).[26] During this period, there are no Indians
documented as having remained in the geographical area of
southeastern New York and northeastern New Jersey. Addi-
tionally, if the petitioner claims Hackensack ancestry and
tribal origin (RMI Response B-39; _Atlas of Bergen County_
1876, 25), there would be no demonstrable continuity of
community or political authority with the 1708 "Ramapoo"
sachem from the Hudson River Wappinger tribe.

Because of the documented connection between the Wappinger
and Mahican Indians of New York and the Stockbridge, Massa-
chusetts, settlement, the BAR historian examined the recent
(1995) book by Colin G. Calloway, _The American Revolution in
Indian Country_ (Calloway 1995), which contains a full chap-
ter on the Stockbridge group's active participation in the
American Revolution (pages 85-107, with extensive citations
to prior literature). Calloway focused directly upon the
activities of the Massachusetts settlement, and presented no
data pertinent to the Pompton subgroup of the Wappinger.
There was no mention of Ramapough Indians, or any other
Indian tribes around the Mahwah area, in _Early American
Indian Documents: Treaties and Laws, 1607 to 1789_ (Calloway
1994).

---

This wording would indicate that the reference does
apply to the Pomptons (RMI PF, Historical Technical
Report 8).

[26] See below under criterion 83.7(3) for a more detailed genealogical
discussion.

Technical Report, Ramapough Mountain Indians, Inc.

The only other "evidence" offered by the RMI to demonstrate
that the RMP had continuously existed as a social community,
from first sustained contact to 1870, were statements that
the RMP were living in the Ramapo Mountains as squatters.
The RMI Response suggested that this was the reason why
records for the RMI were difficult to find (RMI Response B-
12).  The RMI Response indicated that, as squatters, the RMP
were invisible to the state and local governments, churches,
private landowners on whose land they were squatting, and
census takers.  No substantive contemporary evidence sup-
porting this position that the RMI's ancestors were squat-
ting in the Ramapo Mountains from first sustained contact
with non-Indians to 1850 was presented by the petitioner.
Considerable evidence to the contrary, showing that the
petitioner's earliest known ancestors were living in the
valley areas from approximately 1800 to 1850, was located
and analyzed in the technical reports to the Proposed Find-
ing.

The Proposed Finding demonstrated that some RMI ancestors
were living in the Ramapo River valley, among non-Indian
families, by the early 1800's.  Between 1800 and 1850, other
RMI ancestral families were living at locations further east
in Bergen County, New Jersey, and in several towns in Rockl-
and County, New York.  When they first appeared in the
Ramapo River region, the RMP lived in the valley, moving
into the modern settlement area in Ramapo Mountains (Mahwah/
Stag Hill, Hillburn, and Ringwood) only after 1850.

During preparation of the Final Determination, BAR research-
ers located information that supported this analysis.  No
deed records were found to link the RMP with the Indian
descendants whom Jacquemont mentioned as living in the
Ramapo Mountains in 1827 (Davis 1995).  The map of the
Ramapo Valley area in the 1876 Atlas of Bergen County (Atlas
of Bergen County 1992 [1876], 116), shows that the land
which Jas. [James] DeGroat purchased in 1825 was not in the
Ramapo Mountains, as the RMI Response indicated, but on the
east side of the Ramapo River (see Appendix B).  This, when
correlated with the Federal census records cited in the
Proposed Finding, demonstrates that some of the ancestors of
the RMI were living in the valley as late as 1876, when the
atlas was published.  Not all were in the mountains where
the petitioner said its ancestors have always lived.

The Proposed Finding did not deny that RMP settlement in the
Ramapo Mountains began in the period from 1850 to 1870,
although many were still working on farms in the valley
during that period.  The issue is not a lack of evidence for

77

Technical Report, Ramapough Mountain Indians, Inc.

the RMP generally, but the lack of evidence demonstrating that they were a community that had continued from origins in an Indian tribe that existed at the time of first sustained contact with non-Indian settlers to the present. The RMI were informed in technical assistance meetings that the technical reports accompanying the Proposed Finding had traced the historical movements of the families which the RMI identified as their core ancestors as a basis for concluding that they were not part of a distinct social community which had evolved directly from a historical Indian tribe.

**Evidence for social community from 1870 to 1950.** In addition to the 1876 atlas, RMI ancestors also appeared in church records, census records, and newspaper accounts from about 1870 to the present. The Proposed Finding concluded that there was sufficient evidence to establish a reasonable likelihood that the RMP had been a cohesive community from about 1870 until about 1950, but not sufficient evidence to establish that they had been an American Indian community. The RMI Response asserted that the BIA accepted the work of David Cohen uncritically. The BIA's conclusion was very different from Cohen's. Cohen concluded that the three RMP communities were socially distinct from each other.

The RMI Response submitted as evidence a paragraph from a Bergen County, New Jersey, atlas published in 1876. The description of the group was not documented and contained the following description:

> The once numerous and powerful tribe of Hacken-
> sackey [sic] Indians is almost extinct. The only
> descendants of the tribe probably in existence are
> a few half-breeds that inhabit the Ramapo Moun-
> tains in the western part of the County; but they
> bear little resemblance to the Indian in habits or
> physique. They are entirely ignorant, knowing
> absolutely nothing of who they are, what they are,
> or where they came from. Even the traditions of
> their race are forgotten. They live in detached
> huts on the sides of the mountains, and maintain
> their existence by hunting, fishing, and an occa-
> sional day's work (Atlas of Bergen County 1992
> [1876], 26).

As the Proposed Finding concluded, the RMP were thought of as a distinct community by the 1870's. The above citation does not, however, provide any documented evidence of there having been a continuous RMP tribal community from the time

78

Technical Report, Ramapough Mountain Indians, Inc.

of first sustained contact with non-Indians until the present.

The RMI Response stated that the technical reports to the Proposed Finding "distorted" the distances between RMI families (RMI Response B-9) based, in part, on ignorance of the geography of the area.  The Anthropological Technical Report concluded that the distances between the three primary settlements (Mahwah/Stag Hill, New Jersey; Hillburn, New York; and Ringwood, New Jersey) were not sufficient to question the existence of a single community, in spite of the rough terrain separating them.  This conclusion was based not only on the experience of driving around the area to interview RMI members in their homes in the three core area settlements, but also on a snowmobile trip through the woods via foot trails that have long-existed, connecting the three settlements.  The Anthropological Technical Report emphasized how <u>close</u> the settlements were to each other, and found this to be supporting evidence that the RMP were a community from about 1870 to 1950.

There was evidence that the RMI ancestors maintained social relations with each other, both within and between these three settlements between 1870 to about 1950.  This conclusion was based on the partial evidence demonstrating group endogamy, geographical evidence showing that the bulk of the RMI ancestors lived in three communities in close proximity, evidence of patterns of social discrimination against the RMP, and evidence that the RMP participated in racially segregated churches and schools.

New evidence discovered by BIA researchers while evaluating the RMI Response strengthened this conclusion.  Specifically, the data on group endogamy recorded in the <u>Ramapo Presbyterian Church Register</u> from 1868 to 1918 supported the conclusion that the RMP formed a community in the late 19th and early 20th centuries, since they married each other at a very high rate.  See the discussion under criterion 83.7(c) for the impact of linking the high rate of group endogamy identified under criterion 83.7(b) to the issue of political authority and/or influence under criterion 83.7(c).

**Lack of evidence for social community from 1950 to the present.**  For the time period from 1950 to the present, the petition presented very little evidence that the RMP continued to be a social community.  The petition presented some limited, anecdotal evidence of social interaction within the traditional three-settlement area.  The Proposed Finding concluded that approximately one-third of current RMI mem-

79

Technical Report, Ramapough Mountain Indians, Inc.

bers continued to live in the three traditional settlements.
There was some evidence of social interaction among the RMI
members in the three settlements from 1950 to the present,
but most of this activity seemed to be within family groups.
By way of contrast, significant social interaction within an
American Indian tribe involves the maintenance of relation-
ships across family lines as well.

Since more than half of the membership is not still resident
in the geographical core area (Hillburn, New York; Mahwah/
Stag Hill, New Jersey; and Ringwood, New Jersey), it was not
possible to assume that the RMI, as a whole, continued to
constitute a community on the grounds of geographical dis-
tribution alone.  After 1950, many of the people who are now
on the RMI membership list moved away from the three settle-
ments and the immediately surrounding area.  According to
the RMI 1993 membership list, two-thirds of the membership
live outside of the RMP geographical area.  Only one third
of the membership continues to reside there.  In the RMI
Response, the petitioner provided no new evidence for the
period from 1950 to the present regarding the continuing
existence of their community.  No new evidence was presented
concerning the relationship of the two-thirds majority of
the RMI members to the one-third living in the geographical
core area.

According to the RMI membership list, two-thirds of the
members were living outside this core area in 1993.  The
petitioner did not provide evidence that these "non-resident
members" (those living outside the core area) were socially
or politically connected to the one third of the RMI members
living in the core area (BAR, FD 1993).  There was limited,
anecdotal evidence that some of these RMI members continued
to maintain social relations with RMI living in the core
area.  There was no evidence, at the time of the Proposed
Finding, that this was a widely shared pattern for the group
as a whole, however.  There was no reliable evidence that
group endogamy has continued at a rate of 50 percent since
about 1920.  In fact, the limited evidence for endogamy
submitted by the petitioner suggests that marriage within
the group has steadily and sharply declined since about
1920.

The RMI Response asserted that the Proposed Finding por-
trayed the RMI as a "Black group" rather than an "Indian
group" (RMI Response A-4).  The Proposed Finding accepted
the petition's anecdote concerning the RMI members' with-
drawal from the A.M.E. church when African-Americans started
attending in the 1960's as another piece of evidence sup-

Technical Report, Ramapough Mountain Indians, Inc.

porting the social distinctiveness of the RMP; that is, that the petitioner's members in this instance distinguished between themselves and African-Americans in Mahwah. This anecdote was found to be consistent with the way the RMI and their ancestors had always identified themselves, and with the way they had been identified by others: as neither white nor black nor Indian, but mixed.

Linda Stamato's 1968 thesis stated that the RMP had clans that aided in resolving the community's disputes (RMI Response, C-4). There was no corroborating evidence for the existence of these clans in the RMP community. Stamato's data was considered at the time of the Proposed Finding. The Proposed Finding concluded that self-governance in community affairs did indicate some exercise of political influence by the community's leaders, but it was unclear from Stamato's description how extensive that political process was. Basically, there were no specific examples of instances in which disputes were resolved, nor did Stamato include a description of the process by which the clans performed this function. The anthropologist found independent supporting evidence in the course of field work that through the 1950's, the RMP did, in fact, handle their own disputes. However, the independent supporting evidence made to reference to a clan mechanism. The process certainly not through clans as the term is ordinarily understood by anthropologists and specialists in Native American Studies.

The RMI Response did not submit new evidence for the period from 1950 to the present. The RMI Response did not include follow-up on the suggestions made by BAR researchers after the Proposed Finding was issued concerning evidence that might be available to demonstrate social community from 1950 to the present.

### DISCUSSION OF CRITERION 83.7(c): POLITICAL INFLUENCE OR AUTHORITY

83.7(c)   The petitioner has maintained political influence or authority over its members as an autonomous entity from historical times until the present.

The Proposed Finding concluded that there was very little data in the petition to demonstrate directly the maintenance of political influence or authority among the RMI. While there was some evidence for leadership within the three

Technical Report, Ramapough Mountain Indians, Inc.

separate RMI communities after about 1950, there was no
evidence for a single political leadership that exercised
influence over the three communities.  The petition asserted
that the RMI council had maintained political authority
since 1978, but the BIA's research into this matter led to
the conclusion that the RMI council was little more than a
formal organization with a tenuous political connection to
the people on the RMI membership list.  The final conclusion
of the Proposed Finding was, therefore, that the RMI did not
meet criterion 83.7(c).

There was no evidence that the formal leaders of the RMI
organization were maintaining a bilateral relationship with
their members or that the members communicated with their
leaders on a regular basis concerning matters of importance
to the group.  The Anthropological Technical Report found
that there were no political issues of importance to the
group as a whole.  Several RMI members living in the core
area voiced interest in the acknowledgment process, but
there was no evidence that acknowledgment was an issue of
importance to the group as a whole (including the two-thirds
of the membership living outside the core area).  Evidence
concerning participation in the council meetings and the
elections held by the RMI since their 1978 incorporation,
and the annual post-1978 RMI powwow, demonstrated a low
level of participation when considering the entire member-
ship.  There was limited evidence that some individuals
living outside the three principal settlements core area
continued to maintain contact with leaders in the core area,
but there was no evidence that this characteristic was
widely shared.

The RMI Response did not present new evidence with regard to
criterion 83.7(c).  However, under the 1994 revision of the
regulations which links criterion 83.7(c) and criterion
83.7(b) when certain levels of evidence exist under criteri-
on 83.7(b), the conclusion of the Proposed Finding for the
period 1870-1950 has been modified in the Final Determina-
tion on the basis of new evidence obtained by BAR research-
ers during the evaluation process.

BAR researchers expanded upon the work of the petitioner,
utilizing the Ramapo Presbyterian Church Register for the
years 1868 to 1918 (Ramapo Presbyterian Church Register
1994).  This document strengthened the evidence for the
petitioner's claim to group endogamy, with marriage records
providing evidence that the petitioner met criterion 83.7(b)

82

Technical Report, Ramapough Mountain Indians, Inc.

at a sufficient level (83.7(b)(2)(ii)) for marriages which took place between 1901 and 1918. While the BAR had no statistical evidence for the duration of the marriages that took place during this period, it presumed that the majority continued for approximately 30 years on the average, until some time in the period 1930-1950. This evidence, coupled with evidence that 50 percent or more of the petitioner's ancestors lived in a distinct geographical community from 1870 to around 1950 (83.7(b)(2)(i), demonstrated the petitioner met criterion 83.7(b) at a sufficient level of evidence for the period from 1870 to about 1950.

Under the 1994 revised regulations, if a petitioner meets criterion 83.7(b), the maintenance of social community, at a sufficient level of evidence (for example, if 50 percent of the membership lives in an isolated, homogeneous, geographical community, or there is fifty percent endogamy) (83.7 (b)(2), then the regulations assume that political authority has also been maintained within the community. "A group that has met the requirements of paragraph 83.7(b)(2) at a given point in time shall be considered to have provided sufficient evidence to meet this criterion at that point in time" (25 CFR 83.7(c)(3)).

The evidence indicates that, from 1870 to about 1950, the RMI, met criterion 83.7(c) because they met criterion 83.7(b) at the high level based on the high rate of endogamy (over 50 percent) and the high percentage of members living in a geographical community (over 50 percent).

The petitioner has not presented evidence that the RMP maintained political influence or authority from historical times (from the time of first sustained contact with non-Indians) to 1870. As previously stated, there is no evidence demonstrating that the petitioner was a distinct community before 1870. Continuous existence as a social community and continuous exercise of political authority have always been required under the regulations for acknowledgment. For example, in their original petition and in their response to their own Proposed Finding, the Mohegan Tribe provided evidence of continuous political authority in the group from 1641 to the present. This requirement has been met by other successful New England petitioners as well (see the Proposed Findings and Final Determinations for the Wampanoag Tribal Council of Gay Head, Massachusetts, and the Narragansett Tribe of Rhode Island).

Technical Report, Ramapough Mountain Indians, Inc.

Neither the petition nor the RMI Response presented evidence that establishes a reasonable likelihood that the RMP maintained political influence or authority from 1950 to the present. Without the high level of evidence for the maintenance of social community from 1950 to the present, the BIA cannot assume that political authority has been maintained since 1950. The evidence presented by the petitioner, and that found by the BAR, indicates that the descendants of the RMI progenitors began migrating from the social core area after 1900 (Price 1950). This was especially true for the Ringwood community after the Ringwood Mines closed at the time of the Depression in the early 1930's. The mines were reopened briefly during World War II, but closed again after the end of the war. This precipitated further migration by RMI ancestors (and current members) who lived in Ringwood.

Without the benefit of the assumption of political authority that was made for the period from 1870 to 1950, the petitioner needed to present evidence demonstrating political authority for two distinct periods: from the time of first sustained contact with non-Indians to 1870, and from 1950 to the present. This would have included evidence that: political authority was vested in the membership as a whole; that the members and leadership maintained a bilateral political relationship; that the leaders represented their members on matters of importance to the group as a whole; that the members communicated to their leaders their opinions on issues of importance to the group, that members are able to influence their leaders on such issues; and that the leaders in whom the authority is vested are able to influence the behavior of group members.

Neither the RMI Petition nor the RMI Response presented any evidence demonstrating the RMI have met criterion 83.7(c) from first sustained contact with non-Indians to 1870 (see the discussion of Katonah under criterion 83.7(b)) or from 1950 to the present. No such evidence has been found by the BAR researchers.

Technical Report, Ramapough Mountain Indians, Inc.

### DISCUSSION OF CRITERION 83.7(e):
### DESCENT FROM A HISTORICAL INDIAN TRIBE

83.7(e)    **The petitioner's membership
consists of individuals who
descend from a historical
Indian tribe or from histori-
cal Indian tribes which com-
bined and functioned as a
single autonomous political
entity.**

**Introduction.**  In a letter from the BIA dated March 24,
1994, the RMI were advised that the Proposed Finding was
based on extensive evidence concerning their ancestry which
concluded the petition had not demonstrated that the RMI
members descended from a historical tribe of Indians.  The
RMI were also informed that the technical reports accompany-
ing the Proposed Finding had traced the historical movements
of the ancestors as a basis for concluding that they were
not part of a distinct social community which had evolved
directly from a historical Indian tribe.

Problems with identifying Indian ancestry for the four main
RMI families, Mann, VanDunk, DeGroat, and DeFreese, were
specified in both the historical and genealogical technical
reports accompanying the Proposed Finding.  The technical
reports suggested possible additional sources for research,
including original church records and deeds.  For example,
the fact that the Mann family origins had not been explored
before 1800 was cited on page 22 of the historical report.
The need for a thorough search of the deeds was noted on
page 36 of the historical report.

**The RMI Response.**  The RMI petition and the RMI Response
focused their discussion and analysis on attributions of
Indian ancestry and/or what were perceived as "Indian"
social and personal characteristics to some RMI ancestors
who lived in the late 1800's.  These individuals were either
direct ancestors of the modern RMI or were collateral rela-
tives of RMI ancestors.  These sporadic attributions of
Indian characteristics to RMP individuals do not equate with
known, demonstrated, tribal ancestry as required by the
Federal regulations.  The RMI have not demonstrated that
there was tribal ancestry for their known progenitors.

The petition and the RMI Response cited as "proof" of RMI
Indian ancestry an individual who was first referred to as
having Indian ancestry in 1875.  This person's known ances-

85

Technical Report, Ramapough Mountain Indians, Inc.

tors were never identified as Indian, part-Indian, or by a tribal designation. No other evidence was presented regarding who his Indian ancestors might have been. This type of amorphous reference does not constitute satisfactory evidence of a person's Indian ancestry or tribal descent under the provisions of criterion 83.7(e).

**Comparison with genealogical evidence used in other decisions.** The Narragansett Indian Tribe of Rhode Island had a documented history dating to 1614. The membership lists of the Narragansett community prepared after the 1880 Rhode Island "detribalization" act clearly established tribal ancestry for the modern Narragansett by referring to more than 250 years of documents concerning the tribe and its members. The diverse non-Indian ancestry of the Narragansett was not an analytical concern in that Final Determination. Similarly, the Mohegan Tribe of the State of Connecticut also documented an unbroken chain of tribal descent. In weighing the evidence for the three cases--RMI, Narragansett, and Mohegan--the diverse non-Indian ancestry was not considered negative. However, the RMI case lacked the documented tribal ancestry and history that would support a positive finding under criterion 83.7(e).

The RMI Response also compared the RMI's undocumented claims to Indian ancestry to ancestry of the Jena Band of Choctaw, noting that the Historical Technical Report on the Jena Band of Choctaw stated that the precise migratory path of the Jena from Mississippi to Louisiana in the 1870's was not an issue (RMI Response B-34 - B-35). The members of the Jena Band were authoritatively identified as Choctaw by a Federal Indian enrollment (the Dawes Rolls) at a date subsequent to the move from Mississippi to Louisiana. The RMI do not appear on any Federal Indian rolls or treaties. Jena continuity with the Choctaw tribe was independently established by the connection to Choctaw Indians who were removed from Louisiana to Oklahoma, and by the fact that some members of the Jena Band over 45 years of age still speak the Choctaw language, using a specific dialect recognized by the Mississippi Choctaw. The RMI submitted no evidence of equivalent quality and character. Statements made concerning how the evidence is weighed in particular cases must be read in the full context of the case.

By contrast, the Indian ancestry claimed by the RMI cannot be tied to any specific individuals who lived during the 18th or early 19th centuries and who were identified in contemporary documents as being Indian or as part of a specific tribe, or as descended from a specific tribe. The

86

Technical Report, Ramapough Mountain Indians, Inc.

RMI's claim to Indian ancestry is based mainly on working backwards from post-1870 statements which vaguely indicated that some of the RMP "looked Indian" or had Indian "characteristics." Neither the petitioner's exhibits nor the BIA's additional research provided evidence to confirm those late 19th century assertions of Indian ancestry for the RMP.

The post-1870 statements were in conflict and often inconsistent. A pattern of discrepancies such as this sheds doubt on the veracity and reliability of the evidence. For example, see the RMI Response's analysis of Richard DeGroat, which was based on an 1875 New York state census notation and on a partial recounting of DeGroat's ancestry in his Civil War pension record (RMI Response, Joslyn Report 2-3). The same Richard DeGroat was not identified as an Indian in any other Federal or State census, nor were his parents or siblings, even though they were named and ethnically/racially identified in numerous documents. It cannot be assumed that someone who was identified as an Indian for the first and only time in an 1875 state census, in fact, descended from an Indian tribe, if this conflicts with the balance of the record, which in this case is substantial. It is also noted that neither Richard DeGroat nor Florence Maguiness, who was identified as Indian on the 1870 Federal census, has direct descendants on the 1993 RMI membership roll, although they do have collateral descendants on the current roll.

Roger D. Joslyn, a professional genealogist who contributed detailed genealogical reports to the 1992 RMI petition for Federal acknowledgment, submitted an additional report (RMI Response, Joslyn Report) in the RMI Response. The RMI petition had well-prepared genealogical charts and reports that thoroughly documented the ancestry of the modern RMI to the early 19th century. Joslyn's reports included photocopies of the Federal and State censuses from 1790 to 1925 for the counties in New York and New Jersey where the RMI families lived. Mr. Joslyn also accumulated over 200 photocopies of New York and New Jersey birth, death, and marriage records for the ancestors and collateral relatives of the RMI. These records, as well as a large volume of church, tax, probate, cemetery, Vineland Study (Vineland Training School 1917), and Eugenics Record Office (ERO) reports (Osborn c1914; Osborn c1917), contributed much to the understanding of the RMI family connections. In spite of the thorough research conducted by Joslyn, these records only trace RMI ancestry to around 1800 (Degroat, DeFreese, Mann, and Van Dunk). The ancestors of the RMI before that time are not known. The records submitted by the petitioner do

87

Technical Report, Ramapough Mountain Indians, Inc.

not establish a genealogical connection of the earliest
documented RMI ancestors to any historical Indian tribe,
whether Munsee, Tuscarora, or otherwise.

The large volume of the records collected by Joslyn has
often been cited (see editorial newspaper article by Joslyn,
as well as comments from third parties: Joslyn 1993/7/21,
RMI Response Ex. 25; Kraft 1995/6/15, RMI Response Ex. 1;
Hoff 1995/6/4, RMI Response Ex. 3). These citations did
little analysis of what these records actually demonstrate.
For example, on the list of "Ramapough Indians" used to
calculate endogamy for the 1700's (RMI Response, Joslyn
Report, four unnumbered pages at the end of his report,
listing people from the 1700's and 1800's who have the same
surnames as the main RMI families), most of the people
listed from that period have no proven connection to the
petitioner. They merely share the same surnames. The fact
that the people extracted from early 1700's marriage records
shared the same last names as the petitioner's members does
not establish a genealogical relationship between those
individuals and the petitioner. This specific evidence was
irrelevant to demonstrating tribal ancestry for the peti-
tioner under criterion 83.7(e) because, with the exception
of one man, the 18th-century and early 19th-century people
bearing these surnames were not identified as members of
Indian tribes, as Indians, or as part-Indian.

**The Vineland Study considered extensively in the Proposed
Finding.** The RMI Response included a section on the Vine-
land Study, stating that "The BAR went to great lengths to
downplay the importance of this vital source of genealogical
data" (RMI Response, Joslyn Report 10). According to the
Joslyn Report, the Proposed Finding's statements that the
Vineland Study was not limited to the Ramapo Mountain area,
that the Vineland Study did not identify the subjects as
Indian or part of a tribe of Indians, and that some of the
family relationships that it described were unclear, were
misinterpretations of the Vineland Study.

The Vineland Study was discussed at length in all three of
the Proposed Finding's technical reports (RMI PF, Historical
Technical Report 71-75; RMI PF, Anthropological Report 9-10;
RMI PF, Genealogical Technical Report 5, 7, 15-16). For
example, the genealogical report summarized the relationship
of the Vineland Study to the RMI petition.

> The bylaws and amendments of the petitioner refer
> to an unpublished sociological study titled "The
> Jackson Whites, A Study in Racial Degeneracy"

Technical Report, Ramapough Mountain Indians, Inc.

(better known as the Vineland Study) which was an unpublished manuscript researched by [employees of]. . . the New Jersey Training School at Vineland . . . This study was in no way objective as the author(s) were looking for what they called "degenerates" in order to support political beliefs which were precursors to the now debunked national eugenics movement.  While it provides some information of genealogical value, the study was not prepared as a genealogical report and the family relationships given are often unclear. Also, the focus of the study was not confined to the Ramapough Mountain area (RMI PF, Genealogical Technical Report 5).

References are made throughout the Vineland study to "Indian characteristics" and "Indian type" that appear as physical descriptions based upon observations and stereotypes rather than on documented Indian ancestry.  The strongest statement toward proof of Indian descent is a description of Samuel Smith (born about 1800) who was "possibly the son of Peter Smith and an Indian woman" (Vineland Training School, 1917, 91).  However, this is irrelevant to BAR purposes as there are no descendants of Peter Smith on the current RMI membership lists (RMI PF, Genealogical Technical Report 5).

The RMI bylaws regarding membership requirements were quoted on page seven of the genealogical report, under the section on governing documents.  The Vineland Study is one of the sources acceptable to the RMI council as proof of American Indian ancestry.  Other references to the Vineland Study are cited in the sections on the main RMI families.

The Historical Technical Report of the Proposed Finding stated that before using the Vineland Study to evaluate the RMP community, it was necessary to consider two points.  The first point was that the Vineland Study:

was not an objective study of the RMI community, but rather advocacy or propaganda produced by adherents of the U.S. eugenics movement which was already popular prior to World War I and continued through the 1930's (see in general Kevles 1985) (RMI PF, Historical Technical Report 72).

Technical Report, Ramapough Mountain Indians, Inc.

The other point was that, whether described as having Indian characteristics or phenotype or not:

> . . . the majority of the Jackson Whites cited in the Vineland Study as representing dysfunctional families and degenerate life styles are not claimed as ancestors on the genealogical charts submitted by the RMI group--many of them are collateral lines, but few were RMI direct lines . . . . Many of the people traced by the Vineland Study were living 50 or more miles from the RMI central settlements: they were in Orange, Flanders, and Newark. There is actual overlap between the RMI ancestors and the Vineland Study subjects only in three small family groupings (RMI PF, Historical Technical Report, 73).

In summary, if the early 20th-century families specifically discussed in the Vineland Study left direct descendants, those descendants were not on the RMI membership list.

In the Anthropological report, the intent and scope of the Vineland Study were also evaluated:

> The report on the "Jackson White" community was initiated because the researchers believed that it offered one of the best possible natural laboratories for testing the influence of genetics on intelligence. . . . Coming down on the nature side of the nature versus nurture controversy, the now discredited report concluded that environmental factors do not influence intelligence. Similar conclusions were reached in Kite's study of the Piney's, another group purported to have partial Indian ancestry, in Burlington County, New Jersey (Kite 1913). At the end of this report, Ms. Kite tells the governor that the best way for the state to take care of such mental and moral "defectives" was to institutionalize them before they reached an age when they could produce offspring. Such studies formed the foundation of the national eugenics movement and ultimately Nazism in Germany. Groups such as the "Jackson Whites" were victimized by the pseudo-scientific research performed among their populations (RMI PF, Anthropological Technical Report 9-10).

The Vineland Study said that there were 2,611 "Jackson Whites" living in the United States.

90

Technical Report, Ramapough Mountain Indians, Inc.

Though no supporting evidence is cited and the author expresses some doubt in the matter, Algonquian (Minsi) and Tuscarora ancestry is alluded to in the report.  It does not give any information as to whether or not all of these people shared kinship ties to the DeGroat and/or Conklin families.  It also does not say how the census estimates were established.  The author estimated that in 1913 a total of 875 "Jackson Whites" were to be found in the seven towns that now lie within a 5-mile radius of the RMI core area, with the balance of the 1,736 living spread out in another 67 small towns all over New York and New Jersey, in state institutions, and living in other states.  This enumeration represents a further change in meaning for "Jackson Whites;" they are no longer geographically restricted to the Mahwah region, but are living all over New York and New Jersey (RMI PF, Anthropological Technical Report 9-10, and RMI PF, Appendices A and B).

Thus, the Vineland Study was carefully reviewed and quoted in the Proposed Finding.  It was evaluated and it was found wanting as a reliable source of evidence for documenting descent from a historical tribe.  The Vineland Study's assertions about the supposed Indian ancestry of the "Jackson Whites" were not based on primary source evidence.  The Vineland Study simply repeated unfounded assertions regarding tribal origins that had been made by other authors for twenty years or more by local people concerning the origins of "Jackson Whites."

The Vineland Study quoted local historians and journalists whose unsubstantiated assertions were also evaluated in the Proposed Finding.  For example, one of the citations for reputed Indian ancestry referred to in the preceding paragraph was partially quoted in the RMI Response's Joslyn Report:

The J.-W. [sic] are a race of people of mixed Negro, Indian and white blood...(VS 3); the Indian blood found in the J-W...is supposed to have belonged to a remnant of the Algonquin Tribe - to the Minsi or Wolf Clan, who were natives of the Upper Delaware Valley in Pennsylvania, New Jersey and New York.  The Minisick [sic], or Minsi indicates that they were known as the people of the Stony Country, or Mountains, who roamed from place to place as did the wolf.  There were also a few

Technical Report, Ramapough Mountain Indians, Inc.

> families of the Tuscarora Indians who remained in
> the Ramapo mountains after their tribe had made
> there a three years sojourn, from 1710 to 1713, on
> its way to join the five nations in New York State
> (VS, 24) (RMI Response, Joslyn Report 11).

A more complete quotation of the Vineland Study reads:

> But how account for the Indian blood that shows
> itself so conspicuously among this race today?
> Undoubtedly a large part of it comes from Indians
> who were formerly held as slaves. . . . the Indian
> blood found in the Jackson Whites whether it came
> down though individuals held as slaves or through
> isolated free Indians who intermarried with the
> emancipated negroes, is supposed to have belonged
> to a remnant of the Algonquin Tribe - to the Minsi
> or Wolf Clan, who were natives of the Upper Dela-
> ware Valley in Pennsylvania, New Jersey and New
> York. The Minisick, or Minsi indicates that they
> were known as the people of the Stony Country, or
> Mountains, who roamed from place to place as did
> the wolf.  There were also a few families of the
> Tuscarora Indians who remained in the Ramapo moun-
> tains after their tribe had made there a three
> years sojourn, from 1710 to 1713, on its way to
> join the five nations in New York State. . . the
> care-free nature and the desire for physical free-
> dom which appears in many of the J-W's [sic] and
> which may be a sign of their inherited Indian
> traits, for they are born lovers of nature, fond
> of walking, hunting and fishing (Vineland Training
> School 1917, 24-27).

This lengthier quote shows that the author was only assuming
Indian ancestry for some of the RMI ancestors.  No primary
source data that demonstrated that the RMI were descendants
of the Munsee or Tuscarora was cited.

The Proposed Finding concluded that the Vineland Study only
speculated that the assumed Indian ancestry of the RMP came
either from Indian slaves, from "isolated free Indians," or
from a "remnant" of the Algonquin or Tuscarora tribes.  This
speculation was not corroborated by supporting evidence at
the time of the Vineland Study, either by records contempo-
rary to the lives of the ancestors purported to be Indian,
or by subsequent research.  The occasional references to
some of the RMI ancestors as being of "Indian type" were
either based on notions of phenotype (see the section at the

92

Technical Report, Ramapough Mountain Indians, Inc.

beginning regarding phenotype and blood quantum as "evidence" of Indian ancestry) or stereotypical social behaviors attributed to Indians by many non-Indians at that time (migratory, without laws, illiterate, and degenerate).

The Proposed Finding stated that the Vineland Study had some genealogical value, but that some family relationships were unclear. The focus of the Vineland Study was not confined to the Ramapo Mountain area. The lack of clarity of a few late 19th century family relationships was immaterial, however, since there was no evidence that the progenitors of the known RMI ancestors were descended from an Indian tribe. As can be seen from the quotations cited in this report, the Vineland Study included many people who were not ancestors of the RMI. Therefore, observations of their "Indianness" cannot automatically be assumed to apply to their collateral relatives who may be ancestors of some of the RMI. The Vineland Study did not name the 18th century ancestors of the genealogically proven RMI progenitors and did not provide proof that the earliest identified RMI ancestors were descended from a tribe of Indians.

Therefore, the Final Determination finds that the Vineland Study does not document that the RMI descends from a tribe of Indians. The RMI Response did not provide any new evidence to substantiate tribal descent of the RMI and none has been found by the BAR researchers, nor is there acceptable evidence that the RMI represent an amalgamation of Indian tribes as allowed under criterion 83.7(e).

**Analysis of RMI core families.** The results of Joslyn's previous research were a remarkably well-documented record of the RMI families to around 1800. Joslyn's research did not document any ancestors, Indian or non-Indian, for the RMI before this time. All of the evidence submitted in the Joslyn Reports and confirmed by the BAR research identified the earliest known RMI core families as being those with the surnames DeGroat, DeFreese, Mann, and Van Dunk.

The earliest proven RMI progenitors were:

1. John DeFreese, born before 1790, who married Margaret Mann about 1809;
2. James DeGroat, born about 1792, who married Susan DeGroat;
3. William R. DeGroat, born about 1814, who married Sally Ann Mann;
4. John DeGroat, born about 1821, who married Mary E. DeFreese;

93

Technical Report, Ramapough Mountain Indians, Inc.

5. William Mann, born about 1827, who married Fanny Mira
DeGroat;
6. John Van Dunk, who married Clarissa DeFreese about 1800;
and possibly,
7. John DeGroat, born about 1797, who married Margaret
Piggeret.

The frequent duplication of family names in this list of
early proven marriages did provide strong circumstantial
evidence of social contact among the DeFreese, DeGroat, and
Mann families in the first half of the 19th century.  Howev-
er, neither the original petition documents nor the RMI
Response provided evidence, contemporary to the lives of
these individuals, which identified these earliest proven
RMI families as being Indians or as being of Indian descent.
Neither the original petition, the RMI Response, nor addi-
tional research by the BAR, was able to connect these proven
early 19th-century RMI ancestors to any earlier, 18th-centu-
ry Indian tribe.  In the Proposed Finding, the AS-IA did not
accept any evidence that the Van Dunk ancestral family line
was "Indian," as stated in the RMI Response (RMI Response A-
13).

The Joslyn Report in the RMI Response stated:

> The purpose of this Report [sic] is to review the
> major genealogical links of those RMI ancestors
> and collaterals identified in various records as
> Indian or with Indian ancestry, as well as the
> sources that show these identities and provide the
> documentation for genealogical relationships.
>
> In addition, I have identified numerous, signifi-
> cant errors and misconceptions in the Bureau's
> Proposed Findings [sic], and have provided respon-
> sive comments.
>
> As detailed below, it is my professional opinion
> that Indian ancestry for the Ramapough Mountain
> Indian Tribe had been demonstrated, and that the
> proposed negative finding of the BAR staff is both
> erroneous and unsound in its approach (RMI
> Response, Joslyn Report 1).

The Proposed Finding did not question the genealogical links
of the modern RMI membership to the earliest known RMI
ancestors.  Rather, the Proposed Finding concluded that
there was no evidence that the genealogically proven ances-
tors of the RMI descended from a tribe of Indians.  The

Technical Report, Ramapough Mountain Indians, Inc.

Joslyn Report did not include any new research to identify the 18th-century parentage or origins of the proven RMI ancestors. The Joslyn Report consisted of a re-evaluation of the evidence submitted for the petition, a summary of the Vineland Study, and an analysis of the endogamy among the RMI (RMI Response, Joslyn Report 10-12). The BIA does differ from the petitioner in its interpretation of the data. See the section of this report on genealogical methodology for the standards used in preparing the Proposed Finding and the Final Determination.

The Federal regulations for acknowledgment of an Indian tribe require that the petitioner descend from a historical tribe of Indians: a specific, known, named, and documented tribe, or specific, known, named, and documented tribes which amalgamated and subsequently functioned as a single tribe. A hypothesis that the unknown and unnamed ancestors of an earlier generation were Indians does not meet the Federal criteria for acknowledgment, as they have been applied since 1978 under 83.7(e).

Following the Joslyn Report's opening statement is a "review of the major genealogical links" in the RMI DeGroat, De-Freese, and Mann families, and a discussion of one family named Maguiness, that married into the RMI families beginning in the mid-1800's. This was accompanied by Joslyn's interpretation of the evidence regarding each of these families. The evidence regarding the DeGroat, DeFreese, Mann, and Maguiness families will be discussed in turn.

The DeGroat family. The RMI petition cited the 1875 New York census and the Vineland Study as proof that the DeGroat family descended from a tribe of Indians. The Vineland Study attributed Indian-like physical characteristics and/or Indian personality and social traits to some DeGroat descendants included in the study.

The Proposed Finding stated that the DeGroat surname appeared in the Hackensack Reformed Dutch Church as early as 1695 and that none of the early church records identified the DeGroats as Indian. The Proposed Finding also found that none of the DeGroat families who lived from 1850 to 1900 in Hohokus Township, Bergen County, New Jersey (which included the core geographical area of the RMI), were ever enumerated as Indian; that none of the vital records of New York or New Jersey submitted with the petition identified any DeGroat as Indian; and that the attributions of Indian-like physical features or characteristics noted in the

95

Technical Report, Ramapough Mountain Indians, Inc.


Vineland Study did not constitute evidence demonstrating
descent from a historical tribe.

The RMI Response focused on attributions of Indian ancestry
for two DeGroats in the 1875 New York state census, Richard
(b. ca. 1845) and DeWitt Clinton DeGroat.  They were sons of
John and Margaret DeGroat.  The RMI Response also cited the
Vineland Study, which attributed Indian characteristics to
descendants of Richard DeGroat and to some of his siblings'
descendants, as evidence demonstrating the Indian ancestry
of Richard DeGroat (and by implication his ancestors and
descendants; RMI Response, Joslyn Report 2-4).  The RMI
Response stated:

> The BAR genealogical and historic reviews essen-
> tially passed over the key Indian identities for
> the DeGroat family, particularly the one in the
> 1875 New York State Census entries for brothers
> Richard and DeWitt Clinton DeGroat.
>
> In this census, for the Town of Monroe, Orange
> County, New York, the enumerator listed Richard
> "DeGrote," head of a household, as "7/8 Indian."
> This identification was obviously based on Rich-
> ard's claim that his father was "3/4 Indian,"
> [Footnote number 1 in the Joslyn Report reads:
> "This suggests Richard's mother was 1/8 Indian."]
> as described in a separate note by the enumerator
> which was added to the census (the enumerator's
> interest in this family seems to have been peeked
> [sic] by Richard DeGroat's two albino children).
> The very next household was headed by Clinton
> DeGroat, also listed as "7/8 Indian" and therefore
> Richard's brother (RMI Response, Joslyn Report 1).

In actuality, the 1875 census entry read:

> Household #113, Richard DeGrote, 28, m[ale], 7/8
> Ind, [born] NJ; Hannah DeGrote 26, f[emale], m[ul-
> atto], wife, [born] NJ; Sarah F. DeGrote, 8, f,
> albino, daughter,[born] NJ; Margaret A. DeGrote,
> 6, f, albino, daughter, [born] Orange [county, New
> York]; Charles H. DeGrote, m, 3 3/12, albino, son
> [born] NJ.  Household #114, Clinton DeGrote, 26,
> m, 7/8 Ind, [born] NJ; Mary A. DeGrote, 24, f,
> m[ulatto], wife, [born] NJ;  Phebe J. DeGrote, 5,
> f, m[ulatto], [born] NJ; Alice DeGrote, 3 7/12, f,
> m[ulatto], [born] NJ (New York 1875a, 15).

96

Technical Report, Ramapough Mountain Indians, Inc.

The note by the census enumerator read:

> DeGrote, father of the albino children says his
> father was called 3/4 Indian, and his mother a
> mulatto-His wife is a Quadroon: her father a mu-
> latto and her mother nearly white . . . [a de-
> scription of the albino children follows] (New
> York 1875a, 15, "note").

The one-time identification of Richard DeGroat (b. 1845) as
"Indian" by the census enumerator in 1875 is not acceptable
evidence of Indian tribal ancestry for this individual on
its face because other identifications in census records
differed.  The enumerator also did not record that Richard
DeGroat's mother was 1/8 Indian; this is an assumption made
by Joslyn.[27]

John and Margaret DeGroat and their children, including
Richard and DeWitt Clinton, were identified in the 1855 New
York State census (Warwick Town, Orange County) and the 1850
Federal censuses as "mulatto" or "black" (NARS 1850c, 13;
New York 1855, family #245).  It appears that Margaret died
between 1855 and 1860, as an "Eliza" is listed as John's
wife on the 1860 Federal census in Warwick, Orange County
when the father of Richard and Clinton DeWitt was listed as
"black" (NARS 1860c, 258).  The John DeGroat family was not
located in New York on the 1865 state census; however, a
John DeGroat "colored male," Mary Eliza "colored female,"
and Mary Ellen and Catherine "colored children between ages
5 & 16," were enumerated in Hohokus Township, Bergen County,

---

[27]   As already discussed in this report, there is no blood quantum
requirement under the acknowledgment criteria (25 CFR 83.7).  The method
that Joslyn assumes the census enumerator used to calculate DeGroat's
blood quantum is mistaken.  Blood quantum for an individual is not
calculated by adding the percentage of Indian ancestry of that person's
biological parents.  Rather, the Indian blood quantum of each parent is
divided by two, since the child receives half of his or her heritage from
each parent.  For example, the child of a white fur trader (4/4 white) and
a full-blood Indian woman (4/4 Indian) will be 2/4 Indian and 2/4 white.
    In this case, if the father were 3/4 Indian, the mother would have
to be a full blood Indian (that is, 8/8, rather than 1/8 Indian blood) for
their children to be 7/8 Indian (i.e., the children would receive 3/8
Indian from the father and 4/8 Indian from the mother, for a total of 7/8
Indian).
    If the father were 3/4 (6/8) Indian and the mother were 1/8 Indian,
the child's blood quantum would be 3/8 (6/16) from the father and 1/16
from the mother, for a total of 7/16, not 7/8, for the child.  This is a
moot point since there is no primary source documentation supporting the
percentages assumed by the enumerator and the Federal acknowledgment
criteria have no requirement for blood quantum.

97

Technical Report, Ramapough Mountain Indians, Inc.

New Jersey in 1865 (New Jersey 1865a, Families #2259-2262).
This New Jersey census did not list the individual's age or
birthplace; therefore, it is not conclusive that it was the
same John DeGroat family that was last living in Warwick,
New York. However, in 1870 John DeGroat age 70, Eliza A.
age 49, Albert age 21, and Sarah E. age 14, all identified
as "mulatto," were living in West Milford Township, Passaic
County, New Jersey (NARS 1870b).

The actual census records for John and Margaret DeGroat, who
appear to be the parents of Richard and DeWitt Clinton
DeGroat, do not provide evidence that they were ever identi-
fied in Federal census records as Indian in their own life-
times. None of Richard and DeWitt Clinton's other siblings
were identified as Indian on the Federal or State censuses
from 1850 to 1900 (see bibliographical listing of United
States, New Jersey, and New York censuses between 1850 and
1900).

Richard DeGroat was not identified as Indian or part Indian
on any other Federal or State census before or after the one
reference in 1875. Therefore, DeGroat's comment that "his
father was called 3/4 Indian," as recorded by the New York
State census enumerator, cannot be considered as key evi-
dence of Indian ancestry. It is not acceptable evidence for
continuity with a historical American Indian tribe for the
1875 RMP community as a whole. First, the generic census
identification of an individual as "Indian" does not consti-
tute primary source evidence of tribal ancestry, which is
required under criterion 83.7(e). Second, without corrob-
orating evidence, a one-time identification of an individual
as "Indian" cannot even be considered reliable evidence for
the ethnicity of that individual. The State and Federal
censuses from 1790 to 1910 have all been reviewed by the BAR
researchers. No other census identified Richard DeGroat,
his parents, siblings, or descendants as Indians.

If either of Richard DeGroat's parents, or any of his other
siblings, had also been identified as Indian on any of the
Federal or State censuses, then Richard DeGroat's 1875
statement that his father was "called" 3/4 Indian would have
been viewed differently. However, the weight of all the
correlated census evidence does not support the petitioner's
claim that the two isolated identifications by the census
enumerator made in 1875 (for Richard DeGroat and Dewitt
Clinton DeGroat) prove Indian ancestry for the DeGroat
family.

Technical Report, Ramapough Mountain Indians, Inc.

The RMI Response also referred to entries in Richard De-Groat's Civil War pension file as partial proof of his ancestry. The RMI Response stated:

> Richard DeGroat served in the Civil War, and in-formation in his pension file indicates he was born 27 November 1843 in Greenwood, Orange County, New York. . . . There is also reference in the file to Richard's wife, Hannah, and his stepmoth-er, Eliza Ann, as well as those who gave testimony regarding his service--John Defrece [sic], Samuel Mann, Peter Defrese [sic], Silas W. Milligan, Charles T. Van Dunk, and James DeGroat. Further-more, there is a statement about Richard and Han-nah's ten children, nine of whom were albinos (four of whom were living in June 1895) (RMI Re-sponse, Joslyn Report 2).

Although the above statement correctly summarizes some of the information found in the pension file, it is misleading because it does not fully quote the record nor does it summarize all of the information found in the pension. There is nothing in the pension file that indicated that the DeGroats were members of an Indian tribe or that they were Indians by descent. The RMI submitted four pages of Richard DeGroat's pension file, which included the statements re-ferred to above. The entire pension file is quite lengthy and contains depositions from his wife, his stepmother, and his comrades who also served in the United States Colored Troops (USCT). The BAR genealogist reviewed Richard De-Groat's complete pension file in preparation of the Final Determination.

The following quotation from the pension file is included in order to give a fuller picture of Richard DeGroat's family origins, as reported by his contemporaries. In June 1895, James T. Clement, Special Examiner [for pension applica-tions] wrote a report to the Commissioner of Pensions re-garding DeGroat, who had served as a private in Company "K", 26th Regiment, USCT, and had suffered from the effects of a frozen foot during the War. The full statement by Clement was omitted from the Proposed Finding out of sensitivity for the petitioner. However, since the RMI Response relies on the pension file, Clement's report and other records in the file are cited here.

> When I went to make examination in this case I discovered a remarkable fact to me, viz. that while this soldier is at least two thirds negro

99

Technical Report, Ramapough Mountain Indians, Inc.

and his wife about half that they were the parents
of ten children one being the color of the soldier
and the other nine were Albinos.  Five of the
Albinos are dead the other four alive (Petition
Source Records; NARS, n.d., Richard DeGroat
#473,567).

The rest of the page describes the DeGroat children's physi-
cal and mental condition and the examiner's concern for
their welfare after the parents' deaths.  Clement did not
state or imply that Richard DeGroat, his wife, or his par-
ents were Indians or living in tribal relations.

Hannah DeGroat, in her June 11, 1895 deposition, stated that
she had known Richard DeGroat from childhood, that they were
both raised at Ringwood, Passaic County, New Jersey, and
that her brother John DeFreese was in Company "A," 26th
Regiment USCT.  Hannah DeGroat provided the following infor-
mation on Richard DeGroat:

> He boarded at my mothers and fathers house until
> we were married- I remember well when he first
> came home to my fathers house my father made a
> salve for him. . . (NARS, n.d., Richard DeGroat
> #473,567).

Hannah DeGroat did not identify herself, her father, or her
husband, Richard DeGroat, as Indian or of Indian descent.

Eliza Ann DeGroat, in her June 11, 1895, deposition stated
that she was the stepmother of Richard DeGroat, that Richard
entered the army with her son Edward Peterson who served in
Company "A," in the 26th Regiment, USCT, and that Richard
DeGroat went to his uncle Peter DeFreese's house when he was
discharged.

> He was so lame and used up that he did not come to
> my house for about a week. . . . He told me his
> Uncle Peter Defrece [sic] had made a salve for it
> [his frozen toe] (NARS, n.d., Richard DeGroat
> #473,567).

Richard DeGroat himself deposed that:

> My foot was sore and Peter Defreese made a salve
> for me and put it on my toe  He healed me for the
> toe, the best part of a year.  He was not a Doctor
> He was an old colored man who made the salve out

100

Technical Report, Ramapough Mountain Indians, Inc.

of herbs that he got in the wood and lard (NARS, n.d., Richard DeGroat #473,567).

Peter DeFreese, who treated DeGroat's frozen foot, was variously identified in the depositions as Richard's uncle [possibly his mother's brother], as his father-in-law, and as an "old colored man." None of the identifications stated or implied any Indian ancestry or affiliation for DeGroat through the DeFreese line.

In summary, the pension record indicated that Richard De-Groat served in the United States Colored Troops with his neighbors, his stepbrother, and his future brother-in-law. Richard DeGroat did not identify himself or any of his relatives or comrades in service as being members of an Indian tribe or as being of Indian descent. Although the pension file does clarify some of Richard DeGroat's family relations, it does not provide evidence for the petitioner's claim that Richard DeGroat or his family were Indian or of Indian descent. Aside from this, Richard DeGroat does not appear to have direct descendants on the RMI membership list, so any identification of him as "Indian" is not pertinent to meeting criterion 83.7(e).

The Joslyn Report in the RMI Response also attributed Indian ancestry to other DeGroat lines based on evidence from the 1850 Federal census. This evidence led Joslyn to assume that John DeGroat was the full-blood brother of Peter De-Groat and Richard DeGroat (b. ca. 1805). Joslyn's reasoning for this assumption follows:

> Obviously, since Richard DeGroat's father John was 3/4 Indian, John's siblings would share the same degree of ancestry. In 1850, John was enumerated next to the households of Peter DeGroat, 48, and Richard DeGroat, 45 (1850 WK 13). The closeness in age and proximity of these three DeGroats are powerful suggestions that they were brothers (RMI Response, Joslyn Report 3).

> Two of the children of Peter DeGroat (born about 1801) are discussed in the Vineland Study. The family of his son Peter is mentioned on pages 85 and 87-89. Son Owen is treated on pages 45 and 47-48. Furthermore, Owen's daughter, Henrietta is described as "light-colored negro-Indian" (Vineland Training School 1917, 86), and Owen's son, James "Red" DeGroat, "shows a good deal of Indian blood" (ERO 67:392). Owen, who married Nan-

101

Technical Report, Ramapough Mountain Indians, Inc.

cy/Ellen L. Mann, is an ancestor of the current
RMIs (RMI Response, Joslyn Report 3-4).

The petitioner has assumed that the John DeGroat (b. ca.
1797) who is listed in the 1850 federal census was the full-
blood brother of Peter DeGroat (b. ca. 1801) and Richard
DeGroat (b. ca. 1805), just because they were contemporaries
in age, lived near each other, and shared a common surname.
Standard genealogical methodology and BIA precedents for
weighing genealogical data would not accept this conclusion.
They may have been full-blood brothers but, from the limited
evidence available, they could just as easily have been
half-brothers, step-brothers, cousins (of any degree),
uncles and nephews, or not related at all.

In the context of criterion 83.7(e), there is no acceptable
evidence that Richard DeGroat's father, John DeGroat, was
Indian (3/4 or otherwise).  The attribution of Indian ances-
try to Richard DeGroat (b. 1845) by the census enumerator is
unreliable because it is a relatively late, one-time refer-
ence.  There are no other records identifying John DeGroat,
the reputed father of Richard DeGroat (b. ca. 1845), and
supposed brother of Richard DeGroat (b. ca 1805) and Peter
DeGroat, as Indian.  Because there is no reliable evidence
that John DeGroat was Indian, it cannot be assumed that his
siblings were Indians.

The Proposed Finding indicated that James and Susan DeGroat
and their children, William R. and Sally Ann DeGroat and
their children, and John and Mary E. DeGroat and their
children, were traced in the Federal and State census re-
cords for New Jersey from 1850 through 1900.  None of these
families were identified as "Indian" on any of the Federal
or State census reports.

A report entitled "A Branch of the Ramapough DeGroat family
of Upstate New York, Ontario, Wisconsin and Minnesota" was
included in a notebook entitled "Source Materials."  This
notebook was deemed by the BIA to be part of the original
RMI petition, and it was reviewed at the time of the Pro-
posed Finding.  The report traced the lines of descent of
two men, James and Richard DeGroat,[28] of Franklin Township,

---

[28] There is no known connection between this Richard DeGroat and the
other two Richard DeGroats already referred to in this section.  Neither
of the DeGroat men who settled near the Oneida Reservation has a
documented connection (genealogical or social) to the RMP or the
individuals on the modern RMI membership list.

102

Technical Report, Ramapough Mountain Indians, Inc.

Bergen County, New Jersey. Before 1830, these two DeGroats moved near the Brothertown Reservation (also known as "Brotherton"), which was next to the Onondaga Indian Reservation, in Onondaga County, New York. Several descendants of these DeGroats applied for land through the Kansas Indian Claims Commission, as descendants of the Brotherton Tribe, in 1901. Their claim was based on the Indian ancestry of James DeGroat's Indian wife, Philinda (Fowler) DeGroat. The petitioner's genealogist inferred from that fact that Philinda DeGroat was Indian that James DeGroat, her husband, was also Indian.

The BIA has not weighed genealogical evidence in such a way as to pass Indian ancestry between spouses. The BAR research revealed that these 1901 applications were rejected by the Commission because it specifically concluded that James DeGroat and Richard DeGroat were not Brothertown Indians.

Since the Joslyn Report in the RMI Response indicated that Indian ancestry for the DeGroats who made application to the Kansas Indian Claims Commission would imply Indian ancestry for the RMI DeGroat family, these materials were again examined by the BAR researchers during preparation of the Final Determination and are more fully quoted below. The notes made by the Commission on the application of Daniel DeGroat, a descendant of James DeGroat and Philinda Fowler DeGroat, read:

> #919Appl. [sic] is not a Bro. Ind. & never claimed to be until about the time of filing this appl. He is of negro descent - See Misc. Test. p. 46 §8 & p. 55 §14 Appl. does not claim that his father was an Indian & his mother & her parents have [sic] not allottees in 1839. Wife not an Ind. minor children Rejd [sic] (NARS RG75, Entry 903, New York Indians, Kansas Claims, Brothertown, #919).

The Kansas Indian Claims Commission did not infer Indian ancestry for the DeGroat applicants through the paternal line. Instead, the Commission stated very plainly that this applicant did not claim that his father was an Indian, and the Commission found that the applicant was "not a Bro. Ind." The Kansas Claims Commission data provided no evidence, direct or implied, that the James DeGroat who married into a Brothertown Indian family was himself an Indian.

Technical Report, Ramapough Mountain Indians, Inc.

There are other reasons why this data was not weighed as positive evidence for this case by BIA evaluators. Even if this Richard and James DeGroat had demonstrated Indian ancestry, there is no known connection (genealogical or social) between them, on the one hand, and the RMP, or individuals on the modern RMI membership list, on the other. As the Proposed Finding stated, there was no direct evidence of a relationship (genealogical or social) of this James DeGroat to any of the RMP DeGroats, although he clearly came from the same immediate geographical area where the DeGroat families ancestral to the RMI lived. Nor is there a known connection between Philinda (Fowler) DeGroat and the RMP or the RMI. The Proposed Finding stated that "No documentation was submitted to show that James was an Indian" (RMI PF, Genealogical Technical Report 16).

The RMI Response did not include any new evidence which identified any of the known DeGroat RMI ancestors as members of an Indian tribe or of Indian descent. The origins and parentage of the earliest genealogically proven DeGroat ancestors remain unknown. The DeGroat family does not have proven Indian ancestry or a proven line of descent from a historical tribe.

**The DeFreese family.** The RMI petition claimed that all of the RMI DeFreese members descend from John DeFreese (born about 1790) who married Margaret Mann about 1809. The petition also claimed Indian descent of the DeFreese family through Jan defries [sic] or John De Fries, who was enumerated in the 1760 Orange County, New York militia as Indian (RMI Petition, Genealogy of the Ramapough Mountain Indian Tribe, prepared by Roger D. Joslyn, filed June 7, 1993, 7). However, the petition did not provide any evidence identifying descendants of the Indian Jan defries or John De Fries, or documenting a link between him and known ancestors of individuals on the RMI membership list.[39]

---

[39] The actual phrasing of the 1993 report concerning the ancestry of the John DeFreese who married Margaret Mann was as follows:

· The only evidence of a father in the Ramapough area for these DeFreeses was John DeVries who married (1) Elizabeth DeGroat in 1789 and, probably (2) Maria (Mann) Piggery in 1821. With a marriage in the late 1780s, John was probably born in the 1760s.

It is very probable that this John was the son of John De Fries, listed as a 25-year-old Indian on a 1760 military muster roll (NY Prov Troops 334-35, 405-5). The muster roll shows John De Fries, Indian, was born in

Technical Report, Ramapough Mountain Indians, Inc.

The Proposed Finding concurred with the petitioner that John DeFreese and Margaret Mann were the apparent progenitors of the RMI DeFreese families. However, the Proposed Finding stated that, in addition to the mid-18th century Indian militiaman, Jan defries, there were many other references to non-Indian Dutch and "free Negro" families named "DeFreese" in the New York and New Jersey area from as early as 1640. It concluded that there was no clear connection between the RMI's earliest known DeFreese ancestor, John DeFreese, and any of the earlier DeFreese families, including the Indian Jan defries, who were documented as having lived in the region at an earlier date.

Specifically, the Proposed Finding cited the almost 30-year gap between the last date that the Indian Jan defries was known to be alive (1762) and the ca. 1790 birthdate of John DeFreese, the first documented RMI ancestor. BAR research found no evidence that the RMI DeFreese progenitors descended from this Jan defries. In fact, there was no evidence that the Indian militiaman had any descendants at all (RMI PF, Genealogical Technical Report 13-14).

The Joslyn Report referenced the Vineland Study's statements about the Indian-like physical characteristics of Samuel Edward DeFreese, born about 1857, and some of his descendants:

> Perhaps the most important DeFreese ancestor of the current RMI is Samuel Edward DeFreese. Not only is he identified as an early leader of the tribe, but he had "Indian blood" (ERO 32:126). Samuel's Indian ancestry is corroborated through descriptions of his daughter, (Catherine) Margaret DeFreese Smith, who looked "much more like an Indian than a Negro" (ERO 67:407), and his son

---

Tappan, referring to the New Jersey patent of that name in what was then partly in Orange Precinct in Orange (now Rockland) County, New York, extending south across the then disputed New York-New Jersey border in the Ramapough tribal area. Born about 1735, John fits both geographically and chronologically as the father of the John who married Elizabeth DeGroat in 1789 and as the grandfather of the group of Ramapough DeFreeses born in the next two decades. The identification of John De Fris as an Indian further supports the independent claims of Indian ancestry for his grandchildren's generation (RMI Petition, Genealogy of the Ramapough Mountain Indian Tribe, prepared by Roger D. Joslyn, filed June 7, 1993, 7).

Technical Report, Ramapough Mountain Indians, Inc.

Nelson Budd DeFreese, who was "a big, strong man of Indian type..." (VS, 61) (RMI Response, Joslyn Report 5).

Samuel's death certificate does not name his parents, but three of his brothers are identified-- John, Elias, and Thomas (ERO 67:397). Brother John's death record lists his parents as John and Margaret. Other evidence indicates Samuel's other siblings were Catherine (married John Mann), Peter (married Margaret Van Dunk), and James. Peter's death certificate lists his parents as John and Maria Mann, and the ERO study gives the parents of Samuel, John, Elias, and Thomas as Abraham and Margaret (Mann) "DeVries" (ERO, 67:398) (RMI Response, Joslyn Report 5).

This Peter DeFreese, brother of Samuel Edward DeFreese of "Indian blood," was enumerated with other RMI families as part of the Green Mountain Valley settlement (1830f 107) which Victor Jacquemont observed three years earlier as Indians of mixed blood (RMI Response, Joslyn Report 5).

The Joslyn Report also attributes Indian ancestry to other DeFreese family members born in the late 1800's and early 1900's based on references in the 1917 Vineland Study, records of the Eugenics Record Office, and other sporadic post-1900 sources such as one World War I draft registration and one 1920 census enumeration (RMI Response, Joslyn Report 6-7).

The following conclusions are based on both the evidence concerning the RMI DeFreese family contained in the petition and located by the BAR researchers found during evaluation of the RMI petition during preparation of the Proposed Finding, and also on the evidence concerning the RMI DeFreese family contained in RMI Response and on additional research conducted by the BAR during preparation of the Final Determination.

First, the ancestors and origins of the earliest documented RMI DeFreese ancestor are not known. In his own lifetime, the RMI ancestor John DeFreese, who was born about 1790, was not identified as an Indian, as being of Indian descent, or as belonging to an Indian tribe. None of his known children were identified as Indian on any Federal or State census nor were any of his known children or grandchildren identified

106

Technical Report, Ramapough Mountain Indians, Inc.

as Indian in the vital records submitted by the petitioner (RMI PF, Genealogical Technical Report 14).

Second, not all early RMP DeFreeses have been documented as children of this individual. The Proposed Finding concluded that no documentation had been submitted by the petitioner or found by the BAR researchers to prove that the persons listed as additional children of John and Margaret (Mann) DeFreese actually were their children (RMI PF, Genealogical Technical Report 13).

The fundamental issue at the time of the Proposed Finding was, and still is, that there is no evidence that the RMI progenitor, the John DeFreese who was born about 1790, descended from a historical tribe of Indians. In the absence of demonstrated tribal descent, more recent attributions of Indian ancestry for the family, like those in the Vineland Study (Vineland Training School 1917), do not help the petitioner meet the requirements of criterion 83.7(e).

The sources quoted in the Joslyn Report list three different couples as the parents of one particular Samuel DeFreese: John DeFreese and Margaret Mann; John DeFreese and Maria Mann; and Abraham DeVries and Margaret Mann. This Samuel DeFreese (ca. 1815-1893) appears to be the father of Samuel Edward DeFreese (1857-1934). The siblings cited in the Joslyn Report (John, Elias, Thomas, and Peter) were siblings of Samuel, not of Samuel Edward. The death certificates of John and Peter were used to identify their parents and, by inference, the parents of their brother Samuel. The 20th-century Eugenics Record Office records named the parents of Samuel, John, Elias, and Thomas DeFreese as Abraham and Margaret. The only consistent information in each of these records that purportedly identify the parents of Samuel DeFreese is that the mother's maiden name was "Mann." Since the death records and post-1900 information were conflicting, the BAR researchers also reviewed additional sources.

In 1850, Samuel DeFreese (age 35, m[ale], m[ulatto], born in New Jersey), his wife Catherine (age 34, f[emale], m[ulatto], born in New Jersey), and their four children were found living in Pompton Township, Passaic County, New Jersey (NARS 1850b, 133). In 1860 Samuel and Catherine DeFreese and their children, now including Samuel [Edward], age 3, were living in Blooming Grove, Orange County, New York. The family was identified as "Black" (NARS 1860c, 7).

The first census in which "Indian" was a category of identification on the enumerations was 1870. Neither Samuel's own

107

Technical Report, Ramapough Mountain Indians, Inc.

family nor the families of his siblings were identified as
Indian in 1870 (NARS 1870a, 1870b, 1870c, 1870d). Samuel
Edward DeFreese was never identified as an Indian on the
Federal or State censuses from 1860 to 1920 (NARS 1850b,
1860c, 1870a-d, 1880a-b, 1900a-b, 1910a-b, 1920a-b; New
Jersey 1855b, 1865b, 1885b), either as a child in his par-
ents' household or as an adult with children of his own.

Third, the statement that the Peter DeFreese living in the
Green Mountain Valley in 1830 was a brother of the Samuel
Edward DeFreese who was elsewhere identified as being of
"Indian blood" (RMI Response, Joslyn Report 5) appears to be
erroneous. The Peter DeFreese living in 1830 was an adult.
Since Samuel Edward DeFreese was not born until 1857, it is
not likely that they were brothers. Peter DeFreese was
possibly an uncle of Samuel Edward. In either case, Peter
DeFreese's residence in 1830 does not link him to the Indian
descendants described in the Jacquemont letter discussed
below and does not establish that he or his family were
descended from a historical tribe of Indians.

*Relevance of the Jacquemont data.* The statements by the
French naturalist Victor Jacquemont alluded to in the Joslyn
Report were quoted in full in the Proposed Finding. The RMI
Response included a new translation which is quoted here.
There is little difference between the two translations.

> Page 162  I am writing to you from the valley
> where the Indians lived seventy years ago. Now
> they are more than three hundred miles away from
> here. Their people sometimes find themselves
> surrounded by populations of European origin,
> however, they do not mix in any way but rather
> form what the legists' call "imperium in im-
> perio".⁴ The sole Indians remaining here are of
> mixed blood due to the indiscretion of some Indian
> women. The mother's influence prevails in these
> children, who in spite of being almost white,
> retain all the wandering and independent charac-
> teristics of the Indian race. It is therefore
> impossible to make them farmers, to get them to
> live in the valley, to be shoemakers, wheel-
> wrights, or ploughmen. They remain in the woods
> among the nearby mountains, living in miserable
> cabins made out of tree trunks placed one on top
> of the other, along with a cow, a few pigs and a
> small cornfield (Jacquemont 1827, RMI Response,
> Appendix [passage from a personal letter by Victor

Technical Report, Ramapough Mountain Indians, Inc.


Jacquemont, written in 1827, translated by Chris-
tine Jones, 1995]).[30]

It is important to note that there are two parts to Jacque-
mont's observations that were included in this quote.  Part
one, consisting of two sentences at the beginning of the
passage, concerned the Indians who formerly inhabited the
Ramapo Valley area in northern New Jersey.  Jacquemont
indicated that these Indians had been living 300 miles away
for the last seventy years, supporting the Proposed Find-
ing's conclusion that Indians maintaining tribal relations
left the area around 1757, soon after the Treaty of Easton.

The second part of the quotation had to do with the "mixed
blood" Indians who, Jacquemont said, were still living among
the surrounding mountains, refusing to become farmers, or
live in the valley, or take up trades.  In contrast, the
known RMP heads of families appeared in census and tax re-
cords of the first half of the 19th century as residing in
the valley.  The 1850 Federal census, the first which listed
occupations, showed them as farmers, farm laborers, and mine
employees.  All of these factors together indicate that it
is not clear that Jacquemont was referring to the RMI's
ancestors.

Jacquemont did not specifically identify the mixed blood
Indians as a community.  From the information in his letter,
it is unclear if he was referring to individual Indian
families living scattered in the mountains or Indian fami-
lies living in a community.  Even if he were referring to a
community, the vague expression that "they remain in the
woods among the nearby mountains" is not specific enough to
locate the settlement or to identify the individuals com-
prising the community.  Therefore, there is no way to link
the Indians to whom Jacquemont refers to the RMI's ances-
tors.

As reported in the Proposed Finding, Jacquemont's statement
that Indian tribes had not lived in the area for 70 years
coincided with the date of the Treaty of Easton (1757) and
the removal of the Indians from New Jersey.  The "empire
within the empire," or tribe, was gone.  What remained, in
Jacquemont's view, were a few "almost white" people of
"mixed blood" descent.

---

[30]   [In this passage, footnote three translated "legists" as "legal
specialists" and footnote four translated "imperium in imperio" as "an
empire within an empire."]

Technical Report, Ramapough Mountain Indians, Inc.

The Proposed Finding provided the following analysis:

> Because of his visit with the Hagerman family, it
> is possible that Jacquemont was referring to RMI
> ancestors in his statement about Indians of mixed
> blood. . . . However, he referred to no specific
> family names, did not indicate any continuing
> tribal origin or organization, and his description
> of the refusal of the group he was discussing to
> live in the valley does not comport well with what
> can be determined from other documents, which
> place the RMI ancestors well mixed in farming
> communities in the valley (RMI PF, Historical
> Technical Report 38).

The RMI Response did not include any new evidence which
named Peter DeFreese or any other known RMI ancestor as one
of the "mixed blood" Indian families referred to by Jacque-
mont.  Therefore, Jacquemont cannot be considered as sub-
stantive evidence that the family of Samuel Edward DeFreese
descended from a historical Indian tribe.

In conclusion, the RMI Response offered no new evidence to
identify the 18th-century origins of the RMI DeFreese fami-
ly.  None of the comments submitted by interested or in-
formed parties provided substantive comments or evidence
regarding the parentage of John DeFreese, the progenitor of
the RMI DeFreese family.  The origins and parentage of the
earliest genealogically proven DeFreese ancestors of the RMI
are not known.  Therefore, based on the weight of the whole
body of evidence, it is found that there is no substantive
evidence to conclude that the family of Samuel Edward De-
Freese was descended from Indians.

The Van Dunk family.  The attributions of Indian character-
istics to some late 19th-century and early 20th-century
DeFreese family members were not consistent.  For example,
the Joslyn Report referred to Gertrude Tena VanDunk, daugh-
ter of John and Clarissa (DeFreese) Van Dunk, who was called
"Indian" on the 1920 census.  The possibility of Indian
ancestry for Gertrude Tena Van Dunk was explored in the
Proposed Finding.  It was found that both of Tena Van Dunk's
parents were living in 1920 and that both were listed as
"black" on the census.  In 1900 and 1880 Tena's parents and
grandparents were enumerated either as "Black" or "Mulatto."
The report concluded:

> At present, there is no evidence to explain why
> Tena Gertrude was identified as Indian on the 1920

110

Technical Report, Ramapough Mountain Indians, Inc.

census. The question is not of crucial importance to understanding the RMI, as only 25 RMI members (less than 1% of the 1992 enrollment) descend from Tena Gertrude Van Dunk (RMI PF, Genealogical Technical Report 21).

The Mann family. The petitioner submitted ancestry charts which identified William Mann, born about 1827, who married Fanny Mira DeGroat; and Hannah Mann born about 1850, who married Theron Powell, as the two most frequently identified progenitors of the RMI families with Mann lineage. Attributes of the Indian-like characteristics of RMI Mann ancestors were made by the Vineland Study.

The Proposed Finding concluded that William Mann, whose death certificate named Elias Mann and Maria DeGroat as his parents, was the progenitor of approximately 81 percent of the RMI Mann family descendants.

> Probably this is the same Elias Mann who was taxed for 20 acres of unimproved land, four cows and a dog in the 1821 tax list of Franklin Township, Bergen County, New Jersey (New Jersey State Department of Education, Roll 1, 10). In the 1830 Federal census of Franklin Township, Elias has nine "free colored people" in his household. Elias was not found in the 1840 or 1850 census records, so it is not known whether he died or moved away from the area. (U.S. NARS, 1830a, 107, cited in the RMI PF, Genealogical Technical Report 17-18).

The Proposed Finding concluded that there was no evidence of Indian ancestry in the line of William Mann and Fanny Mira DeGroat. The Mann surname was found in the records in the New York-New Jersey area before the Revolutionary War, but none of the early records identified a Mann as an Indian, of Indian descent, or as living in a tribal entity.

None of the early Manns in the church or tax records could be connected to the earliest proven RMI ancestor (RMI PF, Genealogical Technical Report 17-18). None of the Federal or State censuses identified William Mann, Elias Mann, or Hannah (Mann) Powell, or their descendants, as Indian or of Indian descent. It was also found that none of the vital records submitted by the petitioner identified any ancestor named Mann as Indian. The proven Mann ancestors of the RMI were identified in the censuses and vital records as "mulat-

111

Technical Report, Ramapough Mountain Indians, Inc.

to" or "colored," not Indian (RMI PF, Genealogical Technical Report 19).

The RMI Response stated:

> There is evidence identifying various members of the RMI Mann family as Indian or having Indian ancestry. In describing the Mann family, it was noted in the Vineland Study "the Indian predominates in this branch..."(Vineland Study, 46), In 1917, Dorothy Osborn, trained as a field worker by and for the Eugenics Record Office in Cold Spring Harbor, described John Mann, one of the early members of the family (and married to Ellen De-Groat), as "the son of an indian" [sic] (RMI Response, Joslyn Report 7).

The Joslyn Report concludes that John Mann was probably the son of Elias and Maria DeGroat Mann and the grandson of a Samuel Mann.  The report also stated:

> Ms. Osborn claims John was the brother of William Mann (ca. 1827-1890), who married Fanny Maria [sic] DeGroat, so if John was the "son of an indian [sic]," so was William.
>
> " * * * * * *
>
> Several other Manns, many of them RMI ancestors, have been genealogically linked as siblings and other close relatives of John, "son of an indian," [sic] and his brother, William.  They were likely grandsons of Samuel Mann, who was born probably in the 1750s or earlier and was the person of the surname found in records covering the RMI area. Supporting evidence of Samuel as the ancestor of the early Manns comes from the New Jersey death record of Margaret DeFreese, born about 1789, wife of John DeFreese, which lists her parents as Samuel and Ellen Mann.  Margaret was a contemporary of Elias, likely the father of John and William, and of other Manns. . . (RMI Response, Joslyn Report 7-8).

In preparing the Final Determination, the BAR conducted additional research to determine the ancestors of the known RMI progenitors.  Evidence previously submitted with the petition was also re-evaluated.  Comments received from interested parties and third parties during the comment

112

Technical Report, Ramapough Mountain Indians, Inc.

period did not address the issue of the ancestry of the Mann family. The RMI Response did not offer any new evidence that identified the ancestry of William or Elias Mann, nor was there new evidence that they were Indians or descended from an Indian tribe. While it is possible that Margaret (Mann) DeFreese was a sister of Elias Mann, no relationship was documented: she could have been a half sister, a step-sister, a cousin, or no relation at all.[31]

In 1830, the households of Elias Mann, age 36-55, Peter Mann, age 36-55, and Juliana Mann, age 55-100 in Franklin Township, Bergen County, New Jersey were enumerated as "free people of color" (NARS, 1830a, 107). William Mann, his wife and children were all identified as "mulatto" on the Federal census records from 1860 to 1880 (NARS 1860a 278, 1870a 62-63, 1880d 31).

The John Mann mentioned in the Joslyn Report and referred to by Ms. Osborn in 1917 as being the "son of an indian" [sic] appears to have been the man of the same name found in Hohokus Township in 1850. This family was enumerated as John Mann, age 36, m[ale], m[ulatto], born in New Jersey, with his wife "Elen" and their five daughters, who were also identified as mulattos and born in New Jersey (NARS U.S. Census 1850a 251). In his own lifetime, John Mann was not enumerated as an Indian in the census records.

There is no documentation to corroborate that Elias Mann, probably the father of William and John Mann, was a member of one of the families referred to by Jacquemont, although Elias Mann was living in the Green Mountain valley area in 1830. As stated earlier, the 1827 Jacquemont letter did not name any of the "mixed blood" families that he said were still living in the "nearby" mountains, nor did he provide enough information to locate exactly where they were living.

The terms "mulatto" or "colored" found in the censuses and vital records could have been intended by the census enumer-ator to indicate some Indian ancestry. However, these terms did not require Indian ancestry, nor did they in any way specify tribal origin. The BIA cannot, under the 25 CFR

---

[31] Genealogical methodology cannot assume the existence of relation-ships on the basis of identical surnames or the repetition of given names. In Warren County, Kentucky, from 1800-1820, there were three separate, unrelated Graham families with three separate geographical origins. A fourth unrelated Graham family lived nearby in Green County. All four families had one or more members named "Robert," two had members named "Alexander," and two had members named "Edward."

Technical Report, Ramapough Mountain Indians, Inc.

Part 83 regulations, assume that there was, in fact, Indian ancestry in the Mann family without other evidence.

Additional research for the Final Determination included a review of the New Jersey tax lists, the Reformed Church in America Archives, the Bergen County Historical Society collection at the Johnson, Free Public Library in Hackensack, New Jersey, and the Orange County New York Genealogical Society Library.  None of the references to Mann families found in these facilities identified any of the Manns as Indian, as of Indian descent, or as members of any historical Indian tribe.

One reference to a pre-Revolutionary Mann family living in what is now Rockland County, New York identified the family as German stone masons who settled in New York before 1767. This large family continued to live at the Palisades throughout the 19th century (Bailey 1936, 200).  John (Jack) and James Man(n) of Orange County, New York, were identified as "persons of color not taxed" in the 1825 and 1835 State censuses.  The census records show that neither man had property other than one cow and one hog, which would account for them not being taxed.[12]  There is no evidence at this time that the RMI descend from either of these Mann families, but the evidence does confirm that there clearly were non-Indians named Mann in the vicinity of the Ramapo Mountains.

In conclusion, since the origins and parentage of the earliest genealogically proven RMI Mann ancestors are not known, it cannot be assumed that the RMI Mann families descend from a tribe of Indians as required to meet criterion 83.7(e).

**The Maguiness family.**  The petitioner submitted ancestry charts that showed the Maguiness (sometimes spelled Maginess) family married into the four main RMI families.  The Proposed Finding stated that:

> Other modern RMI names of Cisco, Castaloni, Dennison, Maguiness, Morgan and Powell married into the four families that are the focus of this report during the 19th century (RMI PF, Genealogical Technical Report 4).

---

[12]  There were over 70 families in the 1825 census of Warwick, Goshen, Minisink, and Monroe, Orange County, New York who were listed as "people of color not taxed" (New York 1825).

114

Technical Report, Ramapough Mountain Indians, Inc.

Maguiness was also mentioned in the section on the census information used in the Proposed Finding:

> A page by page reading of the 1870 census for the entire Ramapough Mountain area produced only one potential RMI Indian ancestor. The family of Florence Maguiness, including his wife and children, of Bloomingrove Township, Orange County, New York was marked "Ind" (U.S. NARS, 1870c, #343/325). The petitioner submitted extensive research on this family, but no descendants are found on the current membership list (RMI PF, Genealogical Technical Report 22).

The Joslyn Report in the RMI Response also stated that Florence Maguiness did not have descendants in the modern RMI, but claimed that this view was narrow, ". . .for it was shown in the genealogical report that Florence had siblings who are RMI ancestors" (RMI Response, Joslyn Report 8).  The Joslyn Report then posed the question:

> But why are Florence and his family listed as Indian in the 1870 census and his siblings not? This is a matter for some speculation, with explanations that would include the care taken by the census enumerator to the prevailing attitude about the majority of the RMI at the time. . . .the racial identity of a person could and did vary considerably, from one source to the next.  The mixed-race of the RMI is not the question -- in fact, the different labels prove the point.  But it must be acknowledged that while the Indian identities in that area found in the records in the nineteenth and twentieth centuries help confirm the racial mixture of the RMI, they also help establish that there is indeed Indian ancestry.
>
> [The Proposed Finding] seems to take the illogical view that "majority rules"; in other words, because most of the racial labels found for the RMI ancestors are not solely Indian, that the records must be interpreted to conclude that there is no Indian ancestry (RMI Response, Joslyn Report 9).

The Joslyn Report concluded with a discussion of the family connections between the Maguiness families and RMI families and identified David Maguiness who married Ann DeGroat (of unknown parentage) about 1834 as the father of the Florence

115

Technical Report, Ramapough Mountain Indians, Inc.

Maguiness who was identified as Indian on the 1870 census (RMI Response, Joslyn Report 10).

This section of the RMI Response focused on two issues: Maguiness family connections and the very sensitive issue of racial identity.  The Maguiness family did not marry into the core RMI families until the mid-19th century.  Unless the Maguiness family could be shown to have been in association with the other RMI progenitor families in a situation of tribal relations from about 1760 to 1834, any discussion of Maguiness families having Indian ancestors is immaterial to the petitioner's meeting criterion 83.7(e).  Criterion 83.7(e) states that the petitioner's membership must descend from a historical Indian tribe.

Neither the petitioner nor BAR researchers found evidence that the Maguiness RMI ancestors were members of an Indian tribe or descended from an Indian tribe.  The Joslyn Report refers to a passage in <u>Along the Wawayanda Path</u> by Donald Melville Barrell (Barrell 1975) about the Sugarloaf area of Orange County, New York, as proof of the Maguiness Indian descent:

> There was an Indian Village near this place that had been occupied for many years by this friendly Indian tribe.  They never left the area and were finally absorbed by the Negro families -- the Catos, Mapes, McGinness, Hicks, Showers and Petersons, who showed Indian features for generations (Barrell 1975 *in* RMI Response, Joslyn Report 9).

This passage did not name any particular Maguiness family or specify a time when members of the Indian village married into the Maguiness surnamed family.  Without specific information it is impossible to establish a genealogical connection between these Maguinesses and the RMI Maguinesses.  There is no documented connection between the Maguinesses of the Sugar Loaf area and the Maguinesses who eventually married into the RMI community.  The names of the other "Negro families" mentioned by Barrell (Cato, Mapes, Hicks, Showers, and Peterson) show that the Maguinesses to whom this author was referring were not in community with the RMI ancestors, since he did not mention any of the prominent RMI surnames (the Showers family was mentioned in the Vineland Study).  Even if the cited passage had offered reliable evidence of Indian ancestry for the RMI Maguiness line, it simultaneously stated that the Indians were absorbed into

116

Technical Report, Ramapough Mountain Indians, Inc.

the broader population.  It did not state that the non-Indians married into a distinct Indian community and were absorbed by that community.  Even if the RMI Maguinesses were shown to be Indian, they were not a core RMI family; that is, there are very few RMI who have Maguiness ancestry.

**Historical usage of ethnic designations.**  The second issue addressed in the Joslyn Report (RMI Response, Joslyn Report 9), the meaning of racial labels in census and other records, was addressed several times in the Proposed Finding. For example:

> The many references in the census and vital records to "mulatto" and "colored" could possibly indicate some degree of Indian blood, but no documentation has been submitted by the petitioner or found by the BAR to show a connection to any particular Indian or Indian tribe (RMI PF, Genealogical Technical Report 22).

The Proposed Finding indicated repeatedly that the terms "mulatto" and "colored" in census and other records were sometimes used to identify individuals who were part Indian. The Proposed Finding also indicated that "mulatto" and "colored" were not always synonymous with Indian ancestry. In the absence of other reliable evidence, it cannot be assumed that the census taker meant to imply Indian ancestry when employing these racial designations.  These two terms were also used generally for people of mixed race, with no necessary implication that the person was an Indian descendant.  Thus, while being labelled "mulatto" or "colored" by the census taker does not rule out Indian ancestry, it does not clearly demonstrate it in the absence of other supporting evidence.

A secondary source reference, such as a population census in the late 1800's, even if it identified a person as an "Indian," is not sufficient evidence for demonstrating descent from a historical Indian tribe.  Criterion 83.7(e) does not whether some of a petitioner's ancestors were labelled "mulatto" or "colored," but whether primary source evidence establishes descent from a historical tribe.  The RMI did not present primary source evidence of descent from a historical tribe.

The RMI Response also stated that the technical reports that accompanied the Proposed Finding took an "illogical view," asserting that they discounted all references to possible Indian ancestry because the majority of the records did not

117

Technical Report, Ramapough Mountain Indians, Inc.

identify the RMI as Indians.  The Proposed Finding and the
Final Determination used standard methods of evaluating
evidence.  The quality of the evidence, as well as the
corroborating source material, was considered.  The one-time
census reference to Florence Maguiness in 1870 as "Indian"
was given some credibility.  But that one reference did not
out-weigh the other census references which did not identify
the Maguiness families as Indian.  In the absence of proven
Indian ancestors, it cannot be assumed that the creator of
the record (such as a census enumerator) intended "mulatto"
or "colored" to mean Indian.

The individual 1870 census record was also evaluated in the
light of other contemporary records, such as the church
registers and vital records, none of which identified Flor-
ence Maguiness or his siblings as members of an Indian tribe
or as being of Indian descent.  Parallel with how evidence
was evaluated for the Mann, DeGroat, and DeFreese lines,
unsubstantiated observations made in the Vineland Study that
some of the Maguiness descendants were described as having
"Indian blood" or being "decidedly Indian in type" (RMI
Response, Joslyn Report 9), is not sufficient evidence that
the group meets the criterion of descent from a historical
tribe.

**Summation.**  If the petitioner had presented additional
documentation from the late 1700's to the mid-1800's which
spoke of the existence of an Indian tribe and named some of
the RMI's genealogically known ancestors as a part of that
tribe, then more credibility would have been given to the
late 19th and early 20th century attributions.  However,
neither the petitioner nor the BAR researchers were able to
identify the ancestors of the known RMI progenitors or to
trace them to a historical 18th century Indian tribe.

In preparing the Technical Report for this Final Determina-
tion, the BIA reexamined the evidence used for the Proposed
Finding, looked at the RMI Response, and conducted addition-
al research.  None of the interested or third party comments
were directed to the specific genealogies of the RMI progen-
itor families.  None of the interested party or third party
comments provided substantive proof that the RMI ancestors
descended from a historical tribe of Indians; therefore, the
comments were not relevant in making a final determination
concerning criterion 83.7(e).

118

Technical Report, Ramapough Mountain Indians, Inc.

The origins and parentage of the earliest genealogically proven ancestors of the RMI petitioner are not known. The petitioner has not demonstrated that their earliest proven ancestors were members of an Indian tribe or that they descended from an Indian tribe.  The petitioner did not demonstrate specific tribal ancestry as required by the Federal regulations to meet criterion 83.7(e).

Technical Report, Ramapough Mountain Indians, Inc.

120

Technical Report, Ramapough Mountain Indians, Inc.


## APPENDIX A

### A List of Pastors for the Ramapo Presbyterian Church's "Brook Chapel"

The 1994 introduction to the Ramapo Presbyterian Church
Register noted that it "was customary in civil and church
records in the 19th century, non-white members were noted in
the register (Ramapo Presbyterian Church Register 1868-1918,
1994, ii)." The following information quotes relevant
information from the Register that supports the BIA's con-
tention that Brook Chapel, while it was a congregation
established to missionize the Ramapo Mountain People in
1876, it was not considered an Indian mission.

> Pastors of Ramapo Church - Con.  George A. Ford.[1]
> Williams College, Williamstown, Mass. 1872, Union
> Theol. Seminary N.Y.C. 1876.  Began to preach as a
> licenciate of Presbytery of New York Apr. 16th, 1876.
> Ordained by the Presbytery of Hudson Nov 13th, 1876 at
> Ramapo, N.Y.  Sailed, as a missionary, to Syria May
> 1st, 1880 (Ramapo Presbyterian Church Register 1868-
> 1918 1994, V).
>
> Assistant Pastors of Ramapo Church - settled at Brook
> Chapel.
> John A. Caldwell, - (colored) -
> Lincoln University, Pennsylvania,-College Dept.  Theo-
> logical dept.  Ordained by the Presbytery of Chester,
> Pa.
> Settled as a Teacher Brook Chapel District School, and
> as the first ordained preacher at Brook Chapel Sept.
> or Oct 1890.  Not installed.  Resigned May 1st, 1893.
>
> Frederick D. Tildon - (colored)
> Lincoln University - Pennsylvania - College Dept.
> Theological Dept.
> Ordained by the Presbytery of Chester, Pa.          1893.
> Settled as Teacher of District School and as preacher
> at Brook Chapel June 1893.  Resigned Sept 1st, 1896,
> and became pastor of Bethel Pres'n Chapel, Plainfield,
> N.J.
>
> William H. Morrow - (colored)

---

[1] It is this man, who served as pastor of the Ramapo Presbyterian
Church from late 1876 through early 1880, and then went to Syria as a
missionary, whose 1926 letter on the 50th anniversary of Brook Chapel is
cited by the RMI Response (RMI Response 1995, A-9).  The content of this
letter was cited in the Proposed Finding (Proposed Finding 1993,
Historical Technical Report 53-54).

Technical Report, Ramapough Mountain Indians, Inc.

Vanderbilt University - Tennessee 1893, Princeton
Theolog. Sem'y, N.J. 1896.
Ordained by the Presbytery of New Brunswick, N.J.
1896.
Settled as Teacher of District School and as Preacher
at Brook Chapel Sept 1 - 1896. Resigned July 26th.
1900, - and became pastor of the Willard Pres'n Church
of Union, S.C.

John E. Parmly (white)
Princeton College - Princeton, N.J. 1883 (M.A. '86.
Student of Theology with Rev. S. W. Knipe, Oceanic,
N.J. and as Special Student Union Theolog. Seminary
New York City. Licensed by Presbytery of Monmouth,
N.J. 1893. Ordained by Same Presbytery Sep 25th 1900.
Settled as Assistant Pastor Ramapo Church in charge of
Brook Chapel Oct 10th 1900. Resigned June 12th 1902
(Ramapo Presbyterian Church Register 1868-1918 1994,
XIII).

William H. Morrow (colored)
Called to become pastor at Brook Chapel for the second
time June 24th 1902. (see page xiii, ante). Accepted
the call; met the Session and consummated the relation
Aug 2nd 1902. Resigned Oct. 15th, 1906. Died Nov.
28th 1908.

Samuel J. Branch (colored)
Lincoln University. Pa. College Department 1902.
Theological Department 1905. Union Theological Semi-
nary, New York, Post Graduate 1905-1906-1907. Invited
to become Minister at Brook Chapel Dec. 1st 1906: &
then accepted: as yet unlicensed. Resigned Sep 1st,
1907.

Byron Gunner (colored)
Talladega College. Ala. '81. Ordained by the Louisi-
ana Congregational Association 1884. Special theolog-
ical course Oberlin College 89. Called by vote Brook
Chapel Oct 10th 1907. Began preaching Nov 10th 1907.
Resigned Jan 31st 1920.

Thomas Amos (colored)

Edward Robinson (colored) (Ramapo Presbyterian Church
Register 1868-1918 1994, XIV).

122

∫

Technical Report, Ramapough Mountain Indians, Inc.

## APPENDIX B

### MAP OF RAMAPO VALLEY AREA
(taken from the 1876 Bergen County Atlas)



123

Technical Report, Ramapough Mountain Indians, Inc.

## APPENDIX C
### MAP OF THE RMP AREA
(showing locations significant
at the time of Jacquemont's visit in 1827)



124

LIST OF SOURCES
Final Determination

Ramapough Mountain Indians, Inc.

For the reader's convenience, this bibliography includes some
source materials that were referred to in the Proposed Finding,
but it is primarily supplementary to the bibliography that
accompanied the Proposed Finding.  For a complete understanding
of all the evidence considered for the evaluation of this
petition, both bibliographies should be considered.

Acquackanonk, New Jersey.  Protestant Dutch Reformed Church.
   1692-    Records.  Microfilm.  Special Collections & Archives,
   1994     Alexander Library, Rutgers University, New Brunswick, New
            Jersey.

Aguirre Beltrán, Gonzalo
   1963     Regiones de Refugio: de Desayrollo de la Communidad y de
            Procesco Dominical en Mestizo America.  Mexico City:
            Instituto Nacional Indigenista.

Angle, Paul M.
   1970 [1929] The Case of the Man in Love:  Forgery, Impure and
            Simple.  In The Historian as Detective:  Essays on Evidence.
            Robin W. Winks, ed.  Pp. 127-148.  New York: Harper & Row
            Publishers, Harper Colophon Books.  [The Minor Collection:
            A Criticism, The Atlantic Monthly].

Atlas of Bergen County
   1992 [1876] Atlas of Bergen County, New Jersey.  Made from
            Actual Surveys of Each Township and Village, and from
            Historical Facts, arranged specially for this work, under
            the supervision of A. H. Walker.  Teaneck, NJ: Robert D.
            Griffin.  [Original edition published by C.C. Pease,
            Successor to A. H. Walker.  Reading, PA:  Reading Publishing
            House].

Bailey, Rosalie Fellows
   1936     Pre-Revolutionary Dutch Houses and Families in Northern New
            Jersey and Southern New York.  Intro. by Franklin D.
            Roosevelt.  Photography by Margaret De M. Brown.  Prepared
            under the Auspices of The Holland Society of New York.  New
            York:  William Morrow & Company.

Baldwin, Lewis F.
   1983     "Invisible" Strands in African Methodism:  A History of the
            African Union Methodist Protestant and Union American
            Methodist Episcopal Churches, 1805-1980.  ATLA Monograph
            Series No. 19.  Metuchen, NJ and London:  The American
            Theological Library Association and The Scarecrow Press,
            Inc.

125

Bibliography, Final Determination, Ramapough Mountain Indians, Inc.

Balmer, Randall
   1989    A Perfect Babel of Confusion:  Dutch Religion and English
           Culture in the Middle Colonies.  New York:  Oxford
           University Press.

Barrell, Donald Melville
   1975    Along the Wawayanda Path.  Middleton, NY:  T. Emmett
           Henderson.

Barzun, Jacques, and Henry F. Graff.
   1970    The Modern Researcher.  Revised edition.  New York:
           Harcourt, Brace & World, Inc.

Beale, Calvin L.
   1957    American Triracial Isolates:  Their Status and Pertinence to
           Genetic Research.  Eugenics Quarterly 4(4)(December):187-
           196.

   1958    Census Problems of Racial Enumeration.  In Race: Individual
           and Collective Behavior.  Edgar T. Thompson and Everett C.
           Hughes, eds. Pp. 537-540.  Glencoe, New York: The Free Press
           of Glencoe, New York.

   1972    An Overview of the Phenomenon of Mixed Racial Isolates in
           the United States.  American Anthropologist.74(3):704-710.

Beauchamp, William Martin, ed.
   1976    Moravian Journals Relating to Central New York. 1745-66.
           Arranged and edited by Rev. Wm. M. Beauchamp, S.T.D., for
           the Onondaga Historical Association. 1916.  New York:
           A.M.S. Press.

Becker, Carl
   1970 [1932]  Everyman His Own Historian.  In The Historian as
           Detective: Essays on Evidence.  Robin W. Winks, ed.  Pp. 5-
           23.  New York: Harper & Row Publishers, Harper Colophon
           Books.  [American Historical Review 37:221-236].

Beltran.  See: Aguirre Beltran.

Berry, Brewton
   1963    Almost White.  New York:  The Macmillan Company.

   1978    Marginal Groups.  In The Handbook of North American Indians,
           Vol. 15: Northeast.  Bruce G. Trigger, ed.  Pp. 290-295.
           Washington, D.C.:  Smithsonian Institution Press.

Bischoff, Henry
   1995/6/6  Letter.  June 6.  RMI Response, Ex. 7.

126

Bibliography, Final Determination, Ramapough Mountain Indians, Inc.

Bischoff, Henry, and Mitchell Kahn.
    1979    From Pioneer Settlement to Suburb:  A History of Mahwah, New
            Jersey, 1700-1976.  In Cooperation with The Mahwah
            Bicentennial Committee and The Center for Metropolitan
            Studies, Ramapo College of New Jersey.  South Brunswick, NJ
            and New York:  A.S. Barnes and Company; London:  Thomas
            Yoseloff Ltd.

Bond, Horace Mann
    1976    Education for Freedom:  A History of Lincoln University,
            Pennsylvania.  [Lincoln University, PA]:  Lincoln
            University.

Bradley, David Henry, Sr.
    1956    A History of the A.M.E. Zion Church:  Part I, 1796-1872.
            Nashville, TN:  The Parthenon Press.

    1970    A History of the A.M.E. Zion Church:  Part II, 1872-1968.
            Nashville, TN:  The Parthenon Press.

Brain, Belle Marvel
    1904    The Redemption of the Red Man; An Account of Presbyterian
            Missions to the North American Indians of the Present Day.
            New York:  The Board of Home Missions of the Presbyterian
            Church in the U.S.A.

Branch of Acknowledgment and Research (BAR)  See:
        United States.  Bureau of Indian Affairs.  Branch of
        Acknowledgment and Research (BAR).

Brasseaux, Carl A.
    1988    In Search of Evangeline:  Birth and Evolution of the
            Evangeline Myth.  Thibodaux, LA:  Blue Heron Press.

Brasser, Ted J.
    1978    Mahican.  In The Handbook of North American Indians, Vol.
            15: Northeast.  Bruce G. Trigger, ed.  Pp. 198-212.
            Washington, D.C.:  Smithsonian Institution Press.

Brawer, Catherine C., ed.
    1983    Many Trails:  Indians of the Lower Hudson Valley.  Katonah,
            N.Y.: Katonah Gallery.

Bureau of Indian Affairs.  See:
        United States.  Bureau of Indian Affairs.

Burman, Joan M.
    1981    Genealogical Information from the Lost Ledger of the True
            Dutch Reformed Church of Clarkstown.  Monroe, NY:  Library
            Research Associates.

127

Bibliography, Final Determination, Ramapough Mountain Indians, Inc.

Calloway, Colin G.
    1994     Early American Indian Documents:  Treaties and Laws, 1607-
             1789.  Volume XVIII, Revolution and Confederation.
             Bethesda, MD:  University Publications of America.

    1995     The American Revolution in Indian Country:  Crisis and
             Diversity in Native American Communities.  Cambridge, Eng.:
             Cambridge University Press.

Cantrell, Karen
    1995/7/5  Letter to BIA, July 5, 1995.  RMI Response, Ex. 16.

Chinard, Gilbert
    1959     Les Experiences Americaines de Victor Jacquemont.  Paris:
             Museum National d'Histoire Naturelle.  [1827]

Cohen, David Steven
    1974     The Ramapough Mountain People. New Brunswick: Rutgers
             University Press.

Cohen, Felix S.
    1945     Handbook of Federal Indian Law with Reference Tables and
             Index.  United States Department of the Interior, Office of
             the Solicitor.  Washington, DC:  United States Government
             Printing Office.  [1941]

Cole, David, ed.
    1884     History of Rockland County, New York with Biographical
             Sketches of its Prominent Men.  Nyack, New York:  The
             Historical Society of Rockland County.  Reprint 1986 [1884].

Collins, Daniel
    1972     The Racially-mixed People of the Ramapos: Undoing the
             Jackson White Legends.  American Anthropologist 4(5)
             (October):1276-1284.

Colonial Records of Pennsylvania
    1852-53  Colonial Records of Pennsylvania.  Volume 8.  Microfiche
             1018 [title page of original missing].  Washington, DC:
             Library of Congress.

Crawford, Constance
    1942     The Jackson Whites.  1940 M.A. thesis, New York University.
             Abstract prepared by Miriam B. Lernerd.  Trenton, NJ:
             Division Classification & Education, Department of
             Institutions and Agencies.

DalCais, Dan
    1995/4/19  Letter to BAR.  April 19 (BAR files).

Davis, John David, comp.
    1995     Bergen County New Jersey Deed Records 1689-1801.  Bowie, MD:
             Heritage Books, Inc.

Bibliography, Final Determination, Ramapough Mountain Indians, Inc.

DeMarce, Virginia Easley
   1992     "Verry Slitly Mixt":  Tri-racial Isolate Families of the
            Upper South--A Genealogical Study.  National Genealogical
            Society Quarterly 80:5-35.

Dolson, Leroy
   1995/6/23  Letter.  June 28.  RMI Response, Ex. 19.

Donoghue, Frank Lee
   1942     Jackson Whites' Tribal Reserve Broken by War.  The New York
            Journal American, March 24.

Doyle, Sherman Hoadley
   1902     Presbyterian Home Missions; An Account of the Home Missions
            of the Presbyterian Church in the U.S.A.  Philadelphia:
            Presbyterian Board of Publication and Sabbath-School Work.

Duncombe, Frances R.
   1961     Katonah:  The History of a New York Village and its People.
            Katonah, NY:  Historical Committee, Katonah Village
            Improvement Society.

Dunn, Mary, comp.
   1992     Index to Pennsylvania's Colonial Records Series.  Baltimore,
            MD:  Genealogical Publishing Co., Inc.

Durie, Howard I.
   1970     The Kakiat Patent in Bergen County, New Jersey, with
            Genealogical Accounts of Some of Its Early Settlers.  Pearl
            River, New York:  Star Press for Howard Durie.

Edwards, Jonathan
   1822     Memoirs of the Rev. David Brainerd; Missionary to the
            Indians on the Borders of New York, New Jersey, and
            Pennsylvania; Chiefly Taken from His Own Diary.  Including
            his journal, now for the first time incorporated with the
            rest of his diary, in a regular chronological series, by
            Sereno Edwards Dwight. New Haven: S. Converse.

Edwards, W. Cary
   1995/11/3  Letter to Holly Reckord, BAR.  November 3.  (BAR Files)

   1995/11/3  Declaration pertaining to ACR3031.  (BAR Files)

Eugenics Record Office, Cold Harbor, NY (ERO).  See:  Osborn, Dorothy

Evangelical Lutheran Church, New York City, New York.
   1703-    Kercken-Boeck.  Microfilm, Special Collections & Archives,
   1783     Alexander Library, Rutgers University, New Brunswick, New
            Jersey.

Bibliography, Final Determination, Ramapough Mountain Indians, Inc.

Federal Writers' Project of the Works Progress Administration for the
      State of New Jersey
      1946     New Jersey: A Guide to Its Present and Past.  American
               Guide Series.  Sponsored by the Public Library of Newark and
               the New Jersey Guild Associates.  New York:  Hastings House
               Publishers. [1939]

Forbes, Jack D.
      1988     Black Africans and Native Americans:  Color, Race and Caste
               in the Evolution of Red-Black Peoples.  Oxford:  Basil
               Blackwell.

Ford, George A.
      1926     Letter.  RMI Petition 1993, Ex.

France, Thomas C.
      1995/6/23  Letter.  June 23.  RMI Response, Ex. 22.

Frankl, Robert
      1995/6/12  Letter.  June 12.  RMI Response, Ex. 22.

Gasero, Russell L.
      1991     Special Guide to the Archives of the Reformed Church in
               America: Local Church Records.  Special Guide No. 1.  Third
               Edition.  New Brunswick, NJ:  Archives of the Reformed
               Church in America.

Genealogical Society of New Jersey (cited as GSNJ)
      n.d.     Bible transcript.  Manuscript, Special Collections &
               Archives, Alexander Library, Rutgers University, New
               Brunswick, New Jersey.

Gilbert, William Harlen, Jr.
      1946     Memorandum Concerning the Characteristics of the Larger
               Mixed Blood Racial Islands of the Eastern United States.
               Social Forces 4, 438-447.

      1947     Synoptic Survey of Data on the Survival of Indian and
               Part-Indian Blood in the Eastern United States.  U.S.
               Library of Congress, Legislative Reference Service.

      1948     Surviving Indian Groups of the Eastern United States.  In
               1948 Annual Report of the Smithsonian Institution.  Pp.
               407-438.  Washington, D.C.: Smithsonian Institution Press.

Goddard, Ives
      1978     Delaware.  In The Handbook of North American Indians, Vol.
               15: Northeast.  Bruce G. Trigger, ed.  Pp. 213-239.
               Washington, D.C.:  Smithsonian Institution Press.

Gordon, Thomas F.
      1834     Gazetteer of the State of New Jersey.  Comprehending a
               General View of its Physical and Moral Condition, together

Bibliography, Final Determination, Ramapough Mountain Indians, Inc.

_with a Topographical and Statistical Account of its_
_Counties, Towns, Villages, Canals, Rail Roads, &c._
_Accompanied by a Map_. Trenton, NJ: Published by Daniel
Fenton; John C. Clark, Printer, Philadelphia.

Grabowski, Christine
  1995/7/6  Letter.  July 6.  RMI Response, Ex. 15.

Greenbaum, Susan
  1995/6/24  Letter.  June 24.  RMI Response, Ex. 14.

Greenwood, Val D.
  1983    _The Researcher's Guide to American Genealogy_.  Intro. by
          Milton Rubincam.  Baltimore, MD:  Genealogical Publishing
          Co., Inc.

Grumet, Robert S.
  1983    Children of Muhheahkkunnuck:  A Lower River Indian History.
          _In Many Trails:  Indians of the Lower Hudson Valley_.
          Catherine C. Brawer, ed.  Pp. 17-24.  Katonah, N.Y.: Katonah
          Gallery.

Handlin, Oscar, and Irving Mark, eds.
  1964    Chief Daniel Nimham _v._ Roger Morris, Beverly Robinson, and
          Philip Philipse -- An Indian Land Case in Colonial New York,
          1765-1767.  _Ethnohistory_ 11:193-246.

Hastings, Hugh, ed.
  1901    _Ecclesiastical Records:  State of New York_.  Volume I.
          Albany, NY:  James B. Lyon, State Printer.

  1905    _Ecclesiastical Records:  State of New York_.  Volume V.
          Albany, NY:  J. B. Lyon Company, Printers.

Haytaian, Garabed
  1995/10/20  Letter to W. Cary Edwards.  October 20.  (BAR Files)

Hazard, Samuel, comp.
  1860    _General Index to the Colonial Records, in 16 Volumes, and to_
          _the Pennsylvania Archives, in 12 Volumes_.  Philadelphia:
          Joseph Severns & Co.

Hodge, Frederick Webb, ed.
  1907    Munsee.  _In Handbook of American Indians North or Mexico_.
          Volume I.  Smithsonian Institution, Bureau of American
          Ethnology, Bulletin 30.  Washington, D.C.:  Government
          Printing Office.

Hoff, Henry
  1995/6/4  Letter.  June 4.  RMI Response, Ex. 3.

Bibliography, Final Determination, Ramapough Mountain Indians, Inc.

Jacquemont, Victor.  See also:  Chinard.
    1827    Letter.  Christine Jones, tr. [1995].  RMI Response,
            Appendix.

Jones, Charles T.
    1931    The Jackson Whites.  <u>Eugenical News</u> 16 (December):218.

Joslyn, Roger
    1993/7/21  Letter.  July 21.  RMI Response, Ex. 25.

    1995    Joslyn Report.  See:  RMI Response.

Joyce, Caroline L.
    1995/10/27  Letter to John Kingston.  October 27.  (BAR Files)

Keahon, Jeffrey, and Debra Walker
    1995/6/22  Letter.  June 22.  RMI Response Ex. 6.

Kevles, Daniel
    1985    <u>In the Name of Eugenics:  Genetics and the Uses of Human
            Heredity</u>.  New York:  Alfred A. Knopf.

Kingston, John F.
    1995/10/20  Letter to Holly Reckord.  October 20.  (BAR Files)

    1995/11/17  Letter to Holly Reckord.  November 17.  (BAR Files)

Kite, Elizabeth S.
    1913 [1988]  The Pineys.  Pp. 164-185  <i>in</i> Nicole Hahn Rafter, ed.,
            <u>White Trash:  The Eugenic Family Studies 1877-1919</u>.  Boston,
            MA:  Northeastern University Press, 1988.

    1917    Manuscript Research Notes on the Jackson Whites.  Rutgers
            University Manuscript Collection, Box 5.

Koestler, Marie
    1995/6/18  Letter.  June 18.  RMI Response Ex. 5.

Kraft, Herbert C.
    1986    <u>The Lenape:  Archaeology, History, and Ethnography</u>.  Newark,
            NJ:  New Jersey Historical Society.

    1995/6/19  Letter.  June 19.  RMI Response, Ex. 1.

Leiby, Adrian C.
    1976    <u>The United Churches of Hackensack and Schraalenburgh New
            Jersey 1686-1822</u>.  River Edge, New Jersey:  Bergen County
            Historical Society.

Lenik, Edward
    1995/6/20  Letter.  June 20.  RMI Response, Ex. 12.

132

Bibliography, Final Determination, Ramapough Mountain Indians, Inc.

Lincoln, C. Eric and Lawrence H. Mamiya
    1990        The Black Church in the African American Experience.
                Durham, NC:  Duke University Press.

Long, Craig H.
    1995/6/30  Letter.  June 30.  RMI Response Ex. 5.

McCulloch, John
    1995/11/16  Letter to John F. Kingston.  November 16.  (BAR Files)

Merwin, Miles M.
    1963        The Jackson Whites:  A Thesis.  Rutgers University, New
                Brunswick, New Jersey.

Methodist Episcopal Church.
    1856        Minutes of the Annual Conferences of the Methodist Episcopal
                Church, for the Year 1856.  New York:  Carlton & Porter.

    1857        Minutes of the Annual Conferences of the Methodist Episcopal
                Church, for the Year 1857.  New York:  Carlton & Porter.

Methodist Episcopal Church.  Newark Conference.
    1858        Minutes of the Newark Conference of the Methodist Episcopal
                Church.  First Session.  1858.  Newark, NJ:  Daily
                Advertiser Office.

    1859        Minutes of the Second Session of the Newark Conference of
                the Methodist Episcopal Church.  Held at Haverstraw, N.Y.
                1859.  Committee of Publication, R. B. Yard, J. M. Freeman,
                T. Walters.  Newark, NJ:  Daily Advertiser Office.

    1860        Minutes of the Third Session of the Newark Conference of the
                Methodist Episcopal Church. Held at Hackettstown, N.J.,
                1860.  Committee of Publication:  R. B. Yard, J. M. Freeman,
                S. T. Moore, N. Vansant.  New York:  Pudney & Russell,
                Printers.

    1861        Minutes of the Fourth Session of the Newark Conference of
                the Methodist Episcopal Church, Held at Rahway, N.J., 1861.
                Committee of Publication:  R. B. Yard, J. M. Freeman, S. T.
                Moore, J. R. Bryan.  New York:  Joseph Russell, Printer.

    1862        Minutes of the Fifth Session of the Newark Conference, of
                the Methodist Episcopal Church, Held at Newton, New Jersey,
                1862.  Publishing Committee:  J. M. Freeman, J. R. Bryan, J.
                F. Hurst.  New York:  George Russell, Printer.

    1863        Minutes of the Sixth Session of the Newark Conference, of
                the Methodist Episcopal Church, Held at Jersey City, New
                Jersey, 1863.  Publishing Committee:  J. M. Freeman, J. R.
                Bryan, J. F. Hurst.  New York:  C. S. Westcott & Co.,
                Printers.

133

Bibliography, Final Determination, Ramapough Mountain Indians, Inc.

1864    Minutes of the Seventh Session of the Newark Conference, of the Methodist Episcopal Church. Held at Paterson, New Jersey, March 16, 1864. Publishing Committee: J. M. Freeman, J. F. Hurst, R. B. Yard, G. H. Whitney. New York: C. S. Westcott & Co., Printers.

1865    Minutes of the Eighth Session of the Newark Conference, of the Methodist Episcopal Church. Held in Elizabeth, New Jersey, March 22-29, 1865. Publishing Committee: J. M. Freeman, J. F. Hurst, R. B. Yard, G. H. Whitney. New York: C. S. Westcott & Co., Printers.

1877    Minutes of the Twentieth Session of the Newark Conference of the Methodist Episcopal Church, held at Hedding M.E. Church, Jersey City, N.J., March 28-April 2, 1877. Joseph W. Dally, ed. New York: Nelson & Phillips.

1878    Minutes of the Twenty-First Session of the Newark Conference of the Methodist Episcopal Church, held at St. Paul's M.E. Church, Newark, N.J., March 27-April 3, 1878. Joseph W. Dally, ed. [N.p.]: E. Wells Sackett & Bro., Book and Job Printers.

1884    Minutes of the Twenty-Seventh Session of the Newark Conference of the Methodist Episcopal Church. Held in Newark, N.J., at Halsey Street Church, March 26th to April 1d, 1884. H. D. Opdyke, ed. New York: J. W. Pratt's Book and Job Printing House.

Middleton, Arthur Pierce and Douglas Adair
    1970 [1947]  The Case of the Men Who Weren't There:  Problems of Local Pride: The Mystery of the Horn Papers.  In The Historian as Detective:  Essays on Evidence.  Robin W. Winks, ed., Pp. 142-177.  New York: Harper & Row Publishers, Harper Colophon Books.  [William and Mary Quarterly 3rd Series, 4:409-443].

Munsee-Delaware Nation.  See also: Dolson, Leroy.
    [c1995]  Tribal Resolution.  RMI Response, Ex. 19.

Murphy, Virgil
    1995/6/29 Letter.  June 29.  RMI Response, Ex. 17.

Nevins, Allan
    1970 [1962]  The Case of the Cheating Documents.  In The Historian as Detective:  Essays on Evidence.  Robin W. Winks, ed. Pp. 192-212.  New York: Harper & Row Publishers, Harper Colophon Books. [excerpt from The Gateway to History].

New Jersey Archives (cited as NJA)
    1949a   Archives of the State of New Jersey.  First Series.  Volume 17.  Documents Relating to the Colonial History of the State

Bibliography, Final Determination, Ramapough Mountain Indians, Inc.

of New Jersey. Journal of the Governor and Council. Vol.
V, 1756-1768. Frederick W. Rickord, ed. Trenton, NJ:
MacCrellish & Quigley Co. Printers.

New Jersey. Office of Attorney General
   1995/5/8  Letter from George Rover, Deputy Attorney General,
             State of New Jersey to BIA. May 8.  (BAR files).

New Jersey. State Census
   1855a    Bergen County. Photocopy. Petitioner's Source Materials.

   1855b    Passaic County. Photocopy. Petitioner's Source Materials.

   1865a    Bergen County. Photocopy. Petitioner's Source Materials.

   1865b    Passaic County. Photocopy. Petitioner's Source Materials.

   1885a    Bergen County. Photocopy. Petitioner's Source Materials.

   1885b    Passaic County. Photocopy. Petitioner's Source Materials.

New Jersey.  State Department of Education.
   n.d.     County Tax Rateables 1771-1832. Roll 1, Gergen County,
            Bergen Township through Pompton Township; Roll 2, Pompton
            Township.  Trenton, NJ:  Division of State Library, Archives
            and History.  Microfilm.

New York.  State Census
   1825     Orange County.  Photocopy and abstracts.  Office of the
            County Clerk, Goshen, New York.

   1835     Orange County.  Photocopy.  Office of the County Clerk,
            Goshen, New York.

   1845     Orange County.  Photocopy.  Office of the County Clerk,
            Goshen, New York.

   1855     Orange County.  Photocopy.  Petitioner's Source Materials.

   1865a    Orange County.  Photocopy.  Petitioner's Source Materials.

   1865b    Rockland County.  Photocopy.  Petitioner's Source Materials.

   1875a    Orange County.  Photocopy.  Petitioner's Source Materials.

   1875b    Rockland County.  Photocopy.  Petitioner's Source Materials.

New York Times
   1980     'Ramapo People' Seek Recognition as Indians. New York
            Times. January 17, 1980, B1, B10.

Bibliography, Final Determination, Ramapough Mountain Indians, Inc.

Old Paramus
    1975      Old Paramus Reformed Church in Ridgewood, New Jersey.
              Ridgewood, New Jersey:  Old Paramus Reformed Church.

Orange County, New York
    n.d.      Surrogate Court Record.  Index.  Orange County Surrogate
              Court, Goshen, NY.

    1784      Mortgage Liber B. Mortgage from Elihu Smith to Johannes
              DeVries, June 5, 1784.  Orange County Clerk, Goshen, NY.

Osborn, Dorothy
    c1914     Pedigree of Van Donk-DeGrote Albino Family.  Eugenics Record
              Office, Cold Harbor, NY.

    1917      Report #67.  Eugenics Record Office, Cold Spring Harbor, NY.

Pease, C.C.  See: Atlas of Bergen County.

Presbyterian Board of Publication
    1843      The Missionary in the Wilderness [David Brainerd], or Grace
              Displayed Among the Heathen.  Philadelphia, PA:
              Presbyterian Board of Publication.

Presbyterian Publishing Committee
    1865      The Life of John Brainerd:  The Brother of David Brainerd.
              Missionary to the Indians of New Jersey.  Philadelphia, PA:
              Presbyterian Publishing Committee.

Price, Edward Thomas, Jr.
    1950      Mixed-blood Populations of the Eastern United States as to
              Origins, Localization and Persistence.  University of
              California.  Ph.D. dissertation.

Prince, John Dyneley
    1910      The Jersey Dutch Dialect.  Dialect Notes 3:549-484 [check
              cite].

Proceedings to Determine Boundaries
    1915      Proceedings to Determine Boundaries of the Wawayanda and
              Cheesecocks Patents held in 1785 at Yelverton's Barn,
              Chester.  From Official Record in Orange County Clerk's
              Office, Goshen, N.Y.  Goshen, NY:  Independent Republican
              Printing Co.

Quinn, William W., Jr.
    1990      The Southeast Syndrome:  Notes on Indian Descendant Recruit-
              ment Organizations and Their Perceptions of Native American
              Culture, American Indian Quarterly 14 (Spring):147-154.

Rafert, Stewart J.
    [1995]    Letter.  n.d.  RMI Response, Ex. 10.

136

Bibliography, Final Determination, Ramapough Mountain Indians, Inc.

Rafter, Nicole Hahn, ed.
   1988   <u>White Trash:  The Eugenic Family Studies 1877-1919</u>.  Boston,
          MA:  Northeastern University Press.

Ramapo Presbyterian Church Register
   1994   <u>Ramapo Presbyterian Church Register.  Ramapo, Hillburn,</u>
          <u>Brook Chapel.  Rockland County, New York 1868-1918</u>.
          Photocopy, Orange County Genealogical Society, Goshen, NY.
          [Permission to copy original register:  Rev. Anthony J.
          Reif, Sr.  Index:  Marjorie Smeltzer-Stevenot, Marie S.
          Koestler.  Intro. by Marjorie Smeltzer-Stevenot.]

Ramapough Mountain Indians, Inc. (cited as RMI)
   1993   Petition for Federal Acknowledgment.
          Narrative.
          Exhibits.

   1995a   Response to the Proposed Finding.  May 8.

   1995b   Response to Third-Party Comments.  July 10.

Rankin, E.S.
   1932   "The Ramapo Tract."  <u>Proceedings of the New Jersey</u>
          <u>Historical Society</u> 50:375-394.

Reisman, Herbert
   1995/6/15  Letter.  June 15.  RMI Response, Ex. 22.

Reyerse, George
   1771   Surveyor's Journal.  Manuscript, Special Collections &
          Archives, Alexander Library, Rutgers University, New
          Brunswick, New Jersey.

Rockland Journal News
   1993   September 9.  RMI Response, Ex. 25.

Rockwell, George L.
   1927   <u>The History of Ridgefield, Connecticut</u>.  Ridgefield, CT:
          Privately printed.

Rover, George.  See:  New Jersey, Office of Attorney General.

Rubincam, Milton, ed.
   1980   <u>Genealogical Research:  Methods and Sources</u>.  Revised
          edition.  Washington, DC:  The American Society of
          Genealogists.

Ruttenber, Edward Manning
   1971 [1872]  <u>History of the Indian Tribes of Hudson's River</u>:
          <u>Their Origin, Manners and Customs; Tribal and Sub-Tribal</u>
          <u>Organizations; Wars, Treaties, Etc., Etc</u>.  Port Washington,
          NY:  Ira J. Friedman Division, Kennikat Press.

Bibliography, Final Determination, Ramapough Mountain Indians, Inc.

Ryerse [Ryerson], George
1771        The Book of Surveys and Records of George Ryerse Covering
            the years 1752-1771.  Having to do chiefly with the affairs
            of the Board of Proprietors of East Jersey, and particularly
            with territory embraced by the "Ramapock" Patent.  The
            property of the Hon. Abraham Ryerson, of Lincoln Park, N.J.
            Manuscript, Special Collections & Archives, Alexander
            Library, Rutgers University, New Brunswick, New Jersey.

Salomon, Julian Harris
1982        Indians of the Lower Hudson Region: The Munsee.  New City,
            NY: The Historical Society of Rockland County.

Scheulen, Roy
1995/6/18  Letter.  June 18.  RMI Response Ex. 5.

Schraalenburgh, New Jersey, Reformed Dutch Church
1891        Records of the Reformed Dutch Churches at Hackensack and
            Schraalenburgh, New Jeersey, with the Registers of Members,
            Marriages, Baptisms, and the Consistories, to the Beginning
            of the Nineteenth Century.  Part II.  Being the Records in
            Possession of the (South) Church of Schraalenburgh, N.J.
            Collections of the Holland Society of New York 1, pt. 2.
            New York:  The Society.

Schrabisch, Max
1909        Indian Rock Shelters in Northern New Jersey and Southern New
            York.  In The Indians of Greater New York and the Lower
            Hudson.  Anthropological Papers 3:141-165.  New York:
            American Museum of Natural History.

1919        Mountain Haunts of the Coastal Algonquin.  American
            Anthropologist 21:139-152.

1922        Paterson Morning Call.  A photocopy of this article was
            included in the exhibits for the RMI Petition for Federal
            acknowledgment.

Sessions, Ralph
1995/6/19  Letter.  June 19.  RMI Response, Ex. 9.

Shafer, Robert Jones, ed.
1980        A Guide to Historical Method.  3rd ed.  Homewood, IL:  The
            Dorsey Press.

Shapard, Bud
1995/7/5  Letter to Ada Deer, AS - IA.  July 5.  RMI Response
            Ex. 13.

Shaw, James Beverley Fred
1954        The Negro in the History of Methodism.  Nashville, TN:  The
            Parthenon Press.

138

Bibliography, Final Determination, Ramapough Mountain Indians, Inc.

Sherwood, J.M.
    1884    Memoirs of Brainerd, Missionary Work Among the Indians 1742-
            1747. New York:  Funk & Wagnalls.

Shockley, Grant S., Karen Y. Collier, and William B. McClain,   eds.
    1991    Heritage and Hope:  The African-American Presence in United
            Methodism. Nashville, TN:  Abingdon Press.

Simpson, Matthew, ed.
    1878    Cyclopaedia of Methodism. Embracing Sketches of its Rise,
            Progress, and Present Condition, with Biographical Notices
            and Numerous Illustrations. Philadelphia:  Everts and
            Stewart.

Sinclair, Donald A., comp.
    1980    A Guide to Manuscript Diaries and Journals in the Special
            Collections Department, Rutgers University. New Brunswick,
            NJ:  Archibald Stevens Alexander Library, Rutgers
            University.

Six Nations Council.  See:  Williams, Steve.

Skinner, Alanson B.
    1911    A Primitive New Race in the Very Heart of Civilization:  The
            "Jackson Whites." American Examiner. (this article was
            referenced in Cohen 1974; the petitioner did not supply a
            copy of the article and BAR has not been able to find a
            copy).

    1915    The Indians of Greater New York. Cedar Rapids, Iowa:  Torch
            Press.

Speck, Frank G.
    1908a   Letter to Alanson B. Skinner. American Museum of Natural
            History. April 29.

    1908b   Letter to Alanson B. Skinner. American Museum of Natural
            History, listing "Jackson White" artifacts bought at
            Ladentown (outside of the RMI settlement area).  May 1.

    1911    The Jackson Whites.  The Southern Workman 40 (February):
            104-107.

    1943    A Social Reconnaissance of the Creole Houma Indian Trappers
            of the Louisiana Bayous. América Indígena 3:135-146, 212-
            220.

Stamato, Linda L.
    1968    The Jackson Whites of the Ramapo Mountains. M.A. thesis,
            Seton Hall University.

    1995/7/3  Letter.  July 3.  RMI Response, Ex. 11.

Bibliography, Final Determination, Ramapough Mountain Indians, Inc.

Starna, William
    1991    The Southeast Syndrome:  The Prior Restraint of a Non-Event.
            The American Indian Quarterly 15(4):493-502.

Stevenson, Noel C.
    1979    A Guide to the Standard of Proof Relating to Pedigrees,
            Ancestry, Heirship and Family History.  Laguna Hills, CA:
            Aegean Park Press.

    1980    The Rules of Evidence:  A Standard for Proving Pedigrees.
            In Genealogical Research:  Methods and Sources.  Milton
            Rubincam, ed. Pp. 38-49.  Revised edition.  Washington, DC:
            The American Society of Genealogists.

Stockbridge-Munsee Community, Band of Mohicans.  See:  Murphy, Virgil.

Storms, J.C.
    [c1923]  In the Ramapos:  Letters.  Time.

    1935    Jackson Whites, Racial Hybrids, Putter Along in the Ramapos.
            New York Herald-Tribune, September 15.

    1936    Origins of the Jackson-Whites of the Ramapo Mountains.  Park
            Ridge, New Jersey.

    1945    Origins of the Jackson-Whites of the Ramapo Mountains.  2nd
            ed.  Park Ridge, New Jersey.

Straney, Shirley Garton
    1994    The Kallikak Family:  A Genealogical Examination of a
            "Classic in Psychology."  The American Genealogist 69:65-80.

Swanton, John R.
    1952    Indian Tribes of North America.  Smithsonian Institution,
            Bureau of American Ethnology Bulletin 145.  Washington,
            D.C.:  Smithsonian Institution Press.

Sweet, Janet
    1935a   The Jacksons:  Civilization Washes Past Clans' Mountain
            Refuges.  Bergen (NJ) Evening Record, October 21.

    1935b   The Jacksons:  The Mountain Clans Rule by Laws of Their
            Making.  Bergen (NJ) Evening Record, October 22.

Torricelli, Robert
    1993/5/4  Letter.  May 4.  RMI Response, Ex. 25.

Town of Bedford
    1967    Town of Bedford, Westchester County, New York.  Bedford
            Historical Records Volume II:  Land Records I, 1680-1704,
            John Copp's Records of the West Purchase, 1700-1740.  With a
            Historical Introduction on Land Ownership in Colonial

Bibliography, Final Determination, Ramapough Mountain Indians, Inc.

_Bedford and A Biography of John Copp_. Bedford Hills, NY: Town of Bedford.

1969    Town of Bedford, Westchester County, New York. Bedford Historical Records Volume III: Land Records II, 1687-1741 Recorded Between 1708 and c. 1741 Including The Last Indian Deed, 1723 and Genealogical Entries. Map of the Northeast corner, 1736. Release of Dibble's Purchase by Bedford Freeholders to Jacobus Van Cortlandt's Heirs, 1741. Bedford Hills, NY: Town of Bedford.

1972    Town of Bedford, Westchester County, New York. Bedford Historical Records Volume IV: Land Records 1689-1800. Bedford Land Records III (From Town Book III) With Occasional Miscellaneous Entries to 1830. Also Deeds Recorded by New York State and by Westchester County and Unrecorded Documents in Libraries and Private Collections. Bedford Hills, NY: Town of Bedford.

Trigger, Bruce G., ed.
1978    The Handbook of North American Indians, Vol. 15: Northeast. Washington, D.C.: Smithsonian Institution Press.

True Dutch Reformed Congregation
n.d.    Records of the True Dutch Reformed Congregation of Ramapough, Bergen County, New Jersey, 1824. [First Presbyterian Church of Ramsey, New Jersey.] Typescript. Bergen County Historical Society Collection, Johnson Free Library, Hackensack, New Jersey.

United States. Bureau of Indian Affairs
1900    Kansas Indian Claims Commission. NARS, RG 75, Entry 903. Application #919.

1978    25 CFR Part Part 54 Regulations. 43 F.R. 172, 39319-39560. [Part 54 renumbered Part 83, effective 3/30/82, 47 F.R. 61, 13326-13328.]

1982    Proposed Finding for Federal Acknowledgment of the Narragansett Indian Tribe of Rhode Island. 47 F.R. 157, 35347.

1983    Final Determination for Federal Acknowledgement [sic] of Narragansett Indian Tribe of Rhode Island. 48 F.R. 29, 6277.

1984    Federal Acknowledgment of the Poarch Band of Creeks; Proposed Finding. 49 F.R. 5, 1141.

1986    Proposed Finding Against Federal Acknowledgment of the Wampanok Tribal Council of Gay Head, Inc. 51 F.R. 125, 23604.

141

Bibliography, Final Determination, Ramapough Mountain Indians, Inc.

1987        Final Determination for Federal Acknowledgment of the
            Wampanoag Tribal Council of Gay Head, Inc.   52 F.R. 27,
            4193-4194.

1989        Proposed Finding Against Federal Acknowledgment of the
            Mohegan Tribe of Indians of the State of Connecticut.   54
            F.R. 216, 47136-47137.

1993        Proposed Finding Against Federal Acknowledgment of the
            Ramapough Mountain Indians, Inc.  Cited as:  RMI PF 1993.
            Federal Register Notice, 58 F.R. 234, 64662-64663.
            Summary Under the Criteria
            Historical Technical Report
            Anthropological Technical Report
            Genealogical Technical Report

1994a       25 CFR Part 83 Regulations.   Federal Register, 59(38),
            February 24, 1994, 9280-9300.  Cited as 25 CFR Part 83.

1994b       Final Determination That the  Mohegan Indian Tribe of
            Connecticut, Inc. [sic], Does Exist as an Indian Tribe.   59
            F.R. 50, 12140-12141.

1994c       Proposed Finding for Federal Acknowledgment of the Jena Band
            of Choctaw Indians.  59 F.R. 209, 54496-54497.

1995        Final Determination for Federal Acknowledgment of the Jena
            Band of Choctaw Indians.  60 F.R. 104, 28480-28481.

1995/3/30   Letter to Ramapough Mountain Indians, Inc.  March 30.

1995/9/20   Letter to Ramapough Mountain Indians, Inc.  September 20.

United States.  Bureau of Indian Affairs.  Branch of Acknowledgment
    and Research (BAR)
1993        Steven L. Austin, anthropologist.  Fieldnotes and tape-
            recorded interviews with RMI members and other informants
            while under contract with the Branch of Acknowledgment and
            Research.  Cited as BAR FD 1993.

1994/7/5    Reckord to Archivist, A.M.E. Zion Church, Livingstone
            College, Salisbury, NC.  July 5.  (BAR Files)

1995/9/20   Reckord to Silver.  September 20.  (BAR Files)

1995/9/20   Reckord to Haytaian.  September 20.  (BAR Files)

United States City Directories 1861-1881
1878-79     Paterson, New Jersey.  City Directories.  Reel 2, 1872-1873
            thru 1878-['79].  New Haven, CT:  Research Publications,
            Inc.

142

Bibliography, Final Determination, Ramapough Mountain Indians, Inc.

United States City Directories 1882-1901
    1894-95   Paterson, New Jersey.  City Directories.  Reel 4, 1894-'95
              thru 1896-'97.  New Haven, CT:  Research Publications, Inc.

United States.  Department of Commerce.  Bureau of the Census
    1973      The Indian Population of the United States and Alaska.
              Millwood, New York: Kraus Reprint Co.  From the Fifteenth
              Census of the United States: 1930.

    1976      Table 39--Population Classified by Race:  1900 and 1890.  In
              America in Two Centuries: An Inventory.  Abstract of the
              Twelfth Census of the United States, 1900.  Daniel J.
              Boorstin, ed.  New York:  Arno Press.

    1980      American Indian Areas and Alaska Native Villages:  1980
              Supplementary Report to the 1980 Census of Population.

    1982      General Population Characteristics, Part 32: New Jersey.
              In:  1980 Census of Population. Volume 1:  Characteristics
              of the Population.  Chapter B.

    1992a     1990 Census of Population.  Volume 1:  General Population
              Characteristics.  New York: N.p.

    1992b     200 Years of United States Census Taking:  Population and
              Housing Questions, 1790-1990.  Reprint.  N.p.:  Heritage
              Quest.

United States National Archives and Records Service (cited as NARS)
    n.d.      Selected Records from Revolutionary War Pension and Bounty
              Land Warrants.  Applications Files, 1800-1900.  Microfilm
              Series M-805.

    n.d.      Selected  Records from the Civil War Pension Files.  NARS,RG
              15, Richard DeGroat, # 473,567.

    1790      First Census of the United States.  Orange County, New York.
              Microfilm Series M-637, Roll 6.

    1800a     Federal Census, Orange County, New York.  Microfilm Series
              M-32, Roll 21.

    1800b     Federal Census, Rockland County, New York.  Microfilm Series
              M-32, Roll 25.

    1810a     Federal Census, Orange County, New York.  Microfilm Series
              M-252, Roll 29.

    1810b     Federal Census, Rockland County, New York.  Microfilm Series
              M-252, Roll 35.

    1820a     Federal Census, Orange County, New York.  Microfilm Series
              M-33, Roll 64.

143

Bibliography, Final Determination, Ramapough Mountain Indians, Inc.

1820b    Federal Census, Rockland County, New York.  Microfilm Series
         M-33, Roll 78.

1830a    Federal Census, Bergen County, New Jersey.  Microfilm Series
         M-19, Roll 79.

1830b    Federal Census, Orange County, New York.  Microfilm Series
         M-19, Roll 113.

1830c    Federal Census, Rockland County, New York.  Microfilm Series
         M-19, Roll 103.

1840a    Federal Census, Bergen County, New Jersey.  Microfilm Series
         M-704, Roll 247.

1840b    Federal Census, Orange County, New York.  Microfilm Series
         M-704, Roll 258.

1840c    Federal Census, Rockland County, New York.  Microfilm Series
         M-704, Rolls 322-323.

1850a    Federal Census, Bergen County, New Jersey.  Microfilm Series
         M-432, Roll 442.

1850b    Federal Census, Passaic County, New Jersey.  Microfilm
         Series M-432, Roll 461.

1850c    Federal Census, Orange County, New York.  Microfilm Series
         M-432, Rolls 573-574.

1850d    Federal Census, Rockland County, New York.  Microfilm Series
         M-432, Roll 588.

1860a    Federal Census, Bergen County, New Jersey.  Microfilm Series
         M-653, Roll 682.

1860b    Federal Census, Passaic County, New Jersey.  Microfilm
         Series M-653, Roll 706.

1860c    Federal Census, Orange County, New York.  Microfilm Series
         M-653, Rolls 833-835.

1860d    Federal Census, Rockland County, New York.  Microfilm Series
         M-653, Roll 851.

1870a    Federal Census, Bergen County, New Jersey.  Microfilm Series
         M-593, Roll 852.

1870b    Federal Census, Passaic County, New Jersey.  Microfilm
         Series M-593, Rolls 884-886.

1870c    Federal Census, Orange County, New York.  Microfilm Series
         M-593, Rolls 1067-1070.

144

Bibliography, Final Determination, Ramapough Mountain Indians, Inc.

1870d   Federal Census, Rockland County, New York.  Microfilm Series M-593, Roll 1087.

1880a   Federal Census, Bergen County, New Jersey.  Microfilm Series T-9, Rolls 770-771.

1880b   Federal Census, Passaic County, New Jersey.  Microfilm Series T-9, Rolls 794-796.

1880c   Federal Census, Orange County, New York.  Microfilm Series T-9, Rolls 910-912.

1880d   Federal Census, Rockland County, New York.  Microfilm Series T-9, Roll 924.

1900a   Federal Census, Bergen County, New Jersey.  Microfilm Series T-623, Rolls 954-956.

1900b   Federal Census, Passaic County, New Jersey.  Microfilm Series T-623, Rolls 989-993.

1900c   Federal Census, Orange County, New York.  Microfilm Series T-623, Rolls 1139-1142.

1900d   Federal Census, Rockland County, New York.  Microfilm Series T-623, Roll 1155.

1910a   Federal Census, Bergen County, New Jersey.  Microfilm Series T-624, Rolls 868-870.

1910b   Federal Census, Passaic County, New Jersey.  Microfilm Series T-624, Rolls 904-907.

1910c   Federal Census, Orange County, New York.  Microfilm Series T-624, Rolls 1059-1061.

1910d   Federal Census, Rockland County, New York.  Microfilm Series T-624, Rolls 952-953.

1920a   Federal Census, Bergen County, New Jersey.  Microfilm Series T-625, Rolls 1016-1020.

1920b   Federal Census, Passaic County, New Jersey.  Microfilm Series T-625, Rolls 1062-1066.

1920c   Federal Census, Orange County, New York.  Microfilm Series T-625, Rolls 1251-1253.

1920d   Federal Census, Rockland County, New York.  Microfilm Series T-625, Rolls 1258-1259.

Bibliography, Final Determination, Ramapough Mountain Indians, Inc.


Vineland Training School, Vineland, New Jersey
    1917      The Jackson Whites: A Study on Racial Degeneracy.
              Unpublished study by Elizabeth Kite, based upon the research
              of Jane Griffiths, edited in part by Henry H. Goddard.

Walker, A. H.   See: Atlas of Bergen County.

Ward, William Ralph Jr.
    1986      Faith in Action:  A History of Methodism in the Empire State
              1784-1984.  Rutland, VT:  Academy Books.

Williams, Steve
    1995/7/10  Letter.  July 10.  RMI Response, Ex. 20.

Winks, Robin W., ed.
    1970      The Historian as Detective:  Essays on Evidence.  New York:
              Harper & Row Publishers, Harper Colophon Books.

Wojciechowska, Maia
    1993/7/26  Letter.  July 26.  RMI Response, Ex. 25.

    1995/6/6  Letter.  June 6.  RMI Response, Ex. 8.

    1995/6/24  Letter.  June 24.  RMI Response, Ex. 8.

Works Progress Administration.  See:  Federal Writers' Project.