Exhibit "E"

APPENDIX A—Continued

| Name of agency | Address | No. of units | Budget authority |
|---|---|---|---|
| CITY OF LAS VEGAS HSG AUTH ....................... | PO BOX 1897, LAS VEGAS, NV 89125189 ...................... | 85 | 4,294,860 |
| NEW YORK CITY HOUSING AUTHORITY ....................... | 250 BROADWAY, NEW YORK, NY 100070000 .............. | 9 | 461,040 |
| OKLAHOMA HOUSING FINANCE AGENCY ....................... | PO BOX 26720, OKLAHOMA CITY, OK 7312 ................... | 15 | 381,115 |
| NEWPORT NEWS REDEVELOPMENT & H/A ....................... | PO BOX 77, NEWPORT NEWS, VA 23607 ...................... | 49 | 1,686,455 |

PROPERTY DISPOSITION—VOUCHER PROGRAM

| | | | |
|---|---|---|---|
| CITY OF HARTFORD ....................... | 550 MAIN ST, HARTFORD, CT 061030000 ...................... | 100 | 1,223,808 |
| FORT DODGE HOUSING AGENCY ....................... | 700 SOUTH 17TH STREET, FORT DODGE, IA 505010000. | 34 | 541,450 |
| HOUSING AUTHORITY OF BALTIMORE CITY ....................... | 417 E FAYETTE STREET, BALTIMORE, MD 212020000 | 151 | 5,495,710 |
| ST. LOUIS COUNTY HOUSING AUTHORITY ................... | 8865 NATURAL BRIDGE, ST. LOUIS, MO 631210000 ... | 83 | 3,058,370 |
| LINCOLN COUNTY PUB HSG AGENCY ....................... | LINCOLN COUNTY PHA, BOWLING GREEN, MO 83334, 16 NORTH COURT. | 156 | 4,340,830 |
| PUERTO RICO HOUSING FINANCE CORP ....................... | CALL BOX 71361–GPO, SAN JUAN, PR 009360000 ..... | 77 | 2,330,685 |
| EAST TN HUMAN RESOURCE AGENCY ....................... | 408 N CEDAR BLUFF ROAD, KNOXVILLE, TN 379230000, SUITE 400. | 93 | 2,585,995 |
| BEXAR COUNTY HSG AUTHORITY ....................... | 1405 N MAIN, SUITE 240, SAN ANTONIO, TX 782120000. | 4 | 120,010 |
| NEWPORT NEWS REDEVELOPMENT & H/A ................. | PO BOX 77, NEWPORT NEWS, VA 236070077 ............. | 137 | 5,297,075 |
| HOUSING AUTHORITY OF BALTIMORE CITY ................. | 417 E FAYETTE STREET, BALTIMORE, MD 21202000 . | 5 | 178,875 |
| NEWPORT NEWS REDEVELOPMENT & H/A ................. | PO BOX 77, NEWPORT NEWS, VA 23607 ...................... | 250 | 10,039,600 |

[FR Doc. 96–2375 Filed 2–5–96; 8:45 am]
BILLING CODE 4210–33–M

## DEPARTMENT OF THE INTERIOR

### Bureau of Indian Affairs

### Final Determination Against Federal Acknowledgment of the Ramapough Mountain Indians, Inc.

**AGENCY:** Bureau of Indian Affairs, Interior.

**ACTION:** Notice of Final Determination.

**SUMMARY:** This notice is published in the exercise of authority delegated by the Secretary of the Interior to the Assistant Secretary—Indian Affairs (Assistant Secretary) by 209 DM 8.

Pursuant to 25 CFR 83.10(m), notice is hereby given that the Assistant Secretary declines to acknowledge that the Ramapough Mountain Indians, Inc. (RMI), c/o Mr. Ronald Van Dunk, 200 Rte. 17 So., P.O. Box 478, Mahwah, New Jersey 07430–0478, exists as an Indian tribe within the meaning of Federal law. This notice is based on a determination that the group does not satisfy three of the criteria set forth in 25 CFR 83.7, namely: 83.7(b), 83.7(c), and 83.7(e).

**DATES:** This determination is final and is effective May 6, 1996, pursuant to 25 CFR 83.10(l)(4), unless a request for reconsideration is filed pursuant to 25 CFR 83.11.

A notice of the Proposed Finding to decline to acknowledge the Ramapough Mountain Indians, Inc. was published in the Federal Register on December 8,

1993 (58 FR 64662, Dec. 8, 1993). The original 180-day period provided for in the regulations for comment on the Proposed Finding closed April 6, 1994. At the petitioner's request, it was extended until October 7, 1994; again until April 7, 1995; and again until May 8, 1995. The 60-day period provided for in the regulations (25 CFR Part 83.10(k)) for the petitioner to respond to third-party comments ended July 10, 1995. This determination is made following a review of the Ramapough Mountain Indians, Inc.'s response to the Proposed Finding to decline to acknowledge, of the public comments on the Proposed Finding to decline to acknowledge, and of the Ramapough Mountain Indians, Inc.'s response to the public comments.

The Proposed Finding to decline to acknowledge the Ramapough Mountain Indians, Inc. was issued under the 1978 Federal acknowledgment regulations (43 FR 39361–39364, Sept. 5, 1978). On April 22, 1994, the Ramapough Mountain Indians, Inc., requested that the final determination be issued under the 1994 revised Federal acknowledgment regulations. This Final Determination is issued under the revised regulations.

This determination is final and will become effective 90 days from the date of publication, unless a request for reconsideration is filed pursuant to § 83.11. The petitioner or any interested party may file a request for reconsideration of this determination with the Interior Board of Appeals (§ 83.11(a)(1)). The petitioner's or interested party's request must be received no later than 90 days after

publication of the Assistant Secretary's determination in the Federal Register (§ 83.11(a)(2)).

Because of changes in the revised regulations and new evidence located by the Government's researchers, the conclusions for this Final Determination are slightly different from those reached in the Proposed Finding under criteria 83.7(a), 83.7(b), and 83.7(c). The Proposed Finding determined that the RMI did not meet criterion 83.7(a). There was no evidence that the petitioning group had been identified "from historical times until the present on a substantially continuous basis, as 'American Indian' or 'aboriginal'" (25 CFR 83.7(a), 1978). The 1994 revision of the 25 CFR Part 83 regulations was designed to reduce the burden of proof on petitioners. Identification as an Indian entity by external observers from first sustained contact with non-Indians until 1900 is no longer required by criterion 83.7(a). Under the 1994 regulations, the RMI meets criterion 83.7(a), identification by external observers as an American Indian entity, for the period since 1900. This finding is based upon a determination by the Assistant Secretary—Indian Affairs that consistent scholarly and popular identification of a group as a tri-racial isolate believed to have an American Indian component shall constitute evidence for identification of the group as an American Indian entity.

The Proposed Finding determined that the petitioner's ancestral group did show community for the period 1870–1950, based on extensive endogamy and geographical residential concentration.

However, under the 1978 regulations, this was not adequate to meet criterion 83.7(b), as the 1978 wording required that there be a distinct ''community viewed as American Indian'' [emphasis added]. This wording was removed in the 1994 revision of criterion 83.7(b), which now requires only the existence of a distinct community. The regulations continue to require, under both criteria 83.7(b) and 83.7(c), that a petitioning group show continuity from the time of first sustained contact with non-Indians until the present.

Under the provisions of the revised regulations, the Ramapough Mountain Indians, Inc. has been found to meet criteria 83.7(b) and 83.7(c) for a limited period of time, from 1870 until about 1950. No new evidence concerning criterion 83.7(c) was submitted for the final determination. However, under a provision of the 1994 revised regulations that was designed to reduce the burden of proof on petitioners, it is automatically assumed that when a group meets criterion 83.7(b) with a sufficient level of evidence (endogamy of greater than 50 percent; geographically proximate residence of greater than 50 percent, etc.), it also will have met criterion 83.7(c) for the same period of time. Based on this linkage between the two criteria, it is determined that the Ramapough Mountain Indians, Inc. has met criterion 83.7(c) for the period 1870–1950.

The modifications under the revised regulations do not change the ultimate finding concerning criteria 83.7(b) and 83.7(c), however, since the requirement of continuous existence as a social community (83.7(b)) and continuous exercise of political influence or authority over the group's members (83.7(c)), from the time of first sustained contact of the historical tribe, or tribes which amalgamated and functioned as a single political entity, with non-Indians until the present, remains in force. Meeting a criterion for a limited period is not sufficient to meet the criterion overall, because of the requirement of continuous existence. No adequate evidence has been submitted to show the continuous existence of a community from first sustained contact with non-Indians until 1870, or from 1950 to the present. Therefore, the petitioner does not meet criterion 83.7(b). No new evidence was submitted to show the continuous exercise of political influence or authority within the group from first sustained contact with non-Indians until 1870, or from 1950 to the present. Therefore, the petitioner does not meet criterion 83.7(c).

The Proposed Finding concluded that, ''No evidence was found to substantially demonstrate Indian ancestry for the RMI membership which was derived from a historic tribe. It also could not be established that there is any Indian ancestry from isolated Indian individuals, and there is virtually no documentary evidence from historical records for such ancestry.'' No new evidence was submitted pertaining to criterion 83.7(e), descent of the petitioner's membership from a historical Indian tribe, or from tribes which amalgamated and functioned as a single political unit. The petitioner's response presented a re-analysis of the same evidence considered in the Proposed Finding to decline to acknowledge. The conclusion that the origins and parentage of the earliest generation of the petitioner's documented ancestors remain unknown is not changed in this final determination. Therefore, the Ramapough Mountain Indians, Inc., does not meet criterion 83.7(e).

Ada E. Deer,

*Assistant Secretary—Indian Affairs.*

[FR Doc. 96–1822 Filed 2–5–96; 8:45 am]

**BILLING CODE 4310–02–P**

## Indian Gaming, Oregon

**AGENCY:** Bureau of Indian Affairs, Interior.

**ACTION:** Notice of Amendment to Approved Tribal-State Compact.

**SUMMARY:** Pursuant to 25 U.S.C. § 2710, of the Indian Gaming Regulatory Act of 1988 (Pub. L. 100–497), the Secretary of the Interior shall publish, in the Federal Register, notice of approved Tribal-State Compacts for the purpose of engaging in Class III (casino) gambling on Indian reservations. The Assistant Secretary—Indian Affairs, Department of the Interior, through her delegated authority, has approved Amendment II to the Tribal-State Compact for Regulation of Class III Gaming Between the Cow Creek Band of Umpqua Tribe of Indians and the State of Oregon, which was executed on October 27, 1995.

**EFFECTIVE DATE:** February 6, 1996.

**FOR FURTHER INFORMATION CONTACT:** George T. Skibine, Director, Indian Gaming Management Staff, Bureau of Indian Affairs, Washington, D.C. 20240, (202) 219–4068.

Dated: December 14, 1995.

Ada E. Deer,

*Assistant Secretary—Indian Affairs.*

[FR Doc. 96–2451 Filed 2–5–96; 8:45 am]

**BILLING CODE 4310–02–M**

## Indian Gaming

**AGENCY:** Bureau of Indian Affairs, Interior.

**ACTION:** Notice of approval for Blackjack Amendment to Tribal-State Compact.

**SUMMARY:** Pursuant to 25 U.S.C. 2710, of the Indian Gaming Regulatory Act of 1988 (Pub. L. 100–497), the Secretary of the Interior shall publish, in the Federal Register, notice of approved Tribal-State Compacts or considered approved for the purpose of engaging in Class III (casino) gambling on Indian reservations. The Assistant Secretary—Indian Affairs, Department of the Interior, through her delegated authority, is publishing an Amendment to the Tribal-State Compact For Regulation of Class III Gaming Between the Coquille Indian Tribe and the State of Oregon, which is considered approved, but only to the extent the amendment is consistent with the provisions of the Indian Gaming Regulatory Act.

**SUPPLEMENTARY INFORMATION:** The Secretary of the Interior neither approved nor disapproved the Coquille Indian Tribe's Blackjack Amendment within the 45-day statutory deadline set forth in 25 U.S.C. 2710 (d)(8)(C). The deadline expired on January 4, 1996. Thus, the Coquille Indian Tribe's Blackjack Amendment is considered approved as specified in 25 U.S.C. 2710 (d)(8)(C), to the extent that is consisting with the Indian Gaming Regulatory Act.

**DATES:** This action is effective February 6, 1996.

**FOR FURTHER INFORMATION CONTACT:** George T. Skibine, Director, Indian Gaming Management Staff, Bureau of Indian Affairs, Washington, DC 20240, (202) 219–4068.

Dated: January 29, 1996.

Ada E. Deer,

*Assistant Secretary—Indian Affairs.*

[FR Doc. 96–2452 Filed 2–5–96; 8:45 am]

**BILLING CODE 4310–02–M**

## Indian Gaming, Oregan

**AGENCY:** Bureau of Indian Affairs, Interior.

**ACTION:** Notice of Approval for Amendment I to Tribal-State Compact.

**SUMMARY:** Pursuant to 25 U.S.C. § 2710, of the Indian Gaming Regulatory Act of 1988 (Pub. L. 100–497), the Secretary of the Interior shall publish, in the Federal Register, notice of approved Tribal-State Compacts for the purpose of engaging in Class III (casino) gambling on Indian reservations. The Assistant Secretary—

Exhibit "F"



# INTERIOR BOARD OF INDIAN APPEALS

In re Federal Acknowledgment of Ramapough Mountain Indians, Inc.

31 IBIA 61 (07/18/1997)

Decision by Assistant Secretary - Indian Affairs:
    November 7, 1997

Judicial review of this case:
    Summary judgment for defendants granted, *Ramapough Mountain Indians v.*
        *Babbitt*, Civil No. 98-2136 (JR) (D.D.C. Sept. 30, 2000)
    Affirmed, *Ramapough Mountain Indians v. Norton*, 25 Fed. Appx. 2
        (D.C. Cir. 2001)
    Cert. denied, 537 U.S. 817 (2002)



# United States Department of the Interior

OFFICE OF HEARINGS AND APPEALS
INTERIOR BOARD OF INDIAN APPEALS
4015 WILSON BOULEVARD
ARLINGTON, VA 22203

IN RE FEDERAL ACKNOWLEDGMENT OF THE
RAMAPOUGH MOUNTAIN INDIANS, INC.

IBIA 96-61-A                                          Decided July 18, 1997

Request for reconsideration of a final determination against Federal acknowledgment.

Affirmed.  Four issues referred to the Secretary of the Interior.

1.      Indians: Federal Recognition of Indian Tribes: Acknowledgment

        In considering a request for reconsideration of a final
        determination concerning Federal acknowledgement of an entity
        as an Indian tribe, the Board of Indian Appeals has authority to
        determine whether the request for reconsideration has established,
        by a preponderance of the evidence, one or more of the grounds for
        reconsideration in 25 C.F.R. § 83.11(d)(1)-(4).

2.      Indians: Federal Recognition of Indian Tribes: Acknowledgment

        In considering a request for reconsideration of a final
        determination concerning Federal acknowledgement of an entity
        as an Indian tribe, the Board of Indian Appeals has authority,
        under 25 C.F.R. § 83.11(f)(2), to refer certain grounds for
        reconsideration to the Secretary of the Interior.  The Board finds
        that its authority under this provision includes the authority to refer
        matters requiring clarification, whether or not they constitute
        grounds for reconsideration.

3.      Indians: Federal Recognition of Indian Tribes: Acknowledgment

        For purposes of reconsideration of a final determination concerning
        Federal acknowledgment of an entity as an Indian tribe, a
        "reasonable alternative interpretation[ ], not previously considered,
        of the evidence used for the final determination" does not include
        an interpretation, however reasonable, which has been considered
        and rejected.  25 C.F.R. § 83.11(d)(4).

APPEARANCES:  Albert J. Catalano, Esq., and Ronald J. Jarvis, Esq., Washington, D.C., for
petitioner; Brian L. Miele, its Mayor, for the

IBIA 96-61-A

Village of Hillburn, New York; David M. Wagner, Esq., New City, New York, for the
Legislature of Rockland County, New York. 1/

OPINION BY ADMINISTRATIVE JUDGE VOGT

The Ramapough Mountain Indians, Inc. (Petitioner, RMI) seeks reconsideration of a
"Final Determination Against Federal Acknowledgment of [Petitioner]," notice of which was
published at 61 Fed. Reg. 4476 (Feb. 6, 1996).  For the reasons discussed below, the Board
affirms the Final Determination but refers four issues to the Secretary of the Interior pursuant
to 25 C.F.R. § 83.11(f)(2).

Background

In 1978, Petitioner submitted a letter of intent to petition for Federal acknowledgment
as an Indian tribe.  In 1990, it submitted a documented petition.  After preliminary discussions
with the Branch of Acknowledgment and Research, Bureau of Indian Affairs (BAR; BIA),
Petitioner submitted a revised petition.  The BIA began active consideration of the revised
petition in July 1992.

On December 6, 1993, the Assistant Secretary - Indian Affairs published a "Proposed
Finding Against Federal Acknowledgment of [Petitioner]."  58 Fed. Reg. 64,662 (Dec. 8,
1993).  Following a period for response and comments, the Assistant Secretary issued her Final
Determination on February 6, 1996, concluding that Petitioner failed to satisfy the criteria in
25 C.F.R. §§ 83.7(b),(c), and (e), three of the seven mandatory criteria for Federal
acknowledgment. 2/

Petitioner filed a Request for Reconsideration under 25 C.F.R. § 83.11.  The request
was received by the Board on May 6, 1996.  Petitioner alleged:

[T]here is new evidence which could affect the outcome of the proceeding that
must be considered; the record reveals that the BIA has disregarded probative
evidence and based its decision on unreliable evidence; and there are reasonable
alternative inter-

─────────────────

1/  In addition, a filing which might be construed as an entry of appearance was made by Beverly
Tanenhaus, Esq., for the State of New Jersey.  However, no brief or other position statement was
filed on behalf of the State of New Jersey.

2/  The Proposed Finding was issued under regulations promulgated in 1978, 43 Fed. Reg.
39,361 (Sept 5, 1978), 25 C.F.R. Part 83 (1993), which remained in effect until replaced by new
regulations effective Mar. 28, 1994, 59 Fed. Reg. 9293 (Feb. 25, 1994).  Pursuant to Petitioner's
request, the Final Determination concerning its petition was issued under the 1994 regulations.
Except where otherwise noted, all citations to the regulations in 25 C.F.R. Part 83 are to
the 1994 revision.

IBIA 96-61-A

pretations which the BIA failed to consider that could affect the outcome of the proceeding.

Request for Reconsideration at 2-3.

On May 7, 1996, the Board determined, pursuant to 25 C.F.R. § 83.11(c)(2), that Petitioner had alleged grounds for reconsideration under 25 C.F.R. § 83.11(d).

<u>Interested Parties</u>

Lists of potential interested parties were submitted by the Assistant Secretary and by Petitioner.  Briefing was suspended to allow for a determination of interested parties for purposes of the proceedings before the Board.  The Governors and Attorneys General of the States of New Jersey and New York were determined to be interested parties by the terms of the definition of "interested party" in 25 C.F.R. § 83.1. <u>3</u>/  Other individuals and entities included on either of the two lists were given an opportunity to request interested party status before the Board.  Of those requesting  interested party status, the Legislature of Rockland County, New York, and the Village of Hillburn, New York, were determined to be interested parties. <u>4</u>/

The briefing schedule was reinstated on September 26, 1996.  Answer briefs were filed by the Legislature of Rockland County, New York, and the Village of Hillburn, New York, both supporting Petitioner's Request for Reconsideration.  No briefs were filed by the New Jersey or New York State

---

<u>3</u>/ Section 83.1 provides:
   "<u>Interested party</u> means any person, organization or other entity who can establish a legal, factual or property interest in an acknowledgment determination and who requests an opportunity to submit comments or evidence or to be kept informed of general actions regarding a specific petitioner.  "Interested party" includes the governor and attorney general of the state in which a petitioner is located, and may include, but is not limited to, local governmental units, and any recognized Indian tribes and unrecognized Indian groups that might be affected by an acknowledgment determination."

<u>4</u>/ There were three other requests for interested party status.  Two were from individuals who failed to show that they qualified under the definition in § 83.1.  The third was from the Town of Ramapo, New York, which failed to serve its request on the other parties after being given two opportunities to do so.
   The two individuals and the Town of Ramapo, as well as a number of other persons who requested to be informed of the Board's decision, are included on the distribution list for this decision.

IBIA 96-61-A

officials.  Neither the Assistant Secretary nor BIA has participated as an active party in this proceeding. 5/

<u>Petitioner's Motions and Requests</u>

Petitioner has filed a number of motions and requests upon which the Board has not yet acted.

By a request dated May 23, 1996, Petitioner sought to supplement its Request for Reconsideration.  Petitioner stated that the materials included in its Supplement to Request for Reconsideration (Petitioner's Supplement) were more legible copies of documents already submitted or materials specifically referred to in the Request for Reconsideration.

The Board initially intended to rule on this request prior to the reinstatement of briefing. However, in light of subsequent filings made by Petitioner, the Board postponed its ruling and gave the parties an opportunity to respond to all of the materials submitted by Petitioner.

No party has objected to the materials in Petitioner's Supplement.  Therefore, except to the extent that materials in Petitioner's Supplement constitute untimely new evidence (<u>see</u> discussion below), the Board admits these materials into the record.

Under 25 C.F.R. § 83.11(e)(8), the Assistant Secretary designated and transmitted a number of documents to the Board as Critical Documents. 6/  The documents were received by the Board on June 14, 1996.  On August 9, 1996, the Board received from Petitioner a filing entitled "Comments on Administrative Record and Motion to Supplement Record" (Petitioner's Comments). 7/  Attached to the filing were four volumes of exhibits and

_____

5/  The preamble to the 1994 regulations states:  "[BIA] under the regulations does not participate as an active party [in proceedings before the Board] opposing or supporting the submissions of petitioner or interested parties or defending the determination."  59 Fed. Reg. at 9292.

6/  Subsection 83.11(e)(8) provides:
    "For purposes of review by the Board, the administrative record shall consist of all appropriate documents in the [BAR] relevant to the determination involved in the request for reconsideration.  The Assistant Secretary shall designate and transmit to the Board copies of critical documents central to the portions of the determination under a request for reconsideration.  The [BAR] shall retain custody of the remainder of the administrative record, to which the Board shall have unrestricted access."

7/  Arguably Petitioner's filing, insofar as it constitutes an objection to the record, is untimely under 43 C.F.R. § 4.336, which allows only 15 days for objections to the record.  However, the procedures in acknowledgement cases, as well as the records in those cases, are more complex than in other appeals, making the 15-day limit somewhat unrealistic.  Further, in this

31 IBIA 64

a videotape.  The Board requested the Assistant Secretary to review the materials submitted by Petitioner and to advise the Board whether these materials had been a part of the administrative record when this matter was pending before her.

The Assistant Secretary's response listed each document submitted by Petitioner and indicated whether each was a part of the administrative record before the Assistant Secretary and whether each had been transmitted to the Board as a part of the Critical Documents.  The response indicated that the great majority of the documents were, either in whole or in part, a part of the administrative record before the Assistant Secretary and had also been transmitted to the Board as part of the Critical Documents.  Petitioner was given an opportunity to respond to the Assistant Secretary's submission in its Reply Brief.

Petitioner contends:

[M]any documents [in the Critical Documents] were arranged in a manner which serves to "bury" key evidentiary material.  Some voluminous exhibits are partially or totally irrelevant and simply serve to obfuscate important issues.  Other exhibits are apparently deliberately placed out of order to diminish their importance.

The Petitioner's Supplement is designed to correct many of these deficiencies by highlighting, rather than hiding, critical documents and evidence.  This Supplement will assist the Board in understanding the elements of the Petitioner's case and how the various documents interrelate and corroborate each other.  [Footnote omitted.]

Petitioner's Comments at 1-2.

Petitioner also contends that BIA omitted certain documents which Petitioner considers critical to its case.  Petitioner's Comments at 1; Reply Brief at 1, 13.  Nevertheless, Petitioner agrees with the Assistant Secretary that nearly all of the documents it submits with its Comments are already part of the record.

Insofar as Petitioner's documents duplicate documents already before the Board, the documents might be rejected as unnecessary.  However, Petitioner clearly considers its case to be enhanced by its arrangement of the documents.  The Board sees no particular harm in admitting the duplicative documents, in the arrangement favored by Petitioner.

To the extent documents included with Petitioner's Comments are in the administrative record but were not transmitted to the Board under 25 C.F.R. § 83.11(e)(8), their admission into these proceedings will undoubtedly make

---

fn. 7 (continued)
case, proceedings on the merits were stayed at the time Petitioner filed its request, so that no delay in the proceedings resulted.  Accordingly, the Board has not held Petitioner to the time limit in § 4.336.

IBIA 96-61-A

their review more convenient for the Board. 8/  With respect to documents falling into this category, the Board finds that Petitioner has a right to add them to the materials before the Board.

    As to any documents which were not part of the administrative record before the Assistant Secretary, such documents might be construed as new evidence under 25 C.F.R. § 83.11(d)(1).  However, 25 C.F.R. § 83.11(b) requires that a "request for reconsideration * * * include any new evidence to be considered."  Petitioner's Comments were not filed with its Request for Reconsideration.  Nor were they filed within the time allowed in 25 C.F.R. § 83.11(a)(2) for filing such requests.  Thus, any "new evidence" submitted for the first time with Petitioner's Comments would require rejection on the basis of untimeliness. 9/

    The Board admits the documents submitted with Petitioner's Comments, subject to the caveat in the preceding paragraph.

    Petitioner also filed a Motion to Strike, seeking to strike Exhibits 26-A and 26-B of the Critical Documents.  These documents are listed in the table of contents for the Critical Documents as:  Steven L. Austin, "Anthropologist's Field Notes taken and Interview Transcripts of work done in New Jersey on behalf of the BAR" and "Anthropologist's Transcript of field work interview with Rev. Ruth Wainwright."  Petitioner contends that these notes are incompetent under the Federal Rules of Evidence because, inter alia, their authenticity and completeness cannot be determined.  Petitioner further contends that the notes are inadmissible hearsay under these same rules; that the notes are inaccurate and incomplete; that statements in the notes are inconsistent with other statements made by Austin; and that Petitioner has suffered a due process violation in connection with these documents because they were withheld from Petitioner until they were submitted to the Board in these proceedings. 10/

_____

8/  As the regulations provide, and as Petitioner recognizes, the Board has access to the entire administrative record in the custody of BIA.  25 C.F.R. § 83.11(e)(8).

9/  The same is true of documents submitted as new evidence with Petitioner's Reply Brief.

10/  With respect to this last contention, Petitioner alleges:
    "[T]he purported field notes were made available to Petitioner for the first time only when submitted to the Board as part of the Administrative Record, despite Petitioner's repeated oral requests to the BAR staff to make Austin's preliminary report and notes available.  The only response received by Petitioner to these entreaties was stonewalling--the assertion that such records 'did not exist.'"
Motion to Strike at 5.
    The Board returns to this contention at the end of this decision.

Even if these documents would be inadmissible in a Federal court under the Federal Rules of Evidence, they are part of the record in this administrative proceeding because the Assistant Secretary considered them in reaching the decision now under review. Accordingly, the documents are properly before the Board, and the Board therefore declines to strike them.

Arguably, Petitioner should have contended, as it did with respect to certain other evidence discussed below, that the Austin notes are unreliable evidence under 25 C.F.R. § 83.11(d)(2). As noted, however, Petitioner alleges that the notes were not made available to it prior to the time it filed its Request for Reconsideration. If that was in fact the case, a question on which the Board reaches no conclusion here, Petitioner might well be excused from failing to challenge the notes as unreliable in its Request for Reconsideration. Giving Petitioner the benefit of the doubt in this regard, the Board construes Petitioner's Motion to Strike as an argument that the Austin notes are unreliable evidence under 25 C.F.R. § 83.11(d)(2) and discusses this argument below.

Petitioner also filed a Request for Oral Argument and a Request for Evidentiary Hearing. Finding neither an oral argument nor an evidentiary hearing necessary in this case, the Board denies both requests.

<u>Discussion and Conclusions</u>

Under 25 C.F.R. § 83.6(c), "[a] petitioner must satisfy all of the criteria in paragraphs (a) through (g) of § 83.7 in order for tribal existence to be acknowledged." The Assistant Secretary determined that Petitioner failed to satisfy the criteria in paragraphs (b), (c), and (e) of section 83.7. These paragraphs require that:

(b) A predominant portion of the petitioning group comprises a distinct community and has existed as a community from historical [11/] times until the present.

\*          \*          \*          \*          \*          \*

(c) The petitioner has maintained political influence or authority over its members as an autonomous entity from historical times until the present. [12/]

\*          \*          \*          \*          \*          \*

11/ Section 83.1 provides: "<u>Historically, historical or history</u> means dating from first sustained contact with non-Indians."

12/ The Assistant Secretary found that Petitioner satisfied the criteria in § 83.7(b) and (c) for the period 1870-c.1950. However, she stated: "Meeting a criterion for a limited period is not sufficient to meet the criterion overall because of the requirement of continuous existence. No adequate evidence has been submitted to show the continuous existence of a community from first sustained contact with non-Indians until 1870, or from 1950 to the present." 61 Fed. Reg. at 4477.

IBIA 96-61-A

    (e)  The petitioner's membership consists of individuals who descend from a historical Indian tribe or from historical Indian tribes which combined and functioned as a single autonomous political entity.

Petitioner has alleged grounds for reconsideration of the Assistant Secretary's determination under 25 C.F.R. § 83.11(d)(1), (2), and (4), contending:

    (1)  That there is new evidence that could affect the determination; * * *

    (2)  That a substantial portion of the evidence relied upon in the Assistant Secretary's determination was unreliable or of little probative value; [and]

    *        *        *        *        *        *

    (4)  That there are reasonable alternative interpretations, not previously considered, of the evidence used for the final determination, that would substantially affect the determination that the petitioner meets or does not meet one or more of the criteria in § 83.7(a) through (g).

The burden of proof imposed upon petitioner and the standard of proof the Board must apply are set out in 25 C.F.R. § 83.11(e)(9) and (10):

    (9)  The Board shall affirm the Assistant Secretary's determination if the Board finds that the petitioner or interested party has failed to establish, by a preponderance of the evidence, at least one of the grounds under paragraphs (d)(1-4) of this section.

    (10)  The Board shall vacate the Assistant Secretary's determination and remand it to the Assistant Secretary for further work and reconsideration if the Board finds that the petitioner or an interested party has established, by a preponderance of the evidence, one or more of the grounds under paragraphs (d)(1-4) of this section.

Taken together, these several regulatory provisions require that Petitioner establish by a preponderance of the evidence that one or more of the grounds in 25 C.F.R. § 83.11(d)(1), (2), and/or (4) exist with respect to one or more of the findings which caused the Assistant Secretary to decline to acknowledge Petitioner, i.e., her conclusions that Petitioner failed to satisfy the criteria in 25 C.F.R. § 83.7(b), (c), and (e).

[1]  In addition to stating the burden and standard of proof, 25 C.F.R. § 83.11(e)(9) and (10) establish the scope of the Board's review authority.  While some of Petitioner's contentions in this case appear to assume that

IBIA 96-61-A

the Board has authority to review the Assistant Secretary's determination de novo, that is not the case. The Board's adjudicatory authority is limited to the questions of whether Petitioner has established one or more of the grounds in 25 C.F.R. § 83.11(d)(1), (2), or (4).

With respect to any grounds for reconsideration other than those in 25 C.F.R. § 83.11(d), the Board has the more limited authority described in 25 C.F.R. § 83.11(f):

(1) The Board, in addition to making its determination to affirm or remand, shall describe in its decision any grounds for reconsideration other than those in paragraphs (d)(1-4) of this section alleged by a petitioner or interested party's request for reconsideration.

(2) If the Board affirms the Assistant Secretary's decision under § 83.11(e)(9) but finds that the petitioner or interested parties have alleged other grounds for reconsideration, the Board shall send the requests for reconsideration to the Secretary. The Secretary shall have the discretion to request that the Assistant Secretary reconsider the final determination on those grounds.

[2] The Board interprets its authority under 25 C.F.R. § 83.11(f) to incorporate the authority to refer issues to the Secretary for clarification, even if those issues might not rise to the level of "grounds for reconsideration." Absent such an interpretation, matters which the Board identified as requiring clarification, but over which the Board lacks jurisdiction, would simply languish, with no apparent possibility of correction within the Department. 13/ In this case, the Board has identified a few such matters, which it discusses at the end of this decision.

The Board first addresses Petitioner's contention that "there is new evidence that could affect the determination" not to acknowledge Petitioner as an Indian tribe. With its Request for Reconsideration, Petitioner submits 11 items as new evidence. These are:

1. A December 7, 1995, letter from Borough Historian Elbertus Prol, Borough of Ringwood, New Jersey, to the Secretary of the Interior.

2. Three maps.

3. A May 1, 1996, affidavit from Reverend Ruth R. Wainwright, pastor of the Brook Presbyterian Church, Hillburn, New York.

4. A document entitled "Christie Family Gen."

---

13/ In other kinds of appeals, the Board is sometimes able to clarify a BIA decision in the process of issuing its own decision. Given the Board's limited jurisdiction in acknowledgment appeals, this does not appear possible here.

5. A November 6, 1995, letter from Marie Skodak Crissey to Roger D. Joslyn.

6. A November 8, 1995, letter from Edmund Carpenter, Vice-President, Rock Foundation, New York, New York, to the Secretary of the Interior.

7. A May 1, 1996, letter from Jennifer C. Griffin, Curator, Historical Society of Rockland County, New York, to Chief Ronald Redbone VanDunk.

8. An October 31, 1995, letter from Robert D. Griffin, First Vice-President, Bergen County, New Jersey, Historical Society, to the Secretary of the Interior.

9. A retyped copy of a newspaper article, with a caption indicating that the article was written by Alanson Skinner and published about 1911 in an unidentified newspaper.

10. A printed document titled "Biography of Edward C. Smith in the Community," with a handwritten note stating "Testimonial Dinner 9/12/62."

11. A May 2, 1996, affidavit from Linda Powell, Petitioner's custodian of records.

Five of the items, Nos. 1, 3, 5, 6, and 8, are recent letters)) or in the case of No. 3, a recent affidavit)) expressing views and/or interpretations of the already submitted evidence which differ from BIA's interpretation. None of these documents, however, point to any new evidence. Rather, they simply discuss evidence that was before BIA. The Board concludes that Petitioner has failed to establish by a preponderance of the evidence that any of these documents is either itself new evidence or identifies new evidence which could affect the determination.

Item No. 2 consists of three maps. With respect to these maps, Petitioner's Request for Reconsideration states in its entirety:

> **Map Evidence** is being introduced to demonstrate the proximity of Victor Jacquemont's host's house to a known Ramapough community of the 1820's, to which Victor Jacquemont is referring when he describes a community of mixed-blood Indians remaining in the Ramapough Mountain region. This view is supported by Robert A. Scott, the President of Ramapo College, which is now on the site from which Jacquemont was writing. The BAR previously rejected Jacquemont's account because it was not "certain" that Jacquemont was referring to this Ramapough community. Another map shows the historical development and Indian movements in the geographic region during the relevant time periods--to demonstrate a continuing presence.

Request for Reconsideration at 12.

Two of the three maps have no hints whatsoever as to their source, although the annotations on the two maps have a similar type style, suggesting that they derive from the same unidentified source. The annota-

IBIA 96-61-A

tions indicate that the maps are intended to depict certain locations related to Petitioner's history.

The third map appears to have been copied from page 44 of an unidentified book. The page has a running head reading: "From Pioneer Settlement to Suburb."

Petitioner submits slightly different versions of these maps with its Supplement. The first two maps are now in color but still fail to reveal their source. The new version of the third map is marked with yellow highlights and bears at the left the handwritten word "Mountains," with arrows on either side. Petitioner states:

> The third map, taken from Professor Bischoff's history of Mahwah, further documents, through color coding, the closeness of the Christy and Hopper homes to the foothills and the nearby mountains in 1767. The map clearly demonstrates that the neighboring mountainous land was ripe for Indian squatters.

Attachment 3 to Petitioner's Supplement.

As discussed above, in order to be timely, documents presented as new evidence were required to be included in Petitioner's Request for Reconsideration or at least submitted within the time allowed for filing requests for reconsideration. Petitioner's Supplement was not filed within that time. Therefore, to the extent the Supplement versions of the maps contain additional information, that additional information arguably constitutes untimely "new evidence," which cannot be considered. Even assuming, however, that the Supplement versions of these maps can be fully considered, the end result would be the same in all cases.

The first two maps have no source identification in either version. Without some idea of the source of these maps, the Board has no means of determining whether the maps are evidence at all, let alone whether they are evidence which could affect the determination not to acknowledge Petitioner. Therefore, the Board finds that Petitioner has failed to establish by a preponderance of the evidence that these two maps are new evidence which could affect the determination.

With the help of the additional information in Petitioner's Supplement, the Board concludes that the third map was probably taken from Henry Bischoff and Mitchell Kahn, From Pioneer Settlement to Suburb: A History of Mahwah, New Jersey 1700-1976 (1978 and 1979). This work was considered by BIA and is therefore not new evidence. All that could be construed as new evidence are the yellow highlights and the word "Mountains," which appear on the Supplement version of the map. These markings, whose maker is not identified, are insufficient to render the map itself new evidence. Nor do the markings add any meaningful new information. The Board finds that Petitioner has failed to establish by a preponderance of the evidence that either the map or its new markings are new evidence which could affect the determination.

IBIA 96-61-A

Item No. 4, titled "Christie Family Gen," is a three-page typed document concerning the genealogy of a Christie family. No source for this document appears on the document itself. Nor is the source identified in Petitioner's description of the document. Petitioner's discussion of the document states in its entirety:

> **Biographical Material on Squire Christy**, an eyewitness to relevant history, whom the BIA discounted in its analysis of the facts. Squire Christy, born in 1816, lived at the foot of the Ramapough Mountains for his entire life. His father, David I. (J.) Christy (b. 1781 - d. 1863) was a prominent judge in the area, and married some of the Ramapough families. His grandfather was John D. Christy (b. 1748 - d. 1836). The Christy family dated back into the early 1700's in New Jersey. In an 1890 interview, Squire Christy reported that he knew from his father and his grandfather that the mixed-blood Indian "mountain tribes" had been there from the 1700's. In the interview, he directly connected Ramapough family members of the 1890's to these tribes.

Request for Reconsideration at 13. The 1890 interview referred to by Petitioner is evidently the one reported in an article entitled "A People with Pink Eyes," published about 1890 in The New York World. This article is a part of the record here and was considered by BIA during the earlier proceedings. 14/

The document Petitioner now offers as new evidence does not discuss the ancestors of any of Petitioner's members. Rather, it concerns only the Christie family. Petitioner does not claim that the Christie family is in any way related to the ancestors of Petitioner's members. Nor does it explain how genealogical/biographical information concerning an unrelated family could affect the determination not to acknowledge Petitioner. The Board finds that Petitioner has failed to establish by a preponderance of the evidence that Item No. 4 is new evidence which could affect the determination.

Item No. 7 is a May 1, 1996, letter from the Curator of the Historical Society of Rockland County, New York, which attaches notations concerning two bowls in the collection of the Historical Society. These notations were evidently not submitted to BIA during the time this matter was pending before it.

Petitioner describes the letter and attachments thus:

> **Letter from the Rockland County, New York Historical Society** documenting the presence of Indians in the Rockland County, New York area in the 1800-1820 period. The evidence submitted with the letter also shows that Indians in the Ramapough region were called "Ramapo Indians" circa 1800. Additional evidence submitted

---

14/ The article is listed in BIA's "Source Materials for Proposed Finding" under its title.

with the letter concerns a basket bought from an "Indian squaw" in the region in 1793. This evidence directly contradicts the BAR's position that all the Munsee had left the area by 1760.

Request for Reconsideration at 13-14.

The notation concerning one bowl states that it was purchased in 1889 by Alfred Ronk from John Hemmion, who stated that the bowl had been made by a Ramapo Indian and had been the property of one of the first settlers at Ramapo. The notation concerning the other bowl states that it had been purchased from the "Indians at Upper Nyack in 1822." This second notation is initialled "G.H.B." The Curator's letter states that this notation was probably made by George Henry Budke, a Rockland County historian and, if so, "the information is most likely reliable."

Not discussed in the Curator's letter, but apparently also from the files of the Rockland County Historical Society is a handwritten note which states: "Harry C. Stuart, 47 W[_?_], Suffern N.Y., Basket bought of an Indian squaw by Phebe Allison in 1793. She gave it to Jane Smith in 1841. Jane Smith gave it to her daughter Mrs. Emma Stuart in 1887. My mother Emma O. Stuart after she died Feb. 4/1938 gave the Basket to her son Harry Stuart."

Even if entirely accurate, the information in these notations shows at most that there were Indians in the general area at various times in the past. It does not show that those Indians were Petitioner's ancestors. Further, it has no bearing on the question of whether Petitioner satisfies the "community", "political influence," and "tribal descent" criteria in 25 C.F.R. § 83.7 (b), (c), and (e). The Board finds that Petitioner has failed to establish by a preponderance of the evidence that these notations or the letter transmitting them are new evidence which could affect the determination.

Item No. 9 is a retyped copy of a newspaper article titled "What the New Race Means," apparently published about 1911. 15/ Petitioner states that the author was an anthropologist with the Museum of Natural History in New York.

The article describes a group known as the "Jackson Whites," a group which has been identified with ancestors of Petitioner's members. The article states: "That this tribe is the product of Indian, Dutch and negro ancestry is undoubtedly correct. The intermixture of the three races is very evident in their [phy]sical makeup." The article then describes the physical characteristics of one individual, stating in part: "The long,

---

15/ The heading on the page reads: "What the New Race Means By Alanson Skinner (circa 1911) (first column is fragmentary) From unidentified newspaper article in files of Eugenics Record Office (file # A 124: Albinism))."
No copy of the original article is included with Petitioner's filing.

thin jaw was ty[pical] of the Delaware Indian tribes, from one or two of whom the Jackson-Whites are [-----] descended." The article also states that the teeth and the hair of this individual were characteristic of Delaware Indians. Apparently it is these references to Delaware Indians which Petitioner intended to call to the Board's attention.

Although this article was not considered by BIA, other works by Skinner, as well as works by other anthropologists and historians of the same era, were considered. See, e.g., Proposed Finding Anthropological Report at 6-9; Proposed Finding Historical Report at 64-67. These works contained statements similar to the statements made in the article now produced. The BIA found statements of this nature, even those made by professional historians and anthropologists of the era, unpersuasive. In the Final Determination Technical Report at 25-26, BIA summarized: "The technical reports [for the Proposed Finding] noted that since 1870, there had been repeated attributions of Indian ancestry for the RMP [16/] by journalists and local residents, and later by anthropologists, historians, genealogists, social workers, and medical doctors. These were analyzed in the Proposed Finding and rejected as unsubstantiated assertions."

Petitioner's newly produced article is simply another example of the same kind of evidence already analyzed by BIA. Petitioner offers no reason why this article should be found persuasive, when the other works were not, on the question of whether Petitioner satisfies the "community", "political influence," and "tribal descent" criteria in 25 C.F.R. § 83.7 (b), (c), and (e). The Board finds that Petitioner has failed to establish by a preponderance of the evidence that this article is new evidence which could affect the determination.

Item No. 10 is a two-page printed document entitled "Biography of Edward C. Smith in the Community." No date is printed on the document. However, a handwritten note at the bottom states: "Testimonial Dinner 9/12/62." The biography states in part: "Eddie came from Holland Dutch Algonquin Indian and Negro stock. * * * Samuel DeFreese [Smith's grandfather] was an Algonquin Indian." Petitioner states, concerning this biography: "The article further documents Indian ancestry of the DeFreese line." Request for Reconsideration at 14.

Like the previous document, this one is similar to evidence already considered by BIA, but rejected as unsubstantiated, concerning the Indian ancestry of Petitioner's ancestors. Again, Petitioner fails to show that

---

16/ Ramapo Mountain People. This term, as used in the Final Determination, is defined in the Final Determination Summary at 10:

"[A] term used in this report as a designation for the people of the Van Dunk, Mann, DeGroat, and DeFreese families living in and around (or originating from) the towns of Mahwah, New Jersey, Ringwood, New Jersey, and Hillburn, New York. Not all of the RMP are members of [Petitioner], although they share a common ancestry. * * * As used in this final determination, RMP is not synonymous with 'Jackson Whites,' the latter being much broader in meaning and less well-defined."

IBIA 96-61-A

this document could be found persuasive on the question of whether Petitioner satisfies the
"community", "political influence," and "tribal descent" criteria in 25 C.F.R. § 83.7 (b), (c), and
(e). The Board finds that Petitioner has failed to establish by a preponderance of the evidence
that this document is new evidence which could affect the determination.

Item No. 11 is a May 2, 1996, affidavit from Linda Powell, Petitioner's custodian of
records. Petitioner contends that this affidavit documents "that 55% of the Tribe continues
to live in the same geographic area." Request for Reconsideration at 14. 17/

The affidavit states in part:

Of the 2693 (excluding deceased) total members of the Tribe listed
on tribal rolls submitted to the Bureau of Indians [sic] (including the updates),
1377 of the members are living within the core geographic areas of Mahwah, NJ,
Ringwood, NJ and Hillburn, NY. This translates into 55% of the Tribal members
living in the core geographic area.

Petitioner does not, in the "new evidence" section of its Request for Reconsideration,
explain the significance of Powell's statement. From contentions made elsewhere in the Request
for Reconsideration, however, it can be deduced that the statement relates to BIA's findings
concerning "community," particularly with respect to the number of Petitioner's members found
to be residing in "a geographical area exclusively or almost exclusively composed of members of
the group." 25 C.F.R. § 83.7(b)(2)(i). 18/

In the Final Determination Technical Report, at page 80, BIA stated that only
one third of Petitioner's members presently reside in Petitioner's core geographical area. In her
memorandum transmitting the Critical Documents (Transmittal Memorandum), the Assistant
Secretary concedes that the residence percentage stated in the Final Determination Technical
Report was in error:

---

17/ A June 27, 1996, declaration from Powell was submitted with Petitioner's Comments.
To the extent Petitioner may have intended the statements made in this declaration to constitute
new evidence, they cannot be so considered because they are untimely under § 83.11(b).

18/ Subsection 83.7(b)(2) provides:
"A petitioner shall be considered to have provided sufficient evidence of community at
a given point in time if evidence is provided to demonstrate any of the following:
"(i) More than 50 percent of the members reside in a geographical area exclusively or
almost exclusively composed of members of the group, and the balance of the group maintains
consistent interaction with some members of the community."

31 IBIA 75

> The Proposed Finding Summary at 10 correctly notes that 44% of [Petitioner's] membership lives within the three settlement area, leaving 56% of the membership outside the core area. * * * However, instead of the 44%/56% split, the Final Determination Technical Report at 79-80 incorrectly references a split of one third and two-thirds. This error does not change the analysis under § 83.7(b)(2)(i) which requires "more than 50% of the membership" to live in a village-like setting <u>and</u> which requires also that the remaining membership maintain consistent interaction with some members of the community.

Assistant Secretary's Transmittal Memorandum at 4 n.2.

Petitioner disagrees even with the percentages given in this corrected statement. Petitioner's Comments at 5. Undoubtedly, Petitioner hopes to use the Powell affidavit to support its argument in this regard.

However, in addition to requiring "more than 50 percent" resident membership, 25 C.F.R. § 83.7(b)(2)(i) requires that the "balance [i.e., non-resident portion] of the group maintain[ ] consistent interaction with some members of the community." The BIA found that Petitioner failed to satisfy this latter requirement as well as the requirement concerning percentage of residents. Final Determination Technical Report at 80.

Powell's affidavit addresses only the first of the two requirements in 25 C.F.R. § 83.7(b)(2)(i). Thus, even if the affidavit were determined to establish beyond doubt that more that 50 percent of Petitioner's members presently reside in the core area, BIA's conclusion with respect to 25 C.F.R. § 83.7(b)(2)(i) would not be changed, because Petitioner has produced no new evidence which could affect BIA's finding concerning interaction between resident and non-resident members. Therefore, the Board finds that Petitioner has failed to establish by a preponderance of the evidence that the Powell affidavit is new evidence which could affect the determination. 19/

In summary, the Board finds that Petitioner has not established by a preponderance of the evidence that any of the 11 items it offers as new evidence could affect the determination not to acknowledge Petitioner as an Indian tribe.

Petitioner next argues under 25 C.F.R. § 83.11(d)(2) that a substantial portion of the evidence relied upon by the Assistant Secretary was unreliable or of little probative value. Two types of evidence, Petitioner contends, were improperly relied upon: (1) descriptions of individuals as "mulatto,""colored," "free persons of color," or "Negro" in 18th and 19th century documents)) such descriptions, Petitioner alleges, having led the Assistant

---

19/ Despite this conclusion, the Board believes that clarification of various statements made by BIA relating to the percentage of residents in the core geographical area is in order. The Board returns to this subject at the end of the decision.

IBIA 96-61-A

Secretary to assume that the individuals were non-Indian; and (2) tax lists, which Petitioner contends were improperly interpreted by BIA as showing that individuals with Ramapough names were living among the general population, rather than in an isolated group. In addition, as discussed above, the Board treats Petitioner's Motion to Strike as an argument that the notes of anthropologist Steven Austin are unreliable.

As to the racial labels employed in various documents, Petitioner contends that BIA "seeks to base its findings on them, engaging in significant intellectual gymnastics to try to avoid characterization of Ramapough ancestors as 'Indians.'" Request for Reconsideration at 15-16. However, Petitioner quotes statements from BIA's Proposed Finding which indicate that BIA, like Petitioner, understood that the racial terms might have included Indians. The quoted statements further indicate that BIA did not use these labels as evidence that the individuals described were not Indian. Rather, the statements indicate that BIA simply declined to accept the labels as evidence that the individuals were Indian. 20/

The Board finds that Petitioner and BIA agree that the racial labels used in census and other records are not reliable evidence that the individuals described were or were not Indian. The Board further finds that Petitioner has not established by a preponderance of the evidence that BIA relied on these labels to reach its conclusions that Petitioner failed to satisfy the criteria in 25 C.F.R. § 83.7(b), (c), and/or (e).

As to the tax lists, it appears likely that Petitioner's argument is directed to the Assistant Secretary's determination that Petitioner failed to satisfy the "community" criterion in 25 C.F.R. § 83.7(b), insofar as that determination concerned the period prior to 1870. Petitioner contends that the fact that individuals are listed sequentially in a tax list does not mean that they were living adjacent to each other. Therefore, Petitioner argues, the tax lists which show Ramapough names interspersed with non-Ramapough names are not evidence that Petitioner's ancestors were living among the general population rather than in a distinct community.

The BIA discussed the tax lists, together with other evidence, in the Proposed Finding Historical Report. Petitioner's Response to Proposed Finding (Response), which it filed with BIA, objected to BIA's use of the tax lists and submitted a newspaper article concerning a trip taken by a local tax collector through the Ramapo Mountain region, apparently sometime

---

20/ For instance, one of the statements quoted by Petitioner reads:

"Early Federal census records recorded the families as 'free persons of color,' a description which can include American Indian, but which does not allow the BAR to conclude that persons so designated were necessarily American Indian." Proposed Finding Summary at 4, quoted in Request for Reconsideration at 18. (Emphasis by Petitioner.)

during the 1890's. 21/ Petitioner contended before BIA that this article proved conclusively that Petitioner's ancestors were living in the mountains, while the non-Ramapoughs were living in the valley. In the Technical Report for the Final Determination, BIA stated:

> An article written in the 1890's describing a settlement does not provide primary evidence for circumstances in 1810, or in 1840. Residential patterns, population, and economic circumstances may have changed drastically in the interval. In the United States in the 19th century, they certainly did. No reasonable scholar would accept a description of northern New Jersey and southern New York in 1890, however accurate, as providing a description of the population distribution of the same area a half-century earlier.

Final Determination Technical Report at 14. Although this statement makes no specific mention of the January 1905 article, Petitioner apparently interprets the statement as referring to that article. Petitioner clearly considers the BIA response inadequate. Request for Reconsideration at 22.

Before the Board, Petitioner again cites the New York Sun article, as well as another article published in The World in 1890. 22/ It cites nothing for the period before 1870 which would call into question the interpretation of the pre-1870 tax lists employed by BIA. 23/ Nor does it refute BIA's statement concerning the relevance of articles published in the 1890's or later to the analysis of population distribution during an earlier period.

The Board finds that Petitioner has not established by a preponderance of the evidence that the tax lists cited by BIA are unreliable evidence on the question of pre-1870 population distribution.

The Board next considers Petitioner's Motion to Strike as a contention that certain field notes and interview transcripts, identified as the work of anthropologist Steven Austin, are unreliable evidence. The notes and transcripts derive from a trip taken in January 1993 to the Ramapo Mountain area and describe interviews with some of Petitioner's members and others in the area.

Petitioner first objects to the notes and transcripts on the grounds that they lack authentication.

---

21/ The article is titled "Ramapo's Mountaineers" and was published in The New York Sun in Jan. 1905. It is listed in BIA's "Source Materials for Proposed Finding" under its title.

22/ Although its citation to this second article is imprecise, Petitioner is apparently referring to the New York World article mentioned above. See footnote 14 and accompanying text.

23/ As noted in footnote 12, BIA found that Petitioner satisfied the "community" requirement of § 83.7(b) for the period 1870-1950.

It is true, as Petitioner contends, that the notes are unsigned and undated. They are in an informal format and have the appearance of a working document. Clearly, they were used to support the Proposed Finding, as they are cited extensively in the Proposed Finding Anthropological Report, in a section concerning fieldwork data. See, e.g., Proposed Finding Anthropological Report at 20-31. The fact that the notes are informal and unsigned does not mean that they are unreliable, although the condition of the notes makes it difficult to assess their intended scope and purpose absent a statement from the author or other knowledgeable person. However, given the conclusion reached below, the condition of the notes is not critical here.

Petitioner next challenges the "accuracy and completeness" of the notes and transcripts. In support of this challenge, Petitioner submits two affidavits. One is a July 18, 1996, affidavit from Reverend Ruth R. Wainwright, who states that she considers the report of an interview with her, as well as other parts of the notes, to be inaccurate and distorted. The second affidavit, dated August 2, 1996, is from a detective with the Bergen County, New Jersey, Sheriff's Department, who disputes certain statements attributed to another police officer, a detective with the Mahwah, New Jersey, Police Department. It is not clear whether the Bergen County detective is questioning the accuracy of the notes or the veracity of the Mahwah detective.

The Wainwright affidavit is arguably sufficient to show by a preponderance of the evidence that the report of the interview with her is unreliable. However, the substance of the interview, both as reported in the notes and as described in the affidavit, has minimal relevance, at best, to BIA's analysis of the criteria upon which the Final Determination was based.

The affidavit of the Bergen County detective is insufficient to prove by a preponderance of the evidence that the report of the interview with the Mahwah detective is unreliable. Further, the statements which the notes attribute to the Mahwah detective, which concern that detective's beliefs about Petitioner's members, are essentially irrelevant to BIA's analysis of the criteria upon which the Final Determination was based.

Next, Petitioner contends that the Austin notes are inconsistent with statements Austin made to some of Petitioner's members. In support of this contention, Petitioner submits affidavits from five of those members, each stating that Austin had expressed a favorable attitude toward acknowledgment of Petitioner. Petitioner evidently considers the notes unfavorable to Petitioner's acknowledgment and thus at odds with the statements described in the affidavits. "This," Petitioner contends, "raises the clear question of whether Mr. Austin was for some unknown reason compelled, despite his convictions, to alter his position once he returned to Washington." Motion to Strike at 5.

The Board finds this argument unpersuasive. The notes do not express Austin's view, one way or the other, as to whether Petitioner should be acknowledged. Even if Austin made the statements attributed to him in Petitioner's affidavits, those statements would be insufficient to show that

IBIA 96-61-A

Austin distorted, either voluntarily or involuntarily, the data he collected during his January 1993 trip.

Petitioner is required to show by a preponderance of the evidence that <u>a substantial portion</u> of the evidence relied upon in the Assistant Secretary's determination was unreliable or of little probative value. Assuming Austin's notes are unreliable in some respects, or even in all respects, Petitioner must still show that the notes constitute a substantial portion of the evidence relied upon by the Assistant Secretary.

Austin's notes were used in connection with BIA's analysis of Petitioner's recent and present-day community and political structure. Even if the notes were found unreliable in their entirety and even if, as a result of such a finding, BIA were to reverse its conclusion concerning Petitioner's post-1950 community, the ultimate determination concerning Petitioner's satisfaction of the criteria in 25 C.F.R. § 83.7(b) and (c) would not be affected. This is so because BIA's conclusion that Petitioner failed to satisfy the criteria for the period before 1870 did not depend upon the Austin notes but, rather, upon evidence which, except as discussed above, Petitioner does not challenge. Likewise, BIA's conclusion that Petitioner failed to satisfy the criterion in 25 C.F.R. § 83.7(e) did not depend upon the Austin notes and would not be altered were those notes to be entirely disregarded. Under these circumstances, the Board finds that the challenged evidence does not constitute a substantial portion of the evidence relied upon. <u>24</u>/

The Board finds that Petitioner has not shown by a preponderance of the evidence that a substantial portion of the evidence relied upon in the Assistant Secretary's determination was unreliable or of little probative value.

Petitioner next argues under 25 C.F.R. § 83.11(d)(4) that BIA "Failed To Consider Reasonable Alternative Interpretations Of The Evidence That Would Substantially Affect The Determination That The Petitioner Does Not Meet Criteria (b), (c) and (e)." Request for Reconsideration at 23.

In this part of its Request for Reconsideration, Petitioner contends that BIA applied the wrong standard of proof, requiring that Petitioner make its case by conclusive evidence in violation of 25 C.F.R. § 83.6(d), and that BIA failed to use proper genealogical methodology, resulting in an unreasonable interpretation of the evidence. Petitioner then discusses the criteria in 25 C.F.R. § 83.7(b), (c), and (e) individually, contending with respect to each that BIA failed to consider reasonable alternative interpretations of the evidence which would have caused BIA to conclude that Petitioner satisfied that criterion.

---

<u>24</u>/ Petitioner's remaining argument concerning the Austin notes)) that Petitioner suffered a deprivation of due process because the notes were withheld from it)) is addressed below.

IBIA 96-61-A

Throughout this part of its argument, Petitioner puts forth various reasons why BIA should have interpreted the evidence differently than it did.  Most of its discussion is devoted to contentions concerning the standard of proof, the weight given to various pieces of evidence, and allegations of improper interpretation of the evidence.  Although Petitioner alleges that BIA "failed to consider" certain interpretations of the evidence, what emerges from Petitioner's long and somewhat rambling argument is that BIA considered and rejected those interpretations.

[3]  The ground for reconsideration set out in 25 C.F.R. § 83.11(d)(4) is: "That there are reasonable alternative interpretations, not previously considered, of the evidence used for the final determination, that would substantially affect the determination that the petitioner meets or does not meet one of more of the criteria in § 83.11(a) through (g)." (Emphasis added.)  The Board construes this paragraph as contemplating reconsideration in the case of a reasonable alternative interpretation which BIA, through inadvertence or otherwise, truly did not consider.  The Board does not construe the paragraph to apply to an interpretation, even a reasonable one, which BIA has considered and rejected.  In other words, the Board does not construe this paragraph as authorizing the Board to reweigh the evidence or to second-guess BIA's interpretation of the evidence that was before it.

Petitioner does not offer any new interpretation of the evidence that BIA did not, or arguably did not, consider.  The Board finds that Petitioner has failed to show by a preponderance of the evidence that "there are reasonable alternative interpretations, not previously considered, of the evidence used for the final determination, that would substantially affect the determination" that Petitioner fails to satisfy the criteria in 25 C.F.R. § 83.11(b), (c), and/or (e).

Having found that Petitioner has not established by a preponderance of the evidence that any of the grounds for reconsideration in 25 C.F.R. § 83.11(d)(1), (2), or (4) are present here, the Board affirms the Assistant Secretary's February 6, 1996, Final Determination.

As to matters not within the Board's jurisdiction, Petitioner has alleged violations of due process and BIA misconduct in general.  Most of these allegations have been addressed previously, in responses by various Departmental officials to filings Petitioner made with the Secretary of the Interior.  Three of the due process allegations, however, do not appear to have been addressed previously.  The Board therefore refers these allegations to the Secretary under 25 C.F.R. § 83.11(f)(2).

As discussed above, see footnote 10 and accompanying text, Petitioner contends that BIA refused to furnish it with copies of the notes of anthropologist Steven Austin until the notes were submitted to the Board as a part of the Critical Documents.  The Board recommends that the Secretary determine whether this allegation is well-founded and, if so, whether it constitutes a basis for reconsideration in this case.

Petitioner also contends that BIA violated Petitioner's right to due process by failing to provide consultation under 25 C.F.R. § 83.10(l). 25/ Petitioner made this allegation at pages 5-7 of an October 16, 1995, document filed with the Secretary titled "Motion for Reconsideration and Immediate Suspension of Proceeding." The allegation was not specifically addressed in the December 18, 1995, response signed by the Solicitor. Petitioner repeats the allegation before the Board. The Board recommends that the Secretary determine whether the allegation is well-founded and, if so, whether it constitutes a basis for reconsideration in this case.

The third allegation concerns BIA's finding that Petitioner failed to satisfy the "community" requirement under 25 C.F.R. § 83.7(b) for the period after 1950. Petitioner argues that BIA reversed itself on this point. It contends that, in the Proposed Finding, BIA found that Petitioner did show "community" for the entire period after 1870 but, without notice to Petitioner, changed this finding to conclude in the Final Determination that Petitioner failed to satisfy the requirement for the period after 1950. Petitioner suggests that, in technical assistance meetings and letters, BIA misled Petitioner by stating that Petitioner should concentrate on bolstering its research for the period 1750-1820, without mentioning a need for further research on the later period. Petitioner alleges, inter alia, that BIA's failure to give Petitioner notice of the change of position was a denial of due process. The Board recommends that the Secretary determine whether this allegation is well-founded and, if so, whether it constitutes a basis for reconsideration in this case.

In connection with this allegation, the Board also recommends that the Secretary request the Assistant Secretary to address an apparent discrepancy between the Proposed Finding and the Final Determination concerning Petitioner's "community" for the post-1870 period. This apparent discrepancy may well be a result of the change in regulations. The Board believes, however, that some clarification is warranted.

As noted above, the Proposed Finding was made under the 1978 regulations, which were still in effect in 1993. Section 83.7(b) (1993) required: "Evidence that a substantial portion of the petitioning group inhabits a specific area or lives in a community viewed as American Indian and distinct from other populations in the area, and that its members are descendants of an Indian tribe which historically inhabited a specific area."

---

25/ Subsection 83.10(l) provides:
"At the end of the period for comments on a proposed finding, the Assistant Secretary shall consult with the petitioner and interested parties to determine an equitable timeframe for consideration of written arguments and evidence submitted during the response period. The petitioner and interested parties shall be notified of the date such consideration begins."

At page 10 of the Proposed Finding Summary, BIA discussed Petitioner's present-day population distribution and interrelationships between resident and non-resident members. It stated, however, that, "[b]ecause the RMI do not meet the requirements of criterion b on other grounds, it was not necessary to definitively evaluate this question." On the following page, the following conclusion appears:

> The RMI do not meet the requirements of criterion b between 1850 and the present, because although there is significant evidence they were socially cohesive and distinct during this period, they were not distinct as Indians, as called for by the criterion. * * * The RMI do not meet the requirements of the regulations for criterion 83.7(b) before 1850 because they did not exist as a separate, distinct community, however identified.

Id. at 11.

The requirement that a community be viewed as American Indian was removed from 25 C.F.R. § 83.7(b) in the 1994 revision of the regulations. As pointed out in the Notice of the Final Determination in this case, 25 C.F.R. § 83.7(b) "now requires only the existence of a distinct community." 61 Fed. Reg. at 4477. 26/

The Notice of Final Determination, 61 Fed. Reg. at 4476, states: "The Proposed Finding determined that the petitioner's ancestral group did show community for the period 1870-1950, based on extensive endogamy and geographical residential concentration." See also Final Determination Summary at 23: "The Proposed Finding found that there was sufficient evidence that the RMP were a distinct community from about 1870 to 1950."

In the Board's view, these statements are inaccurate in that they indicate that the Proposed Finding (1) had distinguished between the 1870-1950 period and the post-1950 period and (2) had concluded that Petitioner satisfied the "community" requirement for the 1870-1950 period, or would do so absent the now-removed requirement that the community be viewed as American Indian. As the Board reads the conclusion reached by the Proposed Finding, the only time-period distinction made was between the pre-1850 period and the post-1850 period. Further, as the Board understands the Proposed Finding, no conclusion was reached on the question of whether Petitioner satisfied the community requirement, as presently constituted, for any of the period after 1850, because the negative conclusion in the proposed finding was based on another, now-removed, requirement. 27/

---

26/ In addition, in the 1994 revision, the requirement that members be descendants of an Indian tribe was moved from § 83.7(b) to § 83.7(e).

27/ Petitioner's argument that BIA changed its position suggests that Petitioner reads the Proposed Finding differently, construing it as having concluded that Petitioner satisfied the community requirement for the modern period.

IBIA 96-61-A

Although this is not a critical point, the Board recommends that, at the same time Petitioner's due process allegation is considered, the Assistant Secretary be requested to clarify the statements in the Final Determination concerning the findings made in the Proposed Finding.

Another point which the Board believes requires clarification is also related to the "community" requirement in 25 C.F.R. § 83.7(b).  It concerns Petitioner's "core geographical area," 28/ as used to determine residency percentages under 25 C.F.R. § 83.7(b)(2)(i).  The Proposed Finding stated:

> A substantial portion of the RMI ancestors and their descendants have lived in the three Ramapo Mountain communities of Stag Hill/Mahwah, Hillburn, and Ringwood, from the 1870's to the present.  According to the 1992 RMI membership list submitted to BAR, there are about 2,654 members of the group.  Slightly over one-half of these members (1,333) live in a 10-mile geographical core area that includes the three principal settlements of Stag Hill/Mahwah, New Jersey, Hillburn, New York, and Ringwood, New Jersey, with 44 percent in the settlements themselves.

Proposed Finding at 10.  The Assistant Secretary's Transmittal Memorandum (quoted above in connection with the Powell affidavit) indicates that "44% of [Petitioner's] membership lives within the three settlement area, leaving 56% of the membership outside the core area."  This latter statement suggests that the core geographical area, which the Proposed Finding seemed to describe as a 10-mile area, was viewed in the Final Determination as consisting only of the settlements, and perhaps their immediate environs.  It appears possible that Petitioner's argument concerning the percentage of members resident in the core area (see discussion of Powell Affidavit, supra) results in part from the apparent discrepancy between the Proposed Finding and the Final Determination/Transmittal Memorandum as to the reach of Petitioner's core geographical area.

Possibly related to this discrepancy is another undefined term, "village-like setting."  The Assistant Secretary's Transmittal Memorandum stated that, to be considered residents of the core area, members must live in a village-like setting.  The term also appears in the Final Determination Summary, which states at page 22:

> The term "geographical community" [29/] is used as a designation for people living in a village-like setting.  It is

28/  Sometimes, "geographical core area."  There is no definition of either version of this term in § 83.1.  As used in the Proposed Finding and Final Determination, it appears to be a shorthand way of referring to the geographical area described in § 83.7(b)(2)(i), i.e., "a geographical area exclusively or almost exclusively composed of members of the group."

29/  There is no definition of the term "geographical community" in § 83.1.
The term "community" is defined as "any group of people which can demonstrate that consistent interactions and significant social relationships exist within its membership and that its members are differentiated from

accepted by the regulations as a high level of evidence if more than 50% of the petitioner's members live in such a setting.  This means that BIA is willing to assume that people who share kinship ties and live in a limited, homogeneous, isolated geographical area are interacting with each other in significant ways, if there is no significant evidence to the contrary.

The problem with these statements is that 25 C.F.R. § 83.7(b)(2)(i), to which they presumably refer, has no requirement that core area resident members live in a village-like setting.  The regulation requires only that the members live in a "geographical area exclusively or almost exclusively composed of members of the group."  It is conceivable, although perhaps unlikely, that the requirements of the regulation could be met in an undeveloped rural area, or even in an urban area.

It appears possible that imposition of the "village-like setting" requirement was the cause of BIA's apparent alteration in its conclusion concerning the population of Petitioner's core geographical area.  To the extent the imposition of a requirement not stated in the regulations resulted in a conclusion adverse to Petitioner))even though the specific conclusion was not critical to the ultimate determination concerning Petitioner's acknowledgment))the Board recommends that the Secretary determine the requirement to be invalid. 30/

The Board recommends that the Secretary request the Assistant Secretary to clarify the scope of Petitioner's core geographic area, to explain the apparent discrepancy in the Proposed Finding and the Final Determination on this point, and to delete the "village-like setting" requirement.

Therefore, pursuant to the authority delegated to the Board of Indian Appeals by the Secretary of the Interior, 43 C.F.R. § 4.1 and 25 C.F.R. § 83.11, the Assistant Secretary's February 6, 1996, Final Determination is affirmed and the four issues just discussed are referred to the Secretary.

|  | //original signed |
|---|---|
|  | Anita Vogt |
|  | Administrative Judge |

I concur:

_____//original signed_____
Kathryn A. Lynn
Chief Administrative Judge

_____

fn. 29 (continued)
and identified as distinct from nonmembers.  Community must be understood in the context of the history, geography, culture and social organization of the group."

30/ Cf., e.g., Robles v. Sacramento Area Director, 23 IBIA 276 (1993), holding invalid a restriction upon adult vocational training services which does not appear in the regulations governing the program.

Exhibit "G"

# Reconsidered Final Determination Declining to Acknowledge that Ramapough Mountain Indians, Inc. Exists as an Indian Tribe

In an opinion issued on July 18, 1997, the Interior Board of Indian Appeals (IBIA) affirmed the Department of the Interior's (the Department) final determination (January 16, 1996) to decline to acknowledge that the Ramapough Mountain Indians, Inc. (RMI) existed as an Indian tribe. This affirmation was based on the consideration of the arguments and evidence presented by the petitioner and interested parties, and on critical documents relied upon by the Assistant Secretary - Indian Affairs (AS -IA) in the final determination (25 CFR 83.11(e)(8)).[1]  At the same time, the IBIA asked the Secretary of the Department of the Interior (the Secretary) to consider whether four issues specified in the IBIA's decision constituted grounds for reconsideration of the final determination (31 IBIA 61, 81-85 (1997)).

In a memorandum dated September 29, 1997, Secretary Babbitt requested that the AS - IA address the four issues that were raised by the IBIA and, without passing on the merits, requested that the AS - IA issue a "reconsidered determination" in accordance with the applicable regulations, 25 CFR Part 83.  Three of the four issues concern allegations of a denial of due process which, in the opinion of the IBIA, had not been addressed previously by the Department. The fourth issue concerns an interpretation of one of the seven mandatory criteria which must be met to be acknowledged as an Indian tribe.  These issues will be addressed in the order in which they appear in the IBIA opinion.  This reconsidered final determination supplements the final determination of January 16, 1996, and supersedes the final determination and the <u>Federal Register</u> notice, which was published on February 6, 1996, on the specific points discussed below.

---

[1]The regulations read:

> For purposes of review by the Board, the administrative record shall consist of all appropriate documents in the Branch of Acknowledgment and Research relevant to the determination involved in the request for reconsideration.  The Assistant Secretary shall designate and transmit to the Board copies of critical documents central to the portions of the determination under a request for reconsideration.  The Branch of Acknowledgment and Research shall retain custody of the remainder of the administrative record, to which the Board shall have unrestricted access (25 CFR 83.11(e)(8)).

The regulations also contain a provision that the IBIA may ask for technical assistance from the AS - IA  or ask the AS - IA to provide more documents:

> . . . . The Board may also request, at its discretion, comments or technical assistance from the Assistant Secretary concerning the final determination or, pursuant to paragraph (e)(8) of this section, the record used for the determination. (25 CFR 83.11(e)(3)).

# Issue One

The IBIA requested the Secretary to determine whether or not the RMI's allegation that the BIA had ignored its repeated oral requests for photocopies of the field notes taken in 1993 by anthropologist Steven Austin was well-founded:

> **Petitioner contends that BIA refused to furnish it with copies of the notes of anthropologist Steven Austin until the notes were submitted to the Board as a part of the Critical Documents. The Board recommends that the Secretary determine whether this allegation is well-founded and, if so, whether it constitutes a basis for reconsideration in this case (31 IBIA 61, 81 (1997)).**

The anthropologist's field notes, which typically relate to the evaluation of the petition under 25 CFR 83.7(b) and (c), are provided by the Department routinely to petitioners upon request, with necessary redactions to protect privacy interests. The Bureau of Indian Affairs (BIA) is not aware of any requests from the RMI, written or oral, for these field notes. The IBIA decision, in footnote 10, states that the RMI's alleged requests were oral. The petitioner did not specify to the IBIA when the requests were made, who made the requests, or to whom the requests were directed.

In response to the Secretary's request to review this issue of an alleged denial of the field notes as raised by the IBIA in response to the petitioner's allegations, the BIA reviewed the notes taken by the Branch of Acknowledgment and Research (BAR) case administrator on telephone conversations with the petitioner, as well as the limited notes which have been retained from meetings with the petitioner. These documents are available as part of the record. The notes on the telephone conversations with the RMI do not refer to any request for field notes. Those notes retained by BIA researchers on technical assistance meetings held with the RMI do not have any references to a request for the field notes. Further, the February 6, 1995, letter from BIA to Ronald Van Dunk, which summarized the RMI technical assistance meeting of January 12, 1995, does not reference any request for field notes, nor any denial of these notes. In addition, the BIA researchers working on the petition and the BAR Branch Chief do not recall any oral request for these field notes.

In addition to this review, the files containing correspondence to and from the petitioner were reviewed. These files do not include any documents from RMI which requested these notes. Also, these files do not contain any written denials of the field notes, either in response to these alleged oral requests or in response to any written request. Prior to the petitioner's complaint before the IBIA, there were no documents from the RMI which complained that the notes had not been provided to them.

The files do contain references to requests from the petitioner's lawyer for other documents between the time of the anthropologist's fieldwork in March, 1993, and the final determination, January 16, 1996, including requests dated April 13, 1995, May 8, 1995, and May 24, 1995. The

correspondence files reflect the fact that all the requested documents were provided to the petitioner in accordance with the policies of the Department.

Those portions of the field notes which were relied upon in the proposed finding were specifically cited in the proposed finding as "(Austin 1993)." The petitioner was aware of the field notes, therefore, and had the opportunity to request the notes and to respond to all of the interview information relied upon in the proposed finding during the comment and reply periods.[2] The final determination did not rely upon portions of the field work other than those which were cited in the proposed finding.

Based on the review of the files as well as the actual notice of the nature and extent of the AS - IA's reliance on the field notes in the proposed finding, the AS - IA concludes that this allegation of the denial of access to the field notes is without foundation, is not a cause for reconsideration of the final determination, and that there was no denial of due process.

## Issue Two

In discussing a second possible due process issue, the IBIA decision stated:

> **Petitioner also contends that BIA violated Petitioner's right to due process by failing to provide consultation under 25 C.F.R. § 83.10(l). . . Petitioner made this allegation . . . [by letter written] October 16, 1995, . . . [which allegation] was not specifically addressed in the December 18, 1995, response signed by the Solicitor. . . The Board recommends that the Secretary determine whether the allegations are well-founded and, if so, whether it constitutes a basis for reconsideration in this case (31 IBIA 61, 82 (1997)).**

The cited provision of the regulations gives notice to the petitioner of when the Department begins its final deliberations and analysis of the petition, evidence, and comments. The time period for final consideration commences only after the time period for comments has expired and only after unsolicited comments from petitioners and third parties are no longer accepted (25 CFR 83.10(l)). Once this final consideration time period starts, the AS - IA has the opportunity to conduct additional research but is not required to discuss issues or evidence with the petitioner or interested parties. The time period for comments expires before the Assistant Secretary

---

[2]The AS - IA transmitted the anthropologist's field notes to the IBIA as part of the documents relied upon by the AS - IA in the final determination, where they were reviewed by the RMI. The RMI apparently showed the field notes to Reverend Ruth Wainwright, who had been interviewed in 1993 by the anthropologist. The affidavit by Reverend Wainwright, submitted to the IBIA by the RMI, concerning the accuracy of the BAR anthropologist's field notes did not address any of the portions of the field notes that were relied upon in the proposed finding or in the final determination. The affidavit challenges the field notes' record of an example given by Reverend Wainwright of how some of the RMI's members express their low sense of self-esteem. Neither the proposed finding nor the final determination referred to or relied upon this issue of self-esteem generally or to the specific example that she challenged.

3

determines the time frame for final consideration. In the case of the RMI, by letter dated September 20, 1995, the RMI were notified that the Department "will begin consideration" on September 18, 1995.

The acknowledgment regulations state:

> At the end of the period for comment on a proposed finding, the Assistant Secretary shall consult with the petitioner and interested parties to determine an equitable time frame for consideration of written arguments and evidence submitted during the response period. The petitioner and interested parties shall be notified of the date such consideration begins (25 CFR 83.10(l)).

The Department interpreted this consultation provision of the regulations in a letter to another petitioner as follows:

> [T]he consultation which occurs under 25 C.F.R. § 83.10(l) to establish an equitable time frame for consideration of the written comments submitted during the response and rebuttal periods is usually accomplished over the phone, as the time period is governed primarily by work load considerations within the Branch of Acknowledgment and Research. This consultation does not necessitate a meeting. (Letter dated February 26, 1997, from the Assistant Solicitor, Branch of Tribal Government and Alaska, Division of Indian Affairs, to opposing counsel in United Houma Nation v. Babbitt).

The consultation called for in the regulations is commonly done orally, either on the phone or in person. However, given the petitioner's repeated allegations of improper and illegal conduct by BIA personnel, it was more prudent to contact the RMI about the beginning of the final evaluation in writing. The question then is whether the written notification was a denial of due process. It is concluded that written notification was not a denial of due process.

The 1994 revised regulations state that the AS - IA will publish a summary of the final determination in the Federal Register within 60 days after the final determination evaluation process is begun (83.10(l)(2)). The intent of this provision of the regulations is to allow the BIA to discuss with the petitioner a proposed time frame for beginning and/or completing the final determination evaluation when the beginning of the evaluation may be delayed for an extended period of time, or when the amount of new evidence presented by the petitioner is so extensive that the evaluation may require more than the regulatory 60 days. The Department does attempt to ensure that petitioner's researchers are available during the final time period of active consideration, but reserves the right to make the final decision about when the final determination evaluation will begin and end.

The petitioner had previously requested, and received, several extensions to comment on the proposed finding. These extensions postponed the final determination phase of the

4

acknowledgment process from April 8, 1994, until May 8, 1995. The RMI was advised by the BIA in letters as recent as March 31, 1995, and May 5, 1995, that:

> Due to the insubstantial nature of the comments received thus far, we do not foresee any grounds to extend the 60-day response period.
>
> . . .
>
> [T]he Federal regulations were not designed to allow unlimited extensions. It is the intent of the new regulations to make a final determination within one year of the proposed finding (Manuel to Van Dunk May 5, 1995, p.2).

By these statements regarding the comment period and petitioner's response period, the RMI was on notice that the BIA would proceed with the final determination in an expeditious manner. Also, the Department was aware of and considered the RMI objections to beginning the final determination process, as stated in their "Motion for Recusal or Suspension of Consideration Pending Investigation."[3]

Nevertheless, at the close of the period for the RMI to respond to third party comments, it was determined by the AS - IA that personnel were available to begin the final determination evaluation immediately. The RMI had not submitted evidence in their response to the proposed finding or in response to third party comments that would require more than the regulatory 60 days to evaluate. The AS - IA, therefore, did not need to consult with the RMI any further about the beginning or ending of the evaluation.

The decision to notify the RMI in writing about the beginning of the final determination process did not impact the final determination's evaluation under the criteria. The RMI did not allege in their correspondence with the Department or in their submissions to the IBIA any specific harm from being notified in writing on September 20, 1995, that the final determination process had begun. The Department finds no evidence that the petitioner was harmed. The AS - IA determines that this allegation of denial of due process is unfounded. Therefore, there is no need to reconsider the final determination based on this allegation of the denial of due process.

---

[3]The "Motion for Recusal or for Suspension of Consideration Pending Investigation" was filed on July 10, 1995. The Department denied the RMI's request at the same time that it notified the RMI that it would begin final consideration of the petition (Manuel to Van Dunk, September 20, 1995, and AS - IA to Catalano, September 25, 1995). Subsequently, the RMI's "Motion for Reconsideration and Immediate Suspension of Proceeding," dated October 16, 1995, was also denied (Leshy to Catalano, December 18, 1995).

# Issue Three

The third due process issue referred to the Secretary involves several points. The IBIA's opinion states that the third unresolved due process issue raised by the RMI concerned the BIA's evaluation of evidence under criterion 83.7(b).[4] This allegation:

> [C]oncerns BIA's finding that Petitioner failed to satisfy the "community" requirement under 25 C.F.R. § 83.7(b) for the period after 1950. Petitioner argues that BIA reversed itself on this point . . . [and] suggests that . . . BIA misled Petitioner by stating that Petitioner should concentrate on bolstering its research for the period 1750-1820, without mentioning a need for further research on the later period. Petitioner alleges . . . that BIA's failure to give Petitioner notice of the change of position was a denial of due process. The Board recommends that the Secretary determine whether this allegation is well-founded and, if so, whether it constitutes a basis for reconsideration in this case (31 IBIA 61, 82 (1997)).

A review of the files indicates that the petitioner was not misled by the BIA after the proposed finding with regard to which criteria it had failed to meet or what evidence was still needed to satisfy the requirements of the criteria. Several letters from the Department, as well as a technical assistance meeting, addressed the question of required research. For instance, when Ronald Van Dunk, the chief of the RMI council, wrote to Secretary Babbitt (February 23, 1994) stating that the Bureau of Indian Affairs had not told the RMI how much and what type of evidence would be needed to demonstrate that the RMI met the four criteria that they had failed to meet, the Bureau of Indian Affairs responded:

> In order to prove that the RMI meet the four criteria that were not met in the proposed finding, criteria a, b, c, and e, the response must address both the evidence which the proposed finding concludes demonstrates that the RMI do not meet these criteria and also provide evidence that they do meet these criteria. It would be necessary to present additional evidence which would show that our specific factual conclusions concerning the historical origins of the RMI, and its members, as not being derived from an Indian tribe, are incorrect.

> Our report and finding are the best discussion of how the proposed evidence for Indian ancestry and continuous existence as an Indian tribe submitted by the

---

[4]The word "community" has many popular meanings. For some people it has a geographical connotation. The definition of community used when evaluating petitioners under the Federal acknowledgment regulations is: "any group of people which can demonstrate that consistent interactions and significant social relationships exist within its membership and that its members are differentiated from and identified as distinct from nonmembers. Community must be understood in the context of the history, geography, culture, and social organization of the group" (25 CFR 83.1). In this way, the regulations emphasize the importance of the social relations between the people in a group, not a shared geographical area.

petitioner was weighed and evaluated against the evidence which we concluded demonstrated that these four criteria had not been met (Cordova to Van Dunk, March 24, 1994).

See also the letter of September 27, 1994, from the BIA, written in response to the RMI's request for a second extension to the comment period.  The BIA included the following guidance for responding to the proposed finding:

> As stated in our letter of March 24, 1994, and as we discussed with Mr. Jarvis, the new evidence which you are gathering must meet the four criteria (a, b, c, and e) that were not met in the proposed finding.  The response must also address the evidence which the proposed finding concludes demonstrates that the RMI do not meet these criteria . . . .  (Reckord to Van Dunk, September 27, 1994).

Rather than restating what was in the proposed finding's summary under the criteria, which would risk leaving out important points, these letters referred the petitioner back to the summary and the technical reports in answer to Mr. Van Dunk's inquiries.[5]  The summary under the criteria and the technical reports are the clearest statements of the evidence and how it was evaluated, and Mr. Van Dunk was advised that the RMI needed to respond to all of the issues raised in the proposed finding.

At a technical assistance meeting held on January 12, 1995, RMI was told that it not only needed to find evidence establishing a connection to an historical Indian tribe, but also to provide more information on all the issues and concerns addressed in the proposed finding.  It was emphasized in that meeting that finding evidence that demonstrated a connection to an historical tribe was of paramount importance:  without demonstrating a connection to an historical tribe, there would be no practical need to do more research on modern community, because they would fail to meet criteria 83.7(a), (b), (c), and (e) on that point alone.  But the need for more evidence for all the criteria not met was also addressed in that meeting.  In a letter dated February 6, 1995, the BIA summarized the technical assistance meeting with the RMI, stating:

> During the meeting, Branch of Acknowledgment and Research (BAR) researchers advised you to focus your response to the proposed finding on:  criteria (a) identification as an American Indian entity on a substantially continuous basis since 1900: (b) a predominant portion of the group comprises a distinct community and has existed as a community from historical contact *until the present*; (c) maintenance of political influence or authority over the members as an autonomous entity from historical times until the present; and (e) the membership consists of individuals who descend from a historical Indian tribe or

---

[5]While these letters are part of the record on the RMI acknowledgment decision, they were not among the critical documents transmitted by the AS - IA to the IBIA (see 25 CFR 83.11(e)(3) and 83.11(e)(8) and footnote 1, above).

from historical tribes which combined and functioned as a single autonomous
political entity. Since the significance of meeting criteria (a), (b), and (c) depends
on meeting (e), your research should first be to determine which, if any, ancestors
of the RMI were members of an historic Indian tribe (Reckord to Van Dunk,
February 6, 1995). [emphasis added]

These same points were addressed in the BIA letter dated March 31, 1995, in response to the
RMI's request for a suspension of consideration of the RMI petition.

For criteria (b) and (c), you were advised in this 1990 letter to provide
documentation that demonstrated that the scattered communities constituted a
cohesive community which maintained tribal relations and that the members
recognized a leader or leaders of the group. You were asked to provide evidence
that there were activities or events that had helped maintain member interaction
and cohesiveness. The regulations require that *community* and political influence
or other authority be maintained *from historical times until the present* (Manuel to
Van Dunk March 31, 1995). [emphasis added]

Although the period of 1950 to the 1990's may not have been specified in these letters, the record
clearly shows that the RMI were notified that there was a lack of evidence for community to the
present. In each instance, the RMI were guided back to the proposed finding for a discussion of
the critical issues, including criterion 83.7(b). The questions then become, "Did the proposed
finding, either the summary under the criteria or the technical report, indicate that the petitioner
had not met criterion 83.7(b) for the modern time period, particularly from 1950 to the present?
Did the proposed finding indicate that more research was required?

The summary under the criteria, page 10, in discussing present day, or modern, community,
states:

[T]he evidence is not sufficient to establish the existence of patterns of significant
contact beteen [sic] residents and non-residents. . . . Because the RMI do not
meet the requirements of criterion b on other grounds, it was not necessary to
definitively evaluate this question (Proposed Finding, Summary Under the
Criteria, p. 10).

Thus, the proposed finding clearly did not find that the RMI met criterion 83.7(b) from 1950 to
the present. Rather, the proposed finding left unresolved the question of whether the RMI in the
three settlements maintained sufficient contact with those outside the settlements as required for

8

the petitioner to meet criterion 83.7(b).[6]  And, on page 25 of the Anthropology Technical Report, the Department noted that:

> The petitioner did not show that those RMI who are dispersed throughout New York and New Jersey communicate frequently with each other, or those at the core, face to face. . . .  The petitioner could strengthen their case by providing more information on RMI and their patterns of migration from and return to the core.

Referring to another form of possible evidence, the summary under the criteria stated, "There is no evidence that there were significant cultural differences between the RMI and other populations in the area, at any time period, despite petitioner's claims to the contrary" (Proposed Finding, Summary Under the Criteria, p. 8).

The proposed finding did not conclude that the petitioner met criterion 83.7(b) from 1950 to the present.[7]  As a result, the petitioner needed to address this issue during the response period to the proposed finding.  Nothing in the Department's letters to RMI indicated that this issue no longer needed to be addressed.  The letters were consistent in indicating that all aspects of the proposed finding needed to be addressed.  Based on this review, the AS-IA finds that the petitioner was not misled by the BIA after the proposed finding, but was fully informed of the shortcomings of its petition on all four of the criteria it had failed to meet, and that there was no denial of due process on this issue.

In conjunction with the third issue, the IBIA referred a subsidiary question of due process to the Secretary.  This question was based on the petitioner's contention that it had not been notified that the AS - IA had changed her conclusions between the proposed finding and final determination.  Based on new evidence and new arguments, the AS - IA has sometimes changed

---

[6]In the same way that it was necessary for RMI to provide more evidence to meet criterion 83.7(b) in the modern era, the petitioner was directed to focus on criterion 83.7(c) for the petitioner as a whole:

> It is clear that this is a reasonably cohesive and distinct group socially, at least in the core geographic community. . . . To the limited degree that significant informal leadership has been demonstrated for local portions of the group between 1940 and the 1970's, there is supporting evidence that such may exist presently.  Clearly establishing the existence of local leaders and/or organizations would provide supporting evidence for the existence of group-wide exercise of political influence.  However, establishing the existence of political influence within separate subgroupings would not by itself establish political influence for the group as a whole . . . . (Proposed Finding, Summary Under the Criteria, p. 15-16).

These citations refer to large gaps in time, 1940's to 1978 and 1978 to the present, years compatible with the phrase "the 1950's to the present" in question under criterion 83.7(b), where there is little or no evidence that, either among the three settlements or within the petitioner as a whole, there were leaders or bilateral political influence.

[7]For a full discussion of the reasons why the RMI did not meet criterion 83.7(b), the reader is referred to the proposed finding and the final determination, and the respective technical reports.

9

conclusions between the proposed finding and the final determination. The petitioners have never been notified of such changes before the final determination. Before the final determination is actually signed by the AS - IA, there is no requirement in the regulations to give either the petitioner or interested parties such notice. Further, until the AS - IA signs the decision, the BIA staff does not know what the Department's position will be and whether it changes the proposed finding.

In order to maintain the integrity of the deliberative process, the Department does not disclose drafts of acknowledgment decisions. The Department defends vigorously non-disclosure of drafts of the acknowledgment decisions and has moved for a protective order in other acknowledgment cases to protect the integrity of the deliberative process by preventing disclosure of such drafts. RMI's comment to the IBIA that it needed notice of any changes between a proposed finding and a final determination, before the decision is made by the AS - IA, is inconsistent with the positions taken in other acknowledgment litigation to protect the integrity of the deliberative process. The AS - IA determines that there was no denial of due process on the issue of not granting notice to the petitioner that the final determination might change a conclusion of the proposed finding.

The IBIA also recommended the further investigation of another point related to the third issue, which the IBIA opinion characterized as an apparent discrepancy between the proposed finding and the final determination. The apparent discrepancy concerned the AS - IA's conclusions in the proposed finding and the final determination regarding the RMI's maintenance of community. The proposed finding concluded that the RMI did not meet criterion 83.7(b) at any point in time, whereas the final determination concluded that there was sufficient evidence that the RMI met criterion 83.7(b) from 1870 to 1950. The IBIA stated its recommendation as follows:

> [T]he Board also recommends that the Secretary request the Assistant Secretary to address an apparent discrepancy between the Proposed Finding and the Final Determination concerning Petitioner's "community" for the post-1870 period. This apparent discrepancy may well be a result of the change in regulations. The Board believes, however, that some clarification is warranted (31 IBIA 61, 82 (1997)).

The IBIA continues by comparing statements made in the Federal Register notice of the final determination with statements in the proposed finding. The IBIA opinion states: "[i]n the Board's view, these statements [in the final determination] are inaccurate" (31 IBIA 61, 82 (1997)). The Board continues:

> Although this is not a critical point, the Board recommends that, at the same time Petitioner's due process allegation is considered, the Assistant Secretary be requested to clarify the statements in the Final Determination concerning the findings made in the Proposed Finding (31 IBIA 61, 84 (1997)).

10

The IBIA opinion indicates that there are inaccuracies in how the Federal Register notice of the final determination characterized the proposed finding. On review, this discrepancy is not only found in the Federal Register notice, but in the final determination itself (Final Determination, Summary Under the Criteria, p. 21). The IBIA was correct in suggesting that the apparent discrepancy was due, in part, to a change in the wording of the acknowledgment regulations, which were revised in 1994.[8] The following discussion provides a reconsidered determination, as requested by the Secretary, of the differences between the proposed finding and final determination with regard to the conclusions about RMI and the maintenance of community. This discussion supersedes the portions of the final determination which are inconsistent with it.[9] The final determination's conclusion that the RMI did not meet criterion 83.7(b) is affirmed; its characterization of the proposed finding is amended.

The proposed finding on the RMI petition was written under the 1978 regulations, while the final determination was written, following the choice of the RMI, under the 1994 revised regulations. As suggested by the IBIA opinion, changes in the 1994 revised regulations did result in changes

---

[8]After the 1994 regulations were published, petitioners that were already on active consideration, including the RMI, were given the opportunity to choose if they wanted to continue having their petition evaluated under the 1978 regulations, or if they wanted to proceed under the revised 1994 regulations. The RMI chose to proceed under the revised regulations, thus prompting part of the change in conclusions between the proposed finding and the final determination on criterion 83.7(b).

[9]The petitioner's lawyer contended that there was no need to "clarify" issues regarding the maintenance of community from 1870 to the present (Catalano to Babbitt 1997). The letter stated that the proposed finding had established that the petitioner had met 83.7(b) from 1870 to the present. In support of this, the letter quoted several statements from the three technical reports (ibid., 5). For example, the letter quotes one sentence as follows: "Based on this evidence, it is concluded that a community currently does exist among the RMI" (Anthropology Technical Report, p. 24). When read in the context of the preceding and following pages, it is clear that this statement refers only to the RMI members living in the three settlements, not to the RMI membership as a whole. The statement on page 11 of the proposed finding, summary under the criteria, which stated "they were socially cohesive," should be understood in the same way.

The RMI also quoted a portion of a sentence from the history technical report. The full sentence reads: "The petitioning group does represent a distinct community with significant continuity from the early 19th century to the present, but is not a community that has resided in the Ramapo Mountains since colonial times." This reconsidered final determination clarifies that this sentence from the introduction to the summary of the evidence, was intended to reference the RMI living in the three settlements (Proposed Finding, History Technical Report, p. 77).

The only reliable evidence presented by the petitioner that could be used to evaluate whether the petitioner had maintained its community between 1950 and 1992 was the 1992 membership list. The members living in those three settlements only accounted for 44 percent of the individuals on the 1992 membership list. There was only anecdotal evidence regarding social connections between the 56 percent living outside of the three settlements and the 44 percent living in the settlements. This was insufficient evidence to establish the required social connections between those living inside the three settlements and those living outside of them (Proposed Finding, Summary Under the Criteria, p. 10). This lack of evidence contributed to the conclusion in the proposed finding that the RMI as a whole did not meet criterion 83.7(b) at any point in time, including from 1950 to 1992. The RMI was told to provide additional evidence on this point for the final determination (Proposed Finding, Anthropology Technical Report, p. 25).

11

in the conclusions regarding 83.7(b). In the 1978 regulations, the criterion on the maintenance of community read as follows:

> Evidence that a substantial portion of the petitioning group inhabits a specific area or lives in a community viewed as American Indian and distinct from other populations in the area, and that its members are descendants of an Indian tribe which historically inhabited a specific area (25 CFR 83.7(b)).

The guidelines written for the 1978 acknowledgment regulations, in reference to criterion 83.7(b), provide that "[i]n this section the petitioning group should demonstrate that a sizeable number of its members live close enough to each other to meet, associate, and conduct tribal business on a regular basis, and that they do so" (Guidelines for the 1978 acknowledgment regulations, p. 8).[10]

The proposed finding concluded that RMI did not meet this criterion at any point in time (Proposed Finding, Summary Under the Criteria, pp. 11-12). A summary of the evidence for this conclusion in the proposed finding follows. The first evidence that a separate settlement comprised of the RMI's ancestors was coalescing in the Ramapough Mountains (a mission was started for them at Darlington, NJ, by the AME Zion Church) dates to the 1850's. "In the 1860's a major portion of the RMI families listed on the census were living next to each other, while others remained scattered in the various townships" (Proposed Finding, Summary Under the Criteria, p. 6). The first clear evidence that RMI's ancestors were a distinct, separate social community did not appear until 1872[11] (Proposed Finding, Summary Under the Criteria, pp. 6-7). The proposed finding summarized the preceding evidence: "[c]ommunity cohesion is established post-1850 by the existence of geographically distinct, exclusive residence areas, and a high degree of marriage within the group" (Proposed Finding, Summary Under the Criteria, p. 8). Based on this evidence, it was concluded in the proposed finding that at some time between 1850 and 1872, the RMI ancestors developed into a distinct, geographically isolated settlement. The AS - IA concluded that the settlement that was in evidence by 1872 did not meet the requirements of 83.7(b) at any point in time: "[w]hile the group was considered distinct, it was

---

[10]In the preamble to the 1994 revised regulations, the Review of Public Comments discusses changes in the wording of criterion 83.7(b), and the requirements for meeting that criterion.

> Criterion (b), demonstration of community, and the associated definition of community in § 83.1, were substantially revised in the proposed revised rule. The revision omitted an apparently implied requirement that a group live in a geographical community in order to demonstrate that this criterion was met. The revised definition effectively requires a showing that substantial social relationships and/or social interaction are maintained widely within the membership; that is, that members are more than simply a collection of Indian descendants, and that the membership is socially distinct from non-Indians (Federal Register, Vol. 59, No. 38, February 25, 1994, p. 9286).

[11]About 1872, both the Episcopalian and Reformed denominations tried to establish mission activities among the RMI's ancestors. In the summary under the criteria 1872 was sometimes rounded to 1870.

12

not distinguished as Indian; rather, the RMI were distinguished as being part Indian and part non-Indian" (Proposed Finding, Summary Under the Criteria, p. 8).[12]

The proposed finding also drew some conclusions about the RMI and the maintenance of community in the present day.  Using the 1992 RMI membership list, the proposed finding concluded that "a substantial portion of the RMI ancestors and their descendants have lived in the three Ramapo Mountain communities of Stag Hill/Mahwah, NJ, Ringwood, NJ, and Hillburn, NY from the 1870's to the present" (Proposed Finding, Summary Under the Criteria, p. 10).  The summary under the criteria concluded:  "[s]lightly over one-half of these members (1,333 [of 2,654, or 50.2 percent]) live in a ten-mile geographical core area [sic "within a five-mile radius" (i.e. an area ten miles in diameter), as in Anthropology Technical Report, p. 19] that includes the three principal RMI settlements, with 44 percent in the settlements themselves" (Proposed Finding, Summary Under the Criteria, p. 10).

At the time of the field research in 1993, there was only anecdotal evidence of continuing social relations between the 56 percent of the petitioner's members that did not live in those three towns and the 44 percent that did.[13]  The important modern community issue of the social connection between the RMI members who lived in the three towns and those who did not was not definitively answered at the time of the proposed finding:

> Evidence concerning the maintenance of social relations with those RMI resident
> outside of the core geographic area is much more limited than that concerning the
> core geographic area itself.  There is anecdotal evidence for the following
> statements, but the evidence is not sufficient to establish the existence of patterns
> of significant contact beteen [sic] them . . . .  Because the RMI do not meet the
> requirements of criterion 83.7(b) on other grounds, it was not necessary to

_____

[12]The requirement that the petitioner's community be viewed as American Indian was removed from criterion 83.7(b) in the revised 1994 regulations.  This is one of the reasons that the final determination concluded that there was sufficient evidence that the RMI met this criterion from 1870 to 1950 and the proposed finding did not.

[13]In conjunction with this review, it is found that the last full paragraph at the bottom of page 24 of the Anthropology Technical Report is inconsistent with the remaining discussion in that report.  The report stated:

> Based on this evidence, it is concluded that a community currently does exist among the RMI.
> One half of the RMI membership lives in the 10 mile core area and have the opportunity to interact
> on a frequent basis and they seem to do so.  Significant social and economic ties exist between the
> RMI members in the three core communities, based on intermarriage and kinship (Proposed
> Finding, Anthropology Technical Report, p. 24).

This reconsidered final determination clarifies and rejects a portion of that paragraph and finds that it should read as follows:  Based on this evidence, it is concluded that a community currently does exist among the RMI living in the three settlements.  Forty-four percent of the RMI membership lives in separate enclaves of the three main settlements and have the opportunity to interact on a frequent, face-to-face basis, and they seem to do so.  Significant social and economic ties exist between RMI members in the three settlements, based on intermarriage and kinship.

13

definitively evaluate this question." (Proposed Finding, Summary Under the Criteria, p. 10).

That is, there was no need for the BIA to do further analysis on the modern community issue since the petitioner had not demonstrated that it existed from historical times to the present as a community viewed as American Indian, or that its members were descendants of an Indian tribe which historically inhabited a specific area. The acknowledgment regulations clearly state that it is the petitioner's responsibility to do the research for their petition: "The Department shall, upon request, provide petitioners with suggestions and advice regarding preparation of the documented petition. The Department shall not be responsible for the actual research on behalf of the petitioner" (25 CFR 83.5(c)).

The final paragraph of the summary under the criteria for 83.7(b) concluded first that RMI did not meet the requirements of the criterion from 1850 to the present because "they were not distinct as Indians" as called for by the criterion. "Even though outsiders attributed partial Indian ancestry to them, they were not identified as an Indian group by outsiders" (Proposed Finding, Summary Under the Criteria, p. 11). Thus, the IBIA opinion is correct in stating that in the proposed finding: "no conclusion was reached on the question of whether the petitioner satisfied the community requirement, as presently constituted for any of the period after 1850, because the negative conclusion in the proposed finding was based on another, now-removed, requirement" [that its community be identified as American Indian] (31 IBIA 61, 83 (1997)).

The 1994 (revised) regulation's statement of criterion 83.7(b) is as follows:

> A predominant portion of the petitioning group comprises a distinct community and has existed as a community from historical times until the present.

The 1994 statement of criterion 83.7(b) no longer requires that the petitioner's community be viewed as American Indian or that its members descend from an Indian tribe that historically inhabited a specific area.[14]  Because of this change to criterion 83.7(b), evidence concerning the RMI settlements which had come into existence by 1872 was evaluated anew at the time of the final determination. The final determination concluded that the RMI met criterion 83.7(b) from 1870 to 1950. This conclusion does not reflect a significant change from the conclusions in the proposed finding, but a refinement of those conclusions based on revisions in the wording of criterion 83.7(b), as well as additional evidence (church records that reflected a significant rate of

---

[14]The 1994 revised regulations analytically separated out from criterion 83.7(b) the issues of external identification as an Indian entity and descent from an historical Indian tribe. Petitioners must still demonstrate that they have been identified by external sources as an Indian entity, and that they descend from an historical tribe under criteria 83.7 (a) and (e), respectively. While the revision of the regulations may have changed the evaluation for specific criteria - in this case allowing the RMI to meet criterion (b) for a specific time period - the overall outcome of any acknowledgment determination would be the same under the 1978 regulations and the 1994 revisions (see Federal Register, Vol. 59, p. 9280).

endogamy from 1878 to 1918) that was discovered by the BIA in the period between the proposed finding and the final determination.

The evaluation of the evidence at the time of the final determination, under the revised statement of criterion 83.7(b), showed that there _was_ sufficient evidence that the RMI were a distinct community from 1870 to 1950, but not before 1870 or after 1950 (Final Determination, Summary Under the Criteria, p. 24). The IBIA opinion is correct in stating that the proposed finding did not arrive at this explicit conclusion. Rather, at the time of the proposed finding, the issue of whether or not the petitioner had a community in the modern era was left undecided 1) because the evidence available at the time was not sufficient to conclude that RMI met criterion 83.7(b); 2) because RMI had failed to establish that they descended from an historical Indian tribe; 3) because RMI did not document that they had an ancestral community before 1872; and 4) because RMI failed to meet criterion 83.7(b) because as a group they were not viewed as American Indian.

Thus, the Federal Register notice announcing the final determination (and the final determination itself) inaccurately characterized the conclusions in the proposed finding. The proposed finding concluded that the RMI's settlements came into existence over a period of time between 1850 and 1870. It was difficult to be more precise than that based on the available data. The proposed finding also concluded that the first solid evidence that the RMI were a distinct, separate settlement appeared in 1872. The proposed finding determined that further analysis under criterion 83.7(b) was not necessary because the settlements had not been identified as "Indian." Because of the revisions in the wording of criterion 83.7(b), and on the basis of new evidence discovered by the BIA researchers during their evaluation of the RMI response to the proposed finding, the evidence concerning the maintenance of community was reevaluated for the final determination. That reevaluation of the evidence concluded that there was sufficient evidence to demonstrate the maintenance of community between 1870 and 1950 but that the evidence before 1870 and after 1950 remained insufficient.

While the proposed finding did not specify 1950 as the year after which the evidence was insufficient to conclude that the RMI's community still existed, this conclusion in the final determination is consistent with the proposed finding which cited no evidence for community among the RMI as a whole from 1950 to present, and stated that there was only anecdotal evidence in 1992 that members living outside of the three settlements continued to maintain social relations with members living in the three settlements. Anecdotal evidence is not sufficient evidence to demonstrate that a petitioner has met the requirements of criterion 83.7(b) (see Proposed Finding, Summary Under the Criteria, p. 10; Anthropology Technical Report, p. 22).

RMI was not harmed by the refined conclusions of the final determination regarding criterion 83.7(b). In fact, it benefitted from the change in the wording of criterion 83.7(b) in the 1994 revised regulations (which no longer required a petitioner's community to be viewed as an American Indian community). Whereas the proposed finding concluded that RMI did not meet

15

criterion 83.7(b) at any point in time, the final determination found that RMI met criterion 83.7(b) from 1870 to 1950. Of course, without sufficient evidence that RMI descends from an historical Indian tribe, and without sufficient evidence of an ancestral community before 1870, it is a moot point whether there is sufficient evidence for community from 1950 to the present.[15] However, the conclusion of the final determination that the RMI does not meet criterion 83.7(b) before 1870 or from 1950 to the present is affirmed.

## Issue Four

The IBIA opinion notes a fourth and final issue which "requires clarification." It is also related to criterion 83.7(b).

> **Another point which the Board believes requires clarification is also related to the "community" requirement in 25 C.F.R § 83.7(b). It concerns Petitioner's "core geographical area" as used to determine residency percentages under 25 C.F.R. § 83.7(b)(2)(i).**

Specifically, the IBIA found a discrepancy between the proposed finding and the AS - IA's "Transmittal Memorandum" filed by the Department with the IBIA concerning the geographical core area and membership residential distribution. The proposed finding sometimes discussed a "10-mile geographical core area that includes the three principal settlements" (Proposed Finding, Summary Under the Criteria, p. 10) and sometimes referenced "the core geographic area" as the three settlements: "[T]he core geographic area, both within and between the three communities" (Id.).

The transmittal memorandum was written, in part to clarify an error found in the final determination's summary of the proposed finding's conclusions about the residential distribution of RMI members (31 IBIA 61, 84 (1997)). The final determination mistakenly stated that the proposed finding had concluded that one third of the RMI's members still lived in the RMI's three settlements and that two thirds of the RMI's members lived outside of those settlements (Final Determination, Technical Report, p. 80). The same mistake was repeated when referring to the failure of the RMI to provide new evidence about modern community: "No new evidence was presented concerning the relationship of the two-thirds majority of the RMI to the one-third living in the geographical core" (ibid.). This was not a new conclusion of the final determination, but an inaccurate summary of the proposed finding's conclusions. The proposed finding was very clear in its conclusions based on the analysis of the 1992 membership list that had been provided by RMI. The proposed finding stated:

---

[15]If the RMI petition had begun evaluation under the 1994 revised regulations, it would have received an expedited negative proposed finding on criterion 83.7(e) (descent from an historical Indian tribe) alone, prior to the start of active consideration (see 83.10(e)(1); also Final Determination, Summary Under the Criteria, p. 7).

A substantial portion of the RMI ancestors and their descendants have lived in the three Ramapo Mountain communities of Stag Hill/Mahwah, Hillburn, and Ringwood, from the 1870's to the present. According to the 1992 RMI membership list submitted to the BAR, there are about 2,654 members of the group. Slightly over one half of these members (1,333) live in a 10-mile geographical core area that includes the three principal RMI settlements of Stag Hill/Mahwah, New Jersey, Hillburn, New York, and Ringwood New Jersey, with 44 percent in the settlements themselves (Proposed Finding, Summary Under the Criteria, p. 10).

This conclusion was not changed at the time of the final determination. The reasons why this evidence was not sufficient to meet criterion 83.7(b) at the time of the final determination has been discussed above.

The misstatement of the evidence in the final determination did not change the conclusions reached in the final determination, because the issue of concern was the lack of evidence for social connections between the RMI members living in the three settlements and those living outside those settlements. The final determination, including the technical report pages 79-80, are hereby amended to reflect the conclusion in the proposed finding that 56 percent of the RMI lived outside of the three settlements and 44 percent lived in the three settlements in 1992.

The IBIA notes that "core geographical area" and "village-like setting" are two undefined terms which do not appear in the regulations. The RMI's geographical core area,[16] and the social interaction among the RMI living in the three principal settlements was described in the proposed finding's anthropology technical report. The geographical core area was defined usually as having "a five-mile radius core area that includes seven towns or villages"[17] (Proposed Finding,

---

[16]The phrase "geographical core area" is an analytical designation based on historical descriptions of the location of a group's historical place of residence as it existed at a particular point in time. It does not necessarily imply anything about the maintenance of community under criterion 83.7(b) among the people that live in that area, since this can change dramatically over time. For example, in 1992, the area covered by the five-mile radius that encompasses Stag Hill/Mahwah, NJ, Ringwood, New Jersey, and Hillburn, New York includes several other towns and villages which have not historically been associated with the RMI or their descendants. Today these towns and villages have very few, if any, RMI members living in them. Since 1870, many people who are not genealogically related to the RMI have moved into the RMI's "geographical core area," making it impossible to assume that the RMI in that area are maintaining a distinct community with each other solely on the basis of their residence. By contrast, when a petitioner's members live in an area almost exclusively inhabited by them, as the RMI's ancestors did in 1872, it is possible to assume, barring evidence to the contrary, that those members are maintaining a community among themselves. See also final determination technical report (p. 80) which refers to the three settlements in the core area and states that the BIA cannot "assume that the RMI, as a whole, continued to constitute a community on the grounds of geographical distribution alone."

[17]From 1870 to 1992, these were not Indian towns or villages. Nor were they exclusively RMI towns or villages from 1870 to 1992, but towns comprised of non-RMI ancestors and descendants as well. In 1992, the vast majority of the people in this five-mile radius area were not RMI members. While population data on the four towns not historically associated with the RMI was not readily available, it is instructive to consider the data for the three

17

Anthropology Technical Report, pp. 19-22). The proposed finding stated that the geographical core area included the three main towns in which many RMI ancestors and descendants lived since 1870. In 1992, the fact that 50.2 percent of the RMI lived in this five-mile radius was not the same as stating that it lived in an area exclusively inhabited by its members, since the vast majority of the population living in that five-mile radius in 1992 was not descended from RMI ancestors. Further, the statement that 50.2 percent of RMI's members resided in the five-mile radius area in 1992 did not imply anything about the maintenance of community among the people that live in that area.

By contrast, however, when a substantial portion of a petitioner's members reside in an area exclusively or nearly exclusively inhabited by them, the AS - IA does make the assumption that social ties exist among those individuals when there is no direct evidence to the contrary. This is what is meant by "village-like setting." This term, which is not defined in the regulations is sometimes used to designate situations like that anticipated by 83.7(b)(2)(i). According to the proposed finding, no more than 44 percent of the RMI's members lived in such a setting.

The IBIA opinion also states another concern:

> **It appears possible that imposition of the "village-like setting" requirement was the cause of BIA's apparent alteration in its conclusion concerning the population of Petitioner's core geographical area. To the extent the imposition of a requirement not stated in the regulations resulted in a conclusion adverse to Petitioner - even though the specific conclusion was not critical to the ultimate determination concerning petitioner's acknowledgment - the Board recommends that the Secretary determine the requirement to be invalid (31 IBIA 61, 85 (1997)).**

As already discussed, the Department has never imposed a "village-like setting" requirement on petitioners for Federal acknowledgment under criterion 83.7(b), whether they were evaluated under the 1978 regulations or the 1994 revised regulations. The AS - IA agrees that it would be unreasonable to require all petitioners to provide such evidence to meet 83.7(b), even though some petitioners have met some of the provisions of 83.7(b)(2)(i-v).[18]

———————————

settlements themselves. In 1992, 1,168 RMI members lived in the three settlements. In 1997, the population for the three modern towns in which there are RMI enclaves was as follows: Mahwah Township: 21,057; Hillburn, NY: 1,000; Ringwood: 12,500. The total population of these three towns is 34,557. This means that the RMI members living in the three towns are a distinct minority of only three percent. This percentage would be even lower for the five-mile radius area.

[18]In documenting their petitions, several petitioners have successfully provided evidence like this in order to demonstrate that they have met criterion 83.7(b). As one example, see the final determinations for the Jena Choctaw Band, who were acknowledged under the 1994 revised regulations.

18

While the AS - IA does not require that petitioners live in a village-like setting, the concept is used when evaluating petitions. For example, when considering the issue of the maintenance of community, the BIA's researchers perform a series of analyses. The first question asked is, "Has the petitioner demonstrated that it meets the evidence described in 83.7(b)(2)(i-v)?" These five subsections specify evidence that is sufficient, in and of itself, for demonstrating 83.7(b). In the regulations, the first type of sufficient evidence is described as follows:

> A petitioner shall be considered to have provided sufficient evidence of community *at a given point* in time if evidence is provided to demonstrate any one of the following: (i) More than 50 percent of the members reside in a geographical area exclusively or almost exclusively composed of members of the group and the balance of the group maintains consistent interaction with some members of the group [83.7(b)(2)(i), emphasis added].

This is the same as asking, as was done in the RMI proposed finding and final determination, "Do more than 50 percent of the petitioner's members live in a geographical community and, if so, do the remainder of the members interact socially with them?" This approach does not impose a mandatory "village-like setting" requirement on petitioners; rather, it is one of several means for demonstrating 83.7(b). The provisions of 83.7(b)(2)(i-v) were incorporated into the 1994 revised regulations to reduce the burden of research on petitioners who could provide such sufficient evidence and to reduce the time required to evaluate petitions.

It is possible that a petitioner could meet 83.7(b)(2)(i) without living in an actual village. As indicated in the IBIA opinion, a petitioner could live dispersed in a rural area that is mostly inhabited by its members. Or they might, as appears to be the case with many of the RMI members (approximately 44 percent in 1992), live in relatively isolated locations, in three different towns, and form a community. In the three towns of Stag Hill/Mahwah, Hillburn, and Ringwood, the RMI tend to live in separate enclaves. There was sufficient evidence, based on the 1992 RMI membership list and the BIA's 1993 evaluation of it, to demonstrate that 44 percent of the RMI membership lived in those enclaves which interacted with each other.

However, there are several reasons why this was not sufficient for RMI to meet the requirements of 83.7(b). First, the proposed finding and the final determination were evaluations of the petitioner as a whole. If all of the petitioner's members had lived in these three interacting settlements, this would have met criterion 83.7(b) in 1992; rather, only 44 percent of the petitioner's members lived in the three settlements in 1992. Second, it would also have been sufficient had more than fifty percent of RMI members lived in these three interacting settlements and had there been evidence that the remainder of the petitioner's members continued to maintain social relations with members of the group. But, there was insufficient evidence to demonstrate the existence of continuing social relations between the petitioner's members who lived in the three settlements and those who did not. For example, there was no evidence that the 6 percent of RMI members that lived in the other four towns within the five-mile radius interacted socially with RMI members in the three principal towns. And there was only limited,

19

anecdotal evidence that a few of the 56 percent of the RMI living outside the three RMI settlements interacted with those who lived in the settlements. Thus, the RMI failed to demonstrate that they met 83.7(b)(2)(i).

Providing evidence that more than 50 percent of its members live in an area almost exclusively inhabited by its members is not the only sufficient evidence which petitioners may use to demonstrate that they meet the requirements of criterion 83.7(b). If a petitioner does not meet 83.7(b)(2)(i), it is evaluated under the remaining four subsections of 83.7(b)(2), which consider such evidence as shared language, continuing participation in religious activities, and endogamy (a pattern of marriages to other members of the group). The final evaluation found no evidence demonstrating that the petitioner met the provisions of 83.7(b)(2)(ii-v) before 1870 or after 1950.

If the petitioner does not meet 83.7(b)(2)(i-v), it leads to the second question that BIA researchers ask: "Does the petitioner meet the requirements of 83.7(b)(1)?" More specifically, "Is there any other evidence that a predominant portion of the members of the group comprise a distinct community from historical times until the present?" The regulations suggest nine specific types of evidence that may be used in combination to demonstrate that petitioners meet this criterion (83.7(b)(1)(i-ix)). The regulations also state that other evidence may be used to demonstrate that the petitioner meets criterion 83.7(b). Since the final determination found that RMI did not provide sufficient evidence under 83.7(b)(2), an evaluation under 83.7(b)(1) was undertaken. The final determination concluded that the RMI did not provide sufficient evidence that demonstrated it met 83.7(b)(1), before 1870 or between 1950 and the present. No sufficient evidence was found by the BIA. This conclusion of the final determination is affirmed.

Based on the above clarifications, and in response to the Secretary's request for the issuance of a reconsidered final determination, this document, in conjunction with the original final determination, will become an amended final determination for the RMI petitioner. In accordance with 25 CFR §83.11(h)(3), a Federal Register notice announcing the reconsidered final determination will be published.

11-7-97
_____
Date

ada E. Deer
_____
Assistant Secretary - Indian Affairs

20

Exhibit "H"

**i** Cited
As of: December 12, 2022 7:36 PM Z

## *Ramapough Mt. Indians v. Babbitt*

United States District Court for the District of Columbia

September 30, 2000, Decided ; September 30, 2000, Filed

Civil Action No. 98-2136 (JR)

**Reporter**

2000 U.S. Dist. LEXIS 14479 *

THE RAMAPOUGH MOUNTAIN INDIANS and CHIEF SILENT WOLF, Plaintiffs, v. BRUCE BABBITT, Secretary, U.S. Department of the Interior, et al., Defendants.

**Disposition: [*1]** Plaintiffs' motion to supplement administrative record denied. Plaintiff's motion to take judicial notice, to supplement record and for leave to file exhibits denied. Plaintiff's motion for leave to file legal authority granted. Defendant's motion for summary judgment granted.

## Core Terms

BIA, tribe, criterion, regulations, ancestry, records, documents, Treaty, lived, final determination, identification, arbitrary and capricious, piece of evidence, proposed findings, descendants, ancestors, tribal, staff, trace, band, allegations

## Case Summary

### Procedural Posture

Defendant Indian affairs bureau moved for summary judgment, in plaintiffs' action for judicial review of defendant's decision not to recognize plaintiffs as an Indian tribe under *25 C.F.R. §§ 83.1-83.13*.

### Overview

Plaintiffs sought federal recognition as an Indian tribe pursuant to 25 C.F.R. pt. 83. Defendant Bureau of Indian Affairs denied recognition. Plaintiffs sought judicial review pursuant to the Administrative Procedure Act, *5 U.S.C.S. § 706(2)*, asserting many deficiencies in defendant's decision-making process. The court granted defendant's motion for summary judgment. Plaintiffs failed to show that defendant's decision was subject to prejudgment, that defendant applied the wrong standard

of proof, that defendant improperly rejected plaintiffs' proffer of certain evidence of descent from a historical tribe, that defendant failed to follow its own rules, that defendant ignored findings and conclusions of its own staff, that defendant inconsistently applied its rules, that defendant's decision resulted from unlawful racial bias, that defendant manipulated the content of the record, that defendant lacked special expertise, or that defendant's decision was the result of undue influence. Plaintiffs failed to demonstrate that particular evidence was demonstrably limited or not available. Defendant had no duty to disclose documents that were not used in its proposed findings.

### Outcome

Motion for summary judgment was granted, because plaintiffs failed to show that defendant did not adhere to its own regulations or that defendant acted arbitrarily, capriciously, or in violation of any law.

## LexisNexis® Headnotes

Governments > Native Americans > Authority & Jurisdiction

*HN1*[⬆] **Native Americans, Authority & Jurisdiction**

Following procedures established by departmental regulations issued in 1978, *25 C.F.R. §§ 83.1-83.13*, the Bureau of Indian Affairs may grant federal recognition to a tribe, thereby creating a government-to-government relationship between the tribe and the United States and making the tribe eligible for special services and benefits available only to federally recognized tribes.

Administrative Law > Judicial Review > Standards

2000 U.S. Dist. LEXIS 14479, *1

of Review > Unlawful Procedures

Administrative Law > Judicial Review > Standards of Review > General Overview

### HN2[⬇] Standards of Review, Unlawful Procedures

In reviewing an agency decision, the court must closely examine allegations of procedural violations. If the agency violated their own procedural regulations, its decision must be vacated.

Administrative Law > Judicial Review > Standards of Review > Arbitrary & Capricious Standard of Review

Environmental Law > Administrative Proceedings & Litigation > Judicial Review

Administrative Law > Judicial Review > Reviewability > Factual Determinations

Administrative Law > Judicial Review > Standards of Review > General Overview

Administrative Law > Judicial Review > Standards of Review > Abuse of Discretion

### HN3[⬇] Standards of Review, Arbitrary & Capricious Standard of Review

Challenges to the substantive aspects of the an agency's determination may only be disturbed if they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. *5 U.S.C.S. § 706(2)(a)*. This is a deferential standard, but it is not so lenient that the presumption of regularity shields the agency's action from a thorough, probing review. A three-part test governs the review of substantive aspects of agency decisions. The reviewing court must (1) ascertain the facts on which the agency relied in making its decision; (2) determine whether those facts have some basis in the record; and (3) judge whether a reasonable decision maker could respond to those facts as the agency did.

Governments > Native Americans > Authority & Jurisdiction

Governments > Federal Government > Employees

& Officials

### HN4[⬇] Native Americans, Authority & Jurisdiction

Bureau of Indian Affairs regulations concerning federal recognition of an Indian tribe allow the descent from a historical Indian tribe requirement to be satisfied with state, federal, or other official records or evidence identifying present members or ancestors of present members as being descendants of a historical tribe; church, school, and other similar enrollment records; affidavits of recognition by tribal elders, leaders, or the tribal governing body; or other records or evidence identifying present members or ancestors of present members as being descendants of a historical tribe. *25 C.F.R. § 83.7(e)(1)(ii)-(v)*.

Evidence > ... > Exceptions > Business Records > General Overview

Family Law > Marriage > Certificates & Licenses > General Overview

Evidence > ... > Hearsay > Exceptions > Family Records & Statements

Evidence > ... > Exceptions > Public Records > General Overview

Evidence > ... > Hearsay > Exceptions > Religious Records

Evidence > ... > Hearsay > Exemptions > General Overview

Governments > Native Americans > Authority & Jurisdiction

### HN5[⬇] Exceptions, Business Records

The types of evidence listed under *25 C.F.R. § 83.7(e)*, concerning federal recognition of an Indian tribe, as acceptable to prove its ancestry requirement, would be recognized under the rules of evidence as admissible under exceptions to the hearsay rule: records of regularly conducted activity, public records and reports, records of religious organizations, marriage, baptismal and similar certificates, and family records. Anthropologists, scholars, and authors are acceptable on the subject of identification, but not to prove ancestry.

2000 U.S. Dist. LEXIS 14479, *1

Administrative Law > Judicial Review > Standards of Review > General Overview

**HN6[↧]  Judicial Review, Standards of Review**

Failure of an agency to follow its own rules is arbitrary and capricious behavior and mandates a remand to the agency for reconsideration.

Governments > Native Americans > Authority & Jurisdiction

**HN7[↧]  Native Americans, Authority & Jurisdiction**

*25 C.F.R. § 83.10(j)(2)* requires the Assistant Secretary of the United States Department of Interior to hold, at petitioner's request, a formal meeting on the record for the purpose of inquiring into the reasoning, analyses, and factual bases for a proposed finding concerning federal recognition of an Indian tribe.

Governments > Native Americans > Authority & Jurisdiction

**HN8[↧]  Native Americans, Authority & Jurisdiction**

See *25 C.F.R. § 83.10(j)(1)*.

Administrative Law > Judicial Review > Standards of Review > General Overview

**HN9[↧]  Judicial Review, Standards of Review**

An agency acts arbitrarily and capriciously when it ignores studies and data in its own files.

Governments > Native Americans > Authority & Jurisdiction

**HN10[↧]  Native Americans, Authority & Jurisdiction**

See *25 C.F.R. § 83.7(a)*.

Governments > Native Americans > Authority & Jurisdiction

**HN11[↧]  Native Americans, Authority & Jurisdiction**

See *25 C.F.R. § 83.7(b)(1)*.

Governments > Native Americans > Authority & Jurisdiction

**HN12[↧]  Native Americans, Authority & Jurisdiction**

See *59 Fed. Reg. 9281*.

Administrative Law > Judicial Review > Standards of Review > General Overview

**HN13[↧]  Judicial Review, Standards of Review**

An agency acts arbitrarily and capriciously when it unjustifiably discriminates between similarly situated parties.

Civil Procedure > ... > Federal & State Interrelationships > Choice of Law > Significant Relationships

Governments > Native Americans > Authority & Jurisdiction

Civil Procedure > ... > Federal & State Interrelationships > Choice of Law > General Overview

**HN14[↧]  Choice of Law, Significant Relationships**

In the context of federal recognition of an Indian tribe, if the number of residents within the core area is less than 50 percent, the putative tribe must demonstrate that those outside the core maintain contact with those in the core. *25 C.F.R. § 83.7(b)(2)(i)*.

**Counsel:** For Plaintiffs: Albert J. Catalano, Matthew J. Plache, Catalano & Plache, Washington, DC.

For Plaintiffs: James Moody, Washington, DC.

For Defendants: Aimee S. Bevan, R. Anthony Rogers,

2000 U.S. Dist. LEXIS 14479, *1

U.S. Department of Justice, Washington, DC.

**Judges:** JAMES ROBERTSON, United States District Judge.

**Opinion by:** JAMES ROBERTSON

# Opinion

## MEMORANDUM

This is an action for judicial review of the Bureau of Indian Affairs's ("BIA") decision not to recognize plaintiffs Ramapough Mountain Indians ("RMI") as an Indian tribe. RMI's complaint asserts many deficiencies in the BIA's decision-making process. The BIA has moved for summary judgment. For the reasons set forth below, that motion will be granted.

## Background

The RMI number about 2600 individuals who claim to be descendants of Native Americans, specifically the historic Munsee tribe. The majority of the members of this group currently reside near the Ramapough Mountains [*2] on the New York/New Jersey border. They incorporated in 1978 and, in 1979, requested federal recognition as an Indian tribe pursuant to 25 C.F.R. § 83.

After a lengthy administrative process the BIA found no connection between the Munsee Indians and the RMI and concluded instead that the RMI are descended from Afro-Dutch families who lived in Manhattan until the 1700s and then migrated to northeastern New Jersey and Tappan, New York. According to the BIA, the Munsee lived in the Ramapough Mountains until 1758, when they were removed with all other New Jersey Indians pursuant to the Treaty of Easton. The RMI submit that the Treaty of Easton did not apply to their Munsee ancestors and that it was not a removal document. The BIA nevertheless finds that the ancestors of the RMI lived thirty miles from the Ramapough Mountains in 1758 and did not move to the Ramapough Mountain area until thirty years after the Munsee were removed. The BIA's conclusion is that the RMI cannot be descended from the Munsee tribe.

## Procedural History

On August 14, 1979, the RMI filed a letter of intent with the BIA indicating their desire to proceed with recognition procedures pursuant to 25 C.F.R. § [*3] 83. This letter was prompted by the publication of The Ramapough Mountain People, a monograph that denounced the RMI's Native American identity and culture. After more than ten years of research, the RMI filed supporting documentation on April 23, 1990. Two months later, the BIA requested additional information, which RMI provided on January 28, 1991.

The BIA placed the RMI's revised petition on active consideration on July 14, 1992. On December 2, 1993, the Assistant Secretary of the Interior (Assistant Secretary) signed a Proposed Decision, finding that the RMI had failed to meet four of the seven mandatory criteria, specifically 25 C.F.R. § 83.7(a), (b), (c), and (e), set forth in the 1978 regulations. Two weeks before the issuance of that Proposed Decision, then-Congressman Toricelli announced at a press conference that the RMI would be denied recognition.

The RMI exercised their right under 25 C.F.R. § 83.3(g) to seek reevaluation. On January 6, 1996, the Assistant Secretary signed a Final Determination, finding that the RMI had failed to meet three of the seven mandatory criteria -- subsections (b), (c), and (e). The RMI appealed this Final Determination to the [*4] Interior Board of Indian Affairs. The IBIA affirmed the Assistant Secretary's Final Determination on January 18, 1997, but asked that the Secretary of the Interior reconsider four specific issues raised by the RMI. The Assistant Secretary reconsidered those issues and, on January 7, 1998 released a Reconsidered Determination, essentially affirming the BIA's Final Determination. The RMI subsequently filed this action for judicial review.

The RMI request various forms of relief, but they state no claim for which relief can be granted except under the Administrative Procedure Act, 5 U.S.C. § 706(2). Contrary to RMI's suggestion, I have no authority to conduct a de novo review, grant recognition, order the BIA to grant recognition, or retain jurisdiction. If the agency's action was arbitrary and capricious, violated the plaintiffs' constitutional rights, or followed procedures contrary to law, the only remedy is an order vacating the Final Determination and remanding the case to the BIA for reconsideration. [1]

---

[1] At oral argument, the RMI urged the Court not to remand the case, stating a clear preference for an appealable order.

Kevin OConnor

[*5] Analysis

HN1[↑] Following procedures established by departmental regulations issued in 1978, 25 C.F.R. §§ 83.1-83.13, the BIA may grant federal recognition to a tribe, thereby creating a government-to-government relationship between the tribe and the United States and making the tribe eligible for special services and benefits available only to federally recognized tribes. See id. (citing to 25 C.F.R. § 83.2 (1994)).

The RMI asserts that the BIA failed to adhere to its own regulations. HN2[↑] I must closely examine allegations of procedural violations. See NRDC v. SEC, 196 U.S. App. D.C. 124, 606 F.2d 1031, 1048 (D.C. Cir. 1979). If the BIA did in fact violate their own procedural regulations, its decision must be vacated. See 5 U.S.C. § 706(2)(d); New York State Energy Research & Dev. Auth. v. FERC, 241 U.S. App. D.C. 71, 746 F.2d 64, 66-69 (D.C. Cir. 1984).

RMI's HN3[↑] challenges to the substantive aspects of the BIA's determination, however, may only be disturbed if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(a). This is a deferential standard, but it is [*6] not so lenient that "the presumption of regularity . . . shields the Secretary's action from a thorough, probing review." Overton Park, 401 U.S. 402, 415, 91 S. Ct. 814, 28 L. Ed. 2d 136. A three-part test governs the review of substantive aspects of agency decisions. The reviewing court must (1) ascertain the facts on which the agency relied in making its decision; (2) determine whether those facts have some basis in the record; and (3) judge whether a reasonable decision maker could respond to those facts as the agency did. See Recording Indus. Ass'n v. Copyright Royalty Tribunal, 213 U.S. App. D.C. 156, 662 F.2d 1, 8 (D.C. Cir. 1981).

With those principles in mind, I must examine each of the ten alleged deficiencies in the BIA decision that the RMI alleges were not only arbitrary and capricious, but also contrary to law. As a finding for the RMI on any one of the procedural claims would mandate a remand, these claims will be discussed first, before reaching RMI's arguments regarding the reasonableness of the BIA's final determination.

1. The BIA's Decision Was Subject to Prejudgment

The only proffered support for this claim is that then-Congressman Toricelli announced the [*7] outcome before the decision was actually signed. This fact, while disturbing, does not establish or even tend to establish prejudgment. The BIA had already prepared the Proposed Decision and provided it to the Assistant Secretary for final approval. The congressman's foreknowledge indicates that there was an improper leak of information but does not show prejudgment.

2. The BIA Applied the Wrong Standard of Proof

The RMI claim that the BIA required them to prove many facts and elements of their petition with certainty when the proper standard of proof is only a "reasonable likelihood," or "preponderance of the evidence." 25 C.F.R. § 83.6(d). As evidence of their allegation, the RMI present the sworn testimony of former BAR Chief Holly Reckord, who admitted in 1995 (two years after the Proposed Decision was signed by the Assistant Secretary, but before the IBIA appeal) that BAR staff apply the prevailing standard in their professions (anthropology, genealogy, history, etc.) rather than the correct legal standard.

This evidence, too, is disturbing, but it is insufficient without more to prove that the BIA applied impermissibly strict standards in a specific case. The BAR [*8] staff provide technical reports to the BIA and do not themselves reach conclusions or make recognition determinations. Thus, to show that the BAR staff used a particular standard does not prove what standard the BIA ultimately applied. The BIA's Final Determination clearly states that the reasonable likelihood standard was applied overall to the BMI petition.

The RMI makes a specific claim with respect to the BIA's evaluation of criterion (e), descent from a historical Indian tribe, that requires further discussion. HN4[↑] BIA regulations allow this requirement to be satisfied with "State, Federal, or other official records or evidence identifying present members or ancestors of present members as being descendants of a historical tribe," "church, school, and other similar enrollment records," "affidavits of recognition by tribal elders, leaders, or the tribal governing body," or "other records or evidence identifying present members or ancestors of present members as being descendants of a historical tribe." 25 C.F.R. § 83.7(e)(1)(ii-v). RMI asserts that BIA improperly rejected its proffer of "other . . . evidence" to satisfy this criterion, insisting on "primary source" documentation, [*9] and that it was unlawful for BIA to reject materials such as letters and excerpts from books and pamphlets that would qualify under §§ 83.7(a)(4) and (a)(5).

2000 U.S. Dist. LEXIS 14479, *9

This RMI argument conflates the requirements of proof for criterion (a), identification of the petitioner as an American Indian entity on a substantially continuous basis since 1900, with the requirements of proof for criterion (e), membership consisting of individuals who descend from a historical Indian tribe. The works of anthropologists, historians and other scholars, as well as newspapers and books, are acceptable to satisfy the identification requirement of criterion (a), but records are required to satisfy criterion (e). *HN5*[⬆] The types of evidence listed under criterion (e) as acceptable to prove its ancestry requirement would be recognized under the rules of evidence as admissible under exceptions to the hearsay rule: records of regularly conducted activity, public records and reports, records of religious organizations, marriage, baptismal and similar certificates, family records, see *F.R.Evid. 803 (6),(8), (11), (12), (13)*. Anthropologists, scholars, and authors are acceptable on the subject [*10] of identification, but not to prove ancestry.

### 3. The BIA Failed to Follow Its Own Rules

The RMI allege that the BIA failed to follow its own rules in many respects. *HN6*[⬆] Failure of an agency to follow its own rules is arbitrary and capricious behavior and mandates a remand to the agency for reconsideration. See *Cherokee Nation of Oklahoma v. Babbitt, 326 U.S. App. D.C. 139, 117 F.3d 1489, 1499 (D.C. Cir. 1997)*. I must therefore address each of these allegations in turn.

### a. The BIA misapplied historic racial labels

The RMI allege that the BIA misapplied historic racial labels (Black, Negro, Mulatto, Colored, FPC, etc), in contravention of the clear intent of the 1994 regulations. See *59 Fed. Reg. 9286*, AR000630. The BIA's response is that, "while being labeled 'mulatto' or 'colored' by the census taker does not rule out Indian ancestry, it does not demonstrate it in the absence of other supporting evidence." Def.'s Mot. for Summ. J. at 45.

This issue presents a re-play of the arguments discussed forth above. The RMI assert that the BIA's refusal to accept unofficial records was contrary to *25 C.F.R. § 83.7(e)(v)*, and imposed an [*11] impossible standard on them, because official records initially did not allow for the classification as "Indian," and later did not require it, so that identifications were based on the whims of the census takers. But, again, the RMI position ignores the distinction between proof of ancestry and proof of external identification. RMI's examples -- Tena

Gertrude, Def.'s Ex. 3, AR000478, and Florence Maguiness, id., AR000212 -- would not satisfy the proof of descent required by criteria (e) even if their identification as Indian had been accepted.

### b. The BIA failed to take into account Revolutionary War document destruction

The RMI next allege that the BIA failed to "take into account historical situations and time periods for which evidence is demonstrably limited or not available." *25 C.F.R. § 83.6(e)*. The RMI claim that many of the historical records in the area of the Ramapough Mountains were destroyed during the Revolutionary War, rendering it difficult to trace their Indian ancestry to specific, aboriginal ancestors before that time. They claim that the BIA used this lack of evidence against them, in violation of *§ 83.6*. The BIA claims that no such document destruction [*12] ever occurred, and that plenty of information is available from that time period.

The RMI do not suggest what evidence they might have produced had the alleged distruction never occurred, or how it might have helped their case, or in what way the BIA held such a lack of evidence against them. The RMI have not carried their burden of demonstrating that evidence was "demonstrably limited or not available."

### c. The BIA refused to allow the RMI an on-the-record hearing

*HN7*[⬆] Title 25, *Section 83.10(j)(2)* of the Code of Federal Regulations requires the Assistant Secretary to hold, at petitioner's request, a formal meeting on the record for the purpose of inquiring into the reasoning, analyses, and factual bases for the proposed finding. The RMI insist that they requested such a meeting, but that the BIA refused it and failed to give a reason for the refusal. The BIA, on the other hand, states that the RMI expressed a preference for a conference with BIA researchers in a less formal setting and effectively abandoned their request for a formal on-the-record meeting.

The RMI have presented no evidence supporting their allegations, but the BIA has submitted a copy of a letter that it sent [*13] to the RMI, granting RMI's request for a formal meeting and explaining the procedures. The letter and the regulations imposed upon the RMI the obligation to draft an agenda for the meeting and to give notice to all interested parties. Because the RMI never drafted an agenda or gave notice, they effectively abandoned their request. I find no procedural violation.

Kevin OConnor

d. The BIA failed to disclose information in the Administrative Record

The RMI allege that the BIA failed to disclose information in the AR, in violation of 25 C.F.R. § 83.10(j)(1). HN8[⬆] ("The Assistant Secretary shall make available to the petitioner in a timely fashion any records used for the proposed finding not already held by the petitioner, to the extent allowable by Federal law.") See also Connecticut Light and Power v. NRC, 218 U.S. App. D.C. 134, 673 F.2d 525, 530 (D.C. Cir. 1982) (stating that agency must consider and disclose the information it relies on).

Upon reviewing the administrative record filed by the BIA in this case, the RMI discovered documents that they claim had never been made available to them before. Some of these documents, referred to by the RMI as the "Manes Indian deeds," [*14] allegedly enable the RMI to document their ancestry back to a Lenape Indian named Manes and his two sons, Arie and Peter Manes, who lived in the Ramapough Mountains during the 18th century.

The RMI also found a portion of the Treaty of Easton, which the BIA had specifically denied was a part of the AR. (The parties disagree as to the extent of the BIA's reliance upon the Treaty of Easton in the Final Determination, but they agree that the BIA consulted secondary sources about the Treaty and not the actual treaty.)

The alleged omissions of the Treaty and the Manes Indian deeds from the initial AR disclosures did not violate 25 C.F.R. § 83.10(j)(1) unless the contested documents were "used" in the Proposed Finding, and the RMI do not allege that the Manes Indian deeds were used in the Proposed Findings. They do assert that the BIA relied heavily upon secondary sources describing the Treaty and its effects, but there is no claim that the BIA failed to disclose their secondary sources. The BIA had no duty to disclose documents that were not "used" in the Proposed Findings.

4. The Agency Disregarded Evidence

The RMI allege that the BIA disregarded or ignored the findings [*15] and conclusions of its own staff, 18th Century Lenape Indian history, the Treaty of Easton, and the Manes Indian deeds, and that it discounted or rejected each piece of evidence that most strongly supported the RMI's case in an arbitrary and capricious way.

HN9[⬆] An agency acts arbitrarily and capriciously when it ignores studies and data in its own files. See Consumer Alert v. NHTSA, 294 U.S. App. D.C. 35, 956 F.2d 321 (D.C. Cir. 1992). The BIA insists that it carefully considered each piece of evidence submitted by the RMI. I must therefore examine the RMI's specific allegations.

a. The BAR's findings and conclusions

The RMI claim that in order to find that it had not demonstrated community from historical times to the present (criterion (b)), the BIA necessarily had to ignore or disregard findings made by its own BAR researchers. For example, the RMI point to: (1) the BAR anthropologist's concluding remarks that state that the RMI community has existed as an isolated community for nearly 200 years, see Gov. Ex. 7, AR000449; (2) the BAR historian's statement that "the petitioning group does represent a distinct community with significant continuity from the early 19th century to the [*16] present," Gov. Ex. 6, AR000307; and (3) the BAR genealogical report's conclusion that "the RMI consists of a group of people who have lived along the border of northern New Jersey and southern New York for more than 200 years. A core group is found in the Ramapough Mountains, but many families live and/or work in the surrounding area." Gov. Ex. 8, AR000461.

None of these conclusions is necessarily inconsistent with the BIA's finding that the RMI failed to demonstrate community from historical times. The quoted statements are perhaps necessary, but are not sufficient, to satisfy criterion (b). The BIA's conclusion as to criterion (b) does not establish that the anthropological, genealogical and historical statements were ignored.

The RMI also assert that the BIA ignored the findings of Steve Austin, the BAR staff anthropologist, who was the only BIA representative ever to visit the RMI community. After spending two weeks among the RMI conducting research, Austin participated in a recorded interview. He remarked on the closeness of the RMI community, finding it interesting that even those RMI who have moved away from the core area maintain ties through marriage, family, and other [*17] forms of association. In his report to the BIA, Austin wrote that many RMI members living outside the core maintain relations with their natal community, marry other RMI, and visit the core frequently. See Gov. Ex. 7, AR000450. He concluded that "a community currently does exist among the RMI. . ." based on evidence that half of their membership lives within the core and interacts on a

2000 U.S. Dist. LEXIS 14479, *17

frequent basis, and that there are significant social and economic ties between RMI members in the three core communities, based on intermarriage and kinship. See id.; AR 000441.

These statements are not fatally inconsistent with the BIA's Final Determination. Some evidence of community is not necessarily enough evidence of community. The RMI have not established that the BIA ignored the BAR's findings and conclusions, only that the BIA disagreed with them.

b. 18th Century Lenape History

The RMI allege that the BIA's representations regarding the early Lenape demonstrate that the BIA did not consult eighteenth century Lenape Indian history. The RMI do not allege that the BIA overlooked any specific document, but rather that the BAR historian's inadequate background in American history [*18] led her to reach several incorrect conclusions about the 18th century Lenape. The RMI claim that because the BIA decision relied in part on these conclusions about early Lenape history, which were factually incorrect and unsupported in the record, it is arbitrary and capricious.

The BIA responds that, while it was fully aware of Lenape history and political organization, it reached no conclusions regarding the Lenape and did not rely on what the RMI regards as misconceptions. The BIA indeed asserts that Lenape history is irrelevant to its decision because the RMI did not trace its ancestry to the Lenape. Instead, the BIA found that it was not clear which historical tribe, if any, the RMI were descendants of. Various sources mentioned different possible precursors, including the Munsee, Minisink, Tuscarora, Creek, Lenape, Hackensack, and Delaware. The RMI insist that all of these tribes, except for the Creek and the Tuscarora, are Lenape. The Munsee, Minisink and Hackensack are all names for various bands of Lenape, and the Delaware was the name given to the Lenape who left their homelands in the eighteenth century. The Tuscarora allegedly passed through the area during their northern [*19] migration in the early eighteenth century, and some of them may have blended with the Lenape living there. The Creek never lived in the area, and the RMI have never claimed Creek ancestry. The only mention of the Creek ancestry is a reference by a reporter interviewing Squire Christy in the 1890s. The RMI suggest the reporter may have been confused by the nineteenth century settlement of the RMI called Fyke Creek.

The BIA did apparently rely heavily on the fact that tribal

identifications in the record are inconsistent. If all of these tribal names are, in fact, consistent with Lenape heritage, the BIA rejected a great deal of information based on its own lack of knowledge about Native American history. In the absence of adequate proof of descent, however, the BIA's alleged ignorance is inconsequential.

c. Various other documents

The RMI allege that the BIA improperly rejected various other documents, including letters, local histories, and government reports. The record shows that the BIA considered each piece of evidence, and detailed its reasons for according more or less weight to the evidence. It is the duty and the prerogative of the BIA to evaluate the credibility of [*20] each piece of evidence, and to determine what weight the evidence should be afforded. Those discretionary decisions are entitled to deference on review.

5. Failure to Consider Evidence in Light of the Totality of the Evidence

The RMI argue that the BIA rejected each piece of evidence presented individually, as insufficient or inconclusive, and that it failed to comply with its own regulations requiring consideration of all bits and pieces in combination. See 25 C.F.R. § 83.7(a) HN10[⬆] ("evidence . . . may include one or a combination of the following, as well as other evidence"); 25 C.F.R. § 83.7(b)(1) HN11[⬆] ("This criterion may be demonstrated by some combination of the following evidence and/or other evidence. . . ."); BIA Guide, 59 Fed. Reg. 9281 HN12[⬆] ("It has been the Department's experience that historical evidence of tribal existence is often not available in clear, unambiguous packets relating to particular points in time. More often, demonstration of historical existence requires piecing together various bits of information of differing importance."). The Court cannot conclude on this record that BIA failed to look at the evidence in combination. An agency's statement [*21] that it has "rejected" a piece of evidence may not necessarily mean that it found the evidence inadmissible. It may simply mean that it gave the evidence little or no weight. Evaluation of an agency's decision against the "arbitrary and capricious" standard does not require analysis of whether, and how, the agency treated each piece of evidence, or whether it properly used one piece of evidence to corroborate another.

6. Inconsistent Application of Rules

*HN13*[⬆] An agency acts arbitrarily and capriciously when it unjustifiably discriminates between similarly situated parties. *See Airmark Corp. v. FAA, 244 U.S. App. D.C. 365, 758 F.2d 685, 691 (D.C. Cir. 1985).* The RMI point to several ways in which the BIA's treatment of them was different from its treatment of other tribes.

The RMI claim that the BIA treated their application differently than those of other Delaware Indian tribes by requiring that they trace their ancestry back to a particular band of Lenape Indians. The RMI assert that none of the recognized tribes of Delaware Indians traces its lineage back to a distinct band and assert that the Delaware Indians all grew out of groups or bands that joined together, [*22] or individual Lenape Indians from many different bands that ended up living under a single leader. The RMI argue that in light of this, the BIA's insistence that each identification of the RMI's ancestors as "Indian" be accompanied by a specific tribal origin, and the BIA's refusal to consider evidence based on inconsistent tribal identifications, was unreasonable and unfair. The RMI provide no evidence for their claim that no federally recognized Delaware Indian tribe traces its heritage back to a distinct band, however. Nor do the RMI have an answer to the BIA's assertion that its decision was not based on the RMI's failure to trace its ancestry to a particular band of Lenape Indians and that indeed the RMI failed to trace their ancestry back to the Lenape in general.

The RMI further allege that the BIA required them to make a greater showing to meet criterion (c) than was required of the Jena Choctaw or the Gold Hill Indians. The RMI claim that they documented at least three separate families of Indians remaining in the area after the Treaty of Easton. Since the BIA granted recognition to the Jena Choctaw on the basis of the existence of two Indian families, and the Assistant [*23] Secretary determined in the Gold Hill case that just a single ancestor could be enough to meet criterion (c), the RMI insist that the BIA's finding was discriminatory and inconsistent. This argument oversimplifies the requirements of criterion (c), which addresses the maintenance of political influence or authority over members of a tribe since historical times. The number of members is only a small part of this criterion, not even mentioned in the regulations.

Finally, the RMI claim that they met the requirements for criterion (b) at a higher level than other Indian tribes previously granted recognition. For example, the BIA recognized the Mohegan tribe based on the fact that 34% of their population was living in a ten mile radius

core area, and 34% had some connection or ties to the core area. The United Houma Nation and the Nipmuc Nation were advised by BIA to use the Mohegan Model in preparing their petitions. In this case, the Proposed Findings and Technical Reports found that more than 50% of the RMI lived within a five-mile radius core area. The BIA later rescinded this finding, declaring that, while more than 50% of the RMI lived within a five-mile radius core area, this core [*24] area was not exclusively or near exclusively inhabited by the RMI, as required by *25 C.F.R. § 83.7 (b)(2)(i).* However, according to the RMI, even after shrinking the core down to the area inhabited exclusively by the RMI, 44% of the RMI's membership lives within that small core. Under the regulations, *HN14*[⬆] if the number of residents within the core area is less than 50%, the putative tribe must demonstrate that those outside the core maintain contact with those in the core. *§ 83.7(b)(2)(i).* The BIA found that the evidence of interaction between core members of the RMI and members outside the core area was insufficient to establish the existence of patterns of significant contact between residents and non-residents. The RMI have not successfully refuted this finding.

7. The Decision Resulted from Unlawful Racial Bias

The RMI claim that the BIA's decision was the result of racial bias but present no evidence to support the claim. The mere fact that some scholars may have considered the previous work of a BAR historian racist does nothing to establish that racial bias influenced the decision in this case. Furthermore, neutral references to the RMI's African and Dutch ancestry, [*25] mentioned for the purposes of establishing the RMI's history, are not evidence of racial bias.

8. Manipulation of the Content of the Record

The RMI have presented no evidence that the BIA exceeded its statutory authority under § 83.11(e)(8) in forwarding only critical documents to the IBIA for review on appeal. They provided no examples of information that was left out or hidden, and the fact that the BIA allowed the RMI to file their own supplement, organizing the information (most of which was already on the record) in their own way, indicates that the BIA did not attempt to bias the IBIA in any way through manipulation of the record.

9. The BIA Lacks Special Expertise

The RMI assails the competency of the BAR and BIA staff, but these contentions are irrelevant to whether the staff violated procedural regulations or acted in an

2000 U.S. Dist. LEXIS 14479, *25

arbitrary and capricious manner. The deference owed to the administrative agency prevents me from entertaining comparisons between the respective abilities of both sides' experts.

10. <u>The Decision Was Subject to Undue Influence</u>

Finally, the fact that information about the Proposed Decision was somehow leaked to Congressman Toricelli **[*26]** does not constitute evidence that the BIA was unduly influenced in its outcome by Atlantic City casino interests. Discussion in the Proposed Findings of the tribe's intent (or lack thereof) to build a casino is also not evidence of influence upon the decision. The BIA states that it considered intent to build a casino as evidence of political organization, but that it found no consensus among tribe members.

* * *

A number of other arguments advanced by the RMI but not specifically addressed herein have been carefully considered and found to lack merit.

After carefully reviewing the briefs and arguments of the parties and the record of this case, I do not find that the BIA failed to adhere to its own regulations or that it acted arbitrarily, capriciously, or in violation of any law. The defendant's motion for summary judgment will accordingly be granted. An appropriate order accompanies this memorandum.

JAMES ROBERTSON

United States District Judge

Dated: September 30, 2000

**ORDER**

For the reasons set forth in the accompanying memorandum, it is this 30th day of September, 2000,

**ORDERED** that plaintiffs' motion to supplement the administrative record [# 50] **[*27]** is **denied**. It is

**FURTHER ORDERED** that plaintiff's motion to take judicial notice, to supplement the record, and for leave to file exhibits [# 70] is **denied**. It is

**FURTHER ORDERED** that plaintiff's motion for leave to file legal authority [# 73] is **granted**. And it is

**FURTHER ORDERED** that defendant's motion for summary judgment [# 31] is **granted**.

JAMES ROBERTSON

United States District Judge

_____

**End of Document**

Kevin OConnor

Exhibit "I"

**A** Neutral
As of: December 12, 2022 7:38 PM Z

# *Ramapough Mt. Indians v. Norton*

United States Court of Appeals for the District of Columbia Circuit

December 11, 2001, Filed

No. 00-5464

## Reporter
25 Fed. Appx. 2 *; 2001 U.S. App. LEXIS 27805 **

Ramapough Mountain Indians and Silent Wolf, Chief, Ramapough Mountain Indians, Appellants v. Gale A. Norton, Secretary, United States Department of the Interior, et al., Appellees

**Notice:** [**1] RULES OF THE DISTRICT OF COLUMBIA CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**Subsequent History:** Writ of certiorari denied: *Ramapough Mt. Indians v. Norton, 2002 U.S. LEXIS 5546 (U.S. Oct. 7, 2002).*

**Prior History:** Appeal from the United States District Court for the District of Columbia. (No. 98cv02136).

**Disposition:** Affirmed.

## Core Terms

criterion, documentation, tribal, Tribe, regulations, MEMORANDUM, descend, grant summary judgment, district court, ancestors, descent

## Case Summary

### Procedural Posture
Appellant, a group of people seeking recognition as an Indian tribe, sought reversal of the final determination of appellee Secretary of the United States Department of the Interior, which denied them such recognition. The United States District Court for the District of Columbia granted summary judgment for appellees. Appellant challenged the order.

### Overview
The group contended that the secretary erred in a number of significant ways in reaching the decision to deny their petition. The secretary refused to make an assumption of specific tribal ancestry on the basis of 19th and 20th century descriptions of the group's ancestors as Indian because the group provided no documentation that these ancestors descended from any known historical tribe of North American Indians. The group did not contest that it was unable to provide such documentation; rather, the group maintained that the secretary had circumstantial evidence from which it reasonably could be inferred that there was a tribal connection. Because the applicable regulations required some documentation of tribal descent and the group provided none, the court could not conclude that the secretary was arbitrary and capricious in requiring documentation or clearly erred in refusing to make the inference urged by the group where the evidence was as limited as it was.

### Outcome
The appellate court affirmed the decision.

## LexisNexis® Headnotes

Administrative Law > Agency Rulemaking > Rule Application & Interpretation > General Overview

Governments > Native Americans > General Overview

*HN1*[⬇] **Agency Rulemaking, Rule Application & Interpretation**

Under the regulations for recognition as an Indian Tribe, a petitioner is required to meet each of seven criteria. Mandatory Criteria for Federal Acknowledgment, *25 C.F.R. §§ 83.7(a)-(g).*

25 Fed. Appx. 2, *2; 2001 U.S. App. LEXIS 27805, **1

Administrative Law > Agency Rulemaking > Rule Application & Interpretation > General Overview

Governments > Native Americans > General Overview

*HN2*[ ] **Agency Rulemaking, Rule Application & Interpretation**

29 C.F.R. § 83.6 requires thorough explanations and supporting documentation and permits the denial of a petition for federal recognition as an Indian Tribe if there is insufficient evidence that it meets one or more of the criteria.  29 C.F.R. § 83.6(c), (d).

Administrative Law > Agency Rulemaking > Rule Application & Interpretation > General Overview

Governments > Native Americans > General Overview

*HN3*[ ] **Agency Rulemaking, Rule Application & Interpretation**

A criterion is not met if the available evidence is too limited to establish it, even if there is no evidence contradicting facts asserted by the petitioner. Procedures for Establishing that an American Indian Group Exists as an *Indian Tribe, 59 Fed. Reg. 9280, 9280 (Feb. 25, 1994)* (codified at 25 C.F.R. pt. 83).

**Judges:** Before: GINSBURG, Chief Judge, and ROGERS and GARLAND, Circuit Judges.

# Opinion

## [*2] JUDGMENT

This appeal was considered on the record from the United States District Court for the District of Columbia and on the briefs and oral argument of the parties. The court has determined that the issues presented occasion no need for a published opinion. See *D.C. Cir. Rule 36(b)*. For the reasons stated in the accompanying memorandum, it is

**ORDERED AND ADJUDGED** that the district court's Memorandum Opinion and Order granting summary judgment to appellees is hereby affirmed.

The clerk is directed to withhold issuance of the mandate herein until seven days after disposition of any timely petition for rehearing. See *D.C. Cir. Rule 41*.

Per Curiam

## [*3] MEMORANDUM

The Ramapough Mountain Indians, Inc., ("RMI") is a group of people living on the New York and New Jersey border who in 1979 [**2] filed a petition for federal recognition as an Indian Tribe. In 1993 the Bureau of Indian Affairs issued a Proposed Finding denying federal recognition. Subsequently, a Final Determination was issued in 1996. The Interior Board of Indian Appeals affirmed the denial in significant part while remanding for reconsideration of several issues. In 1998 the Assistant Secretary for Indian Affairs ("the Secretary") issued a Reconsidered Final Determination also denying the petition. RMI then sought reversal in the district court, which granted summary judgment to the Secretary. On appeal, RMI contends that the Secretary erred in a number of significant ways in reaching the decision to deny its petition.

*HN1*[ ] Under the regulations for recognition as an Indian Tribe, the petitioner is required to meet each of seven criteria. Mandatory criteria for Federal acknowledgment, *25 C.F.R. §§ 83.7(a) - (g)*. Upon consideration of RMI's contentions and a review of the record, we hold that the Secretary permissibly concluded that the evidence presented by RMI to establish that it met criterion (e) is too limited. Although criterion (e) -- which requires the petitioner to show that its [**3] membership consists of individuals who descend from an historical Indian tribe -- allows a wide range of evidence to show that the criterion is satisfied, *HN2*[ ] *section 83.6* of the regulations requires "thorough explanations and supporting documentation" and permits the denial of a petition "if there is insufficient evidence that it meets one or more of the criteria." *25 C.F.R. § 83.6(c), (d)*. The Bureau of Indian Affairs elaborated on these standards when it stated that *HN3*[ ] "a criterion is not met if the available evidence is too limited to establish it, even if there is no evidence contradicting facts asserted by the petitioner." Procedures for Establishing that an American Indian Group Exists as an *Indian Tribe, 59 Fed. Reg. 9280, 9280 (Feb. 25, 1994)* (codified at 25 C.F.R. pt. 83).

Here, the Secretary refused to make an assumption of

25 Fed. Appx. 2, *3; 2001 U.S. App. LEXIS 27805, **3

specific tribal ancestry on the basis of 19th and 20th Century descriptions of RMI ancestors as Indian because RMI provided no documentation that these ancestors "descended from any known historical tribe of North American Indians." RMI does not contest that it is unable to provide such documentation; rather, RMI maintains **[\*\*4]** that the Secretary had circumstantial evidence from which it could reasonably be inferred that there was a tribal connection. *See* Appellants' Reply Br. at 27 ("It is likely that these "Indian" identifications indicate Lenape Tribal descent. Indeed, BIA found that no other Tribal group had migrated to the Ramapough Mountains. Thus, the only reasonable conclusion is that RMI descend from the Lenape Indians."). Because the regulations require some documentation of tribal descent and RMI has provided none, this court cannot conclude that the Secretary was arbitrary and capricious in requiring documentation or clearly erred in refusing to make the inference urged by RMI where the evidence was as limited as it was.

We agree that RMI has presented strong arguments regarding the Secretary's failure to apply the nonautomatic provisions of criterion (b), her refusing to accept RMI's endogamy study covering the pre-1870 period, her unexplained alteration of the time period during which RMI satisfied criterion (b) and accompanying failure to notify RMI of such change, her consideration of 19th Century geographical and genealogical evidence, the occasional **[\*4]** application of a primary-source rule, **[\*\*5]** and the application of an inappropriate conclusiveness standard at various points of her analysis. We affirm, however, without reaching those issues because to receive federal recognition RMI had to demonstrate that it met all seven of the criteria in *section 83.7*, and the Secretary reasonably concluded that criterion (e) was not satisfied. *25 C.F.R. § 83.6(c)*.

---

**End of Document**

Kevin OConnor